No. 24-1954

In the United States Court of Appeals
for the Fourth Circuit

FREDERICK L. ALLEN and NAUTILUS PRODUCTIONS, LLC,

*Plaintiffs-Appellees*,

v.

JOSHUA H. STEIN, Governor of the State of North Carolina, in his
official capacity, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of North Carolina

## JOINT APPENDIX

Nicholas S. Brod
Deputy Solicitor General

Olga E. Vysotskaya de Brito
Senior Deputy Attorney General

NC Department of Justice
P.O. Box 629
Raleigh, North Carolina 27602
(919) 716-6400
nbrod@ncdoj.gov
ovysotskaya@ncdoj.gov

*Counsel for Defendants-Appellants*

Susan Freya Olive
OLIVE & OLIVE, P.A.
500 Memorial Street
P.O. Box 2049
Durham, NC 27702
solive@oliveandolive.com

Elliot Sol Abrams
CHESHIRE, PARKER, SCHNEIDER,
PLLC
P.O. Box 1029
Raleigh, NC 27602
elliot.abrams@cheshirepark.com

Adam Adler
REICHMAN JORGENSEN LEHMAN
& FELDBERG LLP
100 Marine Parkway
Redwood Shores, CA 94065
aadler@reichmanjorgensen.com

*Counsel for Plaintiffs-Appellees*

# Table of Contents

| Document | Dkt | Page |
|---|---|---|
| Trial Court Docket | | 1 |
| First Amended Complaint | 12 | 29 |
| Order on Remand from the Fourth Circuit | 92 | 53 |
| Status Report | 102 | 54 |
| Notice of Voluntary Dismissal | 104 | 56 |
| Plaintiffs' Motion for Reconsideration | 105 | 58 |
| Order on Motion for Reconsideration | 118 | 60 |
| Second Amended Complaint | 134 | 85 |
| Defendants' Motion to Strike | 144 | 152 |
| Defendants' Brief in Support of Motion to Strike | 145 | 154 |
| Defendants' Motion to Dismiss | 146 | 171 |
| Defendants' Brief in Support of Motion to Dismiss | 147 | 173 |
| Plaintiffs' Brief in Opposition to Motion to Strike and Motion to Dismiss | 153 | 210 |
| Defendants' Reply in Support of Motion to Strike and Motion to Dismiss | 155 | 249 |
| Order on Motion to Strike and Motion to Dismiss | 168 | 261 |
| Plaintiffs' Surreply in Opposition to Motion to Strike and Motion to Dismiss | 169 | 305 |
| Notice of Appeal | 174 | 316 |

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED,Jury Trial,USMJ Jones

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:15-cv-00627-BO

| | |
|---|---|
| Allen et al v. McCrory et al | Date Filed: 12/01/2015 |
| Assigned to: District Judge Terrence W. Boyle | Date Terminated: 09/30/2024 |
| Case in other court:  4th Circuit Court of Appeals, 17-01522 | Jury Demand: Both |
| 4th Circuit Court of Appeals, 17-01602 | Nature of Suit: 950 Constitutional - State Statute |
| 4CCA, 21-02040 | Jurisdiction: Federal Question |
| USCA, 24-01954 | |
| Cause: 17:101 Copyright Infringement | |

**Plaintiff**

**Frederick L Allen**                  represented by   **David McKenzie**
David McKenzie Attorney at Law
9 MacGregor Ct
Durham, NC 27705
919-597-9290
Email: david@mckenzielaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Adler**
Reichman Jorgensen Lehman & Feldberg LLP
1909 K Street NW
Ste 800
Washington, DC 20006
650-623-1480
Email: pacer-
aadler@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

**Elliot Sol Abrams**
Cheshire Parker Schneider, PLLC
P.O. Box 1029
133 Fayetteville St.
4th Floor (27601)
Raleigh, NC 27602
919-833-3114
Fax: 919-832-0739
Email: elliot.abrams@cheshirepark.com
*ATTORNEY TO BE NOTICED*

**G. Jona Poe , Jr.**
Poe Law Firm, PLLC
P O Box 15455

Durham, NC 27704
919-471-4015
Fax: 919-471-4035
Email: joe@poelaw.com
*ATTORNEY TO BE NOTICED*

**Susan Freya Olive**
Olive & Olive, P.A.
P. O. Box 2049
500 Memorial St.
Durham, NC 27701
919-683-5514
Fax: 919-688-3781
Email: emailboxEDNC@oliveandolive.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nautilus Productions, LLC**                represented by  **Adam Adler**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **David McKenzie**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Elliot Sol Abrams**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Susan Freya Olive**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Patrick Lloyd McCrory**                     represented by  **Olga E. Vysotskaya De Brito**
*Governor of the State of North Carolina, in*                 NC Department of Justice
*his official capacity*                                       Post Office Box 629
*TERMINATED: 03/24/2017*                                      Raleigh, NC 27602-0629
                                                              919-716-0185
                                                              Fax: 919-716-6759
                                                              Email: ovysotskaya@ncdoj.gov
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Amar Majmundar**
                                                              North Carolina Deptartment of Justice
                                                              114 West Edenton Street, 9001 Mail Service
                                                              Center
                                                              Post Office Box 629
                                                              Raleigh, NC 27602-0629
                                                              919-716-6820

USCA4 Appeal: 24-1954    Doc: 25    Filed: 03/26/2025    Pg: 5 of 319

Fax: 716-6759
Email: amajmundar@ncdoj.gov
*TERMINATED: 08/18/2023*

**Defendant**

**Susan Wear Kluttz**
*Secretary of the North Carolina Department of Natural and Cultural Resources, individually and in her official capacity*

represented by **Christopher J. Stipes**
Teague Campbell Dennis & Gorham, LLP
4700 Falls of Neuse Rd., Suite 450
Raleigh, NC 27609
919-873-0166
Fax: 919-873-1814
Email: cstipes@NCDOJ.GOV
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6816
Email: cwhitehead@ncdoj.gov
*TERMINATED: 08/29/2024*

**Defendant**

**Karin Cochran**
*Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, individually and in her official capacity*

represented by **Christopher J. Stipes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

**Defendant**

**Kevin Cherry**
*Deputy Secretary of the North Carolina*

represented by **Christopher J. Stipes**
(See above for address)

*Department of Natural and Cultural*
*Resources, individually and in his official*
*capacity*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

**<u>Defendant</u>**

**Cary Cox**
*Assistant Secretary, Marketing and*
*Communications of the North Carolina*
*Department of Natural and Cultural*
*Resources, individually and in her official*
*capacity*

represented by **Christopher J. Stipes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

**<u>Defendant</u>**

**Stephen R Claggett**
*State Archaeologist, individually and in his*
*official capacity*
*also known as*
Steve Claggett

represented by **Christopher J. Stipes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

JA 4

**Defendant**

**John W Morris**
*Deputy State Archaeologist - Underwater and Director of the Underwater Archaeology Branch of the North Carolina Department of Natural and Cultural Resources, individually and in his official capacity*
*also known as*
Billy Ray Morris

represented by **Christopher J. Stipes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

**Defendant**

**James W Davis**
*North Carolina Senator, individually and in his official capacity*
*TERMINATED: 07/22/2016*
*also known as*
Jim Davis
*TERMINATED: 07/22/2016*

represented by **Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Defendant**

**Norman W Sanderson**
*North Carolina Senator, individually and in his official capacity*
*TERMINATED: 07/22/2016*

represented by **Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Defendant**

**North Carolina Department of Natural and Cultural Resources**

represented by **Christopher J. Stipes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

**Defendant**

**State of North Carolina**                    represented by  **Christopher J. Stipes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

**Defendant**

**Friends of Queen Anne's Revenge, a Non-**          represented by  **J. Scott Lewis**
**Profit Corporation**                                          Butler Snow LLP
*TERMINATED: 08/18/2020*                                       6752 Rock Spring Road, Suite 310
Wilmington, NC 28405
910-550-1320
Fax: 910-550-1321
Email: Scott.Lewis@butlersnow.com
*TERMINATED: 10/03/2016*
*LEAD ATTORNEY*

**Jeffrey A. Doyle**
Hedrick, Gardner, Kincheloe and Garofalo,
LLP
4131 Parklake Avenue, Suite 300
Raleigh, NC 27612
919-719-3702
Fax: 919-832-9425
Email: jdoyle@hedrickgardner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Roy A. Cooper**                              represented by  **Christopher J. Stipes**
*Governor of North Carolina*                                   (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olga E. Vysotskaya De Brito**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amar Majmundar**
(See above for address)
*TERMINATED: 08/18/2023*

**Charles G. Whitehead**
(See above for address)
*TERMINATED: 08/29/2024*

**Defendant**

**Josh Stein**                           represented by   **Christopher J. Stipes**
*Attorney General of North Carolina, in his*             (See above for address)
*official capacity*                                       *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Olga E. Vysotskaya De Brito**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Charles G. Whitehead**
                                                          (See above for address)
                                                          *TERMINATED: 08/29/2024*

**Defendant**

**D. Reid Wilson**                        represented by   **Christopher J. Stipes**
*in his individual and official capacity*                 (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Olga E. Vysotskaya De Brito**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Charles G. Whitehead**
                                                          (See above for address)
                                                          *TERMINATED: 08/29/2024*

**Defendant**

**Sarah Koonts**                          represented by   **Christopher J. Stipes**
*in her individual and official capacity*                 (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Olga E. Vysotskaya De Brito**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Charles G. Whitehead**

                                                            (See above for address)
                                                            *TERMINATED: 08/29/2024*

**Defendant**

**Joseph K. Schwarzer II**                   represented by   **Christopher J. Stipes**
*in his individual and official capacity*                           (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                    **Olga E. Vysotskaya De Brito**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Charles G. Whitehead**
                                                    (See above for address)
                                                    *TERMINATED: 08/29/2024*

**Defendant**

**Mike Carraway**                           represented by   **Christopher J. Stipes**
*in his individual and official capacity*                           (See above for address)
                                                            *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                    **Olga E. Vysotskaya De Brito**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Charles G. Whitehead**
                                                    (See above for address)
                                                    *TERMINATED: 08/29/2024*

**Amicus**

**Professor Earnest A Young**
*Amicus Curiae*

**Amicus**

**Professor Ernest A Young**                       represented by   **Donald H. Beskind**
                                                      Donald H. Beskind, P.A.
                                                    110 N. Corcoran St., #1105
                                                    Durham, NC 27701
                                                    919-613-7085
                                                    Email: beskind@law.duke.edu
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/01/2015 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0417-3503086.), filed by Nautilus Productions, LLC, Frederick L Allen. (Attachments: # 1 Exhibit 1 - Settlement Agreement) (Olive, Susan) (Entered: 12/01/2015) |

| 12/01/2015 | 2 | Notice of Appearance filed by Susan Freya Olive on behalf of All Plaintiffs. (Olive, Susan) (Entered: 12/01/2015) |
|---|---|---|
| 12/01/2015 | 3 | ***Counsel refiled at DE 7*** Financial Disclosure Statement by Frederick L Allen (Olive, Susan) Modified on 12/3/2015 (Romine, L.). (Entered: 12/01/2015) |
| 12/01/2015 | 4 | Financial Disclosure Statement by Nautilus Productions, LLC (Olive, Susan) (Entered: 12/01/2015) |
| 12/01/2015 | 5 | Notice of Appearance filed by David Loar McKenzie on behalf of All Plaintiffs. (McKenzie, David) (Entered: 12/01/2015) |
| 12/02/2015 | | NOTICE OF DEFICIENCY regarding: 1 Complaint: Counsel failed to file a JS44 Civil Cover Sheet as required by the Court. Counsel should file a cover sheet using the event "Notice-(other)" as soon as possible. (Romine, L.) (Entered: 12/02/2015) |
| 12/02/2015 | 6 | Notice filed by Frederick L Allen, Nautilus Productions, LLC regarding 1 Complaint - *Civil Cover Sheet*. (Olive, Susan) (Entered: 12/02/2015) |
| 12/02/2015 | 7 | Financial Disclosure Statement by Frederick L Allen (Olive, Susan) (Entered: 12/02/2015) |
| 12/07/2015 | 8 | COPYRIGHT REPORT: Copy of report and complaint forwarded to the Register of Copyrights located at the Copyright Office, Library of Congress, Washington, DC 20559 via US Mail on December 7, 2015. (Felder, J) (Entered: 12/07/2015) |
| 12/14/2015 | 9 | Notice of Appearance filed by G. Jona Poe, Jr on behalf of Frederick L Allen. (Poe, G.) (Entered: 12/14/2015) |
| 12/17/2015 | 10 | Mail Returned as Undeliverable. Mail sent to Register of Copyrights (Attachments: # 1 Envelope) (Romine, L.) (Entered: 12/17/2015) |
| 03/04/2016 | 11 | MOTION for Extension of Time *to Serve* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order Text of Proposed Order Granting Motion to Extend Time to Serve) (McKenzie, David) (Entered: 03/04/2016) |
| 03/07/2016 | | Motion Submitted to US District Judge Terrence W. Boyle: 11 MOTION for Extension of Time *to Serve*. (Romine, L.) (Entered: 03/07/2016) |
| 03/07/2016 | 12 | **AMENDED COMPLAINT** against All Defendants, filed by Nautilus Productions, LLC, Frederick L Allen. (McKenzie, David) (Entered: 03/07/2016) |
| 03/09/2016 | 13 | ORDER granting 11 Motion for Extension of Time. Signed by District Judge Terrence W. Boyle on 3/8/2016. (Romine, L.) (Entered: 03/09/2016) |
| 03/09/2016 | 14 | Notice filed by Frederick L Allen, Nautilus Productions, LLC *NOTICE TO CLERK of Proposed Summons for Issuance to Defendant Friends of the Queen Anne's Revenge*. (McKenzie, David) (Entered: 03/09/2016) |
| 03/09/2016 | 15 | Summons Issued as to Friends of Queen Anne's Revenge, a Non-Profit Corporation. Counsel is directed to print summons and effect service. (Romine, L.) (Entered: 03/09/2016) |
| 03/14/2016 | 16 | Notice filed by Frederick L Allen, Nautilus Productions, LLC *NOTICE TO CLERK of Proposed Summons for Issuance to State of North Carolina & North Carolina Department of Natural and Cultural Resources*. (McKenzie, David) (Entered: 03/14/2016) |
| 03/14/2016 | 17 | Summons Issued as to North Carolina Department of Natural and Cultural Resources, State of North Carolina. Counsel is directed to print summons and effect service. |

| | | (Romine, L.) (Entered: 03/14/2016) |
|---|---|---|
| 03/15/2016 | 18 | Affidavit of Service for Complaint and Amended Complaint *Declaration of Service* filed by Frederick L Allen, Nautilus Productions, LLC served on Friends of Queen Anne's Revenge on 03/10/16. (Attachments: # 1 Exhibit Proof of Service) (McKenzie, David) Modified on 3/15/2016 (Romine, L.). (Entered: 03/15/2016) |
| 03/15/2016 | | NOTICE OF CORRECTION regarding: 18 Affidavit of Service. Docket entry text corrected to reflect Friends of Queen Anne's Revenge served. (Romine, L.) (Entered: 03/15/2016) |
| 03/15/2016 | 19 | Certificate of Service filed by Frederick L Allen, Nautilus Productions, LLC regarding 18 Affidavit of Service, . (McKenzie, David) (Entered: 03/15/2016) |
| 03/22/2016 | 20 | Notice of Appearance filed by Olga E. Vysotskaya De Brito on behalf of Kevin Cherry, Stephen R Claggett, Karin Cochran, Cary Cox, James W Davis, Susan Wear Kluttz, Patrick Lloyd McCrory, John W Morris, North Carolina Department of Natural and Cultural Resources, Norman W Sanderson, State of North Carolina. (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 21 | Financial Disclosure Statement by Kevin Cherry (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 22 | Financial Disclosure Statement by Stephen R Claggett (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 23 | Financial Disclosure Statement by Karin Cochran (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 24 | Financial Disclosure Statement by Cary Cox (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 25 | Financial Disclosure Statement by James W Davis (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 26 | Financial Disclosure Statement by North Carolina Department of Natural and Cultural Resources (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 27 | Financial Disclosure Statement by Susan Wear Kluttz (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 28 | Financial Disclosure Statement by Patrick Lloyd McCrory (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 29 | Financial Disclosure Statement by John W Morris (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 30 | Financial Disclosure Statement by Norman W Sanderson (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 31 | Financial Disclosure Statement by State of North Carolina (Vysotskaya De Brito, Olga) (Entered: 03/22/2016) |
| 03/22/2016 | 32 | Notice of Appearance filed by Amar Majmundar on behalf of Kevin Cherry, Stephen R Claggett, Karin Cochran, Cary Cox, James W Davis, Susan Wear Kluttz, Patrick Lloyd McCrory, John W Morris, North Carolina Department of Natural and Cultural Resources, Norman W Sanderson, State of North Carolina. (Majmundar, Amar) (Entered: 03/22/2016) |

| | | |
|---|---|---|
| 03/24/2016 | 33 | Notice of Appearance filed by J. Scott Lewis on behalf of Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Lewis, J.) (Entered: 03/24/2016) |
| 03/24/2016 | 34 | Consent MOTION for Extension of Time to File Answer regarding 12 Amended Complaint, 1 Complaint filed by Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Attachments: # 1 Text of Proposed Order Order granting Friends extension to answer) (Lewis, J.) (Entered: 03/24/2016) |
| 03/24/2016 | | Motion Referred to Julie Richards Johnston, Clerk of Court: 34 Consent MOTION for Extension of Time to File Answer regarding 12 Amended Complaint. (Romine, L.) (Entered: 03/24/2016) |
| 03/25/2016 | | TEXT ORDER granting defendant's 34 motion for extension of time. Defendant Friends of Queen Anne's Revenge, a Non-Profit Corporation has through and including April 30, 2016 to answer or otherwise respond. Signed by Jolie Skinner for Julie Richards Johnston, Clerk of Court on 3/25/2016. (Skinner, J.) (Entered: 03/25/2016) |
| 03/29/2016 | 35 | Consent MOTION for Extension of Time to File Answer regarding 12 Amended Complaint , Consent MOTION for Extension of Time *regarding Briefing Schedule on Responsive Pleadings* filed by Kevin Cherry, Stephen R Claggett, Cary Cox, James W Davis, Susan Wear Kluttz, Patrick Lloyd McCrory, John W Morris, North Carolina Department of Natural and Cultural Resources, Norman W Sanderson, State of North Carolina. (Attachments: # 1 Text of Proposed Order.pdf ver of proposed order) (Vysotskaya De Brito, Olga) (Entered: 03/29/2016) |
| 03/29/2016 | 36 | ACKNOWLEDGEMENT OF SERVICE Executed as to 12 Amended Complaint, 17 Summons Issued *as embodied in the Acceptance of Service, filed herewith, on behalf of the State of North Carolina and the North Carolina Department of Natural and Cultural Resources* Acknowledgement filed by Frederick L Allen, Nautilus Productions, LLC. (McKenzie, David) (Entered: 03/29/2016) |
| 03/29/2016 | 37 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Kevin Cherry waiver sent on 3/22/2016, answer due 5/21/2016. (McKenzie, David) (Entered: 03/29/2016) |
| 03/29/2016 | 38 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Stephen R Claggett waiver sent on 3/22/2016, answer due 5/21/2016. (McKenzie, David) (Entered: 03/29/2016) |
| 03/29/2016 | 39 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Cary Cox waiver sent on 3/22/2016, answer due 5/21/2016. (Entered: 03/29/2016) |
| 03/29/2016 | 40 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. James W Davis waiver sent on 3/22/2016, answer due 5/21/2016. (McKenzie, David) (Entered: 03/29/2016) |
| 03/29/2016 | 41 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Susan Wear Kluttz waiver sent on 3/22/2016, answer due 5/21/2016. (McKenzie, David) (Entered: 03/29/2016) |
| 03/29/2016 | 42 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Patrick Lloyd McCrory waiver sent on 3/22/2016, answer due 5/21/2016. (McKenzie, David) (Entered: 03/29/2016) |
| 03/29/2016 | 43 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. John W Morris waiver sent on 3/22/2016, answer due 5/21/2016. (McKenzie, David) (Entered: 03/29/2016) |

| 03/29/2016 | 44 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Norman W Sanderson waiver sent on 3/22/2016, answer due 5/21/2016. (McKenzie, David) (Entered: 03/29/2016) |
|---|---|---|
| 03/30/2016 | | Motion Submitted to US District Judge Terrence W. Boyle: 35 Consent MOTION for Extension of Time to File Answer regarding 12 Amended Complaint Consent MOTION for Extension of Time *regarding Briefing Schedule on Responsive Pleadings*. (Romine, L.) (Entered: 03/30/2016) |
| 03/31/2016 | 45 | ORDER granting 35 Motion for Extension of Time to Answer. Signed by District Judge Terrence W. Boyle on 3/30/2016. (Romine, L.) (Entered: 03/31/2016) |
| 04/19/2016 | 46 | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Karin Cochran waiver sent on 3/15/2016, answer due 5/14/2016. (McKenzie, David) (Entered: 04/19/2016) |
| 05/02/2016 | 47 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Attachments: # 1 Text of Proposed Order Order granting FoQAR's Motion to Dismiss) (Lewis, J.) (Entered: 05/02/2016) |
| 05/02/2016 | 48 | Memorandum in Support regarding 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Attachments: # 1 Exhibit 1 - Articles of Dissolution, # 2 unpublished case - Bon Aqua v. Second) (Lewis, J.) (Entered: 05/02/2016) |
| 05/16/2016 | 49 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Cary Cox, James W Davis, Susan Wear Kluttz, Patrick Lloyd McCrory, John W Morris, North Carolina Department of Natural and Cultural Resources, Norman W Sanderson, State of North Carolina. (Vysotskaya De Brito, Olga) (Entered: 05/16/2016) |
| 05/16/2016 | 50 | Memorandum in Support regarding 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Cary Cox, James W Davis, Susan Wear Kluttz, Patrick Lloyd McCrory, John W Morris, North Carolina Department of Natural and Cultural Resources, Norman W Sanderson, State of North Carolina. (Attachments: # 1 Exhibit 2013 Settlement Agreement - DE 1-1) (Vysotskaya De Brito, Olga) (Entered: 05/16/2016) |
| 05/19/2016 | 51 | Consent MOTION for Extension of Time to File Response/Reply as to 48 Memorandum in Support, 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order Text of Proposed Order Granting Motion for Extension of Time) (McKenzie, David) (Entered: 05/19/2016) |
| 05/19/2016 | | Motion Referred to dge Julie Richards Johnston, Clerk of Court: 51 Consent MOTION for Extension of Time to File Response 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Romine, L.) (Entered: 05/19/2016) |
| 05/20/2016 | | TEXT ORDER granting plaintiffs' 51 motion for extension of time. Plaintiffs have through and including June 9, 2016 to respond to defendant Friends of the Queen Anne's Revenge's 47 motion to dismiss. Signed by Jolie Skinner for Julie Richards Johnston, Clerk of Court on 5/20/2016. (Skinner, J.) (Entered: 05/20/2016) |
| 06/08/2016 | 52 | Consent MOTION for Extension of Time to File Response/Reply as to 45 Order on Motion for Extension of Time to Answer, Order on Motion for Extension of Time to File Response/Reply, *and Consent Motion to Modify Briefing Schedule as Ordered (DE# 45)* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of |

| | | |
|---|---|---|
| | | Proposed Order Text of Proposed Order Granting Motion to Modify Briefing Schedule) (McKenzie, David) (Entered: 06/08/2016) |
| 06/10/2016 | | Motion Submitted to US District Judge Terrence W. Boyle: regarding 52 Consent MOTION for Extension of Time to File Response. (Romine, L.) (Entered: 06/10/2016) |
| 06/16/2016 | 53 | ORDER granting 52 Motion for Extension of Time to File Response and Reply regarding 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and for Lack of Jurisdiction. Responses due by 6/30/2016. Replies due by 7/21/2016.Signed by District Judge Terrence W. Boyle on 6/15/2016. (Romine, L.) (Entered: 06/16/2016) |
| 06/30/2016 | 54 | Third MOTION for Extension of Time to File Response/Reply as to 53 Order on Motion for Extension of Time to File Response/Reply, *Filed with the Consent of All Parties* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order Proposed Order Modifying Briefing Schedule) (McKenzie, David) (Entered: 06/30/2016) |
| 07/06/2016 | | Motion Submitted to US District Judge Terrence W. Boyle: 54 Third MOTION for Extension of Time to File Response & Reply as to 53 Order on Motion. (Romine, L.) (Entered: 07/06/2016) |
| 07/07/2016 | 55 | ORDER granting 54 Third MOTION for Extension of Time to File Responses & Replies as to 53 Order on Motion. Responses due by 7/21/2016. Replies due by 8/11/2016. Signed by District Judge Terrence W. Boyle on 7/6/2016. (Romine, L.) (Entered: 07/07/2016) |
| 07/21/2016 | 56 | Notice of Voluntary Dismissal filed by Frederick L Allen, Nautilus Productions, LLC as to and only to Defendant Sanderson and Defendant Davis. (McKenzie, David) (Entered: 07/21/2016) |
| 07/21/2016 | 57 | RESPONSE in Opposition regarding 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Exhibit Exhibit A (described fully as HB1030, ratified bill, excerpted), # 2 Exhibit Exhibit B (described as NC Atty Genl Advisory Opinion 19940316)) (McKenzie, David) (Entered: 07/21/2016) |
| 07/25/2016 | 58 | Consent MOTION for Extension of Time to File Response/Reply as to 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 57 Response in Opposition to Motion, filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Cary Cox, Susan Wear Kluttz, Patrick Lloyd McCrory, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Attachments: # 1 Text of Proposed Order Proposed Order) (Vysotskaya De Brito, Olga) (Entered: 07/25/2016) |
| 07/26/2016 | 59 | Consent MOTION for Extension of Time to File Response/Reply as to 57 Response in Opposition to Motion, 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Attachments: # 1 Text of Proposed Order Order granting FoQAR extension of time) (Lewis, J.) (Entered: 07/26/2016) |
| 07/29/2016 | 60 | ORDER granting 58 Motion for Extension of Time to File Reply regarding 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and for Lack of Jurisdiction. Reply due by 8/25/2016. Signed by District Judge Terrence W. Boyle on 7/28/2016. (Romine, L.) (Entered: 07/29/2016) |
| 07/29/2016 | 61 | ORDER granting 59 Motion for Extension of Time to File Reply regarding 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. Reply due by 8/25/2016. Signed by |

| | | District Judge Terrence W. Boyle on 7/28/2016. (Romine, L.) (Entered: 07/29/2016) |
|---|---|---|
| 08/25/2016 | 62 | REPLY to Response to Motion regarding 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Attachments: # 1 unpublished case - Bon Aqua v. Second, # 2 unpublished case - Atico v. LUV N') (Lewis, J.) (Entered: 08/25/2016) |
| 08/25/2016 | 63 | REPLY to Response to Motion regarding 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Cary Cox, Susan Wear Kluttz, Patrick Lloyd McCrory, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Attachments: # 1 Exhibit Ex A - NCGS 132-1, # 2 Exhibit Ex B - Status of The Alleged Infringements, # 3 Exhibit Ex C - State Sup Ct Answer, # 4 Exhibit Ex D - Table of Allegs re State Defendants) (Vysotskaya De Brito, Olga) (Entered: 08/25/2016) |
| 08/26/2016 | | REMINDER TO COUNSEL as to Queen Anne's Revenge and State Defendants. Pursuant to Judge Boyle's Practice Preferences located on the court's website, counsel shall provide a courtesy copy of all documents over 20 pages, by mailing or delivering to the clerk's office in Raleigh. (Romine, L.) (Entered: 08/26/2016) |
| 08/31/2016 | | Motions Submitted to District Judge Terrence W. Boyle: 49 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Lack of Jurisdiction and 47 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Romine, L.) (Entered: 08/31/2016) |
| 09/23/2016 | 64 | NOTICE of Hearing on Motions to Dismiss: Motion Hearing set for 10/19/2016 at 11:00 AM in Chowan County Courthouse, Edenton before District Judge Terrence W. Boyle. (Romine, L.) (Entered: 09/23/2016) |
| 09/30/2016 | 65 | Notice of Appearance filed by Jeffrey A. Doyle on behalf of Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Doyle, Jeffrey) (Entered: 09/30/2016) |
| 09/30/2016 | 66 | Notice of Substitution of Counsel filed by Jeffrey A. Doyle on behalf of Friends of Queen Anne's Revenge, a Non-Profit Corporation substituting for Scott Lewis. (Doyle, Jeffrey) (Entered: 09/30/2016) |
| 10/04/2016 | | NOTICE OF DEFICIENCY - Failure to File Financial Disclosure Statement as to Friends of Queen Anne's Revenge, a Non-Profit Corporation. Pursuant to 7.1 of the Federal Rules of Civil Procedure and Local Civil Rule 7.3, all parties shall file a financial disclosure statement. A negative statement is required if a party has no disclosures to make. The disclosure statement must be on a form provided by the clerk. This form is available at the clerk's office and on the court's website. (Stouch, L.) (Entered: 10/04/2016) |
| 10/06/2016 | 67 | Financial Disclosure Statement by Friends of Queen Anne's Revenge, a Non-Profit Corporation (Doyle, Jeffrey) (Entered: 10/06/2016) |
| 10/13/2016 | | ****Reset Hearing as to Motion Hearing: Motion Hearing set for 10/19/2016 at 11:00 AM reset to a date and time to be determined. (Stouch, L.) (Entered: 10/13/2016) |
| 10/21/2016 | | Reset Hearing as to the Motions to Dismiss. Motion Hearing set for 11/1/2016 at 02:00 PM in Raleigh - 7th Floor - Courtroom 2 before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 10/21/2016) |
| 10/26/2016 | | Reset Hearing as to Motions to Dismiss. Motion Hearing set for **11/2/2016 at 11:00 AM in Chowan County Courthouse, Edenton** before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 10/26/2016) |
| 11/02/2016 | 68 | Minute Entry for proceedings held before US District Judge Terrence W. Boyle: Motion Hearing held on 11/2/2016 in Edenton, North Carolina. All parties present and ready to |

| | | |
|---|---|---|
| | | proceed. Oral arguments heard. A written order will follow. (Court Reporter Linda Little) (Stouch, L.) Modified on 12/27/2016 to correct the hearing date. (Downing, L.). (Entered: 11/03/2016) |
| 03/23/2017 | 69 | ORDER granting in part and denying in part 47 Motion to Dismiss for Failure to State a Claim; granting in part and denying in part 49 Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction. Signed by US District Judge Terrence W. Boyle on 3/23/2017. (Stouch, L.) (Entered: 03/23/2017) |
| 03/24/2017 | 70 | ORDER FOR DISCOVERY PLAN sent to all parties. Signed by Peter A. Moore, Jr., Clerk of Court on 3/24/2017. (Stouch, L.) (Entered: 03/24/2017) |
| 04/06/2017 | 71 | **ANSWER to** 12 **Amended Complaint** by Friends of Queen Anne's Revenge, a Non-Profit Corporation. (Doyle, Jeffrey) (Entered: 04/06/2017) |
| 04/11/2017 | 72 | *Motion to Deem Timely Filed and* ANSWER to 12 Amended Complaint by Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Vysotskaya De Brito, Olga) (Entered: 04/11/2017) |
| 04/12/2017 | | Notice to Counsel regarding: 72 Answer to Amended Complaint. CM/ECF does not accommodate certain document combinations, such as 'response and reply' or 'answer and motion'. It is noticed that defendant's filing contains reference to a motion to Deem Answer Timely Filed. A motion in accordance with regular motions practice must be filed, as prescribed in the rules, in order to obtain a separate ruling from the court. Pursuant to Local Rule 6.1(a), all motions for extension of time to perform an act required or allowed to be done within a specified time must show prior consultation with opposing counsel and the views of opposing counsel. The motion must be accompanied by a separate proposed order granting the motion. (Stouch, L.) (Entered: 04/12/2017) |
| 04/12/2017 | 73 | Consent MOTION for Extension of Time to File Answer filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Attachments: # 1 Text of Proposed Order Proposed Order on Consent Motion to Extend/Deem Timely Filed) (Vysotskaya De Brito, Olga) (Entered: 04/12/2017) |
| 04/13/2017 | | Motion Submitted to District Judge Terrence W. Boyle: 73 Consent MOTION for Extension of Time to File Answer. (Stouch, L.) (Entered: 04/13/2017) |
| 04/13/2017 | 74 | ORDER granting 73 Motion for Extension of Time to Answer. The State Defendants' Answer to Plaintiffs' First Amended Complaint [D.E.72] is deemed timely filed. Signed by US District Judge Terrence W. Boyle on 4/13/2017. (Stouch, L.) (Entered: 04/13/2017) |
| 04/21/2017 | 75 | Notice of Interlocutory Appeal filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina as to 69 Order on Motion to Dismiss for Failure to State a Claim,, Order on Motion to Dismiss/Lack of Jurisdiction,,,. Filing fee, receipt number RAL056479. (Vysotskaya De Brito, Olga) (Entered: 04/21/2017) |
| 04/21/2017 | 77 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 75 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 04/21/2017) |
| 04/24/2017 | 78 | US Court of Appeals Case Number 17-1522 (Cathy Tyree Herb, Case Manager) as to 75 Notice of Interlocutory Appeal, filed by Cary Cox, Roy A. Cooper, State of North Carolina, North Carolina Department of Natural and Cultural Resources, Susan Wear Kluttz, Kevin Cherry, Stephen R Claggett, Karin Cochran, John W Morris. (Tripp, S.) (Entered: 04/24/2017) |

| 05/05/2017 | 79 | Consent MOTION to Stay regarding 70 Order for Discovery Plan filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order) (Olive, Susan) (Entered: 05/05/2017) |
| 05/05/2017 | 80 | Notice of Interlocutory Appeal filed by Frederick L Allen, Nautilus Productions, LLC as to 69 Order on Motion to Dismiss for Failure to State a Claim,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,. Filing fee, receipt number 0417-4080401. (Olive, Susan) (Entered: 05/05/2017) |
| 05/08/2017 | 81 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 80 Notice of Interlocutory Appeal. (Tripp, S.) (Entered: 05/08/2017) |
| 05/08/2017 | 82 | US Court of Appeals Case Number 17-1602 (Cathy Tyree Herb, Case Manager) as to 80 Notice of Interlocutory Appeal, filed by Frederick L Allen, Nautilus Productions, LLC. (Tripp, S.) (Entered: 05/08/2017) |
| 05/08/2017 | 83 | ORDER of US Court of Appeals as to 75 Notice of Interlocutory Appeal, filed by Cary Cox, Roy A. Cooper, State of North Carolina, North Carolina Department of Natural and Cultural Resources, Susan Wear Kluttz, Kevin Cherry, Stephen R Claggett, Karin Cochran, John W Morris, 80 Notice of Interlocutory Appeal, filed by Nautilus Productions, LLC, Frederick L Allen - The court consolidates Case No. 17-1522 and Case No. 17-1602 as crossappeals. The appellant in Case No. 17-1522 shall be considered the appellant for purposes of the consolidated appeals and shall proceed first at briefing and at oral argument. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. (Tripp, S.) (Entered: 05/08/2017) |
| 05/10/2017 | | Motion Submitted to US District Judge Terrence W. Boyle: 79 Consent MOTION to Stay regarding 70 Order for Discovery Plan. (Stouch, L.) (Entered: 05/10/2017) |
| 05/11/2017 | 84 | ORDER granting 79 Motion to Stay. Signed by US District Judge Terrence W. Boyle on 5/10/2017. (Stouch, L.) (Entered: 05/11/2017) |
| 05/12/2017 | | Notification to Appeals Court of Filing regarding 84 Order on Motion to Stay (Tripp, S.) (Entered: 05/12/2017) |
| 07/11/2017 | 85 | OFFICIAL TRANSCRIPT for dates of 11/2/2016, Motions Hearing, before Judge U.S. District Judge Terrence W. Boyle, regarding 75 Notice of Interlocutory Appeal, 80 Notice of Interlocutory Appeal, Court Reporter - Linda Little. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 8/4/2017. Redacted Transcript Deadline set for 8/14/2017. Release of Transcript Restriction set for 10/12/2017. (Foell, S.) (Entered: 07/11/2017) |
| 07/11/2017 | | NOTICE of Filing of Official Transcript 85 . The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Foell, S.) (Entered: 07/11/2017) |
| 07/10/2018 | 86 | Published Opinion from Fourth Circuit Court of Appeals. Reversed and Remanded With Instructions. (Foell, S.) (Entered: 07/10/2018) |

| 07/10/2018 | 87 | US Court of Appeals Judgment as to 75 Notice of Interlocutory Appeal, 80 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 07/10/2018) |
| 07/25/2018 | 88 | Stay of Mandate regarding 75 Notice of Interlocutory Appeal, 80 Notice of Interlocutory Appeal: Under Fed. R. App. P. 41(d)(1), the timely filing of a petition for rehearing or rehearing en banc or the timely filing of a motion to stay the mandate stays the mandate until the court has ruled on the petition for rehearing or rehearing en banc or motion to stay. In accordance with Rule 41(d)(1), the mandate is stayed pending further order of this court. (Rudd, D.) (Entered: 07/25/2018) |
| 08/09/2018 | 89 | ORDER of US Court of Appeals as to 75 Notice of Interlocutory Appeal, 80 Notice of Interlocutory Appeal. The court denies the petition for rehearing en banc. (Foell, S.) (Entered: 08/09/2018) |
| 08/15/2018 | 90 | ORDER of US Court of Appeals as to 75 Notice of Interlocutory Appeal, 80 Notice of Interlocutory Appeal. Costs for these proceedings are taxed and certified in the amount of $749.60. (Attachments: # 1 Bill of Costs) (Foell, S.) (Entered: 08/15/2018) |
| 08/17/2018 | 91 | MANDATE of US Court of Appeals as to 75 Notice of Interlocutory Appeal, 80 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 08/17/2018) |
| 08/24/2018 | 92 | ORDER - The stay previously entered in this matter [DE 84] is hereby LIFTED. Pursuant to the mandate of the court of appeals, Allen and Nautilus's claims against North Carolina, the Department of Natural and Cultural Resources, and the public officials acting in their official capacity are DISMISSED without prejudice. The remaining claims against the public officials in their individual capacities are DISMISSED with prejudice. The joint report of the remaining parties shall be filed not later than September 14, 2018. Signed by US District Judge Terrence W. Boyle on 8/24/2018. (Stouch, L.) (Entered: 08/24/2018) |
| 09/13/2018 | 93 | MOTION to Stay , with status report, filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order Text of Proposed Order Granting Motion to Stay) (McKenzie, David) (Entered: 09/13/2018) |
| 09/13/2018 | 94 | Memorandum in Support regarding 93 MOTION to Stay , with status report, by Frederick L Allen, Nautilus Productions, LLC. (McKenzie, David) (Entered: 09/13/2018) |
| 09/19/2018 |  | Motion Submitted to District Judge Terrence W. Boyle regarding 93 MOTION to Stay , with status report,. (Stouch, L.) (Entered: 09/19/2018) |
| 09/27/2018 | 95 | ORDER granting 93 Motion to Stay. IT IS ORDERED that the proceedings herein be stayed, and the joint report of the parties be deferred, until after the United States Supreme Court rules on Plaintiffs' petition for certiorari review. The clerk is DIRECTED to remove this case from the Court's active docket during the pendency of the stay, and to return the case to the active docket on the filing of the joint report of the parties. Signed by US District Judge Terrence W. Boyle on 9/26/2018. (Stouch, L.) (Entered: 09/27/2018) |
| 01/08/2019 | 96 | Appeal Remark: Petition for Writ of Certiorari filed in the US Supreme Court. (Foell, S.) (Entered: 01/10/2019) |
| 06/03/2019 | 97 | Appeal Remark - Petition for Writ of Certiorari granted by the US Supreme Court on 6/3/19. (Foell, S.) (Entered: 06/03/2019) |
| 09/16/2019 |  | CERTIFICATE OF RECORD Transmitted to US Court of Appeals regarding 75 Notice of Interlocutory Appeal, 80 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 09/16/2019) |

| 09/16/2019 | 98 | Appeal Remark: Assembled Electronic Record and emailed to the US Supreme Court as directed. (Attachments: # 1 Record Request from US Supreme Court) (Foell, S.) (Entered: 09/16/2019) |
| 03/23/2020 | 99 | Opinion from U.S. Supreme Court of the United States. Judgment is affirmed. (Foell, S.) (Entered: 03/25/2020) |
| 04/24/2020 | 100 | US Supreme Court Judgment affirming the judgment of the United States Court of Appeals for the Fourth Circuit. (Foell, S.) (Entered: 04/24/2020) |
| 06/30/2020 | 101 | ORDER - The deadline to file the joint status report of the remaining parties was stayed pending review by the United States Supreme Court. [DE 95]. The judgment of the United States Supreme Court affirming the judgment of the United States Court of Appeals for the Fourth Circuit was entered on this Court's docket on April 24, 2020. [DE 100]. To date, the joint status report of the remaining parties has not been filed. The joint status report shall be filed not later than July 15, 2020.. Signed by Chief Judge Terrence W. Boyle on 6/29/2020. (Stouch, L.) (Entered: 06/30/2020) |
| 07/15/2020 | 102 | STATUS REPORT by Frederick L Allen (McKenzie, David) (Entered: 07/15/2020) |
| 07/17/2020 | | Remark - 102 Status Report submitted to Chief Judge Boyle for review. (Stouch, L.) (Entered: 07/17/2020) |
| 08/05/2020 | 103 | ORDER - Plaintiffs' request is ALLOWED. Plaintiffs shall have thirty days from the date of entry of this order to file a motion to reconsider. Defendants shall be permitted twenty-one days to respond. Signed by Chief Judge Terrence W. Boyle on 8/4/2020. (Stouch, L.) (Entered: 08/05/2020) |
| 08/17/2020 | 104 | STIPULATION of Dismissal *as to Defendant Friends of Queen Annes Revenge, a Non-Profit Corporation,* by Frederick L Allen (McKenzie, David) (Entered: 08/17/2020) |
| 09/04/2020 | 105 | MOTION for Reconsideration regarding 69 Order on Motion to Dismiss for Failure to State a Claim,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by Frederick L Allen, Nautilus Productions, LLC. (Olive, Susan) (Entered: 09/04/2020) |
| 09/04/2020 | 106 | Memorandum in Support regarding 105 MOTION for Reconsideration regarding 69 Order on Motion to Dismiss for Failure to State a Claim,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Exhibit 1 - Transcript (excerpt) of Oral Argument before U.S. Supreme Court) (Olive, Susan) (Entered: 09/04/2020) |
| 09/04/2020 | 107 | Consent MOTION for Leave to File *Amicus Brief in Support of Plaintiff's Motion for Reconsideration [DE105] and Revising Briefing Schedule [DE 103]* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order Allowing Filing of Amicus Brief and Revising Briefing Schedule) (Olive, Susan) (Entered: 09/04/2020) |
| 09/18/2020 | 108 | Notice of Special Appearance for non-district by David Loar McKenzie on behalf of Earnest A Young. (McKenzie, David) (Entered: 09/18/2020) |
| 09/18/2020 | 109 | Notice of Special Appearance for non-district by David Loar McKenzie on behalf of Ernest A Young. (McKenzie, David) (Entered: 09/18/2020) |
| 09/18/2020 | 110 | Amicus Curiae APPEARANCE entered by David Loar McKenzie on behalf of Ernest A Young (Attachments: # 1 Text of Proposed Order Text of Proposed Order Allowing Amicu, # 2 Exhibit, as offered as a Brief, and submitted as Professor Young's amicus brief) (McKenzie, David) (Entered: 09/18/2020) |

| 09/21/2020 | 111 | Consent MOTION for Extension of Time to File Response/Reply as to 110 Amicus Curiae Appearance, 105 MOTION for Reconsideration regarding 69 Order on Motion to Dismiss for Failure to State a Claim,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by Roy A. Cooper, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Attachments: # 1 Text of Proposed Order Prop order Granting Consent Motion to Extend Time) (Vysotskaya De Brito, Olga) (Entered: 09/21/2020) |
|---|---|---|
| 09/21/2020 | 112 | Consent MOTION for Leave to File *Amicus Brief* filed by Ernest A Young. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Proposed Amicus Brief) (Beskind, Donald) (Entered: 09/21/2020) |
| 09/23/2020 | | Motion Submitted to Chief Judge Terrence W. Boyle regarding 111 Consent MOTION for Extension of Time to File Response/Reply as to 110 Amicus Curiae Appearance, 105 MOTION for Reconsideration regarding 69 Order on Motion to Dismiss for Failure to State a Claim,,,, Order on Motion to Dismiss/Lack of Juri, 112 Consent MOTION for Leave to File *Amicus Brief*, 107 Consent MOTION for Leave to File *Amicus Brief in Support of Plaintiff's Motion for Reconsideration [DE105] and Revising Briefing Schedule [DE 103]*. (Stouch, L.) (Entered: 09/23/2020) |
| 09/25/2020 | 113 | ORDER granting 107 Motion for Leave to File Amicus Brief, 111 Consent Motion for Extension of Time, and 112 Motion for Leave to File Amicus Brief. The briefing deadlines are REVISED as follows: defendants' response to the motion for reconsideration shall be filed not later than October 16, 2020; plaintiffs' reply shall be filed not later than October 30, 2020. Signed by Chief Judge Terrence W. Boyle on 9/25/2020. (Stouch, L.) Modified on 12/2/2020 to correct docket entry text (Stouch, L.). (Entered: 09/25/2020) |
| 09/25/2020 | 116 | Amicus Brief filed by Ernest A Young. (Stouch, L.) (Entered: 12/02/2020) |
| 10/16/2020 | 114 | Memorandum in Opposition regarding 105 MOTION for Reconsideration regarding 69 Order on Motion to Dismiss for Failure to State a Claim,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by Roy A. Cooper, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Attachments: # 1 Exhibit A-Excerpts from SCOTUS Transcript, # 2 Exhibit B-2013 Settlement Agreement, # 3 Exhibit C-Professor Rose SCOTUC Amicus Curiae Brief, # 4 Exhibit D-Excerpts from Allens Amended Complaint) (Vysotskaya De Brito, Olga) (Entered: 10/16/2020) |
| 10/30/2020 | 115 | REPLY to Response to Motion regarding 105 MOTION for Reconsideration regarding 69 Order on Motion to Dismiss for Failure to State a Claim,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Exhibit North Carolinas Affirmative Defense Regarding the 2013 Settlement Agreement in Intersal v. Hamilton) (McKenzie, David) (Entered: 10/30/2020) |
| 11/06/2020 | | Motion Submitted to Chief Judge Terrence W. Boyle regarding 112 Consent MOTION for Leave to File *Amicus Brief*, 107 Consent MOTION for Leave to File *Amicus Brief in Support of Plaintiff's Motion for Reconsideration [DE105] and Revising Briefing Schedule [DE 103]*, 105 MOTION for Reconsideration regarding 69 Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Dismiss/Lack of Jurisdiction. (Stouch, L.) (Entered: 11/06/2020) |
| 02/11/2021 | | ***Set Hearing as to 105 MOTION for Reconsideration: Motion Hearing set for **2/16/2021 at 10:30 AM in Raleigh - 7th Floor - Courtroom 2** before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 02/11/2021) |
| 02/12/2021 | | ***Reset Hearing as to 105 MOTION for Reconsideration: Motion Hearing reset for 2/16/2021 at **03:30 PM** in Raleigh - 7th Floor - Courtroom 2 before District Judge Terrence W. Boyle. **Time change only.** (Stouch, L.) (Entered: 02/12/2021) |

JA 19

| 02/16/2021 | [117](#) | Minute Entry for proceedings held in Raleigh, North Carolina before District Judge Terrence W. Boyle: Motion Hearing held on 2/16/2021. All parties present and ready to proceed. Oral argument held. A written order will follow. (Court Reporter Michelle McGirr) (Stouch, L.) (Entered: 02/16/2021) |
|---|---|---|
| 08/18/2021 | [118](#) | ORDER granting [105](#) Motion for Reconsideration. Plaintiffs' takings claim and constitutional claims under Georgia are no longer dismissed. Plaintiffs may amend their complaint within twenty-one days of the date of entry of this order. Signed by District Judge Terrence W. Boyle on 8/18/2021. (Sellers, N.) (Entered: 08/19/2021) |
| 09/03/2021 | [119](#) | MOTION for Reconsideration regarding [118](#) Order on Motion for Reconsideration, *AND MOTION TO VACATE OR TO EXPEDITE RECONSIDERATION* filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Vysotskaya De Brito, Olga) (Entered: 09/03/2021) |
| 09/03/2021 | [120](#) | Memorandum in Support regarding [119](#) MOTION for Reconsideration regarding [118](#) Order on Motion for Reconsideration, *AND MOTION TO VACATE OR TO EXPEDITE RECONSIDERATION* filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, Norman W Sanderson, State of North Carolina. (Attachments: # [1](#) Exhibit A - Zito v. N.C. Coastal Res. Comm_n_ 2021 U.S. App. LEXIS 23568) (Vysotskaya De Brito, Olga) (Entered: 09/03/2021) |
| 09/08/2021 | [121](#) | Consent MOTION for Extension of Time to File *Second Amended Complaint* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # [1](#) Text of Proposed Order Proposed Order Granting Consent Motion to Extend Time) (McKenzie, David) (Entered: 09/08/2021) |
| 09/09/2021 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding [121](#) Consent MOTION for Extension of Time to File *Second Amended Complaint*. (Sellers, N.) (Entered: 09/09/2021) |
| 09/09/2021 | | TEXT ORDER granting Plaintiffs' Consent Motion for Extension of Time [121](#) . For good cause shown, it is ordered that Plaintiffs have up to and including September 23, 2021, within which to file a second amended complaint. Signed by Peter A. Moore, Jr., Clerk of Court on 9/9/2021. (Hockaday, A.) (Entered: 09/09/2021) |
| 09/20/2021 | [122](#) | Notice of Interlocutory Appeal filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina as to [118](#) Order on Motion for Reconsideration,. Filing fee, receipt number 0417-6237669. (Vysotskaya De Brito, Olga) (Entered: 09/20/2021) |
| 09/20/2021 | [123](#) | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding [122](#) Notice of Interlocutory Appeal. (Foell, S.) (Entered: 09/20/2021) |
| 09/22/2021 | [124](#) | US Court of Appeals Case Number 21-2040 (Cathy Poulsen, Case Manager) as to [122](#) Notice of Interlocutory Appeal, filed by Cary Cox, Roy A. Cooper, State of North Carolina, North Carolina Department of Natural and Cultural Resources, Susan Wear Kluttz, Kevin Cherry, Stephen R Claggett, Karin Cochran, John W Morris. (Foell, S.) (Entered: 09/22/2021) |
| 09/22/2021 | [125](#) | Consent MOTION to Stay *(EXPEDITED REVIEW REQUESTED)* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # [1](#) Text of Proposed Order Text of Proposed Order Granting Motion to Stay) (McKenzie, David) (Entered: 09/22/2021) |

| 09/23/2021 | | Motion Submitted to District Judge Terrence W. Boyle regarding 125 Consent MOTION to Stay *(EXPEDITED REVIEW REQUESTED)*. (Sellers, N.) (Entered: 09/23/2021) |
|---|---|---|
| 09/27/2021 | 126 | ORDER granting 125 Motion to Stay. IT IS ORDERED that proceedings herein be stayed, and the filing of Plaintiffs' Second Amended Complaint and of their response to Defendants' pending Motion for Reconsideration [Dl19] shall each be deferred, until after a final appellate decision is received. The State Defendants' reply for their Motion for Reconsideration is likewise deferred until final appellate decision is received. Signed by District Judge Terrence W. Boyle on 9/26/2021. (Sellers, N.) (Entered: 09/27/2021) |
| 09/28/2021 | | Notification to Appeals Court of Filing regarding 126 Order on Motion to Stay. (Foell, S.) (Entered: 09/28/2021) |
| 12/13/2021 | 127 | OFFICIAL TRANSCRIPT of MOTION HEARING for the date of Tuesday, February 16, 2021, before United States District Judge Terrence W. Boyle, regarding 122 Notice of Interlocutory Appeal. Court Reporter ~ Michelle McGirr. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 1/6/2022. Redacted Transcript Deadline set for 1/16/2022. Release of Transcript Restriction set for 3/16/2022. (McGirr, M.) (Entered: 12/13/2021) |
| 12/13/2021 | | NOTICE of Filing of Official Transcript 127 Appeal Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (McGirr, M.) (Entered: 12/13/2021) |
| 10/14/2022 | 128 | ORDER of US Court of Appeals dismissing appeal 122 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 10/14/2022) |
| 10/14/2022 | 129 | US Court of Appeals Judgment as to 122 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 10/14/2022) |
| 11/07/2022 | 130 | MANDATE of US Court of Appeals as to 122 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 11/07/2022) |
| 12/19/2022 | | NOTICE of Hearing: Hearing set for 1/16/2023 at 03:00 PM in Raleigh - 7th Floor - Courtroom 2 before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 12/19/2022) |
| 12/19/2022 | | NOTICE of Hearing: Hearing reset for **1/17/2023** at 03:00 PM in Raleigh - 7th Floor - Courtroom 2 before District Judge Terrence W. Boyle. **Date change only.** (Stouch, L.) (Entered: 12/19/2022) |
| 12/22/2022 | 131 | Notice of Appearance filed by Charles G. Whitehead on behalf of North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Whitehead, Charles) (Entered: 12/22/2022) |
| 01/17/2023 | 132 | Minute Entry for proceedings held in Raleigh, NC before District Judge Terrence W. Boyle: Hearing held on 1/17/2023. All parties present and ready to proceed. Written order to follow. (Court Reporter Wanda Castantino) (Stouch, L.) (Entered: 01/18/2023) |
| 01/18/2023 | 133 | ORDER - 1. Defendants' appeal having been dismissed and mandate having issued, the stay in this matter is hereby LIFTED; 2. In accordance with the Court's August 18, 2021, |

| | | |
|---|---|---|
| | | order, plaintiffs shall file their amended complaint within twenty-one (21) days of the date of entry of this order; and 3. The Court determines that the arguments raised in defendants' motion to reconsider the Court's order on reconsideration are better raised as a challenge to a claim actually alleged by plaintiffs. Accordingly, defendants' motion to reconsider [DE 119] is DENIED without prejudice as premature. Defendants may make any arguments raised therein after the filing of plaintiffs' amended complaint and in accordance with the Federal Rules of Civil Procedure. Signed by District Judge Terrence W. Boyle on 1/18/2023. (Stouch, L.) (Entered: 01/18/2023) |
| 02/08/2023 | [134](#) | **AMENDED COMPLAINT** *, as allowed by Court Order,* against All Defendants, filed by Nautilus Productions, LLC, Frederick L Allen. (Attachments: # [1](#) Exhibit North Carolina's Settlement Agreement) (McKenzie, David) (Entered: 02/08/2023) |
| 02/10/2023 | [135](#) | First MOTION for Extension of Time to File Answer *to Second Amended Complaint* filed by State of North Carolina. (Attachments: # [1](#) Text of Proposed Order) (Whitehead, Charles) (Entered: 02/10/2023) |
| 02/13/2023 | [136](#) | Notice filed by Frederick L Allen, Nautilus Productions, LLC regarding [134](#) Amended Complaint *and Request for Issuance of Summons.* (Attachments: # [1](#) Proposed Summons Josh Stein, North Carolina Attorney General, in his official capacity, # [2](#) Proposed Summons D. Reid Wilson, Secretary of the North Carolina Department of Natural & Cultural Resources, in his official and individual capacity, # [3](#) Proposed Summons Mike Carraway, in his individual and official capacity, # [4](#) Proposed Summons Sarah Koonts, in her individual and official capacity, # [5](#) Proposed Summons Joseph Schwarzer, in his individual and official capacity) (McKenzie, David) (Entered: 02/13/2023) |
| 02/14/2023 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding [135](#) First MOTION for Extension of Time to File Answer *to Second Amended Complaint*. (Stouch, L.) (Entered: 02/14/2023) |
| 02/14/2023 | [137](#) | Summons Issued as to Mike Carraway, Sarah Koonts, Joseph K. Schwarzer II, Josh Stein, D. Reid Wilson. *(*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.*)* (Stouch, L.) (Entered: 02/14/2023) |
| 02/16/2023 | | TEXT ORDER granting the Motion for Extension of Time [135](#) filed by Defendants Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, and the State of North Carolina. For good cause shown, it is ordered that these defendants have up to and including March 27, 2023, within which to answer or otherwise respond to the Second Amended Complaint [134](#) . Signed by Peter A. Moore, Jr., Clerk of Court on 2/16/2023. (Hockaday, A.) (Entered: 02/16/2023) |
| 02/23/2023 | [138](#) | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Mike Carraway waiver sent on 2/21/2012, answer due 4/21/2012. (McKenzie, David) (Entered: 02/23/2023) |
| 02/23/2023 | [139](#) | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Sarah Koonts waiver sent on 2/21/2023, answer due 4/22/2023. (McKenzie, David) (Entered: 02/23/2023) |
| 02/23/2023 | [140](#) | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Joseph K. Schwarzer II waiver sent on 2/21/2023, answer due 4/22/2023. (McKenzie, David) (Entered: 02/23/2023) |
| 02/23/2023 | [141](#) | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. Josh Stein waiver sent on 2/21/2023, answer due 4/22/2023. (McKenzie, David) (Entered: 02/23/2023) |

| 02/23/2023 | [142] | Waiver of Service Returned Executed filed by Nautilus Productions, LLC, Frederick L Allen. D. Reid Wilson waiver sent on 2/21/2023, answer due 4/22/2023. (McKenzie, David) (Entered: 02/23/2023) |
| 03/07/2023 | [143] | Second MOTION for Extension of Time to File Answer *or otherwise respond to Second Amended Complaint* filed by Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W Morris, North Carolina Department of Natural and Cultural Resources, State of North Carolina. (Attachments: # [1] Text of Proposed Order) (Whitehead, Charles) (Entered: 03/07/2023) |
| 03/09/2023 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding [143] Second MOTION for Extension of Time to File Answer *or otherwise respond to Second Amended Complaint*. (Stouch, L.) (Entered: 03/09/2023) |
| 03/09/2023 | | TEXT ORDER granting the Motion for Extension of Time filed by Defendants Kevin Cherry, Stephen R. Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, John W. Morris, North Carolina Department of Natural and Cultural Resources and the State of North Carolina [143] . For good cause shown, it is ordered that these defendants have up to and including April 22, 2023, within which to answer or otherwise respond to the Second Amended Complaint [134] . Signed by Peter A. Moore, Jr., Clerk of Court on 3/9/2023. (Hockaday, A.) (Entered: 03/09/2023) |
| 04/21/2023 | [144] | MOTION to Strike [134] Amended Complaint filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Whitehead, Charles) (Entered: 04/21/2023) |
| 04/21/2023 | [145] | Memorandum in Support regarding [144] MOTION to Strike [134] Amended Complaint filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Whitehead, Charles) (Entered: 04/21/2023) |
| 04/21/2023 | [146] | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Whitehead, Charles) (Entered: 04/21/2023) |
| 04/21/2023 | [147] | Memorandum in Support regarding [146] MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Attachments: # [1] Index, # [2] Exhibit 1 - 2013 Settlement Agreement, # [3] Exhibit 2 - Public Catalog, U.S. Copyright Office-Copyright Number VA0001872054, # [4] Exhibit 3 - April 2009 Redacted QAR Conservation Lab Report, # [5] Exhibit 4 - 6-28-18 email from Donovan to Tyndall re removal of the 2009 QAR Lab Report, # [6] Exhibit 5 - Declaration of Courtney Page, # [7] Exhibit 6 - 7-25-18 emails between Nilsen and Page confirming the URL for the 2009 Lab Report directed traffic to a redacted version, # [8] Exhibit 7 - Declaration of Michelle Underhill, # [9] Exhibit 8 - 11-7-16 Lrt from Defs to Ps confirming the videos were not viewable, # [10] Exhibit 9 - 11-16-16 email from Vysotskaya to Ps requesting YouTube Links to infringing videos so that they may be taken down, # [11] Exhibit 10 - 8-7-18 Ltr from Feagan to Ps re DNCR has no interest in |

| | | |
|---|---|---|
| | | displaying videos, # 12 Exhibit 11 - 12-1-22 & 11-29-22, emails re Ds offer to take down any infringing materials, # 13 Exhibit 12 - 8-12-15 email from PBS to NCDNCR confirming purchase of the AV version of Secrets of the Dead Blackbeards Ship, # 14 Exhibit 13 - August 2015 receipt from PBS for purchase of AV Secrets of the Dead Blackbeards Ship, # 15 Exhibit 14 - August 2015 PBS Educational Media website defining AV Benefits., # 16 Exhibit 15 - Declaration of Christine Brin, # 17 Exhibit 16 - 4-11-14 ltr from Ds to Ps concerning the search for 22 DVCAMS, # 18 Exhibit 17 - 6-4-14 ltr from Ps to Ds confirming the search for the 22 DVCAMS, # 19 Exhibit 18 - 1-10-20 ltr from DNCR to P confirming DNCRs continuing search for Allens materials under the take down order, # 20 Exhibit 19 - 3-14-23 & 4-10-23 ltrs from Ds to Ps notifying that 22 DVCAMS discovered and DNCR wished to return, # 21 Exhibit 20 - Declaration of Tammy Penny, # 22 Exhibit 21 - Declaration of Charles Whitehead) (Whitehead, Charles) (Entered: 04/21/2023) |
| 05/04/2023 | 148 | Consent MOTION for Extension of Time to File Response/Reply as to 145 Memorandum in Support, 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 147 Memorandum in Support,,,,,,,,, 144 MOTION to Strike 134 Amended Complaint filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order Proposed Order allowing Motion for Extension of Time (DE#148)) (McKenzie, David) (Entered: 05/04/2023) |
| 05/04/2023 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 148 Consent MOTION for Extension of Time to File Response as to 145 Memorandum in Support, 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, MOTION to Dismiss for Lack of Jurisdiction, 147 Memorandum in Support. (Stouch, L.) (Entered: 05/04/2023) |
| 05/04/2023 | 149 | ORDER granting 148 Motion for Extension of Time to File Response as to 145 Memorandum in Support, 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, MOTION to Dismiss for Lack of Jurisdiction, 147 Memorandum in Support, 144 MOTION to Strike 134 Amended Complaint. Responses due by 6/12/2023. Signed by Peter A. Moore, Jr., Clerk of Court on 5/4/2023. (Sellers, N.) (Entered: 05/05/2023) |
| 06/05/2023 | 150 | Second MOTION for Extension of Time to File Response/Reply as to 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 147 Memorandum in Support,,,,,,,,, *as Consented to by Defendants* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Text of Proposed Order Proposed Order allowing Second Consent Motion for Extension of Time (DE#150)) (McKenzie, David) (Entered: 06/05/2023) |
| 06/09/2023 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 150 Second MOTION for Extension of Time to File Response as to 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, MOTION to Dismiss for Lack of Jurisdiction, 147 Memorandum in Support *as Consented to by Defendants*. (Mann, Stephanie) (Entered: 06/09/2023) |
| 06/09/2023 | | TEXT ORDER granting Plaintiffs' Second Motion for Extension of Time 150 . For good cause shown, it is ordered that Plaintiffs have up to and including June 12, 2023, within which to respond to the Motion to Dismiss 146 and Motion to Strike 144 . Signed by Peter A. Moore, Jr., Clerk of Court on 6/9/2023. (Hockaday, A.) (Entered: 06/09/2023) |
| 06/12/2023 | | AMENDED TEXT ORDER granting Plaintiffs' Second Motion for Extension of Time 150 . For good cause shown, it is ordered that Plaintiffs have up to and including June 22, 2023, within which to respond to the Motion to Dismiss 146 and Motion to Strike 144 . Signed by Peter A. Moore, Jr., Clerk of Court on 6/12/2023. (Schline, K.) (Entered: 06/12/2023) |

USCA4 Appeal: 24-1954   Doc: 25   Filed: 03/26/2025   Pg: 27 of 319

| | | |
|---|---|---|
| 06/22/2023 | 151 | Notice of Special Appearance for non-district by Adam Adler on behalf of All Plaintiffs. (Adler, Adam) (Entered: 06/22/2023) |
| 06/22/2023 | 152 | MOTION to Amend/Correct 134 Amended Complaint *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Exhibit Ex. 1 (Redline Caption Comparison Contrasting Erroneous SAC Caption with Corrected Caption), # 2 Exhibit Ex. 2 (Original Caption from Original Complaint (DE#1)), # 3 Exhibit Ex. 3 (Caption from First Amended Complaint (DE# 12), # 4 Text of Proposed Order Text of Proposed Order Allowing Motion to Amend Caption) (McKenzie, David) (Entered: 06/22/2023) |
| 06/22/2023 | 153 | RESPONSE in Opposition regarding 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 144 MOTION to Strike 134 Amended Complaint *as Consolidated in Response to Two Rule 12 Motions (DE#144 (Motion to Strike) and DE#146 (Motion to Dismiss))* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Exhibit Ex A - Jurisdiction Flow Chart for Brief, # 2 Exhibit Ex B - Campinha Complaint) (McKenzie, David) (Entered: 06/22/2023) |
| 06/27/2023 | 154 | Consent MOTION for Extension of Time to File Response/Reply as to 152 MOTION to Amend/Correct 134 Amended Complaint *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)*, 153 Response in Opposition to Motion,, filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Attachments: # 1 Text of Proposed Order) (Vysotskaya De Brito, Olga) (Entered: 06/27/2023) |
| 07/06/2023 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 154 Consent MOTION for Extension of Time to File Response/Reply as to 152 MOTION to Amend/Correct 134 Amended Complaint *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)*, 153 Response in Oppositi. (Sellers, N.) (Entered: 07/06/2023) |
| 07/06/2023 | | TEXT ORDER granting Defendants' Consent Motion for Extension of Time 154 . For good cause shown, it is ordered that Defendants have up to and including July 28, 2023, within which to file their replies in support of the Motion to Strike 144 and Motion to Dismiss 146 , and their response in opposition to the Motion to Amend/Correct the Amended Complaint 152 . Signed by Peter A. Moore, Jr., Clerk of Court on 7/6/2023. (Hockaday, A.) (Entered: 07/06/2023) |
| 07/28/2023 | 155 | REPLY to Response to Motion regarding 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 144 MOTION to Strike 134 Amended Complaint filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Attachments: # 1 Index, # 2 Exhibit 1 - Receipt for CAMS, # 3 Exhibit 2 - CGW Declaration) (Whitehead, Charles) (Entered: 07/28/2023) |
| 07/28/2023 | 156 | RESPONSE in Opposition regarding 152 MOTION to Amend/Correct 134 Amended Complaint *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)* filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Whitehead, Charles) (Entered: 07/28/2023) |
| 08/11/2023 | 157 | MOTION for Leave to File *Surreply to New Arguments and Evidence as Contained in Defendants' Reply Brief (DE# 155 and exhibits)* filed by Frederick L Allen, Nautilus |

| | | |
|---|---|---|
| | | Productions, LLC. (Attachments: # 1 Exhibit SURREPLY (offered as Exhibit 1 to DE# 157) Offered in Response to North Carolina's Reply Brief (DE# 155)), # 2 Text of Proposed Order Text of Proposed Order Allowing Surreply at DE# 157-1) (McKenzie, David) (Entered: 08/11/2023) |
| 08/11/2023 | 158 | Memorandum in Support of *Motion for Leave to Allow Surreply to North Carolina's New Arguments and New Evidence as Contained in Its Reply Brief in Support of Motion to Strike and Motion to Dismiss (DE# 155))* filed by Frederick L Allen, Nautilus Productions, LLC. (McKenzie, David) (Entered: 08/11/2023) |
| 08/11/2023 | 159 | Notice filed by Frederick L Allen, Nautilus Productions, LLC *as to Withdrawal of Docket No. 152 (Plaintiffs' Motion to Amend Caption)*. (McKenzie, David) (Entered: 08/11/2023) |
| 08/11/2023 | 160 | MOTION to Amend/Correct *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)* filed by Frederick L Allen, Nautilus Productions, LLC. (Attachments: # 1 Exhibit Ex. 1 (Redline Caption Comparison Contrasting Erroneous SAC Caption with Corrected Caption), # 2 Supplement Ex. 2 (Original Caption from Original Complaint (DE#1)), # 3 Exhibit Ex. 3 (Caption from First Amended Complaint (DE# 12), # 4 Text of Proposed Order Text of Proposed Order Allowing Motion to Amend Caption) (McKenzie, David) (Entered: 08/11/2023) |
| 08/11/2023 | 161 | Memorandum in Support regarding 160 MOTION to Amend/Correct *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)* filed by Frederick L Allen, Nautilus Productions, LLC. (McKenzie, David) (Entered: 08/11/2023) |
| 08/15/2023 | | Set Hearing: Motion Hearing set for 8/25/2023 at 10:00 AM in Raleigh - 7th Floor - Courtroom 2 before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 08/15/2023) |
| 08/17/2023 | 162 | Notice of Substitution of Counsel filed by Christopher J. Stipes on behalf of Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson substituting for Amar Majmundar. (Stipes, Christopher) (Entered: 08/17/2023) |
| 08/18/2023 | 163 | RESPONSE in Opposition regarding 160 MOTION to Amend/Correct *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)* filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Whitehead, Charles) (Entered: 08/18/2023) |
| 08/25/2023 | 164 | Minute Entry for proceedings held in Raleigh, NC before District Judge Terrence W. Boyle: Motion Hearing held on 8/25/2023. All parties present and ready to proceed. Oral argument held. A written order will follow. (Court Reporter Cissy High, High Reporting) (Stouch, L.) (Entered: 08/25/2023) |
| 09/02/2023 | | Motion Submitted to District Judge Terrence W. Boyle regarding 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction, 157 MOTION for Leave to File *Surreply to New Arguments and Evidence as Contained in Defendants' Reply Brief (DE# 155 and exhibits)*, 160 MOTION to Amend/Correct *CAPTION, as Erroneously Shown in Plaintiffs' Second Amended Complaint (DE#134)*, 144 MOTION to Strike 134 Amended Complaint. (Stouch, L.) (Entered: 10/02/2023) |
| 03/29/2024 | 165 | ORDER STAYING CASE - This Court will address the stay and any related case-management matters on its own motion after the Supreme Court decides Devillier and |

| | | issues its opinion. Signed by District Judge Terrence W. Boyle on 3/29/2024. (Stouch, L.) (Entered: 03/29/2024) |
|---|---|---|
| 08/28/2024 | 166 | Notice filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson *NOTICE OF WITHDRAWAL OF A GOVERNMENTAL ATTORNEY, L.R. 5.2(d)*. (Vysotskaya De Brito, Olga) (Entered: 08/28/2024) |
| 08/30/2024 | 167 | ORDER LIFTING STAY. Signed by District Judge Terrence W. Boyle on 8/29/2024. (Stouch, L.) (Entered: 08/30/2024) |
| 08/30/2024 | 168 | ORDER - Plaintiffs ' Motion for Leave to File a Surreply [DE 157] is GRANTED; the Clerk of Court is DIRECTED to file Plaintiffs' Surreply [DE 157-1]; Defendants' Motion to Strike [DE 144] is GRANTED IN PART and DENIED IN PART. Defendants' Motion to Dismiss [DE 146] is GRANTED IN PART and DENIED IN PART. Allen may proceed on his claims for direct copyright infringement and procedural due process consistent with this order. Signed by District Judge Terrence W. Boyle on 8/29/2024. (Stouch, L.) (Entered: 08/30/2024) |
| 08/30/2024 | 169 | SURREPLY regarding 146 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Frederick L Allen, Nautilus Productions, LLC. (Stouch, L.) (Entered: 08/30/2024) |
| 09/04/2024 | 170 | ORDER - The Plaintiffs' Motion to Amend the Caption of the Second Amended Complaint [DE 161] is DENIED. Signed by District Judge Terrence W. Boyle on 9/3/2024. (Stouch, L.) (Entered: 09/04/2024) |
| 09/04/2024 | 171 | **\*\*DISREGARD: Entered into the case in error.\*\*** STIPULATED PROTECTIVE ORDER. Signed by District Judge Terrence W. Boyle on 9/4/2024. (Stouch, L.) Modified on 9/4/2024 (Stouch, L.). (Entered: 09/04/2024) |
| 09/09/2024 | 172 | Consent MOTION for Extension of Time to File Answer regarding 134 Amended Complaint filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson. (Attachments: # 1 Text of Proposed Order Proposed Order Granting extension) (Vysotskaya De Brito, Olga) (Entered: 09/09/2024) |
| 09/12/2024 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 172 Consent MOTION for Extension of Time to File Answer regarding 134 Amended Complaint . (Sellers, N.) (Entered: 09/12/2024) |
| 09/12/2024 | | TEXT ORDER granting Defendants' Motion for Extension of Time 172 . For good cause shown, it is ordered that Defendants have up to and including September 30, 2024, within which to answer or otherwise respond to the Second Amended Complaint. Signed by Peter A. Moore, Jr., Clerk of Court on 9/12/2024. (Hockaday, A.) (Entered: 09/12/2024) |
| 09/20/2024 | 173 | Notice of Appearance filed by Elliot Sol Abrams on behalf of Frederick L Allen, Nautilus Productions, LLC. (Abrams, Elliot) (Entered: 09/20/2024) |
| 09/30/2024 | 174 | Notice of Interlocutory Appeal filed by Mike Carraway, Kevin Cherry, Stephen R Claggett, Karin Cochran, Roy A. Cooper, Cary Cox, Susan Wear Kluttz, Sarah Koonts, John W Morris, North Carolina Department of Natural and Cultural Resources, Joseph K. Schwarzer II, State of North Carolina, Josh Stein, D. Reid Wilson as to 168 Order on Motion to Strike,,, Order on Motion to Dismiss for Failure to State a Claim,,, Order on |

| | | Motion to Dismiss/Lack of Jurisdiction,,, Order on Motion for Leave to File,,. Filing fee, receipt number ANCEDC-7791603. (Vysotskaya De Brito, Olga) (Entered: 09/30/2024) |
|---|---|---|
| 09/30/2024 | 175 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 174 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 09/30/2024) |
| 09/30/2024 | 176 | ORDER - This action is hereby STAYED in its entirety. As no substantive matters will be decided during the stay, the clerk is DIRECTED to remove this case from the Court's active docket. The parties shall file a joint status update within fourteen (14) days of the issuance of the mandate of the court of appeals. Signed by District Judge Terrence W. Boyle on 9/30/2024. (Stouch, L.) (Entered: 09/30/2024) |
| 10/03/2024 | 177 | US Court of Appeals Case Number 24-1954 (Taylor Barton, Case Manager) as to 174 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 10/03/2024) |
| 01/03/2025 | 178 | OFFICIAL TRANSCRIPT of Proceedings held on 8/25/2023, Motion Hearing, before Judge Terrence W. Boyle. Court Reporter/ Carolyn High, Telephone number 919-630-2987, cissyhigh@nc.rr.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website Redaction Request due 1/27/2025. Redacted Transcript Deadline set for 2/6/2025. Release of Transcript Restriction set for 4/6/2025. (Foell, S.) (Entered: 01/03/2025) |
| 01/03/2025 | | NOTICE of Filing of Official Transcript 178 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Foell, S.) (Entered: 01/03/2025) |

JA 28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
Western Division
Civil Case No. 5:15-cv-627

| | |
|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC<br>        Plaintiffs<br><br>   v.<br><br>PATRICK LLOYD MCCRORY, Governor of the State of North Carolina, *in his official capacity*;<br>SUSAN WEAR KLUTTZ, Secretary of the North Carolina Department of Natural and Cultural Resources, *individually and in her official capacity*;<br>KARIN COCHRAN, Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, *individually and in her official capacity;*<br>KEVIN CHERRY, Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, *individually and in his official capacity;*<br>CARY COX, Assistant Secretary, Marketing and Communications of the North Carolina Department of Natural and Cultural Resources, *individually and in her official capacity;*<br>STEPHEN R. CLAGGETT, State Archaeologist, *individually and in his official capacity;*<br>JOHN W. MORRIS, Deputy State Archaeologist – Underwater and Director of the Underwater Archaeology Branch of the North Carolina Department of Natural and Cultural Resources, *individually and in his official capacity;*<br>JAMES W. DAVIS, North Carolina Senator, *individually and in his official capacity;*<br>NORMAN W. SANDERSON, North Carolina Senator, *individually and in his official capacity;*<br>NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES;<br>STATE OF NORTH CAROLINA; and<br>FRIENDS OF QUEEN ANNE'S REVENGE, A NON-PROFIT CORPORATION<br>        Defendants | **FIRST AMENDED COMPLAINT**<br>**(Jury Trial Demanded)** |

1

# INTRODUCTION

1. This lawsuit involves a conspiracy to steal copyrights and misuse copyrighted photographs and media created by renowned documentary videographer Rick Allen and licensed to his company, Nautilus Productions, that Mr. Allen has painstakingly created since 1998 while documenting the retrieval of *Queen Anne's Revenge*, the pirate Blackbeard's flagship.

2. After the Department of Natural and Cultural Resources effectively admitted in a written agreement signed by Secretary Kluttz that the rights to this historically important videography belonged to Plaintiffs and were not to be used except under contract, the Defendants conspired to convert Plaintiffs' copyrighted works into "public documents" that would be made available to the public without Plaintiffs' consent and without compensation, in violation of the Constitutions of the United States and of North Carolina; and used and permitted others to publicly display, copy, and otherwise use Plaintiffs' copyrighted works without Plaintiffs' consent.

3. Defendants well knew or should have known that only Congress has the right to pass laws governing copyrights, yet conspired to craft and obtain passage of a North Carolina statute, N.C. Gen. Stat. §121-25(b) that removed Plaintiffs' works, and those of similarly situated persons, from the copyright protection to which they are entitled.

4. While the motivation for this misconduct is yet to be fully understood, it appears that at least part of the reason was to create a defense to claims of infringement and breach of the Settlement Agreement.

2

5. It appears that another part of the motivation for this misconduct was to assist the Defendant Department, and the Defendant Friends of Queen Anne's Revenge and/or individuals associated with them, each of which would or expected to achieve considerable savings and profits from uncompensated use of Plaintiffs' work. Defendant Morris is not only an employee of the Defendant Department but also at times pertinent hereto was, and may still be, a member of the Board of Directors of the Friends of Queen Anne's Revenge, and his wife signed a contract with the Friends of Queen Anne's Revenge to produce educational and internet materials concerning the retrieval of the *Queen Anne's Revenge*, the very subject that had been well documented by Plaintiffs since inception of the recovery efforts.

6. Further details are set out in the paragraphs below; and each paragraph of this Complaint is incorporated by reference into each Count of the Complaint.

**PARTIES**

7. Plaintiff Frederick ("Rick") L. Allen (hereafter referred to as "Mr. Allen") is an individual citizen and resident of Cumberland County, North Carolina. Mr. Allen has been producing documentaries and shooting video since 1983. As a video producer, director and HD videographer his work has appeared on ABC, A&E, BBC, CBS, Discovery, TLC, National Geographic, 48 Hours, ESPN, Lifetime, Turner and more. He has followed SWAT teams through the door on drug busts, traveled from Cuba to Kazakhstan with the 82nd Airborne, weathered live broadcasts during hurricanes, gone nose to nose with 14 foot Great White sharks during underwater expeditions and for nearly two decades has been the project videographer on the Queen Anne's Revenge Shipwreck Project.

3

8. Plaintiff Nautilus Productions, LLC (hereafter referred to as "Nautilus"), is a limited liability company organized by under the laws of the State of North Carolina and having its principal place of business in Cumberland County, North Carolina. Nautilus was organized by Mr. Allen after he had spent more than a decade in broadcast television, to be his own video production company focused on documentary production as well as providing freelance HD production and underwater video services to broadcast, corporate and government clients. Nautilus, with Mr. Allen, has produced documentaries for the National Geographic International, the Canadian History Channel, North Carolina Public Television, Texas A&M, the Louisiana State Museum and the Bureau of Ocean Energy Management (US Dept. of the Interior) among others, and for many corporate clients.

9. Defendant Patrick Lloyd McCrory (also known as "Pat McCrory" and hereafter referred to as "Mr. McCrory" or "the Governor") is an individual North Carolina citizen, employed in Wake County, North Carolina, and on information and belief with residences in Wake County and Mecklenburg County, North Carolina and registered to vote in Mecklenburg County, North Carolina. Mr. McCrory currently serves as Governor of the State of North Carolina and has overarching control over the actions of the State and its agencies, and as a part of his official duties is responsible for those actions. He is sued in his official capacity.

10. Defendant Susan Wear Kluttz (hereafter referred to as "Ms. Kluttz" or "the Secretary") is an individual North Carolina citizen, employed in Wake County, North Carolina and on information and belief having residences in Wake County and Rowan County, North Carolina and registered to vote in Rowan County, North Carolina. Ms. Kluttz currently serves as Secretary of the North Carolina Department of Natural and Cultural Resources and supervises and controls the actions of that agency. Ms. Kluttz signed the Settlement Agreement referenced above, a copy of which is attached as Exhibit 1 to this Complaint, and

4

was responsible for its proper implementation.  She at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by the North Carolina Department of Natural and Cultural Resources.  She is sued in her individual and official capacities.

11. Defendant Karin Cochran (hereafter referred to as "Ms. Cochran") is an individual North Carolina citizen, on information and belief residing and registered to vote in Wake County, North Carolina.  Ms. Cochran currently serves as Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources and is responsible for supervising the day to day operations of that agency.  Ms. Cochran was present during the negotiations that led to the Settlement Agreement referenced above, and was responsible for its day to day implementation.  She at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by the North Carolina Department of Natural and Cultural Resources.  She is sued in her individual and official capacities.

12. Defendant Kevin Cherry (hereafter referred to as "Dr. Cherry") is an individual North Carolina citizen, on information and belief residing and registered to vote in Cabarrus County, North Carolina.  Dr. Cherry serves as the deputy secretary of the N.C. Department of Natural and Cultural Resources and director of the Office of Archives, History and Parks and oversees the operations of the divisions of State History and Maritime Museums, State Historic Sites and Properties, Archives and Records, Historical Resources (including the State Historic Preservation Office, Office of Historical Research, and the Office of State Archaeology), among others.  Dr. Cherry personally participated in the negotiations that led to the Settlement Agreement. He at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by those offices and divisions of the North Carolina Department of Natural and Cultural Resources supervised by him, including the

posting of Plaintiffs' materials to DNCR's YouTube channel without Plaintiffs' consent as hereafter set out. He is sued in his individual and official capacities.

13. Defendant Cary Cox (hereafter referred to as "Ms. Cox") is an individual North Carolina citizen, on information and belief residing and registered to vote in Cabarrus County, North Carolina. Ms. Cox currently serves as Assistant Secretary, Marketing and Communications of the North Carolina Department of Natural and Cultural Resources and supervises and controls the actions of that agency. She at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by the North Carolina Department of Natural and Cultural Resources in its marketing and communications, and controlled or had the right and obligation to control dissemination of Plaintiffs' copyrighted works to third parties. She is sued in her individual and official capacities.

14. Defendant Stephen R. Claggett (also known as "Steve Claggett" and hereafter referred to as "Mr. Claggett") is an individual North Carolina citizen, on information and belief residing and registered to vote in Wake County, North Carolina. Mr. Claggett currently serves as the State Archaeologist of the State of North Carolina, within the DNCR. He also during pertinent times was a member and officer of the Board of Directors of Friends of QAR and may still serve on that Board. Mr. Claggett participated in the negotiations leading to the Settlement Agreement referred to hereafter, was present when it was signed, and knew its provisions. He controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by the North Carolina Department of Natural and Cultural Resources. He is sued in his individual and official capacities.

15. Defendant John W. Morris (also known as "Billy Ray Morris" and hereafter referred to as "Mr. Morris") is an individual North Carolina citizen, on information and belief residing and registered to vote in New Hanover County, North Carolina. Mr. Morris currently serves as

the Deputy State Archaeologist – Underwater, and as Director of the Underwater Archaeology Branch of the North Carolina Department of Natural and Cultural Resources and he also has served during pertinent times hereto, and may continue to serve as a member (and is a past treasurer) of the Board of Directors of Defendant Friends of Queen Anne's Revenge, A Non-Profit Corporation (hereafter "Friends of QAR"). Mr. Morris is sued in his individual and official capacities.

16. James W. Davis (also known as "Jim Davis" and hereafter referred to as "Mr. Davis") is an individual North Carolina citizen, on information and belief having a residence in Macon County, North Carolina and registered to vote in Macon County, North Carolina. Mr. Davis is a Senator in the General Assembly of the State of North Carolina. He is sued in his individual and official capacities. On information and belief, based upon published admissions of codefendant Mr. Sanderson, Mr. Davis conspired and cooperated with other Defendants to cause the introduction, and contribute to the passage, of the amendment that ultimately became N.C. Gen.Stat. §121-25(b).

17. Norman Sanderson (hereafter referred to as "Mr. Sanderson") is an individual North Carolina citizen, on information and belief having a residence in Pamlico County, North Carolina and registered to vote in Pamlico County, North Carolina. Mr. Sanderson is a Senator in the General Assembly of the State of North Carolina. He is sued in his individual and official capacities. On information and belief, based upon published admissions, Mr. Sanderson cooperated and conspired with other Defendants to cause the introduction, and contribute to the passage, of the amendment that ultimately became N.C. Gen. Stat. §121-25(b).

18. The Department of Natural and Cultural Resources (formerly known as the Department of Cultural Resources and hereafter referred to as "DNCR") is a principal department and agency of the State of North Carolina, pursuant to Articles I and II of N.C. Gen. Stat. §143B.

7

19. The State of North Carolina (hereafter referred to as the "State") is a state of the United States of America.

20. Defendant Friends of Queen Anne's Revenge, A Non-Profit Corporation ("Friends of QAR"), is a nonprofit corporation organized under the laws of North Carolina, and currently having its registered agent and its registered office in Carteret County, North Carolina.

<strong>JURISDICTION AND VENUE</strong>

21. This action arises in part under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202 and the copyright laws of the United States, 17 U.S.C. §101 et seq. as well as the Constitution of the United States of America and the Constitution of the State of North Carolina, and seeks a declaration that N.C. Gen. Stat. 125-25(b) is invalid, unconstitutional, and unenforceable as pre-empted by federal law, 17 U.S.C. §301, pursuant to U.S. Const. Art. VI, cl.2. and Art. VIII, §8, Cl. 8, and as a violation of the Takings Clause and Due Process Clause of the U.S. Constitution, Amends. V and XIV; and of the Law of the Land Clause of the North Carolina Constitution, N.C. Const. Art. I, §19; and for recovery of Plaintiffs' attorneys' fees and costs. There exists a case and controversy that is ripe for adjudication.

22. This Court has subject matter jurisdiction over the claims arising under the Constitution and laws of the United States, including those claims hereafter set forth seeking a declaration that N.C. Gen. Stat. §121-25(b) violates the United States constitution and the federal Copyright Act; and has original or supplemental jurisdiction over all other claims set out herein. The Court's jurisdiction arising under the constitution and laws of the United States is set out in 28 U.S.C. §1331, with original jurisdiction over claims relating to copyright and infringements thereof set out in 28 U.S.C. §1338 and jurisdiction over declaratory judgment

8

actions set out in 28 U.S.C. §§2201-02; and this Court has jurisdiction over all other claims pursuant to 28 U.S.C. §1367 (a) because they form a part of the same case or controversy.

23. This Court has personal jurisdiction and venue because all parties reside in North Carolina and most of the pertinent acts set out hereafter occurred within the Eastern District of North Carolina.

24. All state employees named as individual Defendants herein knew or should have known, as a similarly situated reasonable person would have known, that depriving Plaintiffs of their copyrights and providing the State with rights that purport to supersede Plaintiffs' copyrights constitute violations of a federal statutory and constitutional right.

25. Each state employee's actions constituting copyright infringement were and are clearly outside the scope of activity permitted by the copyright statute, including reasonable interpretations of fair use.

26. All state employees named as individual Defendants herein, in carrying out the actions hereafter set forth, acted with malice or with reckless indifference to the federally protected rights of the aggrieved Plaintiffs.

27. The acts of each state employee named as a Defendant herein violated, and caused the DNCR and the State to violate, the federal and North Carolina constitutions; and each of these officials are thereby stripped of any otherwise-applicable immunity and are personally liable for their conduct.

28. To the extent sovereign immunity might otherwise apply, it has been waived by the State of North Carolina at least by reason of a contract entered by the State as hereafter described.

9

**GENERALLY APPLICABLE FACTS**

29. For almost two decades, Plaintiffs have documented the finding and recovery of artifacts from the shipwreck believed to be, and known as, *Queen Anne's Revenge*, the former flagship of Edward Teach, more commonly known as the pirate Blackbeard. *Queen Anne's Revenge* was wrecked in 1718; the wreck was discovered in 1996 and Plaintiffs' documentary work commenced in approximately 1998.

30. Over the past years, Plaintiffs have produced a substantial archive of video and still images showing the underwater shipwreck and the efforts of teams of divers and archaeologists to recover various artifacts from the wreck. Plaintiffs have been involved in live educational video webcasts, producing video for public display, as well as production of materials for licensing and/or later review.

31. Plaintiff Rick Allen has faithfully performed and continues to perform his work relating to the *Queen Anne's Revenge*.

32. The copyrights in all pertinent materials filmed and photographed by Plaintiffs belong exclusively to Mr. Allen and are licensed to and commercialized by Nautilus.

33. Plaintiffs registered Mr. Allen's copyrights in his creative work with the United States Copyright Office and Mr. Allen owns, and Plaintiffs control and have the right to use the works covered by, at least the following registrations:

10

| Reg. # | Title |
|---|---|
| PA0001694134 | Queen Anne's Revenge/Blackbeard Shipwreck Underwater Footage |
| PA0001846427 | Queen Anne's Revenge Footage 1999 |
| PA0001846499 | Queen Anne's Revenge Footage 2000 |
| PA0001846497 | Queen Anne's Revenge Footage 2001 |
| PA0001846494 | Queen Anne's Revenge Footage 2004 |
| PA0001846473 | Queen Anne's Revenge Footage 2005 |
| PA0001846465 | Queen Anne's Revenge Footage 2006 |
| PA0001846461 | Queen Anne's Revenge Footage 2007 |
| PA0001846457 | Queen Anne's Revenge Footage 2008 |
| PA0001846462 | Queen Anne's Revenge Footage 2010 |
| PA0001846470 | Queen Anne's Revenge Footage 2012 |
| PA0001872852 | Queen Anne's Revenge Footage 2013 |
| PA0001919638 | Queen Anne's Revenge Footage 2014 |

34.  In mid-2013, the Friends of QAR entered into an agreement to pay $70,000 for production of various educational materials, including videos, an educational website and scholastic educational packets.  Among the recipients of the funding was to be Nicole Morris, spouse of Defendant John Morris, an employee of DNCR; and Ms. Morris signed the agreement on behalf of one of the participating entities.  A former employee of DNCR, Richard Lawrence, signed the agreement on behalf of the Friends of QAR.

35. Prior to October 15, 2013, the State and its DNCR infringed and contributed to infringement and induced infringement of Mr. Allen's registered copyrights by uploading video to the Internet without the consent of Plaintiffs, by publicly displaying, copying, and otherwise using the registered works, and by posting the works on the Internet, allowing and making possible copying by third parties, all without the consent of Plaintiffs.

11

36. In and around June and August 2013, Mr. Allen notified Secretary Kluttz of the infringements and other violations of Plaintiffs' rights.

37. On October 15, 2013, the State and its DNCR entered into a written agreement (the Settlement Agreement) with Plaintiffs that superseded all prior agreements between the parties.

38. The Settlement Agreement contained, among other things, the following Paragraph 22:

> **Copyright Violations.** DCR agrees to compensate Nautilus Productions by payment of the cash sum of $15,000 for any copyright infringements by DCR or its support groups occurring through the date of the signing of this contract, including Friends of the Maritime Museum display photograph of the pile (central portion of the QAR shipwreck), DCR's Flickr account showing anchor A1 on the pile, DCR's website showing anchor A1 on the pile, DCR's News website showing anchor A2, and Friends of the QAR website showing mapping dividers (artifact). DCR shall pay Nautilus Productions $15,000 by 31 January 2014.

39. On or about February 3, 2014, the State and DNCR made payment to Plaintiffs of the $15,000 required by the Settlement Agreement and, as an accommodation to the parties, Plaintiffs accepted the late payment.

40. According to the Settlement Agreement, DNCR was permitted to retain for research purposes certain materials that contained both a time stamp and Nautilus watermark, but was not given the right to use those materials for any other purpose and was required to return all other materials to Nautilus.  Specifically, Paragraph 21 of the Settlement Agreement required:

> **Return of Video.** DCR agrees to return to Nautilus Productions all archival footage, still photographs, and other media, produced by Nautilus Productions, which do not bear a time code stamp and a Nautilus Productions watermark (or bug). DCR may retain, for research purposes, archival footage, still photographs, and other media that contain a time code stamp and

12

watermark (or bug), and as to such media, DCR shall provide Nautilus with a current, accurate list.

41. The Settlement Agreement expressly waived any sovereign immunity otherwise available to the State and its agencies and employees by providing (in Paragraph 32) that in the event of breach, Plaintiffs could avail themselves of "all remedies provided by law or equity."

42. Each of the individual Defendants was aware of the Settlement Agreement.

43. The State retained for research purposes, as permitted by the Paragraph 21 of the Settlement Agreement, archival footage, still photographs, and other media that contain a time code stamp and watermark (or bug), including over eighty (80) hours of such video footage contained on approximately 83 DVD's. All of these works were created by Plaintiffs and are covered by at least one of the above-referenced copyright registrations.

44. After signing the Settlement Agreement, the State and its DNCR resumed infringing Plaintiffs' copyrights. The infringements that occurred after the Settlement Agreement included at least the following works, each of which infringed at least one of the above-listed registered works and each of which was published, performed, and/or displayed at least at the location listed below, without consent of Plaintiffs:

| Title Of Infringing Work | Published At | Approx. Location |
|---|---|---|
| David Moore On Capturing Blackbeard's 13th Cannon | https://www.youtube.com/watch?v=9KfhKYzLRJM | 3:17 min. |
| Raising Blackbeard's Anchor, May 27, 2011 | https://www.youtube.com/watch?v=MTeDBYzo3ps | 4:25 min. |
| Blackbeard's Queen Anne's Revenge 1718 | https://www.youtube.com/watch?v=DdOdDFnyemQ | 3:05 min. |

13

| Title Of Infringing Work | Published At | Approx. Location |
|---|---|---|
| Raising Blackbeard's Cannon From A Conservators Point of View | https://www.youtube.com/watch?v=kN3PLPMUVbE | 2:27 min. |
| What's New At QAR Lab | https://www.youtube.com/watch?v=RkeWj1GBx0Q | 4:18 min. |
| *Maritimes*, Winter/Spring 2013, p. 13 | http://digital.ncdcr.gov/cdm/compoundobject/collection/p16062coll9/id/189990/rec/5 | n/a (still image in print material) |

45. Even after the initiation of this lawsuit over three months ago, DNCR continued to publish, display and/or perform at least many of the above-listed infringing works at these and/or other locations.

46. Thus, Defendants infringed and contributed to infringement and induced infringement of Mr. Allen's registered copyrights by uploading video to the Internet without the consent of Plaintiffs, by publicly displaying, copying, and otherwise using the registered works, and by posting the works on the Internet, allowing, encouraging and making possible copying by third parties, all without the consent of Plaintiffs.

47. As a result of these actions by Defendants, including but not limited to the State and its DNCR, and which at least Secretary Kluttz and Mr. Morris oversaw and either initiated or failed to prevent despite having a duty to do so, Mr. Allen's copyrighted work is now publicly viewable, downloadable and posted without permission or license from Plaintiffs.

48. Plaintiffs issued Takedown Notices in an effort to ameliorate the damage from these unauthorized infringements.

49. Defendants, concerned about their own liability and, on information and belief, in order to enhance the private business efforts of Friends of QAR and of Mr. Morris's wife, developed a plan to steal Plaintiffs' copyright assets and convert them to the use of the State and of themselves, all without payment to Plaintiffs.

50. Defendants collectively wrote, caused to be introduced, lobbied for passage of, and obtained passage of an amendment to an existing North Carolina statute, so that the pertinent section of the statute, as amended, read as follows:

> **§121-25. License to conduct exploration, recovery or salvage operations.**
>
> (b)  All photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions shall be a public record pursuant to G.S. 132-1. There shall be no limitation on the use of or no requirement to alter any such photograph, video recordings, or other documentary material, and any such provision in any agreement, permit, or license shall be void and unenforceable as a matter of public policy.

51. The amendment was on information and belief drafted by Defendant DNCR and its employees.

52. The amendment was on information and belief introduced by Defendant Senators Sanderson and Davis.  It was tacked on to a bill entitled:

> An Act to Allow the Department of Cultural Resources, Office of Archives and History, to Use the Net Proceeds of the Sale of Artifacts for Maintenance or Conservation of Other Artifacts; to Clarify the Process for Transferring Title of Unclaimed or Undocumented Property Loaned to Museums and Historical Repositories to those Museums and Historical Repositories; and to Set a Time Limitation on Confidentiality of Records."

15

The short title of the act, prior to amendment, was "Change DCR Process for Unclaimed Property."

53. According to published newspaper reports, Mr. Sanderson admitted on or about July 30, 2015, prior to passage of the bill, that the amendment creating N.C. Gen. Stat. §121-25(b) was introduced by Mr. Davis and Mr. Sanderson at the request of DNCR, because of a lawsuit alleging that DNCR had breached the Settlement Agreement.

54. The amendment was passed and the bill containing the amendment was signed by Governor McCrory on August 18, 2015, thereby becoming effective as Session Law 2015-218 on August 18, 2015.

55. At the time he signed the bill, Governor McCrory was or should have been aware of the earlier Settlement Agreement, and aware that the amendment creating N.C. Gen. Stat. §121-25(b) was motivated by a desire to avoid liability on account of breaches of the Settlement Agreement and of copyright infringements.

56. The effect of N.C. Gen. Stat. §121-25(b) is to convert each of the copyrighted works of Plaintiffs that are in the possession of the State into "a public record" as to which there is now "no limitation on the use of…any such photograph, video recordings, or other documentary material."

57. Enforcement of N.C. Gen. Stat. §121-25(b) would deprive Plaintiffs of the copyrights in their works and the benefits of those copyrights and the license to use the work to which they are entitled under the United States Copyright Act, 17 U.S.C. §101 *et seq.* and constitutes a

16

violation of the Takings Clause of the North Carolina Constitution and of the Fifth and Fourteenth Amendments to the United States Constitution.

58. The State of North Carolina, Ms. Kluttz, and DNCR already have relied on Session Law 2015-218, in response to a different lawsuit (to which Plaintiffs are not a party), alleging violations of the Settlement Agreement, pleading among other things that:

> Regardless of whether the Department infringed upon Plaintiff's alleged intellectual property rights or breached the contract, which the Department expressly denies, any relief for the alleged infringement and breach of contract should be denied because the purported contract forming the basis for Plaintiff's action…is void, illegal and unenforceable, in its entirety or in part, as being against … public policy… Therefore, Department is not responsible for and has no liability to Plaintiff under the alleged contract and/or its parts.

59. In October, the State of North Carolina, Ms. Kluttz, and DNCR filed a pleading in the same State Court lawsuit (Wake County Civil Action 15-CVS-009995) wherein they asserted the above-quoted defense relying on Session Law 2015-218, alleging that Plaintiffs are necessary parties to that lawsuit.  Plaintiffs have not agreed to join in the Wake County lawsuit and so far as Plaintiffs are aware, no action has been taken on that pleading and no motion has been filed to implead Plaintiffs.

60. State courts have no right to adjudicate claims of copyright infringement, and these Defendants' efforts to implead Plaintiffs in their state court litigation further evidences Defendants' attempt to prevent Plaintiffs from obtaining redress for Defendants' copyright infringements, whether by way of injunctive relief or damages; and further emphasizes the need for prompt adjudication that N.C. Gen. Stat. §121-25(b) is invalid and unenforceable.

61. On information and belief, taking advantage of their position that the Settlement Agreement is void as against public policy, Defendants have entered into, and/or attempted to fulfill, contracts purporting to allow third parties the benefits that formerly would have accrued to Plaintiffs under that agreement.

**COUNT I**
**DECLARATORY JUDGMENT**
**DECLARATION OF STATUTE'S INVALIDITY**

62. N. C. Gen. Stat. §121-25(b) converts, without the permission of the author and without compensation, all photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions into public documents; and permits the unlimited use of such works by third parties without the consent of the author.

63. Congress is granted the right to legislate in the field of copyright pursuant to pursuant to U.S. Const. Art. VIII, §8, Cl. 8; and is entitled to provide that its legislation has pre-emptive effect pursuant to U.S. Const. Art. VI, Cl.2.

64. N.C. Gen. Stat. §121-25(b) purports to govern rights that are equivalent to exclusive rights within the general scope of copyright as specified by 17 U.S.C. §106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by 17 U.S.C. §§102 and 103.

65. N. C. Gen. Stat. §121-25(b) is pre-empted by the Copyright Act of the United States of America, 17 U.S.C. §101 *et seq.,* which expressly provides, in 17 U.S.C. §301(a), that no

18

person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

66. N. C. Gen. Stat. §121-25(b) is additionally invalid, unconstitutional and unenforceable because it violates the Takings Clause and Due Process Clause of the United States Constitution, U.S. Const. Amends. V and XIV; and the Law of the Land Clause of the North Carolina Constitution, N.C. Const. Art. I, §19, by converting to public documents, without due process, without rights for notice and opportunity to be heard, and without compensation to the copyright owners, all photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions; and by permitting the uncompensated use thereof by third parties without due process and without compensation to the copyright owners.

67. N. C. Gen. Stat. §121-25(b) is void and without legal force and effect; and its enforcement would deprive Plaintiffs of their property and/or the benefit of their property without due process and without recompense.

68. An actual, justiciable case or controversy exists between the parties as to the validity and enforceability of N.C. Gen. Stat. §121-25(b).

69. Plaintiffs are entitled to a declaration from the Court that N.C. Gen. Stat. §121-25(b) is unconstitutional, pre-empted by the Copyright Act, and altogether void and without legal force and effect.

19

## COUNT II
## COPYRIGHT INFRINGEMENT

70. Defendants jointly and severally have infringed the copyrights owned by Mr. Allen and damaged his licensee, Nautilus, by making or authorizing copies of Plaintiffs' works and posting or authorizing the posting and/or printing of the same in locations accessible to the public, from which further copies can and inevitably will be made by viewers.

71. Defendants McCrory and Kluttz and each of the defendants employed within DNCR had the ability to prevent and halt at least many of the infringements, and collectively had the ability to prevent and halt all of the infringements, but took no steps to do so.

72. To the extent, if any, that there is no direct liability for infringement by any of Defendants, said Defendants contributed to the infringements of other Defendants and/or benefited therefrom and are vicariously liable therefor.

73. Defendants have failed to recompense Plaintiffs for use of those copyrights, including use not only directly be Defendants but also use by each third party who gained access to Plaintiffs' works and made unlawful use of them as a result of Defendants' infringements.

74. Defendants, having previously infringed the copyrights in Mr. Allen's work, for which payment was previously made to Plaintiffs, knew or should have known their misappropriations of Plaintiffs' work were unlawful, and their above-described infringements were willful.

75. Defendants' continued unlawful conduct clearly is not deterred by the prospect of monetary sanctions and injunctive relief is necessary in addition to monetary recompense because Plaintiffs have no adequate remedy at law.

**COUNT III**
**VIOLATION OF 42 U.S.C. §1983**

76. Defendants have acted in concert and under color of state law to pass N.C. Gen. Stat §121-25(b), and to threaten Plaintiffs and Plaintiffs' vendors with enforcement thereof.

77. The Copyright Act was intended to benefit persons, such as Plaintiffs, who author (whether directly or as works for hire) works, who own copyrights in those works or are the licensees of copyrights, and who seek to benefit from and to enforce their rights therein.

78. Defendants attempted to deprive Plaintiffs to access to the courts for purposes of asserting Plaintiffs' legal rights.

79. Defendants' efforts to prevent Plaintiffs from enforcing rights under the Copyright Act, by passing and seeking to enforce N.C. Gen. Stat. §121-25(b), were willful and each of Defendants knew or should have known the proposed and ultimately enacted statute was unconstitutional and pre-empted by federal law, and that its passage and enforcement would harm both generally the class of persons whom the Copyright Act was intended to protect, and more specifically would harm Plaintiffs and the other private party to the Settlement Agreement (i.e., Intersal, Inc., Mr. Allen, and Nautilus), at whom the law was directed.

80. The acts complained of herein and above constitute an unconstitutional taking in violation of the Fifth Amendment of the United States Constitution. Moreover, Defendants have acted

21

without a modicum of concern for at least the individual Plaintiff's rights for notice and opportunity to be heard, all in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT IV
## UNFAIR AND DECEPTIVE TRADE PRACTICES

81. Plaintiffs license, in commerce, from their location in North Carolina, the right to copy and use Plaintiff's video documentary works; and Plaintiffs are compensated for such use.

82. Defendants' wrongful actions described hereinabove were and are calculated to benefit DNCR, the Friends of QAR, and the spouse of Defendant Morris.

83. Defendants deliberately caused an unconstitutional and pre-empted statute, that any reasonable person in their position would have known violated clearly established statutory and constitutional rights, to be introduced, passed, and sought to be enforced.

84. Defendants unfairly and deceptively sought to compete with Plaintiffs in the marketing of Plaintiffs' work, by unlawfully removing from that work the copyright protection to which it was entitled and declaring that contracts acknowledging the copyrighted status of the work were void as a matter of public policy, and by otherwise implementing the provisions of N.C. Gen. Stat. §121-25(b).

85. Defendants' actions were in and affecting North Carolina commerce.

86. Plaintiffs were harmed by Defendants' unfair and deceptive actions.

**COUNT V**
**CIVIL CONSPIRACY**

87. Defendants agreed with each other to carry out the unlawful acts hereinabove alleged, the purpose and effect of which was to injure Plaintiffs by depriving them of property that was rightfully theirs and to prevent Plaintiffs from asserting their legal rights.

88. Each of defendants committed at least one of the overt acts taken in support of, and to achieve the effects of, the conspiracy.

89. As a proximate result of the acts committed in furtherance of the agreement, Plaintiffs suffered injury, including but not limited to those injuries alleged above.

**PRAYER FOR RELIEF**

Plaintiffs demand trial by jury as to all issues so triable; and seek the following relief:

a) Declaratory judgment that N.C. Gen. Stat. §121-25(b) is void and unenforceable.

b) An injunction prohibiting enforcement of said statute;

c) An award of damages to Plaintiffs from defendants, jointly and severally to the extent not prohibited by the Eleventh Amendment or other immunity, sufficient to compensate Plaintiffs pursuant to each count set out above, together with their attorneys' fees and costs.

d) Trebling of such damages, on account of the willful nature of the conduct and, further, pursuant to statute;

e) In the alternative and/or to the extent not duplicative, an award of punitive damages in an amount sufficient to deter conduct such as that set out hereinabove;

f) In the alternative to recovery of the actual damages suffered as a result of the copyright infringements and any profits of the infringer with respect to such copyright infringements, an award of statutory damages for all infringements involved in the action as provided in 17 U.S.C. Sec. 504(c), together with an award of attorneys' fees and costs;

g) Such other and further relief as to the Court may seem just.

Respectfully submitted this 7th day of March, 2016.

OLIVE & OLIVE, P.A.
*Attorneys for Plaintiffs*

/s/Susan Freya Olive
Susan Freya Olive
  NC Bar No. 7252
David Loar McKenzie
  NC State Bar No. 36376
 P. O. Box 2049
Durham, North Carolina 27702
Telephone:  (919) 683-5514
Email: emailboxMDNC@oliveandolive.com


POE LAW FIRM PLLC

/s/ Joe Poe
G. Jona Poe Jr.
  NC State Bar No. 5920
Poe Law Firm PLLC
PO Box 15455
Durham, North Carolina 27704
Telephone: 919-471-4015
Email: joe@poelaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-627-BO

FREDERICK L. ALLEN and NAUTILUS )
PRODUCTIONS, LLC, )
)
Plaintiffs, )
)
v. )                    O R D E R
)
ROY A. COOPER, III, as Governor of )
North Carolina, *et al.*, )
)
Defendants. )

This cause comes before the Court following remand by the court of appeals.  By opinion

entered July 10, 2018, the court of appeals reversed each of this Court's rulings on immunity and

remanded with instructions to dismiss without prejudice Allen and Nautilus's claims against North

Carolina, the Department of Natural and Cultural Resources, and the public officials acting in their

official capacity and to dismiss with prejudice the remaining claims against the officials in their

individual capacities. [DE 86].  Mandate issued on August 17, 2018. [DE 91].

As the mandate of the court of appeals has issued, the stay previously entered in this matter

[DE 84] is hereby LIFTED.  Pursuant to the mandate of the court of appeals, Allen and Nautilus's

claims against North Carolina, the Department of Natural and Cultural Resources, and the public

officials acting in their official capacity are DISMISSED without prejudice.  The remaining claims

against the public officials in their individual capacities are DISMISSED with prejudice.

The joint report of the remaining parties shall be filed not later than September 14, 2018.

*See* [DE 84].

SO ORDERED, this 2⁴/day of August, 2018.

*Terrence Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**Western Division**
**Civil Case No. 5:15-cv-627**

| | |
|---|---|
| FREDERICK L. ALLEN and NAUTILUS PRODUCTIONS, LLC     Plaintiffs <br><br>                v.<br><br> ROY COOPER, Governor of the State of North Carolina, *in his official capacity*, FRIENDS OF THE QUEEN ANNE'S REVENGE INC., et al.,     Defendants | **STATUS REPORT** |

       Plaintiffs and Defendant Friends of the Queen Anne's Revenge report that they have reached a settlement and are finalizing the necessary documents. Plaintiff expects to file a stipulated notice of voluntary dismissal in the very near future as to this Defendant.

       Although this is technically the only live issue in the case, Plaintiff requests that it be allowed up to 30 days within which to seek reconsideration of this Court's Order as to the unappealed ruling in this cause regarding <u>Count III</u> of the Amended Complaint (DE#12), which this Court dismissed on grounds that the a Section 1983 or takings claims can be brought only in State Court. Subsequent to this Court's Order, the Supreme Court ruled in *Knick v Township of Scott* that takings claims can indeed be brought in Federal Court, thereby overturning the law on which this Court's ruling was based.

       Respectfully submitted on this the 15th day of July 2020 at Durham, North Carolina.

/s/ David McKenzie
**David L. McKenzie**
  NC State Bar No. 36376
OLIVE & OLIVE, P.A.
500 Memorial Street
Durham, North Carolina 27702-2049
Telephone:  (919) 683-5514
Fax:  (919) 688-3781
E-mail:  dmckenzie@oliveandolive.com

## Certificate of Service

I certify that I served the foregoing Status Report by filing it through the CM/ECF system, which will automatically serve file-stamped copies of the same upon all counsel of record in this matter.

Dated: July 15, 2020.

/s/ David McKenzie
**David L. McKenzie**

2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### Western Division
### Civil Case No. 5:15-cv-627

FREDERICK L. ALLEN and
NAUTILUS PRODUCTIONS, LLC
    Plaintiffs

       v.

ROY COOPER, Governor of the State of North
Carolina, *in his official capacity*, FRIENDS OF
QUEEN ANNE'S REVENGE INC., et al.,
    Defendants

**NOTICE OF VOLUNTARY
DISMISSAL**

PLEASE TAKE NOTICE that, pursuant to Rule 41(1)(a)(ii) of the Federal Rules of Civil

Procedure, Plaintiffs dismiss this action, with prejudice, against Defendant Friends of Queen Anne's

Revenge, a Non-Profit Corporation, which stipulates to this dismissal.

Respectfully submitted on this the 17th day of August 2020 at Durham, North Carolina.

/s/ David McKenzie
David L. McKenzie
NC State Bar No. 36376
OLIVE & OLIVE, P.A.
500 Memorial Street
Durham, North Carolina 27702-2049
Telephone:  (919) 683-5514
E-mail:  dmckenzie@oliveandolive.com

**Stipulated to:**

/s/ Jeffrey A. Doyle
Jeffrey A. Doyle
NC State Bar No. 19916
Attorney for Defendant Friends of Queen Anne's Revenge
Hedrick Gardner Kincheloe & Garofalo, LLP
4131 Parklake Avenue, Suite 300
Raleigh, NC 27612

**<u>Certificate of Service</u>**

I certify that I served the foregoing **NOTICE OF VOLUNTARY DISMISSAL** by filing it

through the CM/ECF system, which will automatically serve file-stamped copies of the same

upon all counsel of record in this matter.

Dated: August 17, 2020.

/s/ David McKenzie
David L. McKenzie

2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### Civil Case No. 5:15-cv-627-BO

FREDERICK L. ALLEN and
NAUTILUS PRODUCTIONS, LLC
    Plaintiffs

v.

ROY COOPER, Governor of the State of
North Carolina, *in his official capacity*, et al.,
    Defendants

**PLAINTIFFS' MOTION FOR
RECONSIDERATION
[Fed.R.Civ.P. 60(b)(6)]**

Plaintiffs Frederick Allen and Nautilus Productions, LLC (collectively, "Allen") move pursuant to Rule 60(b)(6) for this Court to reconsider its Order (DE #69) dismissing Count III of Allen's amended complaint against the State of North Carolina and its actors, and in which Allen sets out federal statutory and constitutional grounds for his complaint against those parties. The grounds for this motion are set forth in Allen's memorandum filed herewith.

As stated in the memorandum, should the Court grant reconsideration and thereby reinstitute this lawsuit, Allen will seek permission from the Court to amend his complaint so as to even more clearly set out the facts supporting his cause of action, as further explained in the memorandum.

Respectfully submitted, this 4th day of September 2020.

                    **OLIVE & OLIVE, P.A**.
                    Attorneys for Plaintiffs

                    /s/ Susan Freya Olive
                    **Susan Freya Olive**
                     NC Bar No. 7252
                    **David L. McKenzie**
                      NC State Bar No. 36376
                    P. O. Box 2049
                    Durham, North Carolina 27702
                    Telephone:  (919) 683-5514
                    Email: emailboxEDNC@oliveandolive.com

                    **POE LAW FIRM, PLLC**
                    Attorneys for Plaintiffs

                    /s/ Joe Poe
                    **G. Jona Poe Jr.**
                     NC State Bar No. 5920
                    Poe Law Firm PLLC
                    PO Box 15455
                    Durham, North Carolina 27704
                    Telephone: (919) 471-4015
                    Email: joe@poelaw.com

### Certificate of Service

       I certify that I served the foregoing document by filing it through the CM/ECF system, which will automatically serve file-stamped copies of the same upon all parties through their counsel of record in this matter, on this the 4th day of September, 2020.

                    /s/ Susan Freya Olive
                    **Susan Freya Olive**

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-627-BO

| | | |
|---|---|---|
| FREDERICK L. ALLEN and NAUTILUS PRODUCTIONS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | O R D E R |
| ROY A. COOPER, *et al.*, | ) ) | |
| Defendants. | ) | |

This cause comes before the Court on plaintiffs' motion for reconsideration DE 105. The appropriate responses and replies have been filed, and a hearing was held before the undersigned on February 16, 2021, at Raleigh, North Carolina. For the reasons discussed below, the motion for reconsideration is granted.

BACKGROUND

The shipwreck believed to be *Queen Anne's Revenge*, the former flagship of Edward Teach, more commonly known as the pirate Blackbeard, was discovered in 1996 off the coast of Beaufort, North Carolina. Since 1998, plaintiffs, Frederick Allen and his production company, Nautilus Productions, have been the substantially exclusive underwater photographers of the shipwreck. During this time, plaintiffs have allegedly produced a substantial archive of video and still images showing the underwater shipwreck and the efforts of diving teams and archaeologists to recover various artifacts from the wreck. Allen registered thirteen copyrights in these materials with the U.S. Copyright Office, each copyright covering a year's worth of footage.

In 2013, defendant began arguing that the State of North Carolina and its Department of Natural and Cultural Resources (DNCR) infringed, contributed to infringement, and induced infringement of Allen's registered copyrights by uploading Allen's video-footage to the Internet without Allen's consent. On October 15, 2013, plaintiffs, the State, and the DNCR entered into a written settlement agreement providing for payment to plaintiffs from the DNCR of $15,000 for any copyrights it had infringed prior to that date. The agreement referred to some specific instances of infringement, but none of the parties admitted to any wrongdoing. The agreement also clarified preexisting agreements and divided plaintiffs' video and photographic documentation into two categories to clarify the parties' respective rights. The State and the DNCR paid plaintiffs the $15,000 provided by the settlement on February 3, 2014.

Plaintiffs commenced this action on December 1, 2015, alleging that the State and the DNCR continued to infringe on plaintiffs' copyrights after entry of the 2013 settlement agreement. They further alleged that the State and the DNCR have published, performed, and/or displayed plaintiff's video footage and that, in an effort to convert plaintiffs' copyright assets to state property without payment to plaintiff, defendants collectively wrote and obtained passage of an amendment to an existing North Carolina statute to convert copyrighted works of plaintiffs and others into public record. N.C. Gen. Stat. § 121-25(b).

In their complaint and amended complaint, plaintiffs sought a declaratory judgment that § 121-25(b) is void and unenforceable because it is preempted by the Copyright Remedy Clarification Act (CRCA), 17 U.S.C. §§ 101 *et seq.*, and violates the Takings and Due Process Clauses of the U.S. Constitution. U.S. Const. amends. V and XIV. Plaintiffs further alleged claims of copyright infringement and unconstitutional taking pursuant to 42 U.S.C. § 1983, as well as state law claims for unfair and deceptive trade practices and civil conspiracy. Defendants

2

moved to dismiss plaintiffs' amended complaint, arguing that it is barred by the Eleventh

Amendment, that the individual defendants sued in their individual capacities are protected by

qualified and legislative immunity, that the complaint fails to state a plausible claim for relief,

that plaintiffs lack standing to challenge § 121-25(B) as amended, and that this Court should

abstain from issuing an opinion of first impression regarding North Carolina's public record

statute. Fed. R. Civ. P. 12(b)(1)–(2), (6).

On March 23, 2017, this Court entered an order denying in part and granting in part

defendants' motion to dismiss. The order allowed the claims for a declaratory judgment that §

121-25(b) is void and unenforceable and for copyright infringement to move forward upon

finding that North Carolina's Eleventh Amendment immunity for those counts was validly

abrogated by the CRCA. The order dismissed the remaining claims for unconstitutional taking

pursuant to § 1983, unfair and deceptive trade practices, and civil conspiracy because of

sovereign immunity. In dismissing the § 1983 claim, the Court relied on *Hutto v. South Carolina

Retirement System*, 244 F. Supp. 3d 536 (4th Cir. 2010), and found, "under Fourth Circuit

precedent, that plaintiffs' takings claims brought under § 1983 are barred by the Eleventh

Amendment when North Carolina courts are available for such a claim to be brought." *Allen v.

Cooper*, 244 F. Supp. 3d 525, 540 (E.D.N.C. Mar. 23, 2017) (citing *Hutto*, 773 F.3d at 552).

Defendants appealed this Court's March 23, 2017 order on April 21, 2017, and plaintiffs

cross-appealed on May 5, 2017. This Court granted plaintiffs' motion to stay the case on May

11, 2017, pending a final appellate decision. On July 10, 2018, the Fourth Circuit reversed this

Court's decision. To effect the Fourth Circuit's mandate, on August 24, 2018, this Court entered

an order dismissing plaintiffs' claims against North Carolina, the DNCR, and the public officials

acting in their official capacity without prejudice and dismissing the claims against the public

3

officials in their individual capacities with prejudice. This Court granted plaintiffs' motion to

stay on September 27, 2018, until after the U.S. Supreme Court ruled on plaintiffs' petition for

certiorari, and the Supreme Court granted the writ of certiorari on June 3, 2019. On April 24,

2020, the Supreme Court affirmed the Fourth Circuit's finding that there was no abrogation of

sovereign immunity based on Article I's Intellectual Property Clause or § 5 of the Fourteenth

Amendment in this case.[1]

On September 4, 2020, plaintiffs filed the instant motion for reconsideration asking this

Court to reconsider its 2017 order dismissing the claim for unconstitutional taking pursuant to §

1983. Plaintiffs claim that, although this Court relied on then-prevailing law at the time it

dismissed plaintiffs' takings claim, precedent has been changed by the Supreme Court's decision

in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), dated June 21, 2019. According to

plaintiffs, that change in the law constitutes a valid reason justifying reconsideration of this

Court's previous order and reinstitution of the case. Plaintiffs also argue that, now that the

Supreme Court has rejected the CRCA as a prophylactic abrogation statute, it is appropriate to

consider plaintiffs' claim for case-by-case abrogation based on an actual violation of his

constitutional rights under *United States v. Georgia*, 546 U.S. 151 (2006).

## DISCUSSION

At the outset, this Court notes that plaintiffs have filed their motion pursuant to Rule 60

of the Federal Rules of Civil Procedure. Defendant has not objected to plaintiff moving pursuant

to Rule 60. Under that rule, a court may relieve a party from a final order for a limited set of

circumstances, including mistake, fraud, and newly-discovered evidence. Fed. R. Civ. P. 60(b).

---

[1] Following the Supreme Court's decision, the case proceeded against defendant Friends of *Queen Anne's Revenge*. On August 17, 2020, plaintiffs filed a stipulation of voluntary dismissal dismissing the action, with prejudice, against defendant Friends of *Queen Anne's Revenge*, which stipulated to this dismissal. DE 104.

4

In addition to the specific categories for relief listed, Rule 60(b)(6) allows for a relief for "any other reason that justifies relief." *Id.* "To obtain relief from a judgment under Rule 60(b), a moving party must first show (1) that the motion is timely, (2) that he has a meritorious claim or defense, and (3) that the opposing party will not suffer unfair prejudice if the judgment is set aside." *United States v. Welsh*, 879 F.3d 530, 533 (4th Cir. 2018). The movant bears the burden of showing timeliness. *Moses v. Joyner*, 815 F.3d 163, 166 (4th Cir. 2016). Under Rule 60(b)(6), the party must also show the existence of "extraordinary circumstances." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005).

However, Rule 60(b) is applicable only to final orders. *Roberson v. Paul Smith, Inc.*, No. 5:07-CV-284-F, 2011 U.S. Dist. LEXIS 42978, at *5 (E.D.N.C. Apr. 20, 2011) (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991); *McLaurin v. E. Jordan Iron Works, Inc.*, 666 F. Supp. 2d 590, 596 n.2 (E.D.N.C. 2009)). Final judgments adjudicate and resolve all claims as to all parties. *See Benedict v. Hankook Tire Co.*, No. 3:17-cv-109, 2018 U.S. Dist. LEXIS 58616, at *5 (E.D. Va. Apr. 5, 2018); *Moore v. Lightstorm Entm't*, No. RWT-11-3644, 2013 U.S. Dist. LEXIS 112366, at *8 (citing *Millville Quarry Inc. v. Liberty Mut. Fire Ins. Co.*, 217 F.3d 839, [published in full-text format at 2000 U.S. App. LEXIS 17495], at *8 (4th Cir. 2000) (unpublished)).

In this case, the Court's order dismissed only some of the defendants and some of the claims. Since the order did not resolve all claims as to all parties, it was not a final order. *See Quigley v. United States*, 865 F. Supp. 2d 685, 699 (D. Md. 2012) (finding that an order dismissing claims against only one defendant was not a final judgment) (quoting Fed. R. Civ. P. 54). Rule 60(b) is not applicable. Rather than deny the motion because it cites to Rule 60(b), the

5

Court will construe plaintiffs' Rule 60(b) motion as a Rule 54(b) motion to reconsider. *Id.* (citing

*Fayetteville Inv'rs*, 936 F.2d at 1469–70).

Rule 54(b) governs "any order or decision, however designated, that adjudicates fewer

than all the claims or the rights and liabilities of fewer than all the parties." Pursuant to this rule,

"[a]n interlocutory order is subject to reconsideration at any time prior to the entry of a final

judgment." *Fayetteville Inv'rs*, 936 F.2d at 1469. "'[A] district court retains the power to

reconsider and modify its its [sic] interlocutory orders' at any time prior to final judgment, and

the exercise of such 'power is committed to the sound discretion of the district court." *Roberson*,

2011 U.S. Dist. LEXIS 42978, at *5–6 (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326

F.3d 505, 514–15 (4th Cir. 2003)). A court may revise such an order "under the same

circumstances in which it may depart from the law of the case: (1) 'a subsequent trial

produc[ing] substantially different evidence'; (2) a change in applicable law; or (3) clear error

causing manifest injustice." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (noting

the similarity of this standard to that applicable to Rule 59(e) motions, except that the law-of-the-

case standard allows for new evidence discovered during litigation as opposed to evidence not

available at trial to serve as basis for reconsideration motion) (alteration in original) (citing *Am.

Canoe*, 326 F.3d at 515). This is a lower standard than that of Rule 60(b). *See Am. Canoe*, 326

F.3d 505, 514–15 (4th Cir. 2003) ("Motions for reconsideration of interlocutory orders are not

subject to the strict standards applicable to motions for reconsideration of final judgments.").

I. Plaintiffs' Takings Claim under *Knick*

In determining whether to grant a motion to reconsider pursuant to Rule 54(b), a district

court may look to the Rule 60(b) principles, although it is not bound by that rule. *See Fayetteville

Inv'rs*, 936 F.2d at 1470 (favorably citing a case that used parts of Rule 60(b) in reaching its

conclusion on a motion to reconsider an interlocutory order). Since the parties have argued the motion based on the Rule 60(b) principles and since Rule 60(b) is a more stringent standard than that of Rule 54(b), the Court considers these principles in its analysis. Regardless of whether the Court addresses the issue of reconsideration on the standard of Rule 60(b) or Rule 54(b), plaintiff's request for relief is granted.

*Timeliness*

Plaintiffs filed this motion for reconsideration three-and-a-half years after this Court entered its order dismissing plaintiffs' takings claim. However, plaintiffs argue that their motion to reconsider is nevertheless timely because plaintiffs gave notice of their intent to seek reconsideration just thirteen months after *Knick* allegedly changed the previously-applicable Fourth Circuit precedent and less than ninety days after the lawsuit returned to this Court from the Supreme Court. Courts must determine, based on the circumstances in the case, whether a delay in filing a Rule 60(b) motion is reasonably timely. *Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*, 859 F.3d 295 (4th Cir. 2017); *see also Cox v. Horn*, 757 F.3d 113, 122 (3rd Cir. 2014) (finding that "a district court must consider the full measure of any properly presented facts and circumstances attendant to the movant's request" when determining whether a Rule 60(b)(6) motion is timely); *Days Inn Worldwide, Inc. v. Patel*, 445 F.3d 899, 906 (6th Cir. 2006) ("What constitutes a reasonable time depends on the facts of each case.").

Upon considering the particular circumstances of this case, the Court finds that plaintiffs' delay in filing this motion is reasonably timely. At no point in this case have plaintiffs been dilatory in pursuing the action. Plaintiffs appealed this Court's 2017 order, and they defended against defendants' appeals to both the Fourth Circuit and the Supreme Court. Although plaintiffs filed the instant motion three-and-a-half years after this Court's order of dismissal,

7

based on the facts of this case, this Court determines the starting point for the timeliness inquiry should be the date the Supreme Court affirmed the Fourth Circuit's judgment in this case, or April 24, 2020, rather than the date this Court entered its order of dismissal. *Moses*, 815 F.3d at 165–66 (using the date of a Supreme Court decision creating a change in habeas procedural law as the starting point for the Rule 60(b) timeliness inquiry, rather than the date of the Court's order of dismissal filed nine years prior to the motion for reconsideration at issue); *Werner v. Carbo*, 731 F.2d 204, 207 (4th Cir. 1984) (using the date the Supreme Court denied certiorari to the former decision on appeal as the starting point for the Rule 60(b) timeliness inquiry).

The Court further finds that a delay of eighty-two days between the Supreme Court's order and plaintiff's request to seek reconsideration is reasonably timely. *See id.* at 207 (finding a Rule 60(b) motion timely following a delay of less than eleven weeks); *Wells Fargo Bank*, 859 F.3d at 300 (suggesting a three-and-a-half-month delay in filing a Rule 60(b) motion may be reasonable assuming the moving party was diligent in seeking relief) (citing *Bouret-Echevarria v. Caribbean Aviation Maint. Corp.*, 784 F.3d 37 (1st Cir. 2015)); *Jones v. United States*, No. 5:13-CR-141-FL-1, 2020 U.S. Dist. LEXIS 6206, at *10 (E.D.N.C. Jan. 10, 2020) (finding a Rule 60(b) motion timely when filed approximately four months after the court entered judgment); *Kerr v. United States*, No. 5:08-CR-302-FL-1, 2020 U.S. Dist. LEXIS 1036, at *7 (E.D.N.C. Jan. 3, 2020) (finding a Rule 60(b) motion timely when filed approximately three months after the court entered judgment).

*Meritorious Claim or Defense*

This Court must also determine whether plaintiffs' claim that the Supreme Court's decision in *Knick* changed Fourth Circuit precedent is meritorious. In its 2017 order, this Court relied on *Hutto* and found, "under Fourth Circuit precedent, that plaintiffs' takings claims

brought under § 1983 are barred by the Eleventh Amendment when North Carolina courts are available for such a claim to be brought." *Allen*, 244 F. Supp. 3d at 540.

In *Knick*, plaintiff sued a municipality, the Township of Scott in Pennsylvania, alleging that an ordinance passed by the municipality violated the Takings Clause of the Fifth Amendment. 139 S. Ct. at 2168. The district court dismissed the takings claim because plaintiff had not pursued an inverse condemnation action in state court, but the Supreme Court granted certiorari to reconsider the issue of whether property owners must seek just compensation under state law in state court before bringing a federal takings claim. *Id.* at 2169. Upon consideration of the issue, the Supreme Court found that "a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim under § 1983 at that time." *Id.* at 2177. It also concluded that, "because the violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action." *Id.* Based on this conclusion, the Supreme Court overruled the doctrine of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), which held that a plaintiff could not bring a federal takings claim in federal court until a state court had denied his claim for just compensation under state law in a state court. *Id.* at 2169, 2179.

1. Applicability of *Knick*

In *Hutto*, the Fourth Circuit held that "the Eleventh Amendment bars Fifth Amendment taking claims against States in federal court when the State's courts remain open to adjudicate such claims." 773 F.3d at 552. *Knick* involved a suit against a municipality, rather than a State. Since local governments have no claim to sovereign immunity, *Jinks v. Richland Cty.*, 538 U.S.

9

456, 466 (2003) ("[M]unicipalities, unlike States, do not enjoy a constitutionally protected immunity from suit."). *Knick* did not address the issue of sovereign immunity.

Defendants argue that since *Knick* did not directly address the issue of sovereign immunity, *Knick* cannot have overturned *Hutto*. However, the Court finds it necessary to consider the reasoning of the Supreme Court in *Knick*. After considering the main points the Supreme Court relied upon in *Knick*, the Court finds that *Knick* would have reached the same conclusion had it involved a taking by a state government rather than a township.

In reaching its conclusion in *Knick*, the Court relied upon three primary points. First, the Court relied on the long-standing principle that "[t]he Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Knick*, 139 S. Ct. at 2170. *See also Jacobs v. United States*, 290 U.S. 13, 17 (1933) (holding that a property owner found to have a valid takings claim is entitled to compensation as if it had been "paid contemporaneously with the taking") (citing *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 306 (1923)); *First English Lutheran Church of Glendale v. Cty. of Los Angeles*, 482 U.S. 304, 315 (1987) (finding that a property owner has a constitutional claim for just compensation at the time of the taking because of "the self-executing character" of the Takings Clause "with respect to compensation"). Second, the Court found that *Williamson County* created a preclusion trap in which a plaintiff "cannot go to federal court without going to state court first; but if he goes to state court first and loses, his claim will be barred in federal court." *Knick*, 139 S. Ct. at 2167. Finally, the Court relied on the argument that the Fifth Amendment and the federal civil rights statutes "guarantee[] 'a federal forum for claims of unconstitutional treatment at the hands of state officials,' and the settled rule is that

10

'exhaustion of state remedies is *not* a prerequisite to an action under § 1983.'" *Id.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 480 (1994)).

After applying each of the Supreme Court's primary points to the case at hand, the Court finds that the reasoning in *Knick* still applies, even though this case involves the issue of sovereign immunity, and that *Hutto*'s holding that sovereign immunity applies to cases against States in federal courts when the State's courts remain open to adjudicate such claims is fatally undermined. First, the constitutional violation here, as in *Knick*, arose at the time of the taking without regard to post-taking remedies available to plaintiffs, including any potential state proceedings. *Knick* established that "[t]he fact that the State has provided a property owner with a procedure that may subsequently result in just compensation cannot deprive the owner of his Fifth Amendment right to compensation under the Constitution, leaving only the state law right." *Id.* at 2171. Plaintiffs may bring a federal constitutional claim despite the availability of other compensation remedies, such as an inverse condemnation claim under state law. *Id.* ("The availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's constitutional claim."). The Supreme Court, in reaching its decision, relied on *First English*, stating that "in the event of a taking, the compensation remedy is required by the Constitution." *Id.* at 2171 (quoting *First English*, 482 U.S. at 316). In doing so, the court decisively endorsed the decision in *First English*, including its statement that the Constitution, "of its own force, furnish[es] a basis for the court to award money damages against the government," notwithstanding principles of sovereign immunity. *Id.* at 2172 (quoting *First English*, 482 U.S. at 316 n.9).

In reaching its decision, the *Hutto* court relied on a line of tax cases under the Due Process Clause, holding that due process requires a remedy to recover payments pursuant to an

11

unlawful tax, but that States may choose whether to provide a pre-payment or post-payment remedy. *See* 773 F.3d at 551–52 (citing *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18 (1990); *Reich v. Collins*, 513 U.S. 106 (1994)). However, the Supreme Court notes in *Knick* that "the analogy from the due process context to the takings context is strained." 139 S. Ct. at 2174. Unlike in the due process context, "[a] later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place . . . . A bank robber might give the loot back, but he still robbed the bank." *Id.* at 2172.

Therefore, the Takings Clause requires a compensatory remedy without regard to what remedies state law may provide. *Id.* at 2170. Even though *Knick* was not a sovereign immunity case, its conclusion that a compensatory remedy is constitutionally-required was necessary to its decision and is contrary to *Hutto*'s conclusion that state sovereign immunity can bar takings claims brought under the Fourteenth Amendment. *See also Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) (noting that the Fourteenth Amendment's "sections by their own terms embody limitations on state authority," including state sovereign immunity).

Second, using *Hutto* to require plaintiffs to exhaust their state takings remedies before turning to federal court creates the same preclusion trap *Knick* objected to. *Knick* noted that requiring a plaintiff to seek just compensation under state law generally precludes any subsequent federal suit, leaving a takings plaintiff "in a Catch-22: He cannot go to federal court without going to state court first; but if he goes to state court and loses, his claim will be barred in federal court." 139 S. Ct. at 2167. Thus, just like *Williamson County*'s ripeness rule, *Hutto*'s holding that a federal plaintiff must sue in state court to avoid sovereign immunity "hand[s] authority over federal takings claims to state courts." *Id.* at 2170 (quoting *San Remo Hotel, L.P.*

12

*v. City and Cty. of San Francisco*, 545 U.S. 323, 350 (2005) (Rehnquist, C.J., concurring in judgment) (alteration in original)).

Third, enforcing *Hutto* after *Knick* by allowing States to take responsibility for federal takings litigations flies in the face of both the Fourteenth Amendment and federal rights statutes enforcing the Amendment. The Fourteenth Amendment itself promises access to federal remedies in federal court. *See, e.g., McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 674 (1963) (holding that where plaintiffs assert the "depriv[ation] . . . of rights protected by the Fourteenth Amendment . . . [s]uch claims are entitled to be adjudicated in the federal courts"); *Home Tel. & Tel. Co. v. City of Los Angeles*, 227 U.S. 278 (1913) (rejecting interpretation of the Fourteenth Amendment's state action requirement that would have given state courts the first say as to federal rights claims). Defendants argue that *Knick* specifies when a plaintiff can bring a takings claim, but that only *Hutto* specifies the appropriate forum for such a claim when the defendant is a State. However, *Knick* specifically notes that the Supreme Court has consistently rejected interpretations of federal rights and remedies that would leave those rights at the mercy of state courts. 139 S. Ct. at 2172 ("The 'general rule' is that plaintiffs may bring constitutional claims under § 1983 'without first bringing any sort of state lawsuit, even when state courts actions addressing the underlying behavior are available.'") (quoting David Dana & Thomas Merrill, *Property: Takings* 262 (2002)). *Knick* does, in fact, address the appropriate forum for takings claims, and to hold otherwise would be to do exactly what *Knick* sought to avoid: "relegate[] the Takings Clause 'to the status of a poor relation' among the provisions of the Bill of Rights." *Id.* at 2170 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 392 (1994)).

13

2. Other Court Decisions Following *Knick*

Defendants argue that every appellate court to consider the issue at hand had concluded that *Knick* does not undermine the rule that sovereign immunity bars takings claims against States in federal court. While it is true that several circuits have considered whether *Knick* changed the states' immunity in takings claims, the analysis has almost exclusively been limited to whether *Knick* directly involved sovereign immunity. The Fifth Circuit and Tenth Circuit merely stated that *Knick* did not address sovereign immunity, and then ended their analysis there. *See Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) ("*Knick* did not involve Eleventh Amendment immunity, which is the basis of our holding in this case."); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456 (5th Cir. 2019) ("[T]he Court did not even have occasion to re-consider sovereign immunity law in *Knick*."). As previously discussed, this reliance on the fact that *Knick* involved a taking by a municipality and thus did not consider sovereign immunity is misplaced because *Knick*'s reasoning, which these courts neglect to mention, fatally undermined *Hutto*'s rule.

The Sixth Circuit went slightly further, but not by much. The court noted that "*Knick* says nothing about sovereign immunity," and then notes that *Knick* cited *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), which involved an administrative exhaustion procedure for federal takings of property. *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020). The Sixth Circuit concluded that, if Congress could require administrative exhaustion as a condition of its waiver of sovereign immunity, the Fifth Amendment's Takings Clause did not abrogate sovereign immunity. *Id.* However, *Ruckelshaus* involved a claim for injunctive relief, which is a distinction crucial to *Knick*'s reasoning. *See Knick*, 139 S. Ct. at 2175 (distinguishing respondents' reliance on cases concerning requests for injunctive relief from the case at hand).

14

Defendants also note that another judge in this district concluded that sovereign immunity continued to apply after *Knick. See Zito v. N.C. Coastal Res. Comm'n*, 449 F. Supp. 3d 567 (E.D.N.C. 2020). However, this case is distinct because it involved a taking of real property, a situation in which there is no federal preemption. *Id.* at 571–73. In fact, *Zito* acknowledged "*Hutto*'s tension with *Knick*," stating that plaintiffs raised "significant constitutional issues" under *Knick* and that "the guarantee of a federal forum rings hollow for takings plaintiffs, who are forced to litigate their claims in state court." *Id.* at 582 (quoting *Knick*, 139 S. Ct. at 2167).

After reviewing the other cases considering the interplay between *Hutto* and *Knick*, this Court finds that no other court has attempted to thoroughly consider the relevance of *Knick*'s reasoning to state sovereign immunity in this context. Although the Court recognizes these non-binding cases, there is nothing in these cases that leads the Court to doubt its conclusion that *Knick* would have reached the same result had it involved a State.

3. Longstanding Principles of Sovereign Immunity

Defendants further argue that this Court should continue to follow *Hutto* because its holding is consistent with the foundational principles of sovereign immunity. However, this Court has previously detailed in this case what it believes to be the proper understanding of the Eleventh Amendment: "The Eleventh Amendment was meant to be only what it purports to be by its plain language: a bar of suits against states by citizens of other states or nations brought under the federal courts' diversity jurisdiction." *Allen*, 244 F. Supp. 3d at 535. In support of its reasoning that the line of cases beginning at least as far back as *Hans v. Louisiana*, 134 U.S. 1 (1890), is incorrect and harmful to the country's rule of law, this Court stated that the position that the Eleventh Amendment was intended to constitutionalize a broad principle of sovereign immunity contradicts both the historical evidence and the plain meaning of the Amendment and

15

that the founders wrote a Constitution founded upon the sovereignty of the people, rather than that of the States. *Id.* at 535–540. While the Court does not deem it necessary to repeat its statements regarding the proper interpretation of the Eleventh Amendment in detail, the Court will respond to defendant's assertions that this kind of lawsuit strikes at the heart of North Carolina's sovereign immunity and that there is no historical evidence to show that the Framers intended the Takings Clause to limit sovereign immunity or that the Fourteenth Amendment was intended to abrogate States' sovereign immunity from takings claims.

It is well-established that sovereign immunity is not absolute, and that the Fourteenth Amendment was "enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) (citing *Fitzpatrick*, 427 U.S. 445). After considering the text of the Fourteenth Amendment and noting that it "quite clearly contemplate[d] limitations on [States'] authority," the Supreme Court concluded that whatever amount of sovereign immunity the States retained upon ratification of the Constitution was unmistakably reined in by the passage of the Fourteen Amendment. *See Fitzpatrick*, 427 U.S. at 448, 453, 456 ("[T]he Eleventh Amendment, and the principle of state sovereign immunity which it embodies are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." (citation omitted)). The Fourteenth Amendment's substance is not limited to Congress's action, as "the substantive provisions of the Fourteen Amendment . . . themselves embody significant limitations of state authority." *Id.* at 456. The States "surrender[ed] a portion of the sovereignty that had been preserved to them by the original Constitution" when they enacted the Fourteenth Amendment. *Alden v. Maine*, 527 U.S. 706, 756 (1999) (citing *Fitzpatrick*, 427 U.S. 445).

16

Furthermore, the text of the Fifth Amendment supports a finding of automatic abrogation. The Fifth Amendment Takings Clause is one of only two constitutional clauses that dictate a particular remedy, Richard H. Fallon et al., *Hart & Wechsler's Federal Courts and the Federal System* 849 (4th ed. 1996) (noting that the Constitution refers explicitly to remedies only in the Fifth Amendment's Just Compensation Clause and in safeguarding the remedy of habeas corpus against suspension by Congress), stipulating that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Although the Fifth Amendment only applies to the federal government, the just compensation requirement was extended to the States through the Fourteenth Amendment. *See Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (finding that Fourteenth Amendment due process requires just compensation when a state government takes private land for public use). Since the Constitution explicitly requires "just compensation," the text of the Fifth Amendment seems to require the government to provide money damages despite any applicable sovereign immunity bars, and there is no Eleventh Amendment language requiring a different outcome. Eric Berger, *The Collision of the Takings and State Sovereign Immunity Doctrines*, 63 Wash. & Lee L. Rev. 493, 519 (2006) (citing *SDDS, Inc. v. South Dakota*, 650 N.W.2d 1, 8–9 (S.D. 2002)).

Structurally, the Takings Clause would be stripped of much of its meaning if the government could simply bar suits for just compensation. State governments could take property whenever they wanted without providing any compensation unless they chose to waive their immunity. *Id.* at 525. Additionally, applying state sovereign immunity to the federal Constitution voids the Constitution's purpose of protecting the enumerated rights regardless of the State's political whims. *Id.* at 528–30 ("There is something deeply contradictory about including a right in the Constitution and then constructing a sovereign immunity barrier to prevent injured parties

17

from enforcing it."). This takes on even more meaning when considered with the fact that the Takings Clause is one of only two constitutional provisions that is remedially-oriented.

In conclusion, this Court finds that the reasoning of *Knick* and the longstanding principles of sovereign immunity support a finding that plaintiffs have met the Rule 60(b) requirement of a meritorious claim or defense, despite the decisions of other courts. *Knick* recognizes that the Fifth Amendment requires just compensation for state takings and allows a plaintiff to immediately bring a § 1983 claim in federal court upon the takings. *Knick* impliedly overrules *Hutto*, upon which this Court initially relied in dismissing plaintiffs' takings claim, to the extent *Hutto* requires state exhaustion or the election of a state remedy before proceeding in federal court. Thus, since plaintiffs are no longer required to bring their takings claim in state court before turning to federal court, this Court finds it unnecessary to consider defendant's argument that plaintiffs have viable state court remedies.

*Unfair Prejudice*

Defendants argue that plaintiffs fail to make a showing of any of the requisite procedural criteria for Rule 60(b)(6) relief, but they do not make any specific arguments as to what prejudice defendants would suffer if the instant motion to reconsider is granted. There is no evidence that defendants have relied on the Court's decision in a way that would cause unfair prejudice. *See Wells Fargo Bank*, 859 F.3d at 300–01 (finding unfair prejudice when defendant purchased property in reliance on the court's order). Instead, it appears only that defendants would suffer the prejudice "present when any judgment is vacated: the protraction of proceedings, the time and expense of a new trial, the loss of post-judgment interest." *Werner*, 731 F.2d at 206–07. Such prejudice does not rise to the level of unfair prejudice. *See id.*; *Liu v. Ma*, 1:15cv1026(JCC/TCB), 2016 U.S. Dist. LEXIS 173062, at *4 (E.D. Va. Dec. 14, 2016).

18

Therefore, plaintiffs have satisfied the requirement of showing that defendants, the non-moving party, will not suffer unfair prejudice if this Court's previous order is set aside.

*Extraordinary Circumstances*

Plaintiffs argue that the change in law brought about by *Knick* constitutes "extraordinary circumstances." A court may grant relief under Rule 60(b)(6) if "such action is appropriate to accomplish justice." *Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993) (citing *Klapprott v. United States*, 335 U.S. 601, 615 (1949)). The Fourth Circuit has established that "a change in decisional law subsequent to final judgment provides no basis for relief under Rule 60(b)(6)." *Id*. However, there is a distinction between cases in which a final judgment has been entered and cases where a final judgment has not been entered. *See Holland v. Virginia Lee Co.*, 188 F.R.D. 251, 252–53 (W.D. Va. 1999) ("[I]f the judgment in question has been executed, and thus its effects are no longer prospective, modification of the judgment under Rule 60(b)(6) ordinarily will be unavailable . . . . In contrast, where a change in law effects a consent decree or permanent injunction, a court may indeed find extraordinary circumstances present.") (citing *Hall v. Warden, Md. Penitentiary*, 364 F.2d 495, 496 (4th Cir. 1966); *Ritter v. Smith*, 811 F.2d 1398, 1402 (11th Cir. 1987)). In those cases in which a judgment has not been executed, a "significant change in the law or facts since the submission of the issue to the Court" is a basis for a motion to reconsider. *Henderson v. Clinton & Clinton*, No. 5:13-CV-635-FL, 2014 U.S. Dist. LEXIS 119225, at *18 (E.D.N.C. Aug. 15, 2014) (considering a motion to reconsider under Rule 59 of the Federal Rules of Civil Procedure) (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). This is because extraordinary circumstances are often implicated when prospective effect would be given to a judgment now known to be improper. *Holland*, 188 F.R.D. at 253; *contrast Agostini v. Felton*,

19

521 U.S. 203, 239 ("Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6), the only remaining avenue for relief on this basis from judgments lacking any prospective component.").

In this case, final judgment was never entered, and this Court was never asked to enter final judgment. Therefore, the Fourth Circuit rule that a change in decisional law is not a basis for relief under Rule 60(b)(6) does not apply. Instead of entering final judgment, this Court awaited the outcome of the appellate proceedings before moving forward and stayed the matter twice pending appeal, showing its retention of jurisdiction. In this posture, the concern that this Court will give effect to a decision now known to be improper, *see Holland* 188 F.R.D. at 253, outweighs the concern for finality, *see Dowell*, 993 F.2d at 48 (stating that "[t]here must be an end to litigation someday") (quoting *Ackermann v. United States*, 340 U.S. 193, 198 (1950)). Here, because final judgment has not been entered and because it would be against the interests of justice to effect a decision now known to be improper, the Court finds that the change in decisional law created by the Supreme Court's decision in *Knick* constitutes an "extraordinary circumstance" for the purposes of Rule 60(b)(6).

Defendants further argue that relief pursuant to Rule 60(b)(6) is inappropriate in this case, as this is merely a substitute appeal. *See Aikens v. Ingram*, 652 F.3d 496, 501 ("[I]f the reason asserted for the Rule 60(b)(6) motion could have been addressed on appeal from the judgment, we have denied the motion as merely an inappropriate substitute for an appeal."). When plaintiffs have made a "'voluntary, deliberate, free, [and] untrammeled choice' not to appeal the decision of the district court," plaintiffs "cannot be relieved of such a choice because hindsight seems to indicate to [them] that [their] decision not to appeal was probably wrong." *Dowell*, 993 F.2d at.

20

(first quoting *Ackermann*, 340 U.S. at 200 (internal citation omitted); and then quoting *id.* at 198).

However, the reason asserted for this motion to reconsider, which is the change in Fourth Circuit precedent resulting from the decision in *Knick*, could not have been addressed on appeal. The Fourth Circuit decision affirming this Court's dismissal of plaintiffs' takings claim based on sovereign immunity was entered on July 10, 2018, and mandate issued on August 17, 2018. The Supreme Court did not decide *Knick* until June 21, 2019, well after the period during which plaintiffs could have appealed the Fourth Circuit opinion on this basis. *Knick*, 139 S. Ct. 2162; Sup. Ct. R. 13(1) ("[A] petition for a writ of certiorari to review a judgment in any case . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment."). Even if the issue could have been addressed on appeal, this case is distinct from those of *Aikens* and *Dowell*. In both of those cases, plaintiff sought to reopen the action through a Rule 60(b)(6) long after final judgment has been entered. As previously discussed, final judgment was never entered in this case, and this Court retained jurisdiction by staying the case pending appeal twice. Therefore, this motion is not an improper or substitute appeal.

In conclusion, plaintiffs have shown that their motion to reconsider based on a change in decisional law following *Knick* is timely, presents a meritorious claim, would not cause defendant unfair prejudice, and presents extraordinary or compelling results. The Court therefore finds that plaintiffs meet the standard for reconsideration under either Rule 54(b) or Rule 60(b). Plaintiffs' takings claim is no longer dismissed.

II. Plaintiffs' Takings Claims Under *Georgia*

Plaintiffs also allege in their complaint that defendants intentionally infringed by repeating copying even after express notice, and plaintiffs argue that these allegations would

21

support a finding that defendants' conduct violated the CRCA, the Fifth Amendment, and the Fourteenth Amendment. Plaintiffs ask this Court to allow these claims to proceed under *Georgia*. Plaintiffs seek reinstatement of their lawsuit and an opportunity to amend their complaint to plead the consequences of defendants' intentional infringements more fully.

This Court finds that reconsideration of its previous order of dismissal is appropriate in this case under the Rule 54(b) standard. While the Court acknowledges that "[a] Rule 54(b) motion should not be used as an opportunity to rehash issues already ruled upon because a litigant is displeased with the result," this is not the case here. *Ashmore v. Williams*, No. 8:15-cv-03633-JMC, 2017 U.S. Dist. LEXIS 234, at *9 (D.S.C. Jan. 3, 2017) (citing *U.S. Home Corp. v. Settlers Crossing, LLC*, No. DKC 08-1863, 2012 U.S. Dist. LEXIS 150160, at *10 (D. Md. Oct. 18, 2012)). This Court recognized in its 2017 opinion that Congress can abrogate state immunity prophylactically, by imposing liability on States for all violations of a particular statute, or on a case-by-case basis, by imposing liability on States where conduct violates both a federal statute and plaintiffs' constitutional rights. *See Allen*, 244 F. Supp. 3d at 534 (citing *Georgia*, 546 U.S. at 158). Because this Court found that the CRCA was a valid prophylactic abrogation of state sovereign immunity, it never considered whether plaintiffs have a valid claim for abrogation under *Georgia*. Notably, this Court never expressly closed the door to a valid claim of case-by-case abrogation under *Georgia*. Because this Court, the Fourth Circuit, and the Supreme Court all passed on the *Georgia* issue, it is appropriate to consider this claim for case-by-case abrogation following the Supreme Court's decision rejecting the CRCA as a valid prophylactic statute.

The Court further finds that plaintiffs still have viable claims under *Georgia*. In *Georgia*, the Supreme Court noted that "§ 5 [of the Fourteen Amendment] grants Congress the power to

22

'enforce . . . the provisions' of the Amendment by creating private remedies against the States for *actual* violations of those provisions." 546 U.S. at 158 (alteration in original). The court specifically stated that "[t]his enforcement power includes the power to abrogate sovereign immunity by authorizing private suits for damages against the States." *Id.* at 158–59 (citing *Fitzpatrick*, 427 U.S. at 456). Based on these findings, the *Georgia* court unanimously concluded that abrogation of sovereign immunity necessarily occurs when a plaintiff can establish both a statutory violation of a federal law and a constitutional violation. *Id.* When a plaintiff has established both these elements, "the court need not examine whether that statute could validly prohibit facially constitutional conduct." *Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents of the Univ. Sys. of Georgia*, No. 3:07-CV-084 (CDL), 2008 U.S. Dist. LEXIS 32116, at *25 (M.D. Ga. Apr. 18, 2008), *aff'd in part*, *vacated in part on other grounds*, 633 F.3d 1297 (11th Cir. 2011). At oral argument before the Supreme Court in the present case, the State conceded the legal validity of the case-by-case abrogation under *Georgia*, stating that "whenever a plaintiff can reasonably allege that there has been intentional copyright infringement and there are not adequate remedies, then, under this Court's *Georgia* decision, they can bring a direct constitutional claim." Tr. of Oral Arg., *Allen v. Cooper*, at 39–40 (Nov. 5, 2019).[2]

In this case, plaintiffs have alleged that defendants' conduct amounted to a taking without compensation and simultaneously violated both the CRCA and the Fifth Amendment. Although the Supreme Court ruled that the CRCA was unconstitutional insofar as it attempted to abrogate sovereign immunity prophylactically, *see Allen v. Cooper*, 140 S. Ct. 994, 1007 (2020), the

---

[2] Defendants argue that they made no concessions justifying reconsideration of the prior dismissal of plaintiffs' takings claim. The Court agrees with defendants, and notes that counsel for the State defendants did not concede that the claims were viable in this case, even though counsel acknowledged that constitutional claims may more generally be viable in federal courts under *Georgia*.

23

statute remains whenever plaintiff alleges both a constitutional violation as well as a statutory violation. Therefore, plaintiffs can still use the CRCA as a basis for its *Georgia* claim.

Defendant argues that plaintiffs' *Georgia* argument fails on the merits. However, plaintiffs seek an opportunity to amend to allege more facts to buttress the allegations of taking without due process, intentional infringements, and those responsible. Rule 15 of the Federal Rules of Civil Procedure provides that a party may amend his pleadings with leave of the court. Fed. R. Civ. P. 15(a)(2). Further, Rule 15 directs that leave to amend be freely given when justice requires. *Id.* "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (citing *Conley v. Gibson*, 335 U.S. 41, 48 (1957)). The Court has determined that *Georgia* serves as a valid basis for plaintiffs to bring their constitutional claims, and plaintiffs will have the opportunity to show that defendants have intentionally deprived their intellectual property without adequate state remedies to provide due process of law in an amended complaint.

In conclusion, this Court finds that reconsideration of its prior order dismissing plaintiff's takings and constitutional claims is appropriate in light of the Supreme Court's decision in *Knick* and its rejection of the CRCA as a valid prophylactic abrogation of state sovereign immunity. Plaintiffs may amend their complaint to buttress their allegations of "a modern form of piracy." *Allen*, 140 S. Ct. at 999.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for reconsideration [DE 105] is GRANTED. Plaintiffs' takings claim and constitutional claims under *Georgia* are no longer dismissed. Plaintiffs may amend their complaint within twenty-one days of the date of entry of this order.

24

SO ORDERED, this __18__ day of August, 2021.

Terence W. Boyle
_____
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

25

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## Civil Case No. 5:15-cv-627-BO

| | |
|---|---|
| FREDERICK L. ALLEN and NAUTILUS PRODUCTIONS, LLC<br>     Plaintiffs<br><br>          v.<br><br>ROY COOPER, Governor of the State of North Carolina, *in his official capacity*, JOSH STEIN, Attorney General of North Carolina of North Carolina, *in his official capacity*, D. REID WILSON, *in his individual and official capacity*, DR. KEVIN B. CHERRY, *in his individual and official capacity*, SARAH KOONTS, *in her individual and official capacity*, JOSEPH K. SCHWARZER II, *in his individual and official capacity*, MIKE CARRAWAY, *in his individual and official capacity*, and the STATE OF NORTH CAROLINA, *a body politic*,<br>     Defendants | **PLAINTIFFS' SECOND AMENDED COMPLAINT** |

## INTRODUCTION

1. This lawsuit is about Piracy, Greed, and Revenge.

2. The Plaintiffs in this case are Frederick Allen and his company, Nautilus Productions LLC (collectively, "Allen"; the Complaint uses the term "Rick Allen" to refer to Rick Allen individually). Allen is an underwater videographer and documentarian. Over the last three decades, Allen has spent thousands of hours and hundreds of thousands of dollars documenting the excavation and recovery of *Queen Anne's Revenge* ("QAR"), Blackbeard's flagship.

3. Allen's footage has immense value and represents the pinnacle of underwater photography.

4. Defendants recognized the value of Allen's work and sought to use Allen's footage to earn millions of dollars, enhance their personal and political reputations, promote North Carolina tourism, and bring much needed support to the state's maritime museums. Yet, like Blackbeard himself, Defendants refused to pay for the treasure, choosing instead to steal it.

1

5. Over the last two and a half decades, Defendants have used, copied, distributed, and performed Allen's footage without permission or payment, and often without attribution.

6. Defendants have also taken, and have retained, without Allen's consent, Allen's physical media and have refused to return it.

7. In 2013, Defendant North Carolina ("the State"), through the North Carolina Department of Natural and Cultural Resources ("DNCR"), entered into a settlement agreement ("the Agreement") whereby it agreed to stop infringing Allen's copyrights and to return Allen's physical media.

8. The State did not honor the Agreement. It did not return all of Allen's physical media, continued to infringe Allen's copyrights, and violated numerous other terms of the settlement.

9. When Allen brought these deficiencies to the State's attention, the State retaliated by passing "Blackbeard's Law," N.C. Gen. § 121-25(b), which purports to place the vast majority of Allen's work—including *all* of Allen's work on the QAR—***into the public domain***. The statute states:

> All photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions shall be a public record pursuant to G.S. 132-1. There shall be no limitation on the use of or no requirement to alter any such photograph, video recordings, or other documentary material, and any such provision in any agreement, permit, or license shall be void and unenforceable as a matter of public policy.

10. Blackbeard's Law does not provide any compensation to Allen. Adding insult to the no compensation injury, Defendants passed Blackbeard's Law without a modicum of notice or opportunity to be heard. It is a garish trespass on the Takings Clause of the Fifth Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

11. Blackbeard's Law is an unconstitutional Bill of Attainder and *ex post facto* law. Blackbeard's Law specifically targets Allen and seeks to punish Allen for asserting his rights and for Allen's perceived role in an ongoing and contentious feud between archaeologists

2

and treasure hunters.  In addition to taking Allen's past work, the statute functionally prevents Allen from engaging in any future work in his chosen profession.

12. Blackbeard's Law also purports to "void" any agreement that restricts Defendants' ability to use Allen's footage, and so violates the United States Constitution's prohibition on laws "impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.

13. Since passing Blackbeard's Law, Defendants have claimed they are free to use Allen's life work however they want, as much as they want, without providing any compensation.  In keeping with that policy, Defendants have copied, distributed, sold, and publicly performed Allen's work *thousands* of times since passage of Blackbeard's Law, all without permission or compensation.

14. Allen brings this lawsuit to fight back against Defendants' piracy of his life's work. Blackbeard was an outlaw, not a role model.

15. Allen seeks a declaratory judgment that Blackbeard's Law is and has always been unconstitutional.

16. Allen also seeks just compensation for the state's takings of his property, both physical and intellectual, and for the state's takings of his livelihood.

17. Allen also seeks an order to enjoin state actors from engaging in further copyright infringements or takings, and an order enjoining the state's ongoing policy to treat Allen's work as belonging to the public domain.

18. Allen also seeks to hold several Defendants responsible under 28 U.S.C. § 1983, for their personal involvement in the misappropriation of his intellectual property.

## PARTIES, JURISDICTION, AND VENUE

19. Plaintiff Frederick Allen is a resident of Fayetteville, North Carolina.  He has been a videographer since 1983.  Allen is one of the world's leading underwater videographers. Over the years, Allen has collaborated with and licensed his work to several of the world's most prestigious networks, including ABC, A&E, BBC, CBS, Discovery, National Geographic, and TBS.  For nearly two decades, Allen was the project videographer on the *Queen Anne's Revenge* Shipwreck Project.

20. Plaintiff Nautilus Productions LLC ("Nautilus") is a North Carolina company located in Cumberland County.  Allen organized Nautilus and uses Nautilus to license and monetize his work.  Nautilus specializes in marine video footage, photography, and documentary production.

21. Defendant Roy Cooper III ("Governor Cooper") is the Governor of the State of North Carolina. Governor Cooper is a domiciled resident of Wake County. Governor Cooper is sued in his official capacity. Governor Cooper was the North Carolina Attorney General when "Blackbeard's Law" was passed. Governor Cooper now has overarching control over the actions of the State and its agencies, and is responsible for those actions as a part of his official duties.

22. Defendant Joshua Stein ("Attorney General Stein") is North Carolina's Attorney General. He is North Carolina's chief law enforcement officer. Attorney General Stein is a domiciled resident of Wake County. He is sued in his official capacity. By North Carolina statute, he is authorized to enforce all North Carolina laws, including Blackbeard's Law.

23. The North Carolina Department of Cultural and Natural Resources ("DNCR") is a state agency and a subdivision of North Carolina. It is currently led by D. Reid Wilson (another Defendant), and it is the statutory designee of North Carolina's public records. At all times, it has benefited and profited from Allen's works. DNCR has the authority to control public records in North Carolina, and it has authorized, controlled, and directed those within its control to take and infringe Allen's works. DNCR and those acting within its control spearheaded the effort to enact Blackbeard's Law.

24. Defendant Susan Kluttz ("Secretary Kluttz") is a North Carolina citizen domiciled in Rowan County. Secretary Kluttz was the former Secretary of the DNCR and supervised and controlled the actions of that agency. Secretary Kluttz signed the Settlement Agreement (attached as Exhibit 1) and was responsible for implementing and enforcing the Settlement Agreement. Secretary Kluttz controlled or had the ability to control DNCR's use of Allen's QAR footage. Secretary Kluttz authorized, controlled, and directed DNCR and DNCR's agents' use of "public records," including their use of materials that were classified as public records pursuant to Blackbeard's Law. Secretary Kluttz was instrumental in seeking and implementing Blackbeard's Law. She is sued in her individual and official capacities.

25. Defendant Cary Cox is an individual North Carolina citizen residing in Cabarrus County, North Carolina. Cox served as Assistant Secretary, Marketing and Communications of the North Carolina Department of Natural and Cultural Resources and supervised and controlled the actions of that agency. She at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by the North Carolina Department of Natural and Cultural Resources in its marketing and communications, and controlled or had the right and obligation to control dissemination of Plaintiffs' copyrighted works to third parties. She is sued in her individual and official capacities.

26. Defendant D. Reid Wilson ("Secretary Wilson") is a North Carolina citizen residing in Wake County. Secretary Wilson is the current DNCR Secretary. Defendant Wilson supervises and

4

controls DNCR and the actions of DNCR. Secretary Wilson is responsible for implementing and enforcing the Settlement Agreement. Secretary Wilson controls and has the ability to control DNCR's use of Allen's QAR footage.  Mr. Wilson is sued in his individual and official capacities.

27. Defendant Sarah Koonts is a North Carolina citizen residing in Wake County. Ms. Koonts serves as North Carolina's chief State Archivist, and as such she substantially responsible for all public records in North Carolina.  She is responsible for managing State public records, including over 190,000 cubic feet of public records, private manuscripts, organizational records, and non-textual materials, as well as all of Allen's property that falls under the ambit of Blackbeard's Law.  She is sued in her individual and official capacities.

28. Defendant Stephen R. Claggett (also known as "Steve Claggett") is an individual North Carolina citizen, resides in Wake County, North Carolina.  Claggett served as the State Archaeologist of the State of North Carolina, within the DNCR. He participated in the negotiations leading to the Settlement Agreement, was present when it was signed, and knew its provisions. He controlled or had the right and obligation to control use of Allen's copyrighted works by the North Carolina Department of Natural and Cultural Resources. He is sued in his individual and official capacities.  Claggett was the State *Archaeologist* at North Carolina Office of State *Archaeology (OAH)* and had supervisory responsibility over all *Queen Anne's Revenge* Project activities.

29. Defendant Kevin Cherry ("Dr. Cherry") is a North Carolina citizen. Dr. Cherry previously served as DNCR's Deputy Secretary. Dr. Cherry oversaw DNCR's content archival methods, including methods that infringed Allen's copyrights and took his property without compensation. He had the ability to control DNCR's use of Allen's property, including the posting of Allen's materials to the Internet.  Dr. Cherry personally participated in the negotiations that led to the Settlement Agreement. He at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by those offices and divisions of the North Carolina Department of Natural and Cultural Resources supervised by him, including the posting of Plaintiffs' materials to DNCR's YouTube channel without Plaintiffs' consent as hereafter set out. He is sued in his individual and official capacities.

30. Defendant Joseph K. Schwarzer II is a North Carolina citizen residing in Orange County. He is the director of the North Carolina Maritime Museum system. He controls or has the ability to control video footage and images being displayed in all three of North Carolina's Maritime Museums. Mr. Schwarzer has allowed Allen's property to be displayed and performed at the North Carolina Maritime Museum in Beaufort. He is sued in his individual and official capacities.

5

31. Defendant Mike Carraway is a North Carolina citizen residing in Carteret County. As the Exhibits Curator at the North Carolina Maritime Museum in Beaufort, he is responsible for posting Allen's underwater documentary footage of the *Queen Anne's Revenge* without Allen's permission, in violation of the Settlement Agreement, and without just compensation. Mr. Carraway is sued in his individual and official capacities.

32. Defendant(s) Jane Doe is a North Carolina citizen of unknown gender(s) who works at the North Carolina Maritime Museum in Beaufort, North Carolina. Jane Doe was and is responsible for publicly performing Allen's underwater documentary footage of the *Queen Anne's Revenge* without Allen's permission, in violation of the Settlement Agreement, and without just compensation. Jane is sued in their individual and official capacities.

33. Defendant(s) John Doe is a North Carolina citizen of unknown gender(s) who works for DNCR. John took, copied, and publicly performed Allen's copyrighted works by uploading Allen's video footage and images to the DNCR social media website and to various other sites on the Internet. John Doe is sued in their individual and official capacities.

34. Defendant(s) Jill Doe is a North Carolina citizen of unknown gender(s) who works for DNCR. Jill took, copied, and distributed Allen's copyrighted work, including by sending Allen's work to the *Friends of Queen Anne's Revenge*. Jill Doe is sued in their individual and official capacities.

35. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims arising under the Constitution and laws of the United States and claims relating to constitutional torts set out in 28 U.S.C. § 1983. The Court has subject matter jurisdiction under 28 U.S.C. § 1338 over the claims relating to and arising from the Copyright Act.

36. This Court is authorized to declare under 28 U.S.C. §§ 2201-02 that Blackbeard's Law is invalid, unconstitutional, and unenforceable as preempted by federal law, 17 U.S.C. §301, as a violation of the Takings Clause and Due Process Clause of the United States Constitution, Amends. V and XIV, and as an illegal Bill of Attainder, ex post facto law, and law impairing the obligation of contracts under Article I, § 10 of the United States Constitution.

37. This Court has personal jurisdiction over all parties under N.C. Gen. Stat. § 1-75.4.

38. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants are located within the Eastern District of North Carolina and because a substantial part of the acts giving rise to this Complaint arose from events occurring within this judicial district.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.** ***Queen Anne's Revenge*** **and Blackbeard's Legacy**

39. In November 1717, Edwin Teach, better known as Blackbeard, captured the *La Concorde* in the Caribbean and transformed her into a fear-inspiring warship with 40 cannons and over 300 crewmen.  After transformation, Blackbeard renamed the *La Concorde* the *Queen Anne's Revenge*.

40. Blackbeard used the *Queen Anne's Revenge* to build a fearsome reputation and plunder vessels on the high seas.  In late May 1718, in an act of sheer audaciousness, Blackbeard used the *Queen Anne's Revenge* to blockade Charleston Harbor and hold its inhabitants for ransom.  Weeks later, the *Queen Anne's Revenge* was destroyed when Blackbeard ran it aground near Beaufort Inlet, North Carolina.  The prevailing view is that Blackbeard *intentionally* destroyed his ship to create a diversion that allowed him to abscond with invaluable treasure, leaving his crew uncompensated.

41. Blackbeard is the most (in)famous pirate of all time.  The *Queen Anne's Revenge* is likewise the most famous pirate vessel of all time.  Hundreds of thousands of people from all over the world come to Beaufort to learn about both.

**B.  Discovery of the** ***Queen Anne's Revenge***

42. After the grounding of *Queen Anne's Revenge* tides, winds and waves quickly took over and the ship was soon lost to the depths where she remained untouched at the bottom of the ocean.

43. In the centuries that followed, the ship was lost to the vicissitudes of time—pummeled by hurricanes, buried in sand, and obscured from view.  The ship that had once *carried* priceless treasure had *become* priceless treasure.

44. But while the ship was lost, it was not forgotten.  Starting in the 1980s, archaeologists and treasure hunters from around the world began searching for the remains of *Queen Anne's Revenge*, all hoping to find and recover valuable historical artifacts.

45. One such treasure hunter was Philip Masters, the owner and operator of Intersal, Inc.  Intersal was founded in 1988 with the goals to find the Spanish galleon *El Salvador* and Blackbeard's *Queen Anne's Revenge* and to increase knowledge and awareness of America's rich maritime heritage by researching, locating, and excavating valuable historic shipwrecks.

46. Intersal spent years searching for both the *El Salvador* and *Queen Anne's Revenge* until finally, in November 1996, Intersal found the *Queen Anne's Revenge* remains just over a

7

mile off Bogue Banks, at a depth of just over twenty feet, and almost due south of Ft. Macon State Park, N.C.

## C. A Historic Feud and A Bold New Partnership

47. Intersal's discovery of *Queen Anne's Revenge* exacerbated a deep and longstanding feud between treasure hunters and archaeologists.

48. Archaeologists are academics who study human history and prehistory through the excavation of sites and the analysis of artifacts and other physical remains.

49. Treasure hunters (also referred to as salvagers) search for sunken shipwrecks and retrieve artifacts with market value in the hopes of monetary gain.

50. Archaeologists believe treasure hunters are driven by greed, with little or no respect for history or preservation protocols. According to the former President of the Society for Historical Archaeology, the prevailing view among archaeologists is that treasure hunters engage in "indiscriminate looting of our cultural heritage."[1] The Advisory Council on Underwater Archaeology has similarly accused treasure hunters of "engag[ing] in the destruction of our heritage for commercial reward," and of "exploit[ing] [] underwater cultural heritage."[2]

51. Treasure hunters, on the other hand, believe archaeologists lack the funding and resources needed for large scale recovery and excavation operations, and that, without the ability to profit, many historical artifacts would never be found. The prevailing view among treasure hunters is that archaeologists favor formalities and status over pragmatism, without any regard for the economics that drive recovery operations.

52. The feud between archaeologists and treasure hunters is well-known in the industry, including in North Carolina. One article explained:

> Talk to most treasure hunters and archaeologists and they're likely to bring up a fundamental problem souring the hunt for marine history: they don't particularly like each other.
>
> "The underwater archaeologists and the treasure salvors are like oil and water," [Dr. Charles] Ewen said. "There is very little common ground."

---

[1] https://sha.org/blog/2012/02/the-ethics-of-historical-archaeology/.
[2] https://acuaonline.org/deep-thoughts/a-matter-of-ethics-by-della-scott-ireton/.

8

It's not a problem limited to North Carolina.

"I think there's an unbridgeable gap between the archaeological community and the salvaging community," said Paul Johnston, a curator at the Smithsonian's National Museum of American History in Washington, D.C. "They're going after the same resources, but they have different plans for how to use it."

Ewen said he realized just how bad it was when he tried to plan a panel with both groups at a recent archaeology meeting in Quebec.

"There's that much bad blood that they would not be seen on the same panel," Ewen said. "It is a very sincerely, deeply held belief, I think, on both sides."[3]

53. Intersal recognized that its discovery of *Queen Anne's Revenge* carried immense historical value, and wanted to make sure the wreckage and its artifacts were properly preserved. To facilitate this goal, Intersal sought to transcend the archaeology-treasure hunter feud by forging a partnership with North Carolina's archaeologists and North Carolina's Department of Cultural Resources (DNCR).

54. As part of that partnership, Intersal did something that had never been done before—it agreed to forgo its interest in treasure to facilitate historical preservation and to improve its relationship with DNCR and State archaeologists.

55. Under the terms of its search permit, Intersal was entitled to keep 75% of all treasure recovered from *Queen Anne's Revenge* (with the remaining 25% belonging to the State). Nevertheless, Intersal wanted all recovered artifacts to remain together, as part of one historical collection. Thus, Intersal agreed to let the State keep 100% of the treasure.[4]

56. In exchange, the State agreed to "work in partnership" with Intersal to research, recover, and promote *Queen Anne's Revenge* project. The State also agreed that Intersal would have exclusive rights to create, market, and sell all commercial narratives related to the project, including all commercial video and photography projects.[5]

---

[3] https://www.wral.com/off-north-carolina-s-coast-lure-of-sunken-treasure-fades/14660654/.
[4] *See* Exhibit 1, Attachment A at 2 ("Intersal and Michael E. Daniel are willing to forego entitlement to any coins and precious metals recovered from the QAR site in order that all QAR artifacts remain as one intact collection and in order to permit the Department to determine ultimate disposition of the artifacts[.]").
[5] *Id.* at 2 & 6 ¶ 16.

9

**D. Allen Joins the QAR Project and Invests Thousands of Hours and Hundreds of Thousands of Dollars To Create Valuable Images and Videos of *Queen Anne's Revenge* and Its Treasures.**

57. Intersal asked Allen to serve as the exclusive underwater videographer for the QAR project.

58. Allen was an easy choice for the job. Allen is and was one of the best underwater videographers in the world. And as a North Carolina native, Allen was already familiar with the history of QAR and with the rough waters that would serve as the project's film site. With decades of underwater experience already under his belt, Allen knew what it would take to get the best shots and most compelling footage.

59. For Allen, QAR was the project of a lifetime and the highlight of his career. Allen sought to do what no one had ever done before: document the recovery of a lost ship from beginning to end—from the first underwater survey to the opening of the final *Queen Anne's Revenge* exhibit. Allen spent the next two decades working to make his dream a reality.

60. Capturing underwater footage of QAR is treacherous. The ship's wreckage was roughly 25 feet below the ocean surface and required Allen to dive and film in full Scuba gear. Because of the work environment, even one mistake could lead to serious injury, or even death.

61. Allen also had to carry and operate his underwater video equipment. All told, Allen had to maneuver with nearly 100 pounds of equipment.

62. Shooting conditions were also challenging. Debris and silt from the Newport River, shifting sand from Shackleford Banks, and a fierce current meant visibility was limited to just a few feet in any direction. Capturing underwater footage of the QAR in those conditions is like capturing footage of a coffee can in a washing machine full of grinds.

63. It takes ample patience and hours of dive time to capture only seconds or minutes of footage of the *QAR* wreckage. And each hour of dive time requires dozens of hours of time waiting on a hot barge's steel deck for the right conditions to dive. Allen did all of this and more.

64. For almost two decades, Allen faithfully documented the recovery of artifacts from the *Queen Anne's Revenge*. Allen also documented the historic efforts of divers and underwater archaeologists as they studied the shipwreck and sought to put pieces of history back together. In total, Allen spent thousands of hours collecting the footage, and invested over $150,000 in the project.

65. Allen also implemented innovative methods to create a live transmission from the ocean floor so that archaeologists could see and contribute to the recovery operation in real time. Allen's system involved creating an entire video studio on deck, which was then used to

10

manage a complex relay system to decode, transmit, reencode, and retransmit his footage. *DiveLive* was one of the earliest livestream events in the world.

66. Through his efforts, Allen produced a small but extremely valuable archive of video and still images relating to the *QAR* project. This footage has allowed Allen and others to produce webcasts, promotional videos, and numerous documentaries.

67. Allen's video and still images are property that belong to Allen and Nautilus. The physical media on which they are stored are Allen's physical property. The contents of the videos and images are Allen's intellectual property.

68. While Allen was the only videographer for the QAR project, he was not the only documentarian who attempted to capture footage of *QAR*. Over the years, a handful of other divers have attempted to capture underwater footage of the wreckage, to only limited success.

69. Allen declined other videography projects because he believed that being the first and only videographer to film the *Queen Anne's Revenge* shipwreck would pay off in the form of property. To this end, he paid for his own video equipment, diving equipment, film, air fills, videotape, meals, lodging, and gas to and from the wreck site because he believed that it would pay off in the form of being able to license his property to the likes of Discovery, BBC, CNN, PBS, History Channel, and even the State of North Carolina.

70. The copyrights in all of Allen's footage belong exclusively to Allen and are licensed to and commercialized by Nautilus. In accordance with Intersal's agreement with the State, Allen provided copies of his footage to DNCR to facilitate its use for non-commercial research and educational purposes. Specifically, Allen sent copies of his footage to three DNCR facilities: the Department of Natural and Cultural Resources in Raleigh, the North Carolina Underwater Archaeology Branch at Fort Fisher, and the *Queen Annes Revenge* Lab in Greenville, N.C.

71. Allen timely and thoughtfully secured copyright registrations for his work with the United States Copyright Office. Allen owns the works and creative property covered by these copyright registrations, including:

| Registration # | Title |
|---|---|
| PA0001694134 | *Queen Anne's Revenge*/Blackbeard Shipwreck Underwater Footage |
| PA0001846427 | *Queen Anne's Revenge* Footage 1999 |

11

| | |
|---|---|
| PA0001846499 | *Queen Anne's Revenge* Footage 2000 |
| PA0001846497 | *Queen Anne's Revenge* Footage 2001 |
| PA0001846494 | *Queen Anne's Revenge* Footage 2004 |
| PA0001846473 | *Queen Anne's Revenge* Footage 2005 |
| PA0001846465 | *Queen Anne's Revenge* Footage 2006 |
| PA0001846461 | *Queen Anne's Revenge* Footage 2007 |
| PA0001846457 | *Queen Anne's Revenge* Footage 2008 |
| PA0001846462 | *Queen Anne's Revenge* Footage 2010 |
| PA0001846470 | *Queen Anne's Revenge* Footage 2012 |
| PA0001872852 | *Queen Anne's Revenge* Footage 2013 |
| VA0001872055 | *QAR Anchor* Image 2013 |
| VA0001872054 | *Ballast1 (pile)* 2013 |
| PA0001919638 | *Queen Anne's Revenge* Footage 2014 |

72. Allen's copyrights have immense commercial value, as the works are the only high-quality imagery of *QAR* in existence.  Given the high demand for and use of his footage over the years, conservative estimates place the value of Allen's property at over $1 million.  In the first decade of the project, Allen licensed small portions of his work for use in over two dozen projects, including on BBC, National Geographic, PBS, the History Channel, the Discovery Channel, several international programs in Germany and Italy, and several cable television programs.

**E. Allen, Intersal, and DNCR Develop a Strong Relationship and Build Mutual Respect.**

73. For over a decade, from 1998-2010, the bold partnership between treasure hunters (Intersal) and archaeologists (DNCR and associated staff) proved to be a rousing success.  The success of the project is best illustrated from an article published in *Tributaries*, a magazine

12

published by the North Carolina Maritime History Council. The article, written by noted North Carolina historian, Dr. Lindley S. Butler, explains:

> The state of North Carolina was fortunate in 1996 that the Beaufort Inlet wreck was discovered by a salvor who understood and was deeply interested in history. Unlike underwater treasure projects in other states where clashes between governmental and private interests have led to long and bitter legal battles, in North Carolina there has been cooperation rather than conflict between Intersal, the discoverer of the wreck, and the state, represented by the Department of Cultural Resources. Crucial to this rare, almost unprecedented, partnership has been the understanding and concern that Phil Masters for Intersal and Mike Daniel for Maritime Research Institute, have shown for the importance of the state's history and artifacts.

74. Allen was an indispensable part of the QAR project, and was held in high esteem by everyone involved, archaeologists and treasure hunters alike.

75. With the growing popularity of Internet streaming, Allen recognized that unfettered distribution of his work on the Internet could eviscerate the value of his footage. Because DNCR had access to Allen's work, Allen wrote to the director of the QAR project, Mark Wilde-Ramsing, and the State's head archaeologist, Claggett, to caution them not to use Allen's footage in a way that would infringe his copyrights or destroy the value of his work.

76. Allen's letter included specific rules to govern the State's use of Allen's footage, including rules that limited the State's ability to post or distribute Allen's work on YouTube and other social media sites. Specifically, Allen instructed that the State should only post his videos on State websites, at low resolution, and with a "burned-in" URL located "at least 50 lines from the bottom" of the frame. The State acknowledged and did not dispute Allen's use guidelines.

77. Allen's instructions expressly placed Defendants on notice of their copyright obligations.

**F. Allen Sustains Life-Threatening Injuries; Defendants Infringe Allen's Copyrights.**

78. In January 2011, Rick Allen sustained life threatening injuries resulting from the explosion of a defective oxygen tank. He was in a coma for two months and lost his left arm.

79. While Rick Allen was recovering, one or more Jane Doe DNCR employees copied and uploaded several of Allen's copyrighted images and videos to several websites on the

Internet, including DNCR's social media website, YouTube, and Flickr. The videos were uploaded in their full original resolution, without watermarks, and in violation of each of the usage guidelines Allen had provided. Allen did not discover these violations until mid-2013.

80. At around the same time, one or more Jane Doe DNCR employees copied and distributed several of Allen's copyrighted images to persons outside of the government, with the understanding and intention that the materials be uploaded to the Internet. This included at least two Eastern North Carolina commercial entities.

**G. DNCR Installs a New QAR Project Director and Orchestrates an Extensive, Multi-Faceted Campaign to Oust Allen and Intersal from the QAR Project.**

81. In 2012, DNCR and the State's archaeologists decided they no longer wanted to work with treasure hunters and took steps to end the State's partnership with Intersal and Allen. The bold partnership between archaeologists and treasure hunters was over.

82. Claggett (the State's head archaeologist) hired John "Billy Ray" Morris to serve as the new director for the QAR project. Morris, who was deeply skeptical of treasure hunters, orchestrated a campaign to exclude Intersal and Allen from all QAR activities. This campaign was multi-faceted and included at least the following:

    a. Purging and isolating state employees who were viewed as allies of Allen and Intersal, and who believed treasure hunters and archaeologists should collaborate. For example, QAR Field Director Wendy Welsh was forced off the project for failing to "play politics" with Billy Ray Morris and other archaeologist hard-liners. Other ousted team members include Richard Lawrence (who had served as the Director of North Carolina's Underwater Archaeology Branch), Chris Southerly, and Nathan Henry, among others.

    **b. Attempting to reduce or eliminate Allen's ability to monetize his work by copying, posting, and distributing copies of Allen's work to the public.**

    c. Creating a new set of safety and insurance rules, but only enforcing those rules as to Allen. The rules were not enforced with respect to other team members, creating significant safety risks.

    d. Shifting responsibility for significant aspects of the QAR project from DNCR to a separate, independent organization ("Friends of Queen Anne's Revenge") that was not subject to any state oversight or compliance requirements. That organization also began a $2M fundraising campaign for the *Queen Anne's Revenge* Project in partnership with DCR but excluding Nautilus and Intersal.

14

    e.   Hiring new video production companies to replace Nautilus and Allen.

    f.   Threatening to exclude Allen from all state vessels, thus requiring Allen and Intersal to incur thousands of dollars in additional expenses to reach the QAR site.

    g.   Systematically ignoring and violating the media and notification terms of the 1998 contract between Intersal and DNCR.

    h.   Creating several media campaigns that sought to promote the QAR project while downplaying Allen's and Intersal's contributions to the project.

    i.   Seeking early termination of the 1998 contract between the State and Intersal.

83. Morris's campaign unfolded gradually and in secret. Allen did not discover the full extent of the operation until mid-2013, when a DNCR employee told Allen about Morris's changes. This was by design—Morris had instructed DNCR employees not to inform Allen about the changes to the project.

84. One of the marginalized state archaeologists explained how Morris's hostility towards Allen and Intersal impacted the QAR project: "Formerly, the [Underwater Archaeology Branch] was a highly cohesive, efficient, and effective team, working together to accomplish tasks and goals often with minimal funding or outside support. As you are undoubtedly aware, any illusion of team, cohesiveness, or even morale is just that: an illusion."

85. The State's infringement of Allen's copyrights was especially egregious. The following table summarizes DNCR's known copyright infringements through 2013:

**Table 1: DNCR's Infringements of Plaintiffs' Copyrights Through 2013 (to the best of Plaintiffs' knowledge)**

| Title Of Copyrighted Work | Registration # | Description of Infringing Material | Location of Infringing Material | Estimated Dates of Infringement |
|---|---|---|---|---|
| Queen Anne's Revenge Footage 2008 | PA0001846457 | David Moore On Capturing Blackbeard's 13th Cannon | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Anchor, May 27, 2011 | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Ballast1 | VA0001872054 | Blackbeard's *Queen Anne's Revenge* 1718 | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Cannon From a Conservators Point of View | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | What's New At QAR Lab | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2012 | PA0001846470 | *Maritimes*, Winter/Spring 2013, p. 13 | *Maritimes* Magazine Winter/Spring 2013, DNCR Website | Magazine published in Spring/Smmer 2013 (Posted online Sept. 2015 - August 2016 after Blackbeard's Law) |

86. In addition to the above infringements, from approximately 2009 to 2015, DNCR sold copies of a documentary containing Allen's footage in the gift shop of the North Carolina Maritime Museum at Beaufort, without license or permission from either Allen or the company that produced the film.

87. Allen discovered the State's copyright infringement in 2013, during June recovery operations on the wrecksite.

88. Upon learning of the infringement, Allen sent takedown notices to YouTube, East Carolina University, and North Carolina Public Television. Allen also wrote to the State, through Defendant Kluttz, to express his concerns. The State failed to address Allen's concerns. Thus, on August 2, 2013, Allen wrote to Defendant Kluttz and "revok[ed] any and all rights, licenses and sub licenses" to his copyrighted materials. Allen also demanded that the State return or destroy all physical copies of his footage in its possession.

89. On August 9, 2013, DNCR assured Allen that it had secured all physical copies of Allen's work so that none would be used without Allen's express permission. Allen's work was posted online *again* on that very same day.

**H. Allen, Intersal, and DNCR Enter a Settlement Agreement; The State Immediately Changes Its Mind and Continues Infringement.**

90. On October 24, 2013, the State, through Defendant Kluttz, entered into a settlement agreement with Allen and Intersal ("the Agreement," attached as Exhibit 1).

91. In the Agreement, the State expressly acknowledged that Allen's copyrights, video footage, and still images from the *Queen Anne's Revenge* were his property, and that North Carolina had taken it:

> **Copyright Violations.** DNCR agrees to compensate Nautilus Productions by payment of the cash sum of $15,000 for any copyright infringements by DNCR or its support groups occurring through the date of the signing of this contract, including Friends of the Maritime Museum display photograph of the pile (central portion of the QAR shipwreck), DNCR's Flickr account showing anchor A1 on the pile, DNCR's website showing anchor A1 on the pile, DNCR's News website showing anchor A2, and Friends of the QAR website showing mapping dividers (artifact). DNCR shall pay Nautilus Productions $15,000 by 31 January 2014.

17

Ex. 1 ¶ 22.

92. The Agreement required the State to adhere to a strict set of rules regarding when and how it could use Allen's property.

93. Most importantly, the State was not allowed to use Allen's footage for any commercial or promotional purposes without Allen's express permission.

94. The Agreement also required North Carolina to return all of Allen's videos and images that did not bear a Nautilus watermark, or "a bug," or that otherwise did not bear a timecode stamp. This property was and remains one-of-a-kind and tremendously valuable underwater footage on videotape.

95. The Agreement also provided Allen with a right of first refusal with respect to all media opportunities (commercial and noncommercial) relating to the QAR project.

**I. The State Regrets the Agreement and Turns to Legislation to Secure Access to Allen's Valuable Footage.**

96. The State had buyer's remorse and refused to comply with the terms of the Agreement.

97. On October 25, 2013—less than a week after signing the Agreement—the State scheduled a media day at the QAR site. The State did not notify Allen or provide him an opportunity to participate, as required by the Agreement.

98. The State also failed to comply with the provisions of the Agreement requiring it to return Allen's physical media. In December, 2013, DNCR returned some of Allen's works, but withheld 22 videotapes containing Allen's most valuable footage. To this day, North Carolina has yet to return those tapes.

99. The State also violated several provisions of the Agreement relating to Intersal. On July 27, 2015, Intersal filed suit against Defendants in North Carolina state court, asserting claims for breach of contract, and claiming damages for Defendants' unauthorized use of QAR photographs.

100. Defendants resented Allen for asserting his rights and believed he was improperly attempting to cash-in on history. After Allen asserted his rights, the State requested a meeting with Allen. At that meeting, Defendant Claggett—the State's lead archaeologist— confirmed that DNCR and the State resented Allen for what a perceived treasure hunter mentality. Claggett and Deputy Secretary Cochran claimed that the source of "friction" on the QAR project was Allen's desire to monetize his "hobby" and Allen's refusal to "volunteer" his time and services.

18

101.    Just a few months after ratifying the contract, the State sought to change the terms of the Agreement to allow DNCR to use Allen's footage for commercial purposes. Neither Allen nor Intersal agreed to the State's proposed amendments.

102.    Defendants devised a plan to punish Allen for what they viewed as his obstruction of the QAR Project and to secure the ability to use Allen's copyrighted works for free in perpetuity, including for commercial purposes. This plan became Blackbeard's Law.

103.    Blackbeard's Law was introduced as part of "H184." The relevant portion states:

> All photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions shall be a public record pursuant to G.S. 132-1. There shall be no limitation on the use of or no requirement to alter any such photograph, video recordings, or other documentary material, and any such provision in any agreement, permit, or license shall be void and unenforceable as a matter of public policy.

104.    Under North Carolina law, North Carolina owns, controls, and has exclusive custody over "**all** shipwrecks ... and underwater archaeological artifacts which have remained unclaimed for more than 10 years" in any navigable State waters of the State." N.C. Gen. § 121-22. Thus, Blackbeard's Law purports to place *all* North Carolina historical underwater videography projects in the public domain.

105.    Blackbeard's Law was devised for, directed to, and targeted at Rick Allen and Intersal. Rick Allen and Intersal are the *only* persons on the planet with an extensive corpus of photography and video work depicting "a derelict vessel or shipwreck or its contents, relicts, artifacts, or historical materials in the custody of [North Carolina]."

106.    Allen's work is incredibly specialized. As a North Carolina native, Rick Allen has dedicated his professional career to underwater videography projects of derelict vessels and shipwrecks in North Carolina waters. Blackbeard's Law targets *exactly* that set of documentary materials.

107.    Even nature-based projects are converted to the public domain, since shipwrecks serve as a natural home for the vast majority of marine life in North Carolina coastal waters. For example, Sand Tiger sharks frequently congregate in and around shipwrecks, since the wrecks provide shelter and serve an important role in the Sand Tiger shark food web.

108.   Blackbeard's Law impacts the vast majority of Allen's works and 100% of Allen's work relating to QAR.

109.   By placing Allen's work in the public domain, the State, through Blackbeard's Law, destroyed the commercial value of that work, as no one would pay money to purchase or license something that could be obtained for free.

110.   Blackbeard's Law does not incorporate any due process protections.  Allen did not have *any* opportunity to challenge or contest the placement of his work into the public domain.

111.   The State did not compensate Allen for the destruction of his property.

112.   Blackbeard's Law is self-executing and does not require any action by any state official to enforce.  Instead, the Law simply *declares* that Allen's images and videos are in the public domain.  Thus, the Law does not include any due process protections—it does not set forth procedures to allow affected individuals to challenge a public records classification, to seek reclassification, or to seek compensation.

113.   To the extent Blackbeard's Law is enforced by *anyone*, it would be Defendant Stein, who is North Carolina's attorney general, who is responsible for enforcing *all* North Carolina laws, Defendant Koonts, who is responsible for administering North Carolina's public records laws, and Defendants Cherry and Koonts who are or were responsible for DNCR's archival methods and use of public records.

114.   Blackbeard's Law was conceived, drafted, and promoted by DNCR staff, in furtherance of DNCR's agenda to exclude Allen and Nautilus from the QAR project.  DNCR staff described the law as a "bill[] for Cultural Resources."

115.   Blackbeard's Law was not covered by the media until after its passage and was not otherwise advertised or promoted to the public.  Instead, the Law was added as an amendment to a much larger bill at the last minute, with little fanfare or announcement.  There was no legislative debate relating to the Law, and no meaningful opportunity for Allen to object to or challenge the Law prior to its passage.

116.   Public reporting confirms that lawmakers supported Blackbeard's Law to support DNCR's punitive agenda and strengthen DNCR's litigation position with respect to both Allen and Intersal.  In an interview with the Associated Press, Senator Norman Sanderson, who introduced the bill, stated that Blackbeard's Law "was brought forth because of the lawsuit."[6]

---

[6] https://www.citizen-times.com/story/news/2015/07/29/lawmakers-enter-legal-battle-blackbeards-ship/30853857.

117.    The North Carolina House voted to pass Blackbeard's Law on August 11, 2015 by a vote of Yeah's – 107, Present/NV – 3 & Absent - 3.  The Senate ratified the Law on August 4, 2015 by a vote of Yeah's – 42 & Absent - 8.  Governor McCrory signed the bill into law on August 18, 2015.  Ironically, this act of piracy coincided with the 297th anniversary of a British order that pardoned certain acts of piracy.

**J.   Defendants Rely on Blackbeard's Law to Justify Shameless, Unapologetic Theft of Allen's Videos and Images, and Engage In Rampant Copyright Infringement.**

118.    Defendants resumed their infringement of Allen's copyrights almost immediately after Blackbeard's Law went into effect, despite having full knowledge that Allen opposed their use of his footage, that their actions constituted willful copyright infringement, and that their acts violated the Agreement.

119.    Defendants, acting through one or more Jane Does, infringed Allen's property and copyright rights by reposting several of Allen's copyrighted works on YouTube and on DNCR's social media website, less than three weeks after the passage of Blackbeard's Law.

120.    Several of the State's post-Blackbeard infringements were simply continuations of DNCR's previous infringements.  DNCR posted the videos in 2011, removed them in accordance with the 2013 Settlement Agreement, and then reposted the videos in 2015, after Blackbeard's Law purportedly nullified the use restrictions in the Agreement and placed Allen's content into the public domain.

121.    Allen is informed and believes that Dr. Cherry ordered the posting of Allen's property to the Internet, including YouTube and sites controlled by DNCR.

122.    The following table summarizes DNCR's copyright infringements that commenced after the passage of Blackbeard's Law (to the best of Plaintiffs' current knowledge):

21

**Table 2: DNCR's Infringements of Plaintiffs' Copyrights Commencing After the Passage of Blackbeard's Law (to the best of Plaintiffs' knowledge)**

| Title Of Copyrighted Work | Registration # | Description of Infringing Material | Location of Infringing Material | Estimated Dates of Infringement |
|---|---|---|---|---|
| Queen Anne's Revenge Footage 2008 | PA0001846457 | David Moore On Capturing Blackbeard's 13th Cannon | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Anchor, May 27, 2011 | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Ballast1 | VA0001872054 | Blackbeard's *Queen Anne's Revenge* 1718 | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Cannon From a Conservators Point of View | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | What's New At QAR Lab | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2012 | PA0001846470 | *Maritimes*, Winter/Spring 2013, p. 13 | DNCR Website | 9/2015-12/2016 (Reposted online following initial publication) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - North Anchor A3 | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-55.tif | DNCR Website | Aug. 2016 - July 2018 |

22

| | | | |
|---|---|---|---|
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56-2.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-44.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-60.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-61.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-68.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - a3-anchor.jpg | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-55.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56-2.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-44.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-60.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-61.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-68.tif | DNCR Website | June 2021 - Present |

23

123.    Correspondence from shortly before the passage of the Law shows that Defendants sought to use the Law to earn millions of dollars from Allen's footage.  In a May 29, 2015 letter, DNCR General Counsel Kevin Howell informed Allen that DNCR intended to use "[i]mages of the shipwreck ... provided pursuant to North Carolina's Public Records Law," (i.e., Blackbeard's Law), "to raise an additional $2 million in funding by June 2018."

124.    In the ongoing Intersal litigation, the State declared open season on Allen's copyrights. The State claims that Blackbeard's Law operates as a complete defense to any assertion of intellectual property rights or claims for breach of contract relating to Allen's work:

> Regardless of whether the Department infringed upon Plaintiff's alleged intellectual property rights or breached the contract ... any relief for the alleged infringement and breach of contract should be denied because the purported contract forming the basis for Plaintiff's action…is <u>void, illegal and unenforceable</u>, in its entirety or in part, as being against … public policy… Therefore, the Department is not responsible for and has no liability to Plaintiff under the alleged contract and/or its parts.

(emphasis added).

125.    The "alleged intellectual property rights" North Carolina is referring to belong to Allen. The contract referenced by North Carolina is the Settlement Agreement.  According to North Carolina, Blackbeard's Law extinguished both.

**K. Defendants Continue to Infringe Allen's Copyrights, Even After Commencement of this Lawsuit.**

126.    Even after the initiation of this lawsuit, North Carolina continued to publish, display, and perform Allen's works and property.

127.    After this lawsuit was filed, but before this matter reached oral argument at the Fourth Circuit, the State took down the infringing videos specifically identified in Allen's First Amended Complaint.

128.    However, the State continued (and continues) to assert that it is entitled, under Blackbeard's Law, to take and use Allen's work, however it wants, without compensation.

129.    To this day, North Carolina continues to publish, display and perform many of Allen's works.  Indeed, it is DNCR's policy to post materials, such as those belonging to Allen, to the Internet Archive.  Furthermore, "DNCR uses the tool Archive-It, developed by the Internet Archive to collect, store, and provide access to these Web sites."  See generally,

24

https://archives.ncDNCR.gov/government/digital-records/digital-records-policies-and-guidelines.

130.    Indeed, Defendant Wilson (DNCR Secretary) and Defendant Koonts (acting DNCR Secretary), acting under color of law and through DNCR, continue to take and infringe Allen's property by posting the same to the Internet Archive, as shown in Table 2.

**E. North Carolina's Continued Takings of Allen's Property Part III -- North Carolina Maritime Museum, Beaufort, North Carolina**

131.    Beaufort, North Carolina is the center of North American pirate history.  People come from all over the world to Beaufort to explore that history.  As mentioned, Blackbeard's *Queen Anne's Revenge* lies there, and treasure hunters are still looking for *El Salvador* that is believed to have run aground near Beaufort Inlet.

132.    North Carolina's DNCR operates one of its three Maritime Museums in Beaufort.  The Maritime Museum in Beaufort (MMB) has the most extensive exhibits on pirates and, especially, Blackbeard and his *Queen Anne's Revenge*.

133.    MMB currently welcomes well over 100,000 visitors a year.  Prior to the COVID-19 pandemic, average attendance topped 300,000 visitors a year.

134.    MMB also has a theater that it uses to screen movies and documentaries to museum patrons.  Most visitors enter the theater at some point during their visit.

135.    For the last decade, DNCR has shown Allen's footage to museum visitors multiple times a day, every day on which the museum is open.  These displays continued until mid-January 2023, and stopped only after the District Court granted Allen leave to file an amended complaint.  Under a modest estimate, Allen's footage was shown over 10,000 times, to at least 60,000 museum visitors.

136.    The footage on display is not being used for research purposes, nor does it contain a watermark or timestamp.

137.    North Carolina did not license Allen's footage.  North Carolina did not compensate Allen for showing his footage at MMB.  North Carolina did not seek or obtain Allen's permission to show his footage in Beaufort.

138.    The following images, captured in September 2021, show that Allen's footage was performed in the MMB theater:



*MMB presented Allen's videos in the museum theater without permission.*



*Allen's footage shows the QAR recovery in action.*

26

139.    Defendant Mike Carroway is the Exhibits Curator at the Maritime Museum in Beaufort. Allen is informed and believed that Carroway personally ordered the performance of his videos in the Maritime Museum's theater. Defendant Schwarzer is the Director of the Maritime Museum in Beaufort. Allen is informed and believes that Mr. Schwarzer controls or has the right to control what is performed at the Maritime Museum in Beaufort. Allen is likewise informed and believes that Mr. Schwarzer was aware of this unlawful performance. Defendant Koonts oversees the use of content media by DNCR, including the performance of Allen's work at the Maritime Museum in Beaufort. As a result, she too controls, or has the right to control, what is performed at the Maritime Museum in Beaufort. Defendant Secretary Wilson is pictured next to Governor Cooper at the Maritime Museum. Allen is informed and believes that Secretary Wilson controls or has the right to control what is performed at the Maritime Museum in Beaufort. Allen is likewise informed and believes that Secretary Wilson is aware of this unlawful performance. All have acted under color of law to take Allen's property by performing the same at the Maritime Museum in Beaufort.

## COUNT I
### Copyright Infringement, 17 U.S.C. § 501 *et seq.*
### *(Against North Carolina, DNCR, and individual defendants in their official capacities)*

140.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

141.    Allen owns valid copyrights in each of the works identified in Tables 1-3.

142.    Allen registered each of the photos and videos at issue in this action with the United States Copyright Office.

143.    Allen did not authorize Defendants to copy, display, distribute, or perform any of his work past 2013.  Allen has never authorized Defendants to copy, display, distribute, or perform any of his work for commercial purposes.

144.    Allen clearly and unambiguously revoked any and all authorization Defendants might have had to his work on August 2, 2013.

145.    Defendants have repeatedly infringed Allen's copyrights from 2011 through the present by copying, displaying, distributing, and performing Allen's works without permission, as shown in Tables 1-3 and described in paragraphs 86-88 and 118-123.  These actions were unlawful under 17 U.S.C. § 106 and 17 U.S.C. § 501.

146.    The release of claims in the Settlement Agreement does not absolve Defendants' infringement or otherwise preclude this Claim because the release was rendered void by Defendants' breach of the Agreement, because most of the alleged infringement took place after the Settlement Agreement was executed (and so was not covered by the release), and because Defendants are judicially estopped from relying on the terms of the Settlement Agreement, in view of the arguments they advanced in their ongoing litigation against Intersal.

147.    Defendants' infringement has been willful.  At all relevant times, Defendants knew they were using Allen's works without permission.  Defendants' willful intent is evidenced by the fact that Defendants continued to infringe Allen's copyrights even after Allen expressly notified Defendants of their infringement and demanded that Defendants cease their infringement and return all copies of his work.

148.    Defendants' willfulness can also be inferred from the timing and patterns associated with Defendants' infringement.  For instance, Defendants have repeatedly paused or suspended their infringing behavior when their conduct was subject to judicial scrutiny, only to resume their infringement once judicial attention has dissipated.

149.    Each of the alleged infringements was carried out by DNCR, who was acting on behalf of and under the supervision of North Carolina.

150.    Plaintiffs are entitled to injunctive relief enjoining Defendants from infringing Allen's copyrights.  Plaintiffs are also entitled to the full scope of damages allowed by the Copyright Act.

**COUNT II**
**Violations of the DMCA for Alteration or Removal of  Copyright Management Information, 17 U.S.C. § 1202**
*(Against North Carolina, DNCR, and individual defendants in their official capacities)*

151.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

152.    Allen embedded copyright management information in his works, including through file names, metadata, labeling, and through the use of watermarks that identified Plaintiff Nautilus Productions as the production company and rights-holder.

153.    The metadata in each of Allen's video files contained a copyright notice specifically identifying the work's title and stating: "© [year] Nautilus Productions LLC, All Rights Reserved courtesy; Nautilus Productions."  Each video also contains a title card with similar information as well as a URL to Plaintiffs' website, Plaintiffs' e-mail address, and phone number.

154.    Each item of Plaintiffs' physical media was accompanied with a file setting forth the terms and conditions under which the work could be used.  *See* 17 U.S.C. § 1202(c)(3).  Additional terms and conditions were set forth in the 2013 Settlement Agreement.

155.    Defendants altered or removed Plaintiffs' copyright management information when copying, distributing, reproducing, and performing Plaintiffs' works in connection with each of the infringements shown in Tables 1-3 and described in paragraphs 86-88 and 118-123, including by removing file metadata and altering or removing the terms of use in and accompanying the works.

156.    Defendants altered Plaintiffs' physical media by relabeling them with the phrase "DNCR Marketing & Communications."

157.    These actions were unlawful under 17 U.S.C. § 1202, which prohibits the alteration or removal of copyright management information.

29

158.    Plaintiffs are entitled to injunctive relief enjoining Defendants from violating the copyright management information provisions of the DMCA.  Plaintiffs are also entitled to the full scope of damages allowed by statute.

## COUNT III
### Takings Claim Under the Fifth and Fourteenth Amendments to the United States Constitution, Both Directly and Through the Copyright Act
(*Against North Carolina and DNCR*)

159.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

160.    North Carolina and DNCR's infringements of Plaintiffs' copyrights effectuated a Takings of Allen's property, in violation of the Fifth Amendment to the United States Constitution.

161.    Plaintiffs have a property interest in Allen's copyrights.

162.    The State Defendants effectuated a taking of Allen's property by engaging in wide-scale, willful, and indiscriminate infringement of Allen's copyrights, as shown in Tables 1-3 and described in paragraphs 86-88 and 118-123.

163.    The State Defendants also effectuated a physical taking of Allen's property by withholding and refusing to return Allen's physical media containing copies of his works.

164.    The State Defendants' infringements caused the loss of all economically beneficial and productive uses of Allen's copyrights.  The only economically beneficial use of Allen's copyrights was to monetize the rights through license or sale.  The State Defendants' wide-scale infringement precluded such monetization, as there is no reason to license what can be used for free.

165.    The State Defendants' infringements interfered with Plaintiffs' reasonable investment-backed expectations for the use of Allen's copyrights.

166.    Allen invested thousands of hours, most of his life savings, and the prime years of his professional career into the QAR project.  Allen's work on the project came with a significant opportunity cost, as Allen turned down scores of other projects because he was fully committed to the QAR project.

167.    Allen made those investments with the reasonable expectation—based on decades of experience—that they would pay off in the form of profitable licensing arrangements.  One of the central components of Allen's licensing and monetization strategy was his expectation—again, based on decades of experience—that he would be able to license his footage to State Defendants for use in state museums.

168.    The State Defendants' takings has caused significant economic harm to Allen.  The State's infringement has resulted in a loss of at least $150,000 in potential licensing fees. The number would be even higher if one accounts for the fact that the State Defendants sent Allen's footage to third parties who engaged in additional infringement.

169.    The State Defendants did not afford Allen even a modicum of due process in connection with their takings.  Allen did not have an opportunity to be heard and had no means to challenge the infringements, other than through this litigation.

170.    The State Defendants have not provided Allen with just compensation for their takings. Indeed, Allen has not received *any* compensation in connection with any of the post-Settlement Agreement infringements.  The money Allen received in connection with 2013 Settlement Agreement was inextricably tied to other provisions in that Agreement that were violated before the ink had even dried.  Thus, that, money, too, does not constitute "just compensation."

171.    Plaintiffs are entitled to compensation for the State's takings and infringement of his work, with the appropriate amount of compensation set forth by the damages provisions of the Copyright Act.  Plaintiffs are also entitled to an order enjoining Defendants from taking Plaintiffs' property or infringing Plaintiffs' copyrights, and requiring Defendants to return Plaintiffs' physical media.

172.    The Copyright Act expressly abrogates sovereign immunity and authorizes plaintiffs to pursue copyright infringement claims against states when those infringements constitute "*actual* violations" of a plaintiff's Fourteenth Amendment rights.  *United States v. Georgia*, 546 U.S. 151, 158-59 (2006).  The State Defendants are not immune from suit.

173.    Allen cannot pursue this claim in state court, as any claim would be preempted by the Copyright Act.  North Carolina courts also would not have jurisdiction over Allen's claims, since the Copyright Act expressly prohibits state courts from adjudicating claims arising under the Copyright Act.  *See*  28 U.S.C. § 1338.  In related litigation against Intersal, Defendants have pointed to Blackbeard's Law to argue that  that neither Plaintiffs nor Intersal can pursue any copyright, takings, or contract claims in North Carolina courts.  Thus, Defendants are judicially estopped from making any claim that Allen could or should pursue his claims in state court.

## COUNT IV
### Takings Claim Under the Fifth and Fourteenth Amendments to the United States Constitution, Both Directly and Through the Copyright Act
### (*Against North Carolina and DNCR*)

174.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

175.    North Carolina's passage and use of Blackbeard's Law constitutes one of the most, if not *the* most expansive unlawful takings ever seen under the Fifth Amendment of the United States Constitution.

176.    Blackbeard's Law effectuates a complete taking of each work that falls within its wide ambit.  Under the Copyright Act, Allen has a right to exclude others from using his work.  Blackbeard's Law says the opposite, and provides that "there shall be **no** limitation on the use of" Allen's materials.

177.    The scope and number of Allen's works affected by Blackbeard's Law is expansive, and is not limited to the QAR Project.  Because Allen specializes in historical and natural underwater videography in North Carolina, Blackbeard's Law places the vast majority of Allen's portfolio into the public domain.  In total, this amounts to several *hundred* works— roughly 75% of Allen's entire portfolio and life's work.

178.    Blackbeard's Law destroys all economically beneficial and productive use of Allen's copyrights.  Allen cannot license or monetize "public records" or works in the public domain.

179.    Blackbeard's Law has interfered with Allen's reasonable, investment-backed expectations relating to the creation of his work.  As described in paragraphs 64 and 166-167, Allen invested substantial resources in the creation of images and videos relating to the QAR project.  Allen made similar investments with respect to the rest of his portfolio.  All of these investments were made with the expectation that Allen would be able to recoup his costs through licensing.  Blackbeard's law obliterated those expectations.

180.    The State Defendants' reaction to Blackbeard's Law demonstrates the effect of the taking.  Prior to Blackbeard's Law, the State Defendants had taken down several of Allen's works they had posted on the DNCR website and on YouTube, implicitly acknowledging they would only be able to use those works if they paid for a license.  Immediately after Blackbeard's Law went into effect, the State Defendants reposted those same infringing works, since they no longer needed to pay for a license to use the works.

181.    The State has expressly claimed that Blackbeard's Law eliminates any obligations the state might have to respect Allen's intellectual property, including obligations imposed by

32

the Copyright Act and obligations contained in the 2013 Settlement Agreement. Indeed, the State has argued that the provisions of Blackbeard's Law apply "[r]egardless of whether the Department infringed upon Plaintiff's ... intellectual property rights or breached the contract."

182.    Blackbeard's Law has made it more difficult for Allen to license his work, as potential licensees have expressed concern regarding the status of Blackbeard's Law and how the Law might impact their license.

183.    The State Defendants did not afford Allen even a modicum of due process in connection with their takings. Blackbeard's Law is self-enforcing, and so did not provide Allen with any opportunity to oppose the entry of his work into the public domain, or to seek reclassification once the work was added to the public domain.

184.    The State Defendants have not provided Allen with just compensation for their takings. Indeed, Allen has not received *any* compensation in connection with the taking and destruction of his property under Blackbeard's Law.

185.    Plaintiffs are entitled to just compensation for the State's takings of his works, an order enjoining Defendants from taking Plaintiffs' work, and an order enjoining Defendants from treating Plaintiffs' works as a "public record" or from using Allen's work without permission or just compensation.

186.    Even if Allen's exclusive rights were restored, Plaintiffs would still be entitled to compensation for the complete takings brought into effect for the periods in which it was active.

187.    The Copyright Act expressly abrogates sovereign immunity and authorizes plaintiffs to pursue copyright infringement claims against states when those infringements constitute "*actual* violations" of a plaintiff's Fourteenth Amendment rights. *United States v. Georgia*, 546 U.S. 151, 158-59 (2006). The State Defendants are not immune from suit.

188.    Allen cannot pursue this claim in state court, as any claim would be preempted by the Copyright Act. North Carolina courts also would not have jurisdiction over Allen's claims, since the Copyright Act expressly prohibits state courts from adjudicating claims arising under the Copyright Act. *See* 28 U.S.C. § 1338.

## COUNT V
### Bill of Attainder Under Article I, § 10 of the United States Constitution
### (*Against North Carolina and DNCR*)

189.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

33

190.    Article I, § 10 of the United States Constitution states, in relevant part: "No State shall ... pass any Bill of Attainder[.]"  A bill of attainder is a statute or legislative act that inflicts punishment on specific individuals.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-74 (1977).

191.    Blackbeard's Law is an unlawful Bill of Attainder.

192.    Blackbeard's Law is a punitive in both motivation and effect.

193.    Blackbeard's Law was conceived, drafted, promoted, and passed with punitive intent. The Law is the culmination of a years-long battle between DNCR, Allen, and Intersal. Blackbeard's Law seeks to punish Allen for his perceived alignment with treasure hunters, for Allen's perceived lack of loyalty to archaeological interests, for Allen's attempt to monetize his work, and for Allen's repeated assertions of his contractual and intellectual property rights.

194.    The fact that Blackbeard's Law is targeted specifically at Allen is evident from the fact that the provisions of Blackbeard's Law perfectly mirror the provisions of the 2013 Settlement Agreement.  The Agreement includes an express carve-out for public records, Ex. 1 ¶ 17, so Blackbeard's Law reclassifies Plaintiffs' work as public records.  The Agreement expressly required DNCR to add a "time code stamp, and watermark" to Plaintiffs' work, *id.* ¶ 16(b), so Blackbeard's Law expressly eliminates and invalidates that requirement.  The Agreement prohibited Defendants from using Allen's work for non-commercial purposes, so Blackbeard's Law expressly states that "[t]here shall be no limitation" on the use of the materials.  The clause-for-clause similarities between the Agreement and Blackbeard's Law definitively demonstrates that the Law was targeted Allen and arose from Defendants' grievances with Allen.

195.    Blackbeard's Law imposes penalties that are historically associated with punishment and that have frequently been deemed improper under the prohibition on bills of attainder.  At common law, bills of attainder proscribed "the punitive confiscation of property by the sovereign."  *Nixon*, 433 U.S. at 474.  Blackbeard's law does just that by confiscating Plaintiffs' property rights, converting Plaintiffs' property to the public domain, and preventing Plaintiffs from entering into contracts to govern the use and disposition of their property.

196.    The punitive nature of Blackbeard's Law is further evidenced by the fact that the Law bars Allen "from participation in specified employments or vocations."  Allen's vocation is incredibly specific: Allen is an underwater videographer who specializes in documenting derelict vessels and shipwrecks in North Carolina waters, including the marine wildlife that frequently accompanies those vessels.  Blackbeard's Law targets Allen's chosen vocation

34

with pinpoint precision, and functionally bars Allen from participation in that vocation by legislating away Allen's ability to obtain compensation for his work. The Supreme Court specifically identified this kind of law as "a mode of punishment commonly employed against those legislatively branded as disloyal." *Id.*

197.    The impact of Blackbeard's Law on Allen's vocational opportunities is especially significant in light of the injuries Allen sustained in 2011. After losing his arm, Allen no longer had the ability to shoot footage above water. Thus, the only job within Allen's chosen profession that he can perform is underwater photography. And because Allen lives in North Carolina and specializes in North Carolina maritime environments, Allen is primarily limited to shooting subjects in North Carolina waters, almost all of which fall under the ambit of Blackbeard's Law.

198.    Blackbeard's Law specifically targets Plaintiffs and Intersal, as they are the only persons on the planet with a corpus of photography and video work falling within the ambit of Blackbeard's Law.

199.    Blackbeard's Law does not advance any non-punitive purpose. There is no legitimate reason to place large swaths of privately-owned copyrights into the public domain, and no reason to prevent copyright holders from entering into contracts that govern the use of their copyrights.

200.    Blackbeard's Law seeks to do legislatively what cannot be done through other means. Absent Blackbeard's Law, Allen and Intersal would have the ability to obtain judicial relief for state infringements of their copyrights or breaches of contract. Blackbeard's Law usurps the role of the judiciary by purporting to foreclose Plaintiffs from enforcing their contract and copyright rights through normal judicial means. Blackbeard's Law is thus squarely at odds with core separation of powers principles.

201.    Plaintiffs are entitled to a full revocation of Blackbeard's Law and just compensation for the punishment unjustly imposed upon them because of the Law. This includes compensation for each of Allen's works that was subject to Blackbeard's Law, as well as compensation for DNCR and North Carolina's unauthorized use of Allen's property. Plaintiffs are also entitled to an order enjoining the State from treating Allen's works as a public record, from using Allen's work without permission, and from punishing or retaliating against Allen for his assertion of rights.

## COUNT VI
## Ex Post Facto Law Under Article I, § 10 of the United States Constitution
### (*Against North Carolina and DNCR*)

202.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

203.    Article I, § 10 of the United States Constitution states, in relevant part: "No State shall ... pass any ... ex post facto Law[.]"

204.    Blackbeard's Law is an unlawful *ex post facto* law.

205.    As explained above, Blackbeard's Law is punitive by motivation, design, and effect.

206.    Blackbeard's Law has retroactive effect.  The Law seeks to punish Plaintiffs for conduct that predated the Act.

207.    Blackbeard's Law places *pre-existing* works in the public domain, and renders "void and unenforceable" all pre-existing contracts and licenses relating to those works.

208.    Plaintiffs are entitled to a full revocation of Blackbeard's Law and compensation for the punishment unjustly imposed upon them because of the Law.  This includes compensation for each of Allen's works that was subject to Blackbeard's Law, as well as compensation for DNCR and North Carolina's unauthorized use of Allen's property.  Plaintiffs are also entitled to an order enjoining Defendants from using Allen's work without Plaintiffs' permission.

## COUNT VII
## Impairment of the Obligation of Contracts Under Article I, § 10 of the United States Constitution
### (*Against North Carolina and DNCR*)

209.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

210.    Article I, § 10 of the United States Constitution states, in relevant part: "No State shall ... pass any  ... Law impairing the Obligation of Contracts[.]"

211.    Blackbeard's Law impairs the Obligation of Contracts, including, in particular, the State's 2013 contract with Plaintiffs (the 2013 Settlement Agreement).  The Law expressly states that any "agreement, permit, or license," (i.e., any contract) that limits the use of covered works (including Plaintiffs' works) "shall be void and unenforceable."

212.    The State's litigation positions (described above) confirm that Blackbeard's Law "impairs" the 2013 Settlement Agreement, as described above.

36

213.    Plaintiffs are entitled to a full revocation of Blackbeard's Law and compensation for the harms Plaintiff suffered from the temporary abrogation of the 2013 Agreement, which includes compensation for Defendants' unauthorized use of Plaintiffs' work that purportedly was authorized by Blackbeard's Law.  Plaintiffs are also entitled to an order requiring Defendants to honor the terms of the 2013 Agreement.

**COUNT VIII**
**VIOLATION OF 42 U.S.C. § 1983**
***(Defendants Schwarzer, Wilson, Carraway, Koonts, Kluttz, Cherry, Cochran, in their personal capacities)***

214.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

215.    Each of the individually named Defendants have, under color of law, deprived Plaintiffs of rights guaranteed by the United States Constitution.

216.    Defendants Koonts and Cherry are and were (respectively) responsible for managing North Carolina's archival records, including all of Allen's works that were deemed public records by Blackbeard's Law.  Koonts and Cherry violated Plaintiffs' constitutional rights by effectuating a taking of Plaintiffs' property under Blackbeard's Law, in violation of the 5th and 14th amendments to the United States Constitution, and by implementing, promoting, and using an unlawful bill of attainder and ex post facto law, in violation of Article I, § 10 of the United States Constitution.  Defendant Koonts' violation of Plaintiffs' rights is ongoing, and will continue unless specifically enjoined.

217.    Defendants Kluttz, Wilson, Claggett, Cochran, and Cherry were responsible for setting DNCR policy, and were personally responsible for DNCR's policies to take Plaintiffs' property and infringe Plaintiffs' copyrights.   Each of these defendants personally participated in and contributed to the multi-faceted campaign to punish Allen, including through the passage of Blackbeard's Law.  Each of these defendants also participated in the development, implementation, and administration of DNCR's policies after the passage of Blackbeard's Law, including the decision to resume infringing Allen's property and copyrights and to disregard the requirements of the 2013 Settlement Agreement.  Kluttz, Wilson, Claggett, Cocrhan, and Cherry were thus personally responsible for the violation of Plaintiffs' rights under the 5th and 14th Amendments to the United States Constitution, as well as the Constitution's prohibition on bills of attainder and ex post facto laws.  Defendant Wilson's violation of Plaintiffs' rights is ongoing, and will continue unless specifically enjoined.

218.    Each of the above-named Defendants are sophisticated actors, and each has access to legal counsel.  The actions that gave rise to this claim were not made in the heat of the

37

moment or in the face of any exigent circumstances.  Defendants knew or should have known that their actions were contrary to law and that the policies they created and administered would violate Plaintiffs' constitutional rights.

219.    Under 42 U.S.C. § 1983, Plaintiffs are entitled to entitled to compensation for constitutional violations.  Plaintiffs are also entitled to an order enjoining Defendants Koonts and Wilson  from taking Plaintiffs' property, infringing Plaintiffs' copyrights, or relying on any provision of Blackbeard's Law.

## COUNT IX
### Claim for Injunctive Relief Under *Ex Parte Young*
### *(Defendants North Carolina, DNCR)*

220.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

221.    Defendants have violated Plaintiffs' constitutional rights and continue to violate Plaintiffs' constitutional rights, as alleged in Counts III-VII of this Complaint.  Defendants continue to operate under a policy through which DNCR and North Carolina expressly claim the right and ability to use Plaintiffs' copyrighted works for any purpose without permission or compensation.  This policy is unconstitutional.  Nevertheless, the policy will remain in place and in effect unless specifically enjoined.

222.    Under the Supreme Court decision in *Ex Parte Young*, 209 U.S. 123 (1908), Plaintiffs are entitled to assert a direct action under the Constitution to obtain injunctive relief for constitutional violations.

223.    Plaintiffs expressly seek an injunction that requires Defendants to cease all infringement of Plaintiffs' copyrighted works, to return all of Plaintiffs' property, and to cease their use, implementation, administration, and enforcement of Blackbeard's Law.

224.    Plaintiffs further seek an order enjoining Defendants' current policy regarding Plaintiffs' copyrights.  Plaintiffs further seek an injunction requiring Defendants to

## COUNT X
### Claim for Declaratory Relief Under the Declaratory Judgments Act, 28 U.S.C. § 2201
### *(All Defendants)*

225.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

226.    Under the Declaratory Judgments Act, a party may seek declaratory relief in connection with any case of "actual controversy" that falls within the jurisdiction of federal courts.

38

227.    In view of the above constitutional and statutory causes of action, Plaintiffs seek a judicial declaration stating:

    a. Defendants have engaged in widespread and willful infringement of Plaintiffs' copyrights.

    b. Defendants have violated 17 U.S.C. § 1202 by removing or altering copyright management information from Plaintiffs' worls.

    c. Defendants' have effectuated a taking of Plaintiffs' property without compensation or due process, in violation of the 5th and 14th Amendments to the United States Constitution.

    d. Blackbeard's Law is unconstitutional, as it violates the 5th and 14th Amendments to the United States Constitution, as well as the Constitution's prohibition on bills of attainder, ex post facto laws, and laws impairing the obligations of contracts.

    e. Federal courts have jurisdiction to resolve federal constitutional claims, and North Carolina cannot claim sovereign immunity with impunity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Frederick Allen and Nautilus Production LLC respectfully pray:

1. That the actions of Defendants be declared to be in violation of the United States Constitution.

2. That an injunction be issued restraining Attorney General Stein from enforcing Blackbeard's Law.

3. That an injunction be issued against D. Reid Wilson enjoining him from relying on, using or enforcing Blackbeard's Law, including in connection with Plaintiffs' property.

4. That an injunction be issued against Sarah Koonts enjoining her from relying on Blackbeard's Law or enforcing it to continue to take Plaintiffs' property, including by posting Plaintiffs' works on the Internet.

5. That an injunction be issued against Joseph Schwarzer, as Director of the Maritime Museum Deputy Secretary, and Mike Carraway, as Exhibit Curator, from relying on Blackbeard's Law or enforcing it to continue to take Allen's property, and to further enjoin them from performing Allen's property at the Maritime Museum in Beaufort.

39

6. That Defendants be ordered to compensate Plaintiffs for the damages Plaintiffs have suffered as a result of Defendants' takings, including through the use of the damages provisions of the Copyright Act.

7. That Allen have and recover of the individual Defendants compensatory and punitive damages from the individual Defendants for violation of his rights under the United States Constitution, pursuant to 28 U.S.C § 1983.

8. That Allen recover his attorneys' fees under 28 U.S.C § 1988 and 17 U.S.C. § 505.

9. For such other relief as the Court finds just, equitable and proper.

Respectfully submitted this 8th day of February, 2023.

/s/ David McKenzie
**David McKenzie**
NC State Bar No. 36376
/s/ Susan Freya Olive
**Susan Freya Olive**
NC State Bar No. 7222
P.O. Box 2049
Durham, North Carolina 27702
Telephone:  (919) 683-5514
Email: emailboxEDNC@oliveandolive.com

/s/ Adam Adler
**Adam Adler**
Reichman Jorgensen Lehman& Feldberg LLP
Member in good standing of the Bar of New York
(Bar No. 5470174), and appearing as EDNC LR
83.1 Counsel

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and complete copy of the foregoing document, together with any and all attachments thereto, has been electronically filed with the Clerk of Court using CM/ECF, which will provide notice to all Defendants through their counsel of record:

Olga E. Vysotskaya de Brito
Amar Majmundar
ovysotskaya@ncdoj.gov
amajmundar@ncdoj.gov
*Counsel for State Defendants*

on this the 8th day of February 2023.

/s/ David McKenzie
**David Loar McKenzie**

41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**Western Division**
**Civil Case No. 5:15-cv-627**

| | |
|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC<br>                    Plaintiffs<br><br>      v.<br><br>PATRICK LLOYD MCCRORY, Governor of the State of North<br>Carolina, *in his official capacity*;<br>SUSAN WEAR KLUTTZ, Secretary of the North Carolina<br>Department of Natural and Cultural Resources, *individually and*<br>*in her official capacity*;<br>KARIN COCHRAN, Chief Deputy Secretary of the North<br>Carolina Department of Natural and Cultural Resources,<br>*individually and in her official capacity;*<br>KEVIN CHERRY, Deputy Secretary of the North Carolina<br>Department of Natural and Cultural Resources, *individually and*<br>*in his official capacity;*<br>CARY COX, Assistant Secretary, Marketing and<br>Communications of the North Carolina Department of Natural<br>and Cultural Resources, *individually and in her official capacity;*<br>STEPHEN R. CLAGGETT, State Archaeologist, *individually*<br>*and in his official capacity;*<br>JOHN W. MORRIS, Deputy State Archaeologist – Underwater<br>and Director of the Underwater Archaeology Branch of the<br>North Carolina Department of Natural and Cultural Resources,<br>*individually and in his official capacity;*<br>JAMES W. DAVIS, North Carolina Senator, *individually and in*<br>*his official capacity;*<br>NORMAN W. SANDERSON, North Carolina Senator,<br>*individually and in his official capacity;*<br>NORTH CAROLINA DEPARTMENT OF NATURAL AND<br>CULTURAL RESOURCES;<br>STATE OF NORTH CAROLINA; and<br>FRIENDS OF QUEEN ANNE'S REVENGE, A NON-PROFIT<br>CORPORATION<br>                 Defendants | |

# EXHIBIT 1

## Settlement Agreement

Case 5:15-cv-00627-BO Document 134-1 Filed 12/01/23 Page 1 of 26
Case 5:15-cv-00627-BO Document 134-1 Filed 12/01/23 Page 1 of 26
JA 126

## Settlement Agreement

This Settlement Agreement, made this the 15th day of October, 2013, by and between the North Carolina Department of Cultural Resources ("DCR"), Intersal, Inc. ("Intersal"), and Rick Allen and Nautilus Productions, LLC (collectively, "Nautilus"):

WHEREAS, Intersal, a private research firm, operating under a valid permit issued to it by DCR, discovered the site believed to be *Queen Anne's Revenge* ("QAR") on 21 November 1996. QAR was located near Beaufort Inlet, North Carolina, by Intersal's director of operations, Michael E. Daniel, who used historical research provided by Intersal's president, Phil Masters. Daniel now heads up Maritime Research Institute ("MRI"), the non-profit corporation formed to work on the project in cooperation with State archaeologists and historians of the North Carolina Department of Cultural Resources, Office of Archives and History; and

WHEREAS, DCR, MRI, and Intersal previously executed a Memorandum of Agreement on 1 September 1998 ("1998 Agreement"); and

WHEREAS, as a result of the 1998 Agreement, Intersal and Michael E. Daniel agreed to forego entitlement to their share of any coins and precious metals recovered from the QAR site in order that all QAR artifacts remain as one intact collection, and in order to permit DCR to determine ultimate disposition of the artifacts;

WHEREAS, Nautilus has been filming underwater and other footage of the QAR project for approximately fifteen (15) years as the project's videographer;

WHEREAS, various disputes and uncertainties have arisen between DCR, Intersal, and Nautilus regarding the terms of the 1998 Agreement and related issues; and

WHEREAS, Intersal and DCR currently are in administrative appeal litigation regarding the terms of the 1998 Agreement, and desire to fully settle such litigation and related issues; and

WHEREAS, DCR, Intersal, and Nautilus desire to resolve fully their differences and continue their mutual efforts to promote the history of Blackbeard the Pirate, and continue the archaeological recovery and conservation of his flagship, the *Queen Anne's Revenge* ("QAR").

NOW, THEREFORE, DCR, Intersal, and Nautilus contract, settle and agree as follows:

### I. GENERAL

1.  **Prior Agreements.** This Agreement supersedes the 1998 Agreement, attached as **Attachment A**, and all prior agreements between DCR, Intersal, and Nautilus regarding the QAR project.

2.  **No Admission of Liability.** DCR, Intersal, and Nautilus mutually agree that this Agreement is entered into for the purpose of compromising all disputed claims, grievances, or allegations, and is not to be construed as an admission by DCR, Intersal, or Nautilus regarding the merit or lack of merit of DCR's, Intersal's, or Nautilus's contentions, nor an admission of any wrongdoing by the same.

### II. *EL SALVADOR* PERMIT

3.  ***El Salvador* Permit.** In consideration for Intersal's significant contributions toward the discovery of the QAR and continued cooperation and participation in the recovery, conservation, and promotion of the QAR, DCR agrees to continue to issue to Intersal an exploration and recovery

permit for the shipwreck *El Salvador* in the search area defined in the current permit dated 9 August 2013.  DCR agrees to continue to issue the permit through the year in which the QAR archaeology recovery phase is declared complete so long as the requirements contained in the permit are fulfilled.  Subject to the provisions of Article 3 of Chapter 121 of the North Carolina **General Statutes, entitled, "Salvage of Abandoned Shipwrecks and Other Underwater Archaeological Sites,"** and the North Carolin**a** Administrative Code, DCR agrees to recognize **Intersal's efforts and participation in the QAR project as sufficient to satisfy any performance requirements associated with annual renewal of Intersal's permit for the** *El Salvador*.  DCR expects to complete recovery of the QAR shipwreck by the end of 2016.  The Secretary of DCR shall have the exclusive authority to determine when recovery of QAR is complete.  The Secretary shall timely **notify Intersal in writing of DCR's determination that recovery is complete**.  If the recovery phase is complete prior to 2016, DCR agrees to renew the permit through at least the end of 2016.

## III.  EXACT AND MINIATURE REPLICAS AND COLLECTIBLES

4.  **Artifact Replicas.**  DCR and Intersal may make, or have made, molds or otherwise reproduce, or have reproduced, replicas of QAR artifacts for educational, scientific, retail sale, or other commercial purposes.  All aspects of the conservation of artifacts, including whether or not to conserve the artifact, shall be at the sole discretion of DCR.

5.  **Types of Replicas.**  DCR and Intersal may make two types of replicas:

    a.  <u>Miniature or Exact Replicas</u>.  Miniature or exact replicas shall be museum or archival quality and shall be produced on a limited edition basis, be individually numbered, or otherwise uniquely identified to facilitate authentication.

    b.  <u>Collectibles</u>.  Collectibles shall be true representations of artifacts.  Collectibles do not have to be miniatures or exact replications, and may be constructed of materials that do not rise to the level of museum or archival quality, and may be mass produced without being individually identifiable.

6.  **Selection of Miniature or Exact Replicas to Produce.**  Up to ten (10) QAR artifacts may be in the replication process at any given time.  DCR and Intersal shall select one artifact each, taking alternate turns, until each has selected up to five (5) artifacts for possible replication.  DCR and Intersal must present a separate business plan for the production, marketing, and sale of each of its selected replicas.  The Business Panel must review and approve the business plan.  Once a prototype is made, the Business Panel must review and approve the prototype, and accompanying packaging, marketing, or audio, visual, or literary materials (e.g., booklets, DVDs, etc.) for replication quality and historical accuracy.  The Business Panel will issue its decisions in writing and provide the same to Intersal and DCR.  Upon approval by the Business Panel, the entity seeking to reproduce the artifact may proceed with production, marketing, sales, and distribution.  If, two (2) years after the written approval of the prototype by the Business Panel, the replica has not been offered for sale or distribution, the artifact will be placed back into the available pool of artifacts to replicate.  The replication, sale, or distribution of replicas (as opposed to selection) need not be on alternating bases, but may be done according to **DCR's and Intersal's respective plans and schedules**.

Intersal agrees that the sword hilt it currently plans to produce as a miniature or exact replica shall **be Intersal's first selection and shall fall under the terms of this** Agreement.

7.  **Production of Subsequent Miniature or Exact Replicas.**  DCR and Intersal may, individually or collectively, produce more than one artifact replica at a time.  When either DCR or Intersal completes a replica and has offered it for sale or distribution, it may begin producing another

2

Case 5:15-cv-00627-BO   Document 34-1   Filed 02/08/23   Page 3 of 26
Case 5:15-cv-00627-BO   Document 34-1   Filed 12/01/15   Page 3 of 26

JA 128

artifact according to the approval process in ¶ III.6.  Once DCR or Intersal has offered an artifact for sale and distribution, it may choose another artifact from the artifact pool so that it has up to five (5) artifacts eligible for replication at any given time.  If either DCR or Intersal decides to relinquish an artifact before the end of two (2) years, the artifact will be placed back into the available pool of artifacts to replicate.  DCR and Intersal may enter into a written agreement as to the further selection of artifacts after the first ten (10) have been selected.

Except by written agreement, neither Intersal nor DCR may select additional artifacts until they have produced, or the Business Panel has declined, all five (5) of its initially-selected artifacts.

8.   **Collectibles.**   Either DCR or Intersal may propose the reproduction, marketing, sales, and distribution of collectible replicas as defined above.   The reproduction, marketing, sales, and distribution of collectible artifacts shall be approved in advance by DCR and Intersal, or, if consensus cannot be reached between them, by the Business Panel.

9.   **Replicas to be Used in Exhibits, Scientific Study, or Educational Tools.**   Understanding that there may be times when original artifacts cannot be used, DCR may make, or have made, molds or otherwise reproduce, or have reproduced, any QAR artifacts of its choosing for use in museums or traveling exhibits, as educational props in its exhibits, museums or laboratories, as scientific tools, or for scientific study.   These replicas shall not be sold.

10.   **Costs.**   DCR and Intersal shall each be responsible for their own costs of making miniature or exact replicas, or collectibles produced by or for them.

11.   **Profits.**   DCR and Intersal agree to share the profits generated by the sale of miniature or exact replicas and collectibles.  The entity producing the replica shall receive 80% of the net income after taxes: the other entity shall receive the remaining 20%.   Where DCR is the entity producing, selling, and distributing the replica, DCR will account for its marketing and operations in determining net income.   Either DCR or Intersal may request from the other documentation regarding marketing, distribution, or other costs.

12.   **Miniature or Exact Replicas Sold at Auctions or Fundraisers.**   If DCR or Intersal sells a miniature or exact replica at auction or a fundraiser, the gross/net income shall be based on a fair market value and not on the price the replica was sold for at auction or a fundraiser.

13.   **Termination.**   After five (5) years, either DCR or Intersal may terminate, with or without cause, this Reproduction Agreement section upon ninety (90) days written notice.

## IV.  PROMOTION OPPORTUNITIES

14.   **Commercial Documentaries.**   Intersal, through Nautilus, has documented approximately fifteen (15) years of underwater and other activities related to the QAR project.  For purposes of this Commercial Documentaries section, Intersal represents to DCR that Nautilus Productions shall re**main Intersal's designee.**   Intersal shall have the exclusive right to produce a documentary film about the QAR project for licensing and sale.  Intersal may partner with DCR if it chooses to do so.  If Intersal chooses to partner with DCR, DCR and Intersal shall negotiate an appropriate cost-sharing agreement, and will agree about the documentary script for historical accuracy, content and story line.   If DCR and Intersal do not partner to make a documentary, the Intersal documentary script shall be reviewed by DCR for historical accuracy prior to final release by Intersal or its agents.

Case 5:15-cv-00627-BO Document 34-1  Filed 02/08/23  Page 4 of 26
3
Case 5:15-cv-00627-BO  Document 34-1  Filed 12/01/16  Page 4 of 26
JA 129

Intersal agrees to allow DCR to use its completed documentary, free of charge, in its museums and exhibits for educational purposes. DCR agrees to recognize Intersal's participation in the making of the documentary.

**Termination.** Either DCR or Intersal may terminate this Commercial Documentaries section at any time after four (4) years have passed from the date the Secretary of DCR notifies Intersal in writing of DCR's determination that recovery is complete. Notice of termination must be given in writing six (6) months in advance.

15. **Other Commercial Narrative.** DCR and Intersal agree to collaborate in making other commercial narrative such as, but not limited to, books and e-books, mini- and full-length documentaries, and video games. Any profit-sharing agreements shall be based on the amount of work contributed by each entity. If DCR and Intersal cannot reach an agreement on the sharing and production of any such commercial ventures that they propose to undertake, DCR and Intersal will refer the issues to a mutually selected, neutral arbitrator for binding arbitration, with arbitration to be concluded within three (3) months of selection of the neutral arbitrator.

16. **Media and Access Passes.**

    a. **Procedure**.

        1) DCR agrees to establish and maintain access to a website for the issuance of Media and Access Passes to QAR-project related artifacts and activities.

        2) DCR shall manage the issuance of Media and Access Passes after receiving access requests from third parties via the website.

        3) The website shall be the primary means of access for requests, and shall include, at a minimum:

            (a) An Intersal terms of use agreement, to be electronically submitted:

            (b) The QAR media fact sheet; and

            (c) Links to DCR, Intersal, and Nautilus Productions websites.

        4) Upon electronic submission of requests and terms of use, if applicable, electronic notice shall be sent to DCR and Intersal or its designee showing acceptance or non-acceptance of the terms of use.

        5) Intersal shall bear the sole responsibility for managing and enforcing its terms of use.

        6) For requests for access that are not received through the website, DCR shall provide the requestor with substantially the same information contained on the website.

    b. **Non-commercial Media.**

        1) All non-commercial digital media, regardless of producing entity, shall bear a time code stamp, and watermark (or bug) of Nautilus and/or DCR, as well as a link to DCR, Intersal, and Nautilus websites, to be clearly and visibly displayed at the bottom of any web page on which the digital media is being displayed.

        2) DCR agrees to display non-commercial digital media only on DCR's website.

4

Case 5:15-cv-00627-BO   Document 34-1   Filed 12/01/15   Page 5 of 26
Case 5:15-cv-00627-BO   Document 34-1   Filed 12/01/15   Page 5 of 26
JA 130

c.   **Termination.**  This Media and Access Pass section shall terminate after the 5th anniversary of the signing of this Agreement.  After five (5) years, DCR and Intersal may agree to extend this provision by mutual written consent.

## V.  RECORDS

17.  **Public Records.**  Nothing in this Agreement shall prevent DCR from making records available to the public pursuant to North Carolina General Statutes Chapters 121 and 132, or any other applicable State or federal law or rule related to the inspection of public records.

18.  **Records Management.**  During the recovery phase of the QAR project, DCR and Intersal agree to make available to each other records created or collected in relation to the QAR project.  The entity requesting copies bears the cost of reproduction.  Within one (1) year after the completion of the recovery phase, Intersal shall allow DCR to accession duplicate or original records that were created or collected by Intersal during the project and that are related to the site, or the recovery or conservation of the QAR materials.  Such records shall include relevant field maps, notes, drawings, photographic records, and other technical, scientific and historical documentation created or collected by DCR or Intersal pursuant to the study of the site and the recovery of materials therefrom.  These materials shall become public records curated by DCR.  All digital media provided by Intersal under the terms of this paragraph shall include a time code stamp and watermarks (or bugs).  It is expressly recognized and agreed that, to the extent Intersal possesses confidential information or documents related to its search for *El Salvador*, no such documents or information fall under the terms of this paragraph.

## VI.  Business Panel

19.  **Business Panel.**  Members of the Business Panel shall include a secretary level representative from DCR, the president of Intersal, the president of Nautilus Productions, one representative from the North Carolina Department of Commerce or its successor, and one member of the academic community.

Business Panel meetings shall be subject to the open meetings laws codified at Article 33 of Chapter 143 of the North Carolina General Statutes.

## VII.   NAUTILUS PRODUCTIONS

20.  **Right of First Refusal.**  Nautilus Productions shall have the right of first refusal on the production of all commercial and non-commercial digital media for which no time code stamp, and watermark or bug of Nautilus has been affixed. Nautilus Productions agrees that digital media produced in-house by DCR staff shall not be included in this right of first refusal.

**Termination.**  This Right of First Refusal provision shall terminate after the 5th anniversary of the signing of this Agreement.

21.  **Return of Video.**  DCR agrees to return to Nautilus Productions all archival footage, still photographs, and other media, produced by Nautilus Productions, which do not bear a time code stamp and a Nautilus Productions watermark (or bug).  DCR may retain, for research purposes, archival footage, still photographs, and other media that contain a time code stamp and watermark (or bug), and as to such media, DCR shall provide Nautilus with a current, accurate list.

22.  **Copyright Violations.**  DCR agrees to compensate Nautilus Productions by payment of the cash sum of $15,000 for any copyright infringements by DCR or its support groups occurring through the date of the signing of this contract, including Friends of the Maritime Museum display photograph

of the pile (central portion of the QAR shipwreck)**, DCR's Flickr a**ccount showing anchor A1 on the **pile, DCR's website showing anchor A1 on the pile, DCR's News website showing anchor A2, and** Friends of the QAR website showing mapping dividers (artifact).  DCR shall pay Nautilus Productions $15,000 by 31 January 2014.

## VIII.   MISCELLANEOUS

23.   **DCR Agreement and Release.**  Except as expressly provided in this Agreement, DCR and the State, their successors and assigns hereby release and forever discharge Intersal and Nautilus, including their officers, agents and employees, from any and all claims, demands, actions, causes of action, rights, damages, costs, attorney fees, expenses and compensation whatsoever, whether arising out of common law or statute, whether state or federal claim, that DCR or the State now have, or that were or could have been made relating to their rights under the 1998 Agreement or any other prior agreements related to the *Adventure*, *El Salvador*, or *Queen Anne's Revenge* shipwrecks.  DCR expressly represents that it is not aware of any contracts that other State agencies have entered into that infringe upon the intellectual property rights of Nautilus Productions.

24.   **Intersal Agreement and Release.**  Except as expressly provided in this Agreement, Intersal and its successors and assigns hereby release and forever discharge the State, its officers, agents and employees, including DCR, from any and all claims, demands, actions, causes of action, rights, damages, costs, attorney fees, expenses and compensation whatsoever, whether arising out of common law or statute, whether state or federal claim, that Intersal now has, or that were or could **have been made relating to Intersal's rights under the 1998 Agreement or any other prior** agreements related to the *Adventure*, *El Salvador*, or *Queen Anne's Revenge* shipwrecks.

25.   **Petition for Contested Case Hearing.**  Intersal agrees to withdraw its petition for contested case hearing in *Intersal v. N.C. Dep't of Cultural Resources* (13DCR15732) within five (5) business days of the signing of this Agreement.

26.   **Nautilus Productions/Rick Allen Agreement and Release**.  Except as expressly provided in this Agreement, Nautilus and Rick Allen, and their heirs, successors, and assigns, hereby release and forever discharge the State, its officers, agents and employees, including DCR, whether individually or in their capacity as State employees, and its support groups, including the Friends of the Maritime Museum and the Friends of the QAR, from any and all claims, demands, actions, causes of action, rights, damages, costs, attorney fees, expenses and compensation whatsoever, whether arising out of common law or statute, whether state or federal claim, that Nautilus now **has, or that were or could have been made relating to Nautilus's and Rick Allen's rights under the** 1998 Agreement or any other prior agreements related to the *Queen Anne's Revenge* shipwreck or United States Copyright Act.  Nautilus and Rick Allen agree that, as part of this Agreement and Release, Nautilus/Rick Allen shall withdraw the public records request it submitted to DCR on 28 August 2013, within five (5) business days of the signing of this Agreement.

27.   **Binding Effect of Agreement on Successors in Interest.** This Agreement shall be binding on and inure to the benefit of the successors and assigns of DCR, Intersal, and Nautilus.

28.   **Non-disparagement Clause.**  DCR, Intersal, and Nautilus agree that they will not disparage one another professionally or in any public forum regarding any allegations related to this Agreement.

29.   **Choice of Laws.**  This Agreement is entered into in the State of North Carolina and shall be construed and interpreted in accordance with its laws.

6
Case 5:15-cv-00627-BO Document 34-1  Filed 12/01/15  Page 7 of 26
Case 5:15-cv-00627-BO Document 34-1  Filed 02/08/23 Page 7 of 26
JA 132

30.  **Counterparts.**  This Agreement may be executed in counterparts, any of which shall be deemed to be an original and all of which together shall be deemed the same instrument.

31.  **Entire Agreement.** The foregoing constitutes the entire agreement as specified by DCR, Intersal, and Nautilus, and the considerations stated herein are contractual and are not mere recitals.

32.  **Effect of Breach of Agreement.**  In the event DCR, Intersal, or Nautilus breaches this Agreement, DCR, Intersal, or Nautilus may avail themselves of all remedies provided by law or equity.

33.  **Review and Construction.**  Intersal, DCR and Nautilus have read and reviewed all of the terms of this Agreement, with the benefit of advice from legal counsel of their choosing.  The terms of this Agreement have been drafted and revised with input from all of them and, thus, the terms of this Agreement shall not be construed for or against any of them as author.

34.  **Notice.**  Notices under this Agreement shall be provided as follows:

   **To DCR:** Secretary, North Carolina Department of Cultural Resources, 109 East Jones Street, Raleigh, NC 27601

   **To Intersal:** Intersal, Inc., c/o Haft Steinlauf & Co., 1200 South Pine Island Road, Plantation, Florida 33324

   **To Nautilus:** Nautilus Productions, LLC, c/o Mr. Rick Allen, P.O. Box 53269, Fayetteville, NC 28305

   Any of the entities named above may change its contact information as stated above by providing written notice of the new information to all other entities named above.

**[THIS SECTION INTENTIONALLY LEFT BLANK]**

**Intersal, Inc.:**

BY: _____

David J. Reeder, President

DATE: _____10. 23 .13_____

STATE OF FLORIDA
COUNTY OF _Brevard_

Sworn to (or affirmed) and subscribed before me this 23 day of
October, 2013, by David J. Reeder.



JULIE A. STONE
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE836549
Expires 9/19/2016

(NOTARY SEAL)

_____
Notary Public

Julie A Stone
_____
Print Name

Personally Known _____ OR Produced Identification ✓
Type of Identification Produced _Florida Drivers License_

My Commission Expires:

_9│19│2016_

**Nautilus Productions:**

BY: _____

Frederick Allen, Owner

DATE: _____10/23/13_____

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

    I, G. JONA POE JR, a Notary Public in and for the County of DURHAM and State aforesaid, do hereby certify that Frederick Allen, personally appeared before me this date and acknowledged the due execution by him of the foregoing instrument as for the purposes therein expressed.

    WITNESS my hand and Notarial Seal, this the 23rd day of OCTOBER, 2013.

_____
Notary Public

G. JONA POE JR.
Print Name

My Commission Expires:

_____7/17/2017_____

G. JONA POE
NOTARY
MY COMMISSION EXPIRES
7/17/2017
DURHAM COUNTY, NC
PUBLIC

**North Carolina Department of Cultural Resources:**

BY: _Susan W. Kluttz_
      Susan W. Kluttz, Secretary

DATE: _10-24-13_

STATE OF NORTH CAROLINA

COUNTY OF WAKE

    I, _Jennifer M. Fontes_, a Notary Public in and for the County of _Wake_ and State aforesaid, do hereby certify that _Susan W. Kluttz_, personally appeared before me this date and acknowledged the due execution by her of the foregoing instrument as for the purposes therein expressed.

    WITNESS my hand and Notarial Seal, this the _24th_ day of _October_, 2013.

_Jennifer M. Fontes_
Notary Public

_Jennifer M. Fontes_
Print Name

My Commission Expires:

_10|21|17_



JENNIFER M. FONTES
NOTARY
PUBLIC
WAKE COUNTY, NC

Case 5:15-cv-00627-BO   Document 34-1   Filed 12/01/15   Page 11 of 26
Case 5:23-cv-00662   Document 1-1   Filed 12/08/23   Page 91 of 26
JA 136

STATE OF NORTH CAROLINA

COUNTY OF WAKE

AGREEMENT

THIS AGREEMENT is entered into this **1st** day of **Sept.**, 1998, by and among the

State of North Carolina represented by the Department of Cultural Resources (hereinafter the

"Department"), Intersal, Inc., a Florida corporation (hereinafter "Intersal"), and Maritime

Research Institute, Inc., a North Carolina nonprofit corporation (hereinafter "MRI").

WITNESSETH, THAT:

WHEREAS, under the provisions of the federal Abandoned Shipwreck Act of 1987 (43

U.S.C. §§ 2101-2106) and Article 3 of Chapter 121 of the General Statutes of North Carolina

(N.C.G.S. §§121-22 through 121-28), the title to non-federal abandoned shipwrecks and artifacts

embedded in the submerged lands of the State of North Carolina is transferred by the United

States to the State of North Carolina and all such artifacts are placed under the custody and

control of the Department; and

WHEREAS, working under a permit issued by the Department, Intersal, under the

direction of Michael E. Daniel, located a shipwreck site believed to be that of the ship *QUEEN*

*ANNE'S REVENGE* (hereinafter "QAR") within the State waters of North Carolina, and are to be

credited with the discovery of said vessel; and

WHEREAS, QAR was the flagship of the pirate Edward Teach or Thatch (a.k.a.

"Blackbeard") and was lost while attempting to enter Beaufort Inlet in 1718 and is of inestimable

historical and archaeological value; and

2

WHEREAS, Intersal has been searching for QAR and other 18th Century shipwrecks at Beaufort Inlet under permits issued by the Department since 1987, and has expended a considerable amount of personnel and financial assets in that effort; and

WHEREAS, paragraph L of the QAR Permit (BUI 585) issued to Intersal states that "Any material recovered during Phase Five [the salvage phase] of the project shall be divided between the Department and the Permittee, according to a system to be developed, with 25% of all coins and precious metals retained by the Department, and 75% of the material awarded to the Permittee. The Department and the Permittee agree that the most appropriate disposition of other artifacts, such as vessel structure, ship's fittings, weapons, personal effects, and non-precious cargo shall be a suitable facility, possibly in the Beaufort area [the North Carolina Maritime Museum], where the material can be curated for scientific study and public display;" and,

WHEREAS, Intersal and Michael E. Daniel are willing to forego entitlement to any coins and precious metals recovered from the QAR site in order that all QAR artifacts remain as one intact collection and in order to permit the Department to determine ultimate disposition of the artifacts; and,

WHEREAS, the Department recognizes MRI, as a partner in the project for the life of this Agreement; and,

WHEREAS, in order to facilitate this Agreement, the Department recognizes Intersal and MRI as partners, to work in partnership with the Department to research, survey, search, recover, preserve, protect, conserve, curate, and promote the collection for the life of this Agreement; and,

WHEREAS, Intersal, MRI, and the Department, in a spirit of partnership, are willing to establish a five-member project Advisory Committee with the responsibilities set out in

Case 5:15-cv-00627-BO Document 194-1 Filed 02/08/16 Page 19 of 26   Attachment A
Case 5:23-cv-00062-D Document 39-1 Filed 04/10/23 Page 140 of 319
JA 138

3

paragraph 12 of this Agreement; and,

WHEREAS, Intersal has shown in the past, and continues to evidence, a strong awareness of and commitment to the historical significance of QAR through the quantity and quality of Intersal's historical research, its willingness to employ state of the art equipment in its underwater search and recovery efforts, and the prompt reporting of its activities to the Department; and,

WHEREAS, all of the Parties to this Agreement are desirous that all aspects of the project be accomplished in a manner that will preserve and protect the QAR and its artifacts and will provide the highest degree of historical and archaeological knowledge both to the general public and to serious scholastic study; and

WHEREAS, the Department is responsible for the protection of the public heritage of North Carolina; and

WHEREAS, the officers of Intersal, aware of their responsibility to protect the interests of their stockholders, are also aware of the importance of the QAR site to the public heritage of North Carolina; and

WHEREAS, Intersal and MRI agree that title and ownership of the QAR and its artifacts shall be as set out in paragraph 14 of this Agreement; and

WHEREAS, the Parties believe that the terms of this document will create a relationship that will facilitate and finance the project in an appropriate manner;

NOW, THEREFORE, the Parties to this Agreement hereby agree as follows:

## ARTICLE I- PARTIES

1.      The Department is an agency of the State of North Carolina;

4

2.    MRI is a North Carolina non-profit corporation incorporated under the provisions of Chapter 55A of the General Statutes of North Carolina.  MRI shall be fully qualified under State and Federal law to engage in fund raising and to receive philanthropic tax exempt contributions as project funds.

3.    Intersal is a corporation incorporated under the laws of the State of Florida.

4.    By entering into this Agreement, the Parties named above certify that they are legally constituted entities with full authority to perform the terms of the agreement.  The laws of North Carolina will be applied to interpreting and enforcing the terms of this document.

ARTICLE II - DEFINITIONS

5.    The term "Parties" means the parties to this Agreement, i.e. the Department, MRI and Intersal.

6.    The term "Recovery" means the location, identification, and retrieval of any portion of the shipwreck of the QAR, or artifact from the site area.

7.    The term "Artifact" means those materials showing human workmanship or modification or having been used or intended to be used or consumed by humans, including relics, monuments, tools and fittings, utensils, instruments, weapons, ammunition, and treasure trove and precious materials including gold, silver, bullion, jewelry, pottery, ceramics, and similar or related materials from QAR.

8.    The term "Preservation" means the protection of the shipwreck of QAR and artifacts while on the site area.

9.    The term "Conservation" means the protection, treatment and long term curation of any portion of the shipwreck of QAR or any artifacts after recovery from the site area.

5

10.     The term "Site Area" means the area located within 300 yards of a point at coordinates 76 degrees 40.972 minutes West Longitude and 34 degrees 40.513 minutes North Latitude, the area surrounding the shipwreck, and this may be further defined by the Parties in the event artifacts or debris from the shipwreck are discovered outside of this area.

11.     The term "Project" means all survey, documentation, recovery, preservation, conservation, interpretation and exhibition activities related to any portion of the shipwreck of QAR or its artifacts.

## ARTICLE III - GENERAL PROVISIONS

12.     The primary responsibility for the planning and accomplishment of the preservation, recovery and conservation of the shipwreck of the QAR and the artifacts and all operations, including security operations, and any determinations as to priority of operations, is that of the Secretary of the Department. The State Archaeologist, the Supervisor of the Underwater Archaeology Unit, a representative of MRI, a representative of Intersal, and a representative selected by the Secretary of the Department from outside the Division of Archives and History shall form the Advisory Committee on Archaeological Operations ("Advisory Committee") having planning and oversight responsibility for the recovery and preservation of the shipwreck of the QAR and its artifacts, however, the final decisions with regard to such matters rest with the Secretary of the Department.

13.     Any and all funds raised by MRI shall be used as directed by MRI to cover costs associated with the project, which shall include the payment of MRI's employees and operating expenses. Any MRI funds remaining after the payment of such costs may be used by MRI in the furtherance of its non-profit purpose of maritime research consistent with its charter and bylaws.

6

14.    Subject to their rights under this Agreement, Intersal and MRI hereby assign to the Department, and the Department hereby accepts, on behalf of the People of North Carolina, the interests of Intersal and MRI in the title and ownership of QAR and its artifacts.

15.    The Parties agree that MRI shall conduct research, documentation, search, survey, recovery, preservation, conservation and curation, in conjunction with the Department. In addition, MRI may on its own conduct fund raising activities related to the project regarding the QAR site (except as noted in paragraphs 16 and 17).

16.    Except as provided in paragraph 20 and this paragraph, Intersal shall have the exclusive right to make and market all commercial narrative (written, film, CD Rom, and/or video) accounts of project related activities undertaken by the Parties. Intersal (or its designee) will be responsible for its own costs related to the making and marketing of such narrative accounts, and may participate in operations in the course of making such accounts. All Parties agree to cooperate to a reasonable degree in the making of a film and/or video documentary, or group of documentaries, that Intersal will produce (or contract to be produced) with regard to project activities.

17.    All Parties agree to cooperate in the making of a non commercial educational video and/or film documentary, or series of such documentaries, as long as there is no broadcast originating outside of North Carolina, and there is no distribution or dissemination for sale of the said educational documentary without Intersal's written permission. Intersal shall have the rights to reasonable access and usage, subject to actual costs of duplication, of all video and/or film footage generated in the making of said educational documentary.

The Parties agree to reasonably cooperate with all legitimate news media inquiries

7

regarding the project, using guidelines described in this paragraph and paragraph 35.

18. Subject to Intersal establishing compliance with standard museum practices relating to the preservation and conservation of artifacts, Intersal shall have the exclusive rights to make (or have made) molds or otherwise reproduce (or have reproduced) any QAR artifacts of its choosing for the purpose of marketing exact or miniature replicas. Intersal will be responsible for all costs related to its making and marketing of such replicas. All such replicas will be approved by the Advisory Committee, be made on a limited edition basis, and be individually numbered or otherwise uniquely identified to facilitate authentication. The Advisory Committee shall have the right to veto the reproduction, marketing or sale of a replica when the quality of the replica is deemed to be inappropriate. The Department shall have the right to sell such replicas at any state owned or state sponsored shop. Furthermore, the Department may make (or have made) molds or otherwise reproduce (or have reproduced) any QAR artifacts of its choosing for non-commercial educational purposes. The Department will be responsible for all costs related to its making and use of such replicas.

19. MRI shall have the right to designate other entities as official sponsors of the project, or other similar designations with the approval of the Advisory Committee.

20. The Department shall have the right to authorize access to, and publish accounts and other research documents relating to, the artifacts, site area, and project operations for non commercial educational or historical purposes. Nothing in this document shall infringe to any extent the public's right to access public records in accordance with Chapters 121 and 132 of the General Statutes of North Carolina.

21. MRI and the State of North Carolina jointly shall have the exclusive right to

8

nationally and internationally tour and exhibit a representative cross section of the artifacts, if MRI establishes its compliance with standard museum practices with regard to a proposed tour and exhibit. Either entity may initiate and administer such a tour, and either entity may participate in a tour initiated and administered by the other. Each entity shall be responsible for the costs incurred by their participation in such a tour and funds generated by each entity on such a tour may be used to cover that entity's costs.

Nothing in this paragraph shall affect the Department's responsibility and authority with regard to the curation of the artifacts and their display for non commercial purposes.

22.    The Parties agree to cooperate with each other and with any law enforcement or other government agency to protect the site area from unauthorized visitation, diving and unauthorized collection of Artifacts.

23.    The Parties will neither knowingly solicit nor accept gifts from third parties when such gifts may involve conflict of interest or an appearance of a conflict of interest.

ARTICLE IV - REIMBURSEMENT TO INTERSAL: EXCESS PROCEEDS

24.    All net profits (as certified by Intersal to the reasonable satisfaction of the Department) from Intersal's sale of media rights and replicas shall be entirely due to Intersal, up to an amount which represents Intersal's costs to date which have been expended in connection with the search and recovery of artifacts from the QAR. Any further funds received by Intersal from these sources shall be divided  75% (seventy five percent) of the net profits (as certified by Intersal to the satisfaction of the Department) to Intersal, and 25% (twenty-five percent) to be donated by Intersal to MRI to be used by MRI   as directed by the Advisory Committee for the purposes enumerated in this Agreement. The Advisory Committee shall take into account the

9

goal of ensuring that the heritage of the QAR is available to all of the citizens of the State of North Carolina.

## ARTICLE V - PLANS, REPORTS AND RECORDS

25.    The Department, Intersal, and MRI shall provide the Advisory Committee with copies of their plans, status reports, records of fund raising activities and expenditures relating to the project. If the Advisory Committee determines that it needs additional or different information, it may establish a system for receiving the same. The provisions of this paragraph are in addition to the requirement of paragraph 30.

## ARTICLE VI - CHARITABLE FUND RAISING ACTIVITIES BY MRI

26.    The Advisory Committee, the Department, Intersal, and MRI will all make available to each other such information and data as may reasonably be required and are generally available to inform potential donors and others about the project.

27.    All Parties recognize that MRI is an independent entity with authority to solicit both funds and equipment for the purposes enumerated in this agreement.

28.    All funds raised by MRI shall be used as directed by MRI, according to the provisions of paragraph 12 herein.

## ARTICLE VII - ACCESSION OF RECORDS

29.    Subject to the provisions of G.S. § 70-18, for the purposes of maintaining pertinent project records, MRI, Intersal and the Department agree to make available for duplication by each other, or, when appropriate, to provide the Department with, relevant field maps, notes, drawings, photographic records and other such technical, scientific and historical documentation created or collected by MRI, Intersal or the Department pursuant to the study of

10

the site and the recovery of materials therefrom. These materials shall become public records curated by the Department.

### ARTICLE VIII - MAINTENANCE OF FINANCIAL RECORDS AND AUDIT

30.    The parties to the Agreement shall develop procedures for keeping records pertaining to costs and funds associated with the project. These procedures shall incorporate, and apply as appropriate, the standards for financial management systems set forth in the Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments, at 32 CFR Section 33.20.

### ARTICLE IX - NOTICES

31.    Any notice, request, demand or other communication required or permitted to be given under this document shall be deemed to have been duly given if in writing and either delivered personally or by telegram or mailed by first class, registered, or certified mail, as follows:

If to the Department:  109 East Jones Street, Raleigh, NC 27601-2807;

If to MRI:  P. O. Box 8681, Jupiter, FL 33468;

If to Intersal:  104 Stanton Road, Beaufort, NC 28516.

A Party can change the address to which such communications are to be sent by giving written notice to the other party in the manner provided in this paragraph.

### ARTICLE X - OBLIGATIONS OF APPROPRIATIONS

32.    Nothing herein shall constitute, nor be deemed to constitute, an obligation of current or future appropriations by the General Assembly of North Carolina.

### ARTICLE XI - ADDITIONAL PROVISIONS

11

33.    The Department recognizes that Intersal's efforts and cooperation with regard to

the QAR permit have had, and will continue to have, a significant impact on its compliance with

the performance standards agreed to with regard to Intersal's permit to search for the *El

Salvador*. The Department believes that the cooperation and continued effort of Intersal with

regard to both its QAR permit and its *El Salvador* permit are of benefit to the historical heritage

of the State. The Department believes that the cooperation and effort of MRI with regard to this

project and the search for the *Adventure* are of benefit to the historical heritage of the State.

Subject to the provisions of Article 3 of Chapter 121 of the General Statutes of North Carolina

and subchapter .04R of Title 7 of the North Carolina Administrative Code, the Department

agrees to recognize Intersal's and MRI's efforts and participation in the QAR project as

sufficient to satisfy any performance requirements associated with annual renewal of Intersal's

permits for either *El Salvador* or *Adventure*, and for the life of this Agreement, renewal of said

permits cannot be denied without just cause.

34.    In the event that it is determined that the shipwreck site which is the subject of

this Agreement is not the QAR, Intersal and the State shall enter into a contract along the terms

of the permit issued to Intersal for the exploration and recovery of the QAR. In the event that the

ship *El Salvador* is discovered as a result of project operations, the terms of Intersal's *El

Salvador* permit (BUI 584) shall apply.

35.    All press releases concerning the project shall contain the following information,

when appropriate: "Intersal, Inc., a private research firm, discovered the site believed to be

*Queen Anne's Revenge* on November 21, 1996. QAR was located near Beaufort Inlet, NC by

Intersal's director of operations, Mike Daniel, who used historical research provided by Intersal's

12

president, Phil Masters.  Daniel now heads up Maritime Research Institute, the non-profit

corporation formed to work on the project in cooperation with State archaeologists and historians

of the North Carolina Department of Cultural Resources, Division of Archives and History."

The Parties agree that their spokespersons and employees will be instructed, when being

interviewed by legitimate news media, to endeavor to give appropriate credit where due for the

discovery of QAR, and mention the continuing participation of each of the Parties in the project.

36.     This document shall become effective when signed by all the Parties and shall be

effective for a period of fifteen (15) years, unless sooner terminated by written consent of all

Parties.  The Parties shall have the option to renew this agreement for an additional period of ten

years.  The option must be exercised in writing to the Department or its successors on or before

the expiration of this Agreement.

37.     This Agreement shall be governed by the law of North Carolina.


IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, this the 1st

day of _Sept._____, 1998.


Maritime Research Institute, Inc.


By:_____

Witness:_____

13

Intersal, Inc.

By: _____

Witness: _____


The State of North Carolina

By: _____

Witness: _____

STATE OF NORTH CAROLINA
COUNTY OF WAKE

<u>AMENDMENT TO AGREEMENT</u>

WHEREAS , on the 1st day of September, 1998, the State of North Carolina represented by the Department of Cultural Resources (hereinafter the "Department"), Intersal, Inc., a Florida corporation (hereinafter "Intersal"), and Maritime Research Institute, Inc., a North Carolina non-profit corporation (hereinafter "MRI") entered into an Agreement pertaining to the shipwreck site believed to be that of the ship QUEEN ANNE'S REVENGE (hereinafter "QAR"), which is located within the state waters of North Carolina.; and

WHEREAS, the parties to said Agreement desire to amend said Agreement in order to expand the Advisory Committee on Archaeological Operations ("Advisory Committee") in order to include additional persons involved in said project on the "Advisory Committee" including the QAR Project Director, the Director of the North Carolina Maritime Museum, an additional member from MRI and an additional member from Intersal;

THEREFORE, Article III, Paragraph 12 of the Agreement between the Department, Intersal, and MRI entered into on the 1st day of September, 1998 is amended as follows:

12.     The primary responsibility for the planning and accomplishment of the preservation, recovery and conservation of the shipwreck of the QAR and the artifacts and all operations, including security operations, and any determinations as to priority of operations, is that of the Secretary of the Department.  The State Archaeologist, the Supervisor of the Underwater Archaeology Unit, the QAR Project Director, the Director of the North Carolina Maritime Museum, two representatives of MRI, two representatives of Intersal, and a representative selected by the Secretary of the Department from outside the Division of Archives and History shall form the Advisory Committee on Archaeological Operations ("Advisory Committee") having planning and oversight responsibility for the recovery and preservation of the shipwreck of the QAR and its artifacts, however, the final decisions with regard to such matters rest with the Secretary of the Department.

IN WITNESS WHEREOF, parties hereunto have executed this Amendment to Agreement this the ___ day of _____, 2001.

Maritime Research Institute, Inc.

By: _____

Witness: _____

Interan, Inc.

By:

Witness: George W. Shannon, Jr. Ph.D.

The State of North Carolina

By:

Witness: Jeffrey Crow

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-627-BO

| | | |
|---|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC, | ) )<br>) | |
| Plaintiffs, | ) )<br>) | |
| v. | ) )<br>) | |
| ROY COOPER, Governor of the State<br>of North Carolina, in his official<br>capacity, JOSH STEIN, Attorney<br>General of North Carolina, in his official<br>capacity, D. REID WILSON, in his<br>individual and official capacity, DR.<br>KEVIN B. CHERRY, in his individual<br>and official capacity, SARAH<br>KOONTS, in her individual and official<br>capacity, JOSEPH K. SCHWARZER II,<br>in his individual and official capacity,<br>MIKE CARRAWAY, in his individual<br>and official capacity, and the STATE<br>OF NORTH CAROLINA, a body<br>politic, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS'**<br>**MOTION TO STRIKE**<br><br>**[Fed. R. Civ. P. 12(f)]** |
| Defendants. | ) ) | |
| _____ | ) | |

NOW COME Defendants the State of North Carolina, North Carolina Department of Natural and Cultural Resources ("DNCR"), Roy Cooper, in his official capacity, Josh Stein, in his official capacity, D. Reid Wilson, Sarah Koonts, Joseph K. Schwarzer II, Mike Carraway, Susan Wear Kluttz, Karin Cochran, Dr. Kevin B. Cherry, Cary Cox, Stephen R. Claggett, John W. Morris, in their official and individual capacities, (hereinafter collectively referred to as "Defendants")[1], and respectfully request this Court strike the portions of Plaintiffs' Frederick L.

---

[1] Defendants are not conceding or waiving any jurisdictional arguments or requirements.

Allen and Nautilus Productions, LLC (Allen) Second Amended Complaint that exceed the scope of this Court's Order granting Allen's Motion for Reconsideration and allowing Allen to file a Second Amended Complaint under Fed. R. Civ. P. 15 and 12(f). Additionally, Defendants respectfully move this Court to strike certain improperly named and/or referenced individuals and entities in the Second Amended Complaint, as well as certain paragraphs and/or allegations that are scandalous and, therefore immaterial pursuant to Fed. R. Civ. P. 12(f). In support of this motion, Defendants rely on the factual grounds, arguments and legal authorities set forth in the accompanying brief.[2]

Respectfully submitted, this 21st day of April, 2023.

/s/ Charles G. Whitehead
Charles Whitehead
Special Deputy Attorney General
State Bar No. 39222
Email: cwhitehead@ncdoj.gov
Phone: (919) 716-6816

Olga E. Vysotskaya de Brito
Special Deputy Attorney General
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov
Phone: (919) 716-0185

N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602

*Counsel for Defendants*

---

[2] Defendants also rely on and incorporate by reference their Motion to Dismiss Plaintiffs Second Amended Complaint and Memorandum in Support of the Motion to Dismiss filed concurrently herewith.

2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-627-BO

| | | |
|---|---|---|
| FREDERICK L. ALLEN and NAUTILUS PRODUCTIONS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **DEFENDANTS'** |
| ROY COOPER, Governor of the State of North Carolina, in his official capacity, JOSH STEIN, Attorney General of North Carolina, in his official capacity, D. REID WILSON, in his individual and official capacity, DR. KEVIN B. CHERRY, in his individual and official capacity, SARAH KOONTS, in her individual and official capacity, JOSEPH K. SCHWARZER II, in his individual and official capacity, MIKE CARRAWAY, in his individual and official capacity, and the STATE OF NORTH CAROLINA, a body politic, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **BRIEF IN SUPPORT OF MOTION TO STRIKE** **[Fed. R. Civ. P. 12(f)]** |
| Defendants. | ) ) | |

## STATEMENT OF THE FACTS

The facts giving rise to this case are well known to the parties and this Court through many years of litigation, and thus do not require restating in detail here. In general, this case concerns the online display of a few copyrighted images by North Carolina Dept. of Natural and Cultural Resources (DNCR) whose purpose is to preserve and promote state history. When the shipwreck *Queen Anne's Revenge* (*QAR*) was discovered off the coast of North Carolina by Intersal, DNCR, through a permit issued by North Carolina to Intersal, employed a team of professional divers and research scientists to excavate, preserve, and study the wreck. Under the terms of an agreement,

1

signed by Intersal and Rick Allen ("Allen"), Intersal designated local videographer Allen to document the excavation. Defendants secured written guarantees that it could use the resulting materials to further its educational mission. Allen sued Defendants for copyright infringement, citing the agency's display of a handful of snippets of Allen's work in educational videos and an image in a museum newsletter. Allen claimed that Defendants' use of the images was copyright infringement. He also alleged that Defendants violated his due-process rights by amending the State's public-records law, which he further alleged amounted to taking of his property without just compensation.

## STATEMENT OF THE CASE

Plaintiffs filed their First Amended Complaint on February 7, 2016, claiming that Defendants' use of his images was copyright infringement, and that Defendants violated his due process rights by amending the State's public records law (an act that he alleged amounted to taking of his property without just compensation). (DE 12, pp 70-80). Plaintiffs named, *inter alia*, Patrick McCrory, Governor of the State of North Carolina, *in his official capacity*; Susan Wear Klutz, Secretary of DNCR, *individual and official capacity*; Karin Cochran, Chief Deputy of DNCR, *individual and official capacity;* Kevin Cherry Deputy Secretary of DNCR, *individual and official capacity;* Cary Cox, Assistant Secretary of DNCR*, individual and official capacity;* Stephen R. Claggett, State Archeologist, *individual and official capacity;* John W. Morris, Deputy State Archeologist, *individual and official capacity;* DNCR and the State of North Carolina. (DE 12). Plaintiffs alleged that the state employees named in their individual capacity "knew or should have known" and acted "with malice or with reckless indifference" by depriving Plaintiffs of their copyrights in violation of the federal and N.C. constitutions. (DE 12, pp 24-27).

2

Defendants moved to dismiss all claims, arguing that sovereign immunity bars all claims brought by Plaintiffs. (DE 49, 50). This Court denied the motion to dismiss Plaintiffs' copyright claim, concluding that Congress appropriately abrogated the State's sovereign immunity pursuant to the Copyright Remedy Clarification Act (CRCA) under congressional powers stemming from Section 5 of the Fourteenth Amendment. (DE 69 p 18.) This Court further denied the motion to dismiss Plaintiffs' Declaratory Judgement claim as to the validity of N.C.G.S. §121-25(b). (DE 69 p 24) This Court, however, dismissed Plaintiffs' takings claims brought under § 1983 as barred by the Eleventh Amendment because the North Carolina courts are available to the Plaintiffs to provide an adequate remedy. (DE 69 p 18). This Court further dismissed Plaintiffs' State law claims. (DE 69 pp 26-27).

Defendants appealed to challenge this Court's denial of its sovereign immunity, qualified immunity, and legislative immunity defenses. Plaintiffs cross-appealed, challenging several of the district court's specific conclusions regarding sovereign immunity and dismissal of declaratory and takings claims. *Allen v. Cooper*, 895 F.3d 337, 346 (4th Cir. 2018). The Fourth Circuit reversed the district court on the copyright grounds, holding that the CRCA was not a valid abrogation to the State's sovereign immunity on claims violating the copyright laws, that Congress cannot abrogate sovereign immunity under Article I's Intellectual property Clause, and that the CRCA was not valid under Section 5. *Id*. at 347-354. The Fourth Circuit also dismissed all claims against the North Carolina officials in their individual capacities, with prejudice, because of qualified and legislative immunity. The appellate court held that those officials could have reasonably believed the Plaintiffs authorized them to display his works online for noncommercial purposes. *Id*. at 356-358. Further, legislative immunity entitled the public officials to absolute immunity for the performance of their legislative functions. *Id*. at 357. The Fourth Circuit also affirmed this Court's

3

dismissal of Plaintiffs' takings claim confirming the Plaintiffs have "not even shown the § 121-25(b) can be enforced against a private party" and, "in view of the officials' roles, it is apparent that none of them would or could have any role in enforcing the statute, as required." *Id*. at 354-355. The Fourth Circuit remanded with instructions to this Court to dismiss without prejudice Plaintiffs' claims against North Carolina, DNCR, and the public officials acting in their official capacities, and to dismiss with prejudice the remaining claims against the officials in their individual capacities. *Id*. at 358.

In response to the opinion and mandate issued by the Fourth Circuit, this Court entered an order on August 24, 2018, dismissing, without prejudice, all claims against North Carolina, DNCR and the public officials acting in their official capacity and dismissing, with prejudice, "the remaining claims" against the public officials in their individual capacities. (DE 92). Plaintiffs petitioned to the Supreme Court of the United States for review of the Fourth Circuit's decision with respect to its holding on States' immunity from copyright infringement claims but chose not to seek a certification based on the dismissal of his takings claim. The U.S. Supreme Court affirmed the Fourth Circuit's decision in all respects, concluding that sovereign immunity bars copyright infringement actions against nonconsenting States. According to the U.S. Supreme Court, "Article I's Intellectual Property Clause could not provide the basis for an abrogation of sovereign immunity[,]" and "Section 5 of the Fourteenth Amendment could not support an abrogation on a legislative record like the one here." *Allen v. Cooper*, 140 S. Ct. 994, 1007 (2020). Thus, it held that Congress lacked authority to abrogate the States' sovereign immunity on either one of these grounds. Dismissal of Plaintiffs' copyright infringement claims was therefore affirmed, and the U.S. Supreme Court did not remand for any additional findings on the takings or due process claims.

4

On September 4, 2020, Plaintiffs moved for reconsideration "of this Court's dismissal of Count III of [Plaintiffs'] Amended Complaint." DE 105, 106. Count III of Plaintiffs' Amended Complaint specifically sought relief under 42 U.S.C § 1983 based upon Defendants "passing and seeking to enforce N.C. Gen. Stat. § 121-25(b)" was an unconstitutional taking in violation of the Fifth Amendment of the United Sates Constitution and violated the Due Process Clause of the Fourteenth Amendment. DE 76-80. Plaintiffs sought reconsideration based on two reasons. First, the alleged change in takings claims under *Knick v. Township of Scott,* 139 S. Ct. 2162 (2019), and a second "alternative basis" for proceeding under *U.S. v. Georgia,* 546 U.S. 151 (2006). DE 106 at 1-2. Plaintiff sought "reinstatement of his lawsuit, and upon reinstatement will seek to amend his complaint." DE 106 at 2. Defendants responded in opposition. DE 114.

On August 18, 2021, this Court ordered that "*Knick* impliedly overrules *Hutto,* upon which this Court initially relied in dismissing Plaintiffs' takings claim, to the extent *Hutto* requires state exhaustion or the election of a state remedy before proceeding in federal court" (DE 118 p 18) and found that Plaintiffs "still have viable claims under *Georgia.*" DE 118 p 22. In conclusion, "Plaintiffs' takings claim and claims under *Georgia* are no longer dismissed." This Court also, *sua sponte*, allowed "Plaintiffs to amend their complaint within twenty-one days of the date of the entry of this order" as to those two claims under Rule 15 of the Federal Rules of Civil Procedure. DE 118 p 24.

On September 3, 2021, Defendants moved for reconsideration of this Court's Order (DE 118) based upon the Fourth Circuit's clarification that sovereign immunity continues to bar takings claims against the State of North Carolina in the aftermath of *Knick* and re-affirmed the binding validity of *Hutto*. (DE 119, 120) *See Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281 (4th Cir. 2021). This Court denied, without prejudice, Defendants' motion to reconsider as premature. (DE

5

133). Defendants sought appeal to the Fourth Circuit from the district court's order (DE 118) granting Plaintiffs' motion for reconsideration. (DE 122). The Fourth Circuit dismissed Defendants' appeal because it was not a final order nor an appealable interlocutory or collateral order. (DE 128).

On February 8, 2023, without any proposed amended pleading being first provided to Defendants, counsel, or the Court as required by the Local Rules, Plaintiffs filed a Second Amended Complaint (SAC) alleging **ten (10)** separate counts. *See*, *generally*, DE 134. Among these counts, Plaintiffs include causes of action for Copyright Infringement under 17 U.S.C. § 501 *et seq.* (Count I), Violations of the DMCA for Alteration or Removal of Copyright Management Information under 17 U.S.C. § 1202 (Count II), Bill of Attainder under Article I, § 10 of the United States Constitution (Count V), Ex Post Facto Law under Article I, § 10 of the United States Constitution (Count VI), Impairment of the Obligation of Contracts under Article I, § 10 of the United States Constitution (Count VII), Violation of 42 U.S.C. § 1983 (Count VIII), Injunctive Relief under *Ex Parte Young* (Count IX), and Declaratory Relief under 28 U.S.C. § 2201 (Count X). *Id.* at ¶¶ 140-158 and 189-227.

Additionally, Plaintiffs' SAC improperly names certain individuals and entities as defendants in the caption of the SAC and asserts allegations against certain individuals in the body of the SAC who do not appear as named defendants in the caption. Specifically, the following individuals who were not included in the caption of the First Amended Complaint now appear as named defendants in the caption of the SAC: Josh Stein; D. Reid Wilson; Sarah Koonts; Joseph K. Schwarzer II; and Mike Carraway. Relatedly, the following individuals and entities appear in the body of the SAC but do not appear in the caption as named defendants: DNCR; Susan Kluttz; Cary Cox; Stephen R. Claggett; Jane Doe; John Doe; and Jill Doe. (DE 134 ¶¶ 23-25, 28, and 32-

6

35). Adding further confusion, Cary Cox and Jill Doe appear in the "Parties, Jurisdiction, and Venue" subsection of the SAC (but not in the caption), yet have no allegations made against them in the remainder of the SAC. Conversely, Karin Cochran and John Morris have allegations made against them in the body of the SAC but do not appear in either the caption or the "Parties, Jurisdiction, and Venue" subsection.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(f) allows a court to strike any "redundant, immaterial, impertinent, or scandalous matter" from a pleading. A motion to strike may be granted where the allegations sought to be stricken have no bearing on the issues in the case and their inclusion would prejudice the defendant and/or cause confusion on the issues in the case. *Racick v. Dominion Law Associates*, 270 F.R.D. 228 (E.D.N.C. 2010). The issue before the Court on a Rule 12(f) motion is not whether evidence is admissible, but whether it is immaterial, impertinent, and scandalous." *Fender v. Biltmore Forest Country Club, Inc.*, 2018 WL 1995532, at *1 (W.D.N.C. April 27, 2018) (quoting *Lane v. Endurance Am. Specialty Ins. Co.*, No. 3:10-CV-401-MOC-DCK, 2011 WL 1343201, at *2-3 (W.D.N.C. April 8, 2011)). Although generally disfavored, North Carolina courts have held that scandalous, and therefore immaterial, allegations are subject to being stricken from pleadings. See, e.g., *Racick*, 270 F.R.D. at 237; *Smith-Phifer v. City of Charlotte*, No. 3:19-CV-00026-RJC-DSC, 2019 WL 3822258, at *1 (W.D.N.C. Aug. 14, 2019).

It is well-settled law at both the federal and state level that a motion for reconsideration is not intended to provide a party with a second opportunity to present arguments that were previously considered and rejected or to advance new arguments that could have been presented at an earlier stage of the litigation. *See*, *e.g.*, *JTH Tax, Inc. v. Aime*, 984 F.3d 284, 290 (4th Cir. 2021) (a motion for reconsideration "may not be used ... to raise arguments which could have been

7

raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance.")(quoting *Pac. Ins. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998); *Hatch v. DeMayo*, No. 1:16CV925, 2018 WL 6003548, at *1 (M.D.N.C. Nov. 15, 2018) (motions for reconsideration "should not be used to rehash arguments the court has already considered" or "to raise new arguments or evidence that could have been raised previously.")(quoting *South Carolina v. United States*, 232 F. Supp. 3d 785, 793 (D.S.C. 2017).

It is also well-settled law that a party may not exceed the scope of an order allowing a particular filing. *See*, *e.g.*, *Lilly v. Carter*, No. 1:16CV400, 2017 WL 3017704, at *3 (M.D.N.C. July 14, 2017)(striking allegations in amended pleading that exceeded the scope of leave previously granted by the Court, thereby prejudicing defendant); *Massenburg v. Innovative Talent Sols., Inc.*, No. 5:16-CV-957-D, 2019 WL 441172, at *11 (E.D.N.C. Feb. 4, 2019), *aff'd*, 779 F. App'x 174 (4th Cir. 2019) (striking new claims against original defendant in amended pleading that exceeded the scope of leave granted to add new defendant); *Smith v. Charter Commc'ns*, No. 3:18-CV-80-MOC-DSC, 2019 WL 2751078, at *5 (W.D.N.C. July 1, 2019) (granting defendant's motion for partial dismissal of amended pleading for exceeding scope of prior order expressly limiting amendment to two specific claims); *Hyatt v. Miller*, No. 1:19 CV 250 MR WCM, 2020 WL 5750864, at *2 (W.D.N.C. Sept. 25, 2020) (striking amended pleading because it differed from the proposed amended pleading that was included with and incorporated by reference in plaintiff's motion for leave to amend, stating "Plaintiffs were not given leave to file *any* amended complaint; they were given leave to file the Proposed Third Amended Complaint.").

On the topic of proposed amended complaints, Rule 15(a)(2) of the Federal Rules of Civil Procedure allow a party to amend its pleading with leave of court and "the court should freely give

leave when justice so requires." Pursuant to Local Rule 15.1(a) of the U.S. District Court for the Eastern District of North Carolina, "[a] party moving to amend a pleading **shall** attach to the motion: (i) [t]he proposed amended pleading, duly signed, and any exhibits thereto; and (ii) [a] form of the amended pleading indicating in what respect it differs from the pleading that it amends, by bracketing or striking through text to be deleted and underlining or highlighting text to be added." (emphasis added).

Lastly, Rule 10(a) of the Federal Rules of Civil Procedure requires a plaintiff to include in the caption of the complaint the names of all parties to the action to provide clarity and notice to all parties, including the court, as to who is involved in the case and avoid confusion and prejudice for the parties involved. The Courts recognizes that a person is not a proper party to litigation unless they are named in the caption. *See*, *e.g.*, *Perez v. Humphries*, No. 3:18CV107, 2018 WL 4705560, at *1 (W.D.N.C. Oct. 1, 2018) ("A plaintiff's failure to name a defendant in the caption of a Complaint renders any action against the purported defendant a legal nullity.") (internal citation omitted); *See also*, *Johnson v. Lett*, No. 5:22-CV-00161-MR, 2023 WL 362393, at *1 (W.D.N.C. Jan. 23, 2023) (Under Fed. R. Civ. P. 10(a) the title of the complaint **must** name all the parties.)(emphasis added). The Courts also recognizes that a person named as a defendant in the caption but without any allegations against that person appearing in the body of the complaint is similarly not a proper defendant. *See Leach v. Shelby County Sheriff*, 891 F. Supp. 2d 964, 970 (W.D.N.C. 2012) ("A plaintiff cannot simply name a defendant in the caption of a complaint and expect the defendant to defend the action without any factual allegations against him or her.").

## **ARGUMENT**

Counts I, II, V, VI, VII, VIII, IX, and X of Plaintiffs' SAC must be stricken because they exceed the scope of the Court's Order granting the Motion for Reconsideration and allowing

Plaintiffs to amend the complaint. DE 118. Relatedly, Defendants further contend that Plaintiffs' SAC violates the Local Rules for the Eastern District of North Carolina for failure to include a proposed amended complaint and allow the Court an opportunity to review the proposed amended pleading. Additionally, Plaintiffs' SAC includes several improper persons and entities that should be stricken. Lastly, certain individual paragraphs and portions of paragraphs of Plaintiffs' SAC contain scandalous and irrelevant allegations that should be stricken. Accordingly, Defendants respectfully move to strike Plaintiffs' SAC or, alternatively, certain aspects of Plaintiffs' SAC to properly limit the amended pleading to the issues and parties contemplated and permitted by this Court's Order granting the Motion for Reconsideration, namely the legal challenge to the decisional impact of *Knick* on the State's sovereign immunity in takings claim and the constitutional claims under *Georgia*.

## I.     THE MAJORITY OF COUNTS IN PLAINTIFFS' SAC EXCEED THE SCOPE OF THE COURT'S ORDER AND MUST BE STRICKEN.

Plaintiffs include several allegations and claims in the SAC that exceed the limited scope of the Order granting Plaintiffs' Motion for Reconsideration and allowing Plaintiffs leave to file the amended pleading.  Plaintiffs simultaneously added new allegations and claims that were not included in any prior pleadings and included previously litigated and dismissed and/or adjudicated claims that were not permitted by or otherwise contemplated in the Order granting reconsideration. Specifically, of all ten counts alleged in the SAC, only Counts III and IV for Takings Claims under the Fifth and Fourteenth Amendments to the United States Constitution through the Copyright Act were deemed no longer dismissed by the Order granting reconsideration. DE 118 p 24.

Again, Plaintiffs' Motion for Reconsideration requested reconsideration of this Court's 2017 Order dismissing their Count III claim in the Amended Complaint for unconstitutional taking pursuant to 42 U.S.C. §1983, which arguably ties into a direct constitutional claim under the 14th

10

Amendment pursuant to *U.S. v. Georgia*. *See*, *generally*, DE 105. In granting Plaintiffs' Motion for Reconsideration, this Court issued an Order stating, "[f]or the foregoing reasons, plaintiffs' motion for reconsideration [DE 105] is GRANTED. Plaintiffs' **takings claim** and **constitutional claims under *Georgia*** are no longer dismissed. Plaintiffs may amend their complaint within twenty-one days of the date of entry of this order." DE 118 at p. 24 (emphasis added).  As such, this Court, in no uncertain terms, allowed Plaintiffs leave to amend their complaint, pursuant to Rule 15, as to only <u>two</u> specific claims: (1) their constitutional takings claim under the Fifth and Fourteenth Amendments, and (2) constitutional claims permitted pursuant to *Georgia*.

        In *Georgia*, the United States Supreme Court held that, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159. As such, the constitutional claims permitted by *Georgia* pertain to the Fourteenth Amendment. Therefore, as evidenced by the entire body of this Court's Order granting the Motion for Reconsideration, the takings claim and the *Georgia* constitutional claims are inextricably linked. No other claims were deemed no longer dismissed by this Court or otherwise discussed in the Plaintiffs' Motion for Reconsideration [DE 105] or this Court's Order granting reconsideration [DE 118].  As such, the other eight claims included in Plaintiffs' SAC, namely Counts I, II, V, VI, VII, VIII, IX, and X, are entirely inappropriate and fall far outside the limited scope of this Court's Order.

        As cited above, a motion for reconsideration is not an opportunity to reargue the same issues or present new arguments that could have been raised earlier. The numerous extraneous claims that were improperly included in Plaintiffs' SAC are exactly that: a combination of prior claims that have already been litigated and decided and entirely novel claims that could have been

raised earlier. Again, none of these claims were even remotely considered by this Court in issuing its Order on Plaintiffs' Motion for Reconsideration, nor do they have any bearing on or relation to Plaintiffs' takings claim, *Georgia* constitutional claims, or the *Knick* decision upon which Plaintiffs relied in their reconsideration arguments. Therefore, all of Plaintiffs' causes of action in the SAC <u>except</u> for Counts III and IV for Takings Claims under the Fifth and Fourteenth Amendments to the United States Constitution through the Copyright Act must be stricken pursuant to Rule 12(f) and this Court's limited Order.

Moreover, Plaintiffs' SAC violates this Court's Local Rules for amendment of pleadings. The Order granting Plaintiffs' Motion for Reconsideration explicitly granted Plaintiffs leave to file their SAC pursuant to Rule 15 of the Federal Rules of Civil Procedure. Pursuant to Local Rule 15.1(a) of the U.S. District Court for the Eastern District of North Carolina for amending pleadings under Federal Rule 15, "[a] party moving to amend a pleading shall attach to the motion: (i) [t]he proposed amended pleading, duly signed, and any exhibits thereto; and (ii) [a] form of the amended pleading indicating in what respect it differs from the pleading that it amends, by bracketing or striking through text to be deleted and underlining or highlighting text to be added." Here, Plaintiffs provided no proposed amended pleading nor any indication as to the respect in which it differs from the pleading it amends.

Accordingly, Defendants respectfully request this Court strike Plaintiffs' SAC in its entirety on the grounds that it is in violation of this Court's Local Rules for amending pleadings or, alternatively, that the Court strike Counts I, II, V, VI, VII, VIII, IX, and X in Plaintiffs' SAC

pursuant to Rule 12(f) on the grounds they exceed the scope of this Court's limited Order granting reconsideration.[1]

## II. SEVERAL PERSONS AND ENTITIES ARE IMPROPERLY NAMED IN PLAINTIFFS' SAC AND SHOULD BE STRICKEN.

As detailed above, several persons and entities do not appear as defendants in the caption of Plaintiffs' SAC, while others appear solely in the caption with no substantive allegations against them in the body paragraphs. Plaintiffs are required to include in the caption of the complaint the names of all parties to the action. F. R. Civ. P. 10(a). The purpose of this Rule is to provide clarity and notice to all parties, including the court, as to who is involved in the case and avoid confusion and prejudice for the parties involved. Under North Carolina law, as cited above, persons or entities not included in the caption of the Complaint are not considered proper parties to the litigation. Accordingly, Defendants respectfully request the following individuals and entities be stricken from Plaintiffs' SAC pursuant to Rule 12(f): DNCR; Susan Kluttz; Cary Cox; Stephen R. Claggett; Karin Cochran; John Morris; Jane Doe; John Doe; and Jill Doe.

In a similar vein, a person named as a defendant in the caption but without any allegations against that person appearing in the body of the complaint is not a proper defendant to the litigation. As cited above, a plaintiff cannot name a defendant in the caption of a complaint and expect them to defend the action without any factual allegations. There are no allegations in the body of Plaintiffs' SAC against Cary Cox or Jill Doe. Accordingly, Defendants respectfully request these individuals be stricken from Plaintiffs' SAC pursuant to Rule 12(f).

---

[1] In the alternative, Defendants move for dismissal of Counts I, II, V, VI, VII, VIII, IX, and X in Plaintiffs' SAC pursuant to Rules 12(b)(1), 12(b)(2), and/or 12(b)(6) as detailed in the concurrently filed Memorandum in Support of Motion to Dismiss.

13

In addition, per Defendants' arguments and case law cited above, Plaintiffs' addition of the following individuals to the caption of the SAC whom did not appear in the caption of the First Amended Complaint [DE 12] improperly exceeded the scope of the Court's Order granting reconsideration: Roy Cooper; Josh Stein; D. Reid Wilson; Sarah Koontz; Joseph K. Schwarzer II, and Mike Carraway.  Accordingly, these individuals should also be stricken from Plaintiffs' SAC.[2]

## III.    CERTAIN ALLEGATIONS IN PLAINTIFFS' SAC SHOULD BE STRICKEN AS REDUNDANT, IMMATERIAL, IMPERTINENT, AND/OR SCANDALOUS.

Plaintiffs' SAC includes several redundant, immaterial, impertinent, scandalous, and otherwise irrelevant allegations.  Said allegations consist of paragraphs: 1; 4; 10 (third/final sentence only); 14; 47-52; 53 ("sought to transcend the feud by" language only); 81; 82 (except first sentence); 83; 90 ("through Defendant Kluttz" language only); 96; 100; 102; 114; 117 (last sentence only); 175; 193 (last sentence only); and 217 (references to "Defendant Kluttz" and "Defendant Claggett" only).

Examination of the paragraphs and portions thereof in question show that they contain scandalous and inflammatory allegations that are immaterial to the claims alleged.  Further, the surrounding paragraphs and allegations adequately convey Plaintiffs' claims without needless inclusion of said inflammatory language.  These allegations serve no legitimate purpose and are included solely to prejudice Defendants.  They are immaterial to the claims and, again, their inclusion serves only to potentially inflame the jury and/or otherwise prejudice Defendants.

Courts have held that scandalous and immaterial allegations are subject to being stricken from pleadings. *See*, *e.g.*, *Smith-Phifer*, 2019 WL 3822258, at *1 (granting a motion to strike

---

[2] In the alternative, Defendants move for dismissal the referenced individuals and entities on similar grounds pursuant to Rules 12(b)(1), (2), and/or (6) as detailed in the concurrently filed Memorandum in Support of Motion to Dismiss.

impertinent allegations from a complaint that had no bearing on the claims alleged). Accordingly, Defendants respectfully request the Court strike the paragraphs and portions of paragraphs identified above from the SAC pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

## **CONCLUSION**

Pursuant to Rule 12(f) for the reasons stated above, Defendants request this Court strike Plaintiffs' SAC for failure to provide a proposed amended pleading in violation of this Court's Local Rules for amending pleadings. Alternatively, Defendants request this Court strike all counts in Plaintiffs' SAC except Counts III and IV for Takings Claims under the Fifth and Fourteenth Amendments to the United States Constitution through the Copyright Act as exceeding the scope of the Order granting reconsideration and allowing leave for Plaintiffs to amend.

Additionally, Defendants request the following persons and entities be stricken from the SAC: DNCR; Susan Kluttz; Cary Cox; Stephen R. Claggett; Karin Cochran; John Morris; Jane Doe; John Doe; Jill Doe; Roy Cooper; Josh Stein; D. Reid Wilson; Sarah Koontz; Joseph K. Schwarzer II, and Mike Carraway.

Finally, Defendants request the following paragraphs and portions of paragraphs be stricken from the SAC [DE 134]: 1; 4; 10 (third/final sentence only); 14; 47-52; 53 ("sought to transcend the feud by" language only); 81; 82 (except first sentence); 83; 90 ("through Defendant Kluttz" language only); 96; 100; 102; 114; 117 (last sentence only); 175; 193 (last sentence only); and 217 (reference to "Defendant Kluttz" and "Defendant Claggett" only).

Respectfully submitted, this the 21st day of April, 2023.

JOSHUA H. STEIN
Attorney General

/s/ Charles G. Whitehead
Charles Whitehead
Special Deputy Attorney General

15

State Bar No. 39222
Email: cwhitehead@ncdoj.gov
Phone: (919) 716-6816

Olga E. Vysotskaya de Brito
Special Deputy Attorney General
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov
Phone: (919) 716-0185

N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602

*Counsel for Defendants*

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies that pursuant to LR 7.2(f)(3) of the Local Civil Rules, the foregoing Memorandum contains 4419 words (including the body of the brief, headings, and footnotes, but excluding the caption, signature blocks, this certificate of compliance, and exhibits) as reported by the word-processing software.

This the 21st day of April, 2023

/s/ Charles G. Whitehead
Charles Whitehead
Special Deputy Attorney General

17

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-627-BO

| | | |
|---|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| ROY COOPER, Governor of the State<br>of North Carolina, *in his official*<br>*capacity*, JOSH STEIN, Attorney<br>General of North Carolina*, in his official*<br>*capacity*, D. REID WILSON, *in his*<br>*individual and official capacity*, DR.<br>KEVIN B. CHERRY, *in his individual*<br>*and official capacity*, SARAH<br>KOONTS, *in her individual and official*<br>*capacity*, JOSEPH K. SCHWARZER II,<br>*in his individual and official capacity*,<br>MIKE CARRAWAY, *in his individual*<br>*and official capacity*, and the STATE<br>OF NORTH CAROLINA, *a body*<br>*politic*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' MOTION<br>TO DISMISS PLAINTIFF'S SECOND<br>AMENDED COMPLAINT**<br><br>**[Fed. R. Civ. P. 12(b)(1), (2) and (6)]** |
| Defendants.<br>_____ | ) ) | |

NOW COME Defendants the State of North Carolina, North Carolina Department of Natural and Cultural Resources ("DNCR"), Roy Cooper, in his official capacity, Josh Stein, in his official capacity, D. Reid Wilson, Sarah Koonts, Joseph K. Schwarzer II, Mike Carraway, Susan Wear Kluttz, Karin Cochran, Dr. Kevin B. Cherry, Cary Cox, Stephen R. Claggett, John W. Morris, in their official and individual capacities, (hereinafter collectively referred to as "Defendants")[1], and respectfully submit this motion to dismiss Plaintiffs' Frederick L. Allen and

---

[1] Defendants are not conceding or waiving any jurisdictional arguments or requirements.

Nautilus Productions, LLC (Allen), Second Amended Complaint in the above-captioned action against all Defendants in the above-captioned matter pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(6). Allen's Second Complaint should be dismissed for lack of personal and/or subject matter jurisdiction and Allen's failure to state a claim upon which relief can be granted. Furthermore, Allen's Second Amended Complaint exceeds the scope of this Court's limited order granting reconsideration and allowing the amended pleading (DE 118), improperly names certain individual and entity defendants and improperly asserts allegations against both and claims are barred by the applicable statute of limitations. In support of this motion, Defendants rely on the factual grounds, arguments and legal authorities set forth in the accompanying brief.[2]

       Respectfully submitted, this 21st day of April, 2023.

/s/ Charles G. Whitehead
Charles Whitehead
Special Deputy Attorney General
State Bar No. 39222
Email: cwhitehead@ncdoj.gov
Phone: (919) 716-6816

Olga E. Vysotskaya de Brito
Special Deputy Attorney General
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov
Phone: (919) 716-0185

N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602

*Counsel for Defendants*

---

[2] Defendants also rely on and incorporate by reference their Motion to Strike Allen's Second Amended Complaint and Memorandum in Support of the Motion to Strike filed concurrently herewith.

2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-627-BO

| | | |
|---|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' MEMORANDUM** |
| ROY COOPER, Governor of the State of | ) | **IN SUPPORT OF THEIR** |
| North Carolina, in his official capacity, | ) | **MOTIONS TO DISMISS** |
| JOSH STEIN, Attorney General of North | ) | **ALLEN'S SECOND** |
| Carolina, in his official capacity, D. REID | ) | **AMENDED COMPLAINT** |
| WILSON, in his individual and official | ) | |
| capacity, DR. KEVIN B. CHERRY, in his | ) | |
| individual and official capacity, SARAH | ) | **[Fed. R. Civ. P. 12(b)(1), (2) and (6)]** |
| KOONTS, in her individual and official | ) | |
| capacity, JOSEPH K. SCHWARZER II, in | ) | |
| his individual and official capacity, MIKE | ) | |
| CARRAWAY, in his individual and official | ) | |
| capacity, and the STATE OF NORTH | ) | |
| CAROLINA, a body politic, | ) | |
| Defendants. | ) | |
| _____ | ) | |

# INDEX

STATEMENT OF THE FACTS ............................................................................ 2

STATEMENT OF THE CASE.............................................................................. 2

STANDARD OF REVIEW ................................................................................. 3

ARGUMENT ...................................................................................................... 4

I.     MAJORITY OF COUNTS EXCEED SCOPE OF LIMITED ORDER ALLOWING
       RECONSIDERATION. ............................................................................... 4

II.    IMPROPERLY NAMED OR REFERENCED PERSONS OR ENTITIES SHOULD BE
       DISMISSED. ............................................................................................ 4

III.   ALL CLAIMS AGAINST GOVERNOR COOPER AND ATTORNEY GENERAL
       ("AG") STEIN IN THEIR OFFICIAL CAPACITIES SHOULD BE DISMISSED FOR
       LACK OF FEDERAL JURISDICTION, FAILURE TO STATE A CLAIM, AND ON
       THE BASIS OF SOVEREIGN IMMUNITY. ................................................... 4

IV.    SAC SHOULD BE DISMISSED FOR LACK OF PERSONAL AND SUBJECT
       MATTER JURISDICTION, SOVEREIGN IMMUNITY, LEGISLATIVE AND
       QUALIFIED IMMUNITIES, RES JUDICATA, LAW OF THE CASE, AND FAILURE
       TO STATE A CLAIM. ................................................................................ 5

COUNT I & COUNT II ....................................................................................... 5

       A.     The CRCA is not a Valid Abrogation of State Sovereign Immunity. ................... 5

COUNTS III & IV ............................................................................................... 6

       B.     Allen's Takings Claims are Barred by Sovereign Immunity, Res Judicata,
              and Law of the Case. .......................................................................... 6

       C.     *Knick* Has No Effect on the State's Sovereign Immunity to a Takings
              Claim. ................................................................................................ 6

              1.     The State Provides an Adequate Remedy for a Takings Claim. ....................... 8

              2.     Allen Has No Takings Claim Under *Penn Central*. ....................................... 10

       D.     Allen has Failed to Allege that the State's Conduct is a Violation of the
              Fourteenth Amendment under *Georgia*. ................................................. 11

- ii -

E.     Allen has Failed to Allege or Aver that any Alleged Taking Under the CRCA was Intentional. ........................................................... 12

1.     Table 1: DNCR's infringements of Allen's copyrights through 2013 ........... 13

2.     2009 QAR Lab Report. ................................................................. 14

3.     2009 PBS Episode of Secrets of the Dead, Blackbeard's Lost Ship. ............. 16

4.     22 DVCAMS. ............................................................................. 16

F.     Allen has Adequate State Remedies Available that Satisfy the Due Process Requirements of a *Georgia* Claim. ................................................. 17

G.     Several Courts have Rejected a CRCA Due Process Claim Under *Georgia*. ....... 18

COUNTS V, VI, and VII ................................................................ 19

COUNT VIII ............................................................................. 23

COUNT IX ................................................................................ 25

COUNT X ................................................................................. 27

CONCLUSION ........................................................................... 29

CERTIFICATE OF WORD COUNT ................................................ 30

ii

- iii -

## <u>TABLE OF CASES AND AUTHORITIES</u>

**Cases**                                                                       *Page(s)*

*Allen v. Cooper,*
   140 S. Ct. 994 (2020)............................................................. passim

*Allen v. Cooper,*
   895 F.3d 337 (4th Cir. 2018) .............................................. passim

*Am. Shooting Ctr., Inc. v. Secfor Int'l,*
   2016 U.S. Dist. LEXIS 96111 (S.D. Cal. July 22, 2016) ...................... 19

*Bay Point Props., Inc. v. Miss. Transp. Comm'n,*
   937 F.3d 454 (5th Cir. 2019) ...................................................... 7

*Campinha-Bacote v. Regents of the University of Michigan,*
   2016 U.S. Dist. LEXIS 5958 (S.D. Ohio Jan. 19, 2016) ................ 18, 19

*Can. Hockey. LLC v. Tex A&M Univ Ath. Dep't,*
   2022 U.S. App. LEXIS 3976 (5th Cir. Feb. 14, 2022). .................... 18

*Clay v. Osteen,*
   2010 U.S. Dist. LEXIS 111395 (M.D.N.C. 2010)........................ 27

*Clodfelter v. Republic of Sudan,*
   720 F.3d 199 (4th Cir. 2013) .................................................. 24

*Corum v. Univ. of N.C.,*
   413 S.E.2d 276 (N.C. 1992)...................................................... 9

*Cory v. White,*
   457 U.S. 85 (1982)............................................................... 26

*Davis v. Monroe Cty. Bd. Of Educ.,*
   562 U.S. 629 (1999)............................................................... 3

*Dean v. Motel 6 Operating L.P.,*
   134 F.3d 1269 (6th Cir. 1998) .................................................. 3

*Duggan v. Ocean City,*
   516 F. Supp. 1081 (D. Md. 1981)............................................ 24

*Fla. Prepaid Postsecondary Ed. Expense Bd, v. Coll. Sav. Bank,*
   527 U.S. 627 (1999)......................................................... 8, 17

iii

- iv -

*Goldstein v. Moatz*,
364 F.3d 205 (4th Cir. 2004) ................................................................. 27

*Halscott Megaro, P.A. v. McCollum*, No. 22-1505,
2023 U.S. App. LEXIS 9179 (4th Cir. Apr. 18, 2023) ........................... 28

*Hutto v. S.C. Ret. Sys.*,
773 F.3d 536 (4th Cir. 2014) ........................................................ passim

*J&J Sports Prods. v. W. Side Stories*, No. 5:10-CV-179-F,
2011 U.S. Dist. LEXIS 77964 (E.D.N.C. July 18, 2011) ....................... 25

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)................................................................................ 16

*Knick v. Twp. of Scott*,
139 S. Ct. 2162 (2019) ................................................................. passim

*Ladd v. Marchbanks*,
971 F.3d 574 (6th Cir. 2020) .................................................................. 7

*Lake v. State Health Plan for Tchrs. & State Emps.*,
380 N.C. 502 (2022) ............................................................................. 23

*Lynch v. West Virginia*,
805 F. Supp. 12 (S.D. W. Va. 1992)...................................................... 26

*Mims v. Kemp*,
516 F.2d 21 (4th Cir. 1975) .................................................................... 3

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) .................................................................. 9

*Mylan Labs., Inc. v. Akzo, N.V.*,
2 F.3d 56 (4th Cir. 1993) ........................................................................ 3

*Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents*,
633 F.3d 1297 (11th Cir. 2011) .................................................... 9, 18, 19

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) .................................................................. 3

*Nettleman v. Fla. Atl. Univ. Bd. of Trustees*,
228 F. Supp. 3d 1303 (S.D. Fla. 2017) ................................................. 18

*News and Observer Publishing Co. v. Wake County Hospital System, Inc.*,
55 N.C. App. 1, 284 S.E.2d 542 (1981)................................................. 19

- v -

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977)....................................................................................... 20, 21

*Pavlock v. Holcomb*,
   35 F.4th 581 (2022)............................................................................................. 7

*Penn Cent. Transp. Co. v. N.Y. City*,
   438 U.S. 104 (1978)....................................................................................... 10, 11

*Pulte Home Corp. v. Montgomery Cty.*,
   909 F.3d 685 (4th Cir. 2018) ........................................................................... 10

*Richmond, Fredericksburg & Potomac R.R. v. U.S.*,
   945 F.2d 765 (4th Cir. 1991) ............................................................................. 3

*Ruckleshaus v. Monsanto Co.*,
   467 U.S. 986 (1984)......................................................................................... 10

*S.C. State Bd. of Dentistry v. FTC*,
   455 F.3d 436 (4th Cir. 2006) ........................................................................... 25

*Smith v. State*,
   289 N.C. 303 (1976) .......................................................................................... 9

*State v. Johnson*,
   169 N.C. App. 301 (2005) ........................................................................... 21, 22

*Teachy v. Coble Dairies, Inc.*,
   306 N.C. 324 (1982) ........................................................................................ 10

*U.S. v. Aramony*,
   166 F.3d 655 (4th Cir. 1999) ........................................................................... 13

*U.S. v. Georgia*,
   546 U.S. 151 (2006).................................................................................. passim

*United States v. Morrison*,
   529 U.S. 598 (2000)......................................................................................... 22

*Volvo GM Heavy Truck Corp. v. U.S. DOL*,
   118 F.3d 205 (4th Cir. 1997) ........................................................................... 28

*Weller v. Cromwell Oil Co.*,
   504 F.2d 927 (6th Cir. 1974) ............................................................................. 3

*Will v. Michigan Dept. of State Police*,
   491 U.S. 58 (1989)........................................................................................... 25

- vi -

*Williams v. Utah Dep't of Corr.*,
   928 F.3d 1209 (10th Cir. 2019) ................................................................. 7

*Zito v. N.C. Coastal Res. Comm'n*,
   8 F.4th 281 (4th Cir. 2021) ..................................................................... 7, 8

**Statutes**

17 U.S.C. §106 ........................................................................................... 5

17 U.S.C. §108(a) .................................................................................... 14

17 U.S.C. §109(a) .................................................................................... 16

17 U.S.C. §501 ........................................................................................... 5

17 U.S.C. §507(b) .................................................................................... 25

17 U.S.C. §511 ........................................................................................... 5

17 U.S.C. §1202 ......................................................................................... 5

28 U.S.C.S. §§2201-02 ............................................................................ 27

N.C.G.S. §1-52 ........................................................................................ 25

N.C.G.S. §121-25 .............................................................................. passim

N.C.G.S. §121-25(b) ......................................................................... passim

N.C.G.S. §125-21 .................................................................................... 12

N.C.G.S. §125-21(b) ......................................................................... 11, 12

N.C.G.S. §132 .......................................................................................... 15

N.C.G.S. §132-1(a) .................................................................................. 19

N.C.G.S. §143-291 .................................................................................. 10

**Rules**

Fed. R. Civ. P. 12(b)(1), (2) and (6) .................................................. 1, 3, 4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-627-BO

| | | |
|---|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' MEMORANDUM<br>IN SUPPORT OF THEIR<br>MOTIONS TO DISMISS<br>ALLEN'S SECOND<br>AMENDED COMPLAINT** |
| ROY COOPER, Governor of the State of<br>North Carolina, in his official capacity,<br>JOSH STEIN, Attorney General of North<br>Carolina, in his official capacity, D. REID<br>WILSON, in his individual and official<br>capacity, DR. KEVIN B. CHERRY, in his<br>individual and official capacity, SARAH<br>KOONTS, in her individual and official<br>capacity, JOSEPH K. SCHWARZER II, in<br>his individual and official capacity, MIKE<br>CARRAWAY, in his individual and official<br>capacity, and the STATE OF NORTH<br>CAROLINA, a body politic,<br>Defendants. | ) | **[Fed. R. Civ. P. 12(b)(1), (2) and (6)]** |
| _____ | ) | |

**STATEMENT OF THE FACTS**

For purposes of brevity, Defendants incorporate by reference the Statement of Facts in their concurrently filed Memorandum in Support of Motion to Strike. Defendants also refer to the numerous filings, orders, and rulings in this matter providing factual statements, including but not limited to: *Allen v. Cooper*, 140 S. Ct. 994, 1007 (2020); *Allen v. Cooper*, 895 F.3d 337, 346 (4th Cir. 2018); and this Court's Order granting Allen's Motion for Reconsideration (DE 118 pp1-4).

**STATEMENT OF THE CASE**

Defendants incorporate by reference the Statement of the Case in their concurrently filed Brief in Support of the Motion to Strike, which provides a complete procedural history. Defendants reassert the following important procedural facts. On August 24, 2018, in response to the Fourth Circuit mandate, this Court entered an order dismissing all claims in this matter. DE 92. On September 4, 2020, Plaintiffs Allen and Nautilus Productions, LLC (Allen) moved for reconsideration "of this Court's dismissal of Count III of [Plaintiffs'] Amended Complaint." DE 105, 106. Allen sought reconsideration based on (1) the alleged change in takings claims under *Knick v. Twp. of Scott,* 139 S. Ct. 2162 (2019) and (2) for proceedings under *U.S. v. Georgia.* DE 106 pp1-2. Defendants objected. DE 114.

On August 18, 2021, this Court ordered that "*Knick* impliedly overrules *Hutto,* upon which this Court initially relied on dismissing Plaintiffs' takings claim" (DE 118 p18) and that plaintiffs "still have viable claims under *Georgia.*" DE 118 p22. "Plaintiffs' takings claim and constitutional claims under *Georgia* are no longer dismissed." DE 134 p24. This Court allowed "Plaintiffs to amend their complaint within twenty-one days of the date of the entry of this order"

2

as to those two claims. DE 118 p24. On February 8, 2023, Allen filed a Second Amended Complaint (SAC) alleging **ten (10)** separate counts.

## STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Davis v. Monroe Cty. Bd. Of Educ.*, 562 U.S. 629, 633 (1999). The "court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint," but does not consider "legal conclusions, elements of a cause of action, ...bare assertions devoid of factual enhancement[,]...unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009)(citations omitted).

Under Rule 12(b)(1), the burden of proving subject matter jurisdiction is on the plaintiff. *See Mims v. Kemp*, 516 F.2d 21 (4th Cir. 1975). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991) (citations omitted).

Rule 12(b)(2) tests a court's jurisdiction over an individual. The burden is on the plaintiff to demonstrate that jurisdiction is proper, *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998), and the plaintiff must set forth specific facts showing that the court has jurisdiction. *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974). Plaintiff is entitled to all reasonable inferences, but the court is not required to look solely to plaintiff's proof. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56 (4th Cir. 1993).

3

## ARGUMENT

I.  **MAJORITY OF COUNTS EXCEED SCOPE OF LIMITED ORDER ALLOWING RECONSIDERATION.**

For the same reasons discussed in Defendants' Memorandum in Support of Motion to Strike, Defendants move the Court, in the alternative, to dismiss SAC Counts I, II, and V through X pursuant to Rule 12(b)(1), 12(b)(2), and/or 12(b)(6) on the grounds they exceed the scope of this Court's Order. (DE 118).

II.  **IMPROPERLY NAMED OR REFERENCED PERSONS OR ENTITIES SHOULD BE DISMISSED.**

Alternatively, Defendants move the Court to dismiss the following persons and entities from the SAC pursuant to Rule 12(b)(1), 12(b)(2), and/or 12(b)(6): DNCR; Kluttz; Cox; Claggett; Cooper; Stein; Wilson; Koonts; Schwarzer II; Carraway; and the Doe defendants.

III.  **ALL CLAIMS AGAINST GOVERNOR COOPER AND ATTORNEY GENERAL ("AG") STEIN IN THEIR OFFICIAL CAPACITIES SHOULD BE DISMISSED FOR LACK OF FEDERAL JURISDICTION, FAILURE TO STATE A CLAIM, AND ON THE BASIS OF SOVEREIGN IMMUNITY.**

First, Allen fails to make any factual allegations against Governor Cooper and AG Stein averring only that the Governor is sued because he is Governor and was the AG before that, DE 134 ¶21, and that AG Stein is the Attorney General "authorized to enforce North Carolina laws," DE 134 ¶22. Those allegations are insufficient to grant this Court jurisdiction to hear claims against these officials, pierce these officials' sovereign immunity, or state any claims against them.

Second, Governor Cooper was already dismissed from this action by the Fourth Circuit, and that dismissal rationale equally applies to AG Stein. "As we explained in *Hutto*, the 'requirement that there be a relationship between the state officials sought to be enjoined and the enforcement of the state statute prevents parties from circumventing a State's Eleventh

4

Amendment immunity.' We thus noted 'that a governor cannot be enjoined by virtue of his general duty to enforce the laws,' nor can an 'attorney general...be enjoined where he has no specific statutory authority to enforce the statute at issue.'" *Allen*, 895 F.3d at 355 (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014). An attempt to revive the lawsuit against Governor Cooper after the Fourth Circuit's dismissal is improper, barred by sovereign immunity and res judicata doctrines, and should be disallowed. The Fourth Circuit's rationale equally applies to the AG. The law of the case/collateral estoppel and sovereign immunity doctrines bar an action against AG Stein under these circumstances, as he has no specific statutory authority to enforce the statute at issue.

IV.  **SAC SHOULD BE DISMISSED FOR LACK OF PERSONAL AND SUBJECT MATTER JURISDICTION, SOVEREIGN IMMUNITY, LEGISLATIVE AND QUALIFIED IMMUNITIES, RES JUDICATA, LAW OF THE CASE, AND FAILURE TO STATE A CLAIM.**

## COUNT I & COUNT II

A.    **The CRCA is not a Valid Abrogation of State Sovereign Immunity.**

Allen alleges Defendants violated the CRCA (17 U.S.C. §511) by copying, displaying, distributing, and performing Allen's works in violation of 17 U.S.C. §106 and 17 U.S.C. §501. Additionally, Allen alleges Defendants altered or removed copyright management information from Allen's media in violation of 17 U.S.C. §1202. DE 134 at 28-30. Both claims must be dismissed.

The Supreme Court, in this matter, already held the CRCA was not a valid abrogation of the State's sovereign immunity and dismissed Allen's claim. The Court held that "Article I's Intellectual Property Clause could not provide the basis for an abrogation of sovereign immunity" and "that Section 5 of the Fourteenth Amendment could not support an abrogation" based on the CRCA legislative record. *Allen*, 140 S. Ct. at 1007. Therefore, SAC Counts I and II

5

must be dismissed based on res judicata, law of the case, and failure to show the valid abrogation

of sovereign immunity.[1] Additionally, these claims exceed the scope of this Court's limited

Order (DE 118) and should be dismissed on that basis as well.

<u>COUNTS III & IV</u>

**B.    Allen's Takings Claims are Barred by Sovereign Immunity, Res Judicata, and Law of the Case.**

Count III of the Amended Complaint alleged N.C. violated the Takings Clause of the

Fifth Amendment. (DE 12 ¶¶ 76-80). This court granted the request to dismiss that takings claim.

(DE 50 at 25-28 and DE 69 at 18, 28). Allen appealed to the Fourth Circuit. The Fourth Circuit

affirmed the dismissal. *Allen*, 895 F.3d at 354-55. Allen failed to appeal that judgment to the

Unites States Supreme Court, which made no remand or referral for any additional findings on

the takings issue. Accordingly, that judgment is final and sovereign immunity, res judicata, and

law of the case all preclude revival of the previously dismissed takings claim.

**C.    *Knick* Has No Effect on the State's Sovereign Immunity to a Takings Claim.**

On March 23, 2017, this Court correctly determined Allen's takings claim is barred by

N.C.'s sovereign immunity based on *Hutto* and the doctrine of sovereign immunity. DE 69 pp18,

28. After a unanimous loss in Supreme Court, Allen moved for reconsideration of this Court's

dismissal of the takings claim (DE 69 and 92), relying on the recent decision in *Knick*, 139 S. Ct.

2162. Allen argued that *Knick* constituted a precedential change, and nullified the doctrine of

---

[1] Allen states, without any evidence, that "Defendants' [copyright] infringement has been willful." DE 134 p28. Even if true, which is denied, these allegations have no impact on sovereign immunity here. "*Congress* must identify a pattern of unconstitutional conduct *before* it abrogates Eleventh Amendment immunity" and "States may not be subject to suits unless *Congress has identified* a specific pattern of constitutional violations." *Allen*, 895 F.3d at 353-54 (emphasis added)(citations and quotations omitted).

sovereign immunity for alleged takings claims filed against the State. This Court granted Allen's request for reconsideration based exclusively on its analysis of *Knick*'s impact on the issue of sovereign immunity for takings' claims. DE 118 pp4-21. The Court held that "plaintiffs have shown that their motion to reconsider is based on a change in decisional law following *Knick*" and therefore, "[p]laintiffs' takings claim is no longer dismissed" and allowed Allen's to amend their complaint. DE 118 pp21, 24.

On August 9, 2021, the Fourth Circuit unanimously rejected the argument that *Knick* overturned and nullified sovereign immunity of the states in takings claims. *Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281 (4th Cir. 2021). The Fourth Circuit clarified that sovereign immunity continues to bar takings claims against N.C. in the aftermath of *Knick* and re-affirmed the binding validity of *Hutto*, 773 F.3d 536. *Knick* was not and is not an alteration of the sovereign immunity framework an Allen's takings claims must be dismissed. *Zito*, 8 F.4th at 287.

Each circuit addressing *Knick's* effect on sovereign immunity has similarly concluded that *Knick* did not abrogate State sovereign immunity in federal court. *Id*. *See Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019)("But *Knick* did not involve Eleventh Amendment immunity, which is the basis of our holding in this case."); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456-57 (5th Cir. 2019)("Nor does anything in *Knick* even suggest, let alone require, reconsideration of longstanding sovereign immunity principles protecting states from suit in federal court."), *cert. denied*, 140 S. Ct. 2566 (2020); *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020)("[T]he Court's opinion in *Knick* says nothing about sovereign immunity."), *cert. denied*, 141 S. Ct. 1390 (2021); *Pavlock v. Holcomb*, 35 F.4th 581, 589 (2022) ("But unlike in *Knick*, which involved a suit against a Town, [this suit] is against a state, and states enjoy sovereign immunity."), *cert. denied*, 143 S. Ct. 374 (2022).

7

The Fourth Circuit and each circuit which has addressed the issue confirms that *Knick* was not a decisional change in law and *Hutto* remains controlling authority on the issue of states' sovereign immunity in a takings claim. This Court's original conclusion that *Hutto* precluded a takings claim against the Defendants and subsequent dismissal of Allen's takings claim was correct and vindicated by the Fourth Circuit's decision in *Zito*. Allen's takings claims under Count III and IV of the SAC must be dismissed.

### 1.    The State Provides an Adequate Remedy for a Takings Claim.

This Court correctly ruled that "[b]ecause [state] remedy is available in the State's courts, the Court finds that count III [Allen's takings' claim] must be dismissed." DE 69 p18. Allen has several adequate state remedies available: under the N.C. Constitution, for common law breach of contract, and under state tort claim theory. Given these adequate state procedures for full compensation, Allen's federal lawsuit is barred by sovereign immunity. *Hutto*, 773 F.3d at 552; *Zito*, 8 F.4th at 290.

The Fourteenth Amendment bars the State from depriving a person of property without due process of law, but the infringement must be intentional and the State must fail to offer an adequate remedy for the infringement "because such a remedy itself satisfies the demand of due process." *Allen*, 140 S. Ct. at 1004(citations and quotations omitted). In *Fla. Prepaid Postsecondary Ed. Expense Bd, v. Coll. Sav. Bank,* 527 U.S. 627, 643-44, and n.9 (1999), the Court explicitly recognized that Florida provided alternate remedies for patent infringement, including through a takings or conversion claim and these remedies satisfy due process. The Court in *Allen* stated that remedies such as contract claims or unjust enrichment claims "might themselves" satisfy due process. *Allen*, 140 S. Ct. at 1006-07; *Zito,* 8 F.4th at 288-90 ("North

8

Carolina's courts remain open for takings claims. Under *Hutto*, this means that sovereign immunity bars the [plaintiff's] claims against the State in federal court.").

Allen alleges he cannot pursue this claim in state court because the claim and any damages would be preempted by the CRCA. DE 134 ¶¶173, 188. Allen also alleges the only appropriate compensation for his takings claim is set forth in the damages provision of the CRCA. DE 134 ¶171. Adequate alternative state remedies for a copyright claim are not limited only to copyright damages. *Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents*, 633 F.3d 1297 (11th Cir. 2011). N.C. courts remain open to adjudicating a takings claim if they provide a "reasonable, certain, and adequate" means for challenging an action as a taking and obtaining compensation if the challenge is successful. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019)(quotations omitted). Direct constitutional claims in N.C. courts are available if the claimant's rights cannot be fully redressed through statutory or other state claims. *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 289 (N.C. 1992).

As shown by the pending claim against the State in connection with the 2013 Settlement Agreement, breach of contract claims are available. In October 2013, the State, Allen, and Intersal entered into a written settlement agreement ("Agreement")(**Ex. 1**) concerning, *inter alia*, commercial and noncommercial media related to the *Queen Anne's Revenge* (*QAR*). DE 134 ¶¶90-93. Allen is listed as Intersal's designee for *QAR* video and photographic images. Allen, a cosignatory to the Agreement, alleges here that the State failed to perform under the terms of the Agreement. Intersal filed a state court claim for breach of contract and resulting damages, which Allen inexplicably chose not to join. DE 134 ¶¶96-99. When the State of North Carolina enters into a valid contract, the State implicitly consents to be sued for breach of contract. *Smith v. State*, 289 N.C. 303, 320 (1976).

9

Here, the Fourth Circuit already concluded that Allen's rights are limited by the Agreement. *Allen*, 895 F.3d at 356. Thus, to the extent Allen claims compensatory damages from the State's breach of the Agreement, state courts provide an avenue for compensation. Moreover, N.C. has partially waived sovereign immunity for negligence. *Teachy v. Coble Dairies, Inc.*, 306 N.C. 324, 329 (1982) The N.C. Tort Claims Act empowers the N.C. Industrial Commission to award compensatory damages up to a million dollars for state negligent actions or omissions, providing Allen yet another state venue for potential relief.  N.C.G.S. §§143-291 and 299.2.

Allen's argument that *Knick* has reversed *Hutto* must be rejected. *Hutto* continues to be binding authority that States are entitled to sovereign immunity in federal takings claims where, as here, state tribunals offer adequate remedies for alleged takings violations.  The rationale applies equally to compensatory and injunctive claims.  Because there are adequate state remedies and compensation available, no injunctive relief is available under the Takings Clause either. *See*, *Ruckleshaus v. Monsanto Co.,* 467 U.S. 986, 1016 (1984) ("[e]quitable relief is not available to enjoin an alleged taking of private property…when suit for compensation can be brought against the sovereign subsequent to the taking.") *See also*, *Knick*, 139 S. Ct. at 2168.

### 2.    Allen Has No Takings Claim Under *Penn Central.*

Defendants did not find any Fourth Circuit case applying a takings claim analysis to the State. Presumably, state remedies are available and sovereign immunity bars such claims. Even if N.C. did not enjoy sovereign immunity, Allen's takings claims still fail under *Penn Central* analysis. *Penn Cent. Transp. Co. v. N.Y. City*, 438 U.S. 104, 122 (1978).

It is exceedingly rare for a takings claim to succeed where, as here, a due process claim fails. "[W]here a due process claim is unsuccessful, 'it would be surprising indeed to discover the challenged statute nonetheless violat[es] the Takings Clause.'" *Pulte Home Corp. v.*

10

*Montgomery Cty.*, 909 F.3d 685, 695 (4th Cir. 2018). Allen fails to allege any possible taking by the State under the substantive test announced in *Penn Central*. Defendants have submitted detailed arguments to contend Allen has failed to adequately allege a *Penn Central* claim. DE 114 pp22-23. For brevity, the argument is not presented here, but is instead incorporated by reference. *Id. See also*, Arg. Count V, Bill of Attainder below regarding Allen allegations that N.C.G.S. §121-25, "nullified the use restrictions in the Agreement and placed Allen's work in the public domain." DE 134 ¶119.

**D.    Allen has Failed to Allege that the State's Conduct is a Violation of the Fourteenth Amendment under *Georgia*.**

Allen alleges a direct takings claim by using his copyrighted material and through the passage of N.C.G.S. §125-21(b) in violation of the CRCA and an abrogation of sovereign immunity under *U.S. v. Georgia*, 546 U.S. 151 (2006). DE 134 ¶¶140-188. Allen's reliance on *Georgia* is misplaced and Counts III and IV of Allen's complaint must be dismissed.

In *Georgia*, the Supreme Court considered whether Congress validly abrogated the sovereign immunity of the States under the Title II of the ADA. 126 S. Ct. at 880-81. The Court held that Title II featured an unequivocal expression of congressional intent to abrogate sovereign immunity, and concluded that when "Title II creates a private cause of action for damages against the States for conduct that actually violates that Fourteenth Amendment, Title II validly abrogates sovereign immunity." *Id*. The Court declined to decide whether the ADA validly abrogates sovereign immunity for claims "premised on conduct that does not independently violate the Fourteenth Amendment." *Id*. The Supreme Court then remanded to the lower court to give the plaintiff an opportunity to amend his complaint, after which the lower court would be best situated to determine, on a claim-by-claim basis, (1) which aspects of the

11

State's alleged conduct violated Title II, (2) to what extent such misconduct also violated the Fourteenth Amendment, and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Id.* To come within the reach of the procedural requirements of the Due Process Clause, a violation must (1) be "intentional, or at least reckless," and (2) lack adequate post-deprivation state remedies. *Allen*, 140 S. Ct. at 1004.

This Court need not decide whether *Georgia* extends to copyright infringement cases, which is in no way clear or conceded, because even assuming it does, Allen has failed to allege that Defendants' conduct constitutes an actual violation of the Fourteenth Amendment.

### E.    Allen has Failed to Allege or Aver that any Alleged Taking Under the CRCA was Intentional.

Allen alleges that Defendants' infringements of copyright claims, directly and through the passage of N.C.G.S. §125-21(b), effectuated a taking in violation of the Fifth Amendment to the U.S. Constitution. DE 134 pp30-33.[2] Allen further alleges Defendants failed to provide "due process in connection with their takings" and failed to provide "just compensation." DE 134 ¶¶169, 170, 183, 184. However, Allen fails to allege what, if any, copyright violations are attributable to a direct takings claim and which are attributable to N.C.G.S. §125-21. At best, the copyright takings Allen is alleging are, (1) contained in "Tables 1-3[3] and described in paragraphs 86-88 and 118-123" (DE 134 ¶162), (2) "withholding and refusing to return Allen's physical media" identified as "22 videotapes containing Allen's most valuable footage" (DE 134 ¶¶98, 163), and (3) that the Maritime Museum in Beaufort, N.C. (MMB) has "shown Allen's footage

---

[2] This argument is also applicable and incorporated into Defendants' argument above concerning a direct Takings claim.

[3] Allen's SAC contains only 2 numbered Tables. Those tables correspond with page sections identified in the SAC allegations and Defendants shall address those 2 Tables.

12

to museum visitors" without a license from Allen and did not compensate Allen for "showing his footage at [the Museum]." DE 134 p25.

Despite using conclusory language (DE 134 ¶162), Allen has failed to allege any facts showing the intentional nature of the alleged infringements. Rather, the facts show that the opposite is true.

### 1.    Table 1: DNCR's infringements of Allen's copyrights through 2016.

Table 1 of the SAC (DE 134 p16) repeats the same violations (four videos, one photograph in video, and one photo in print[4]) and alleged dates of infringement (September 2015 to December 2016) as those in Allen's First Amended Complaint. (DE 12 pp13-14; DE 134 p22). However, these images have not been posted since 2016 or, since the Fourth Circuit decision in 2018. The Fourth Circuit already held that Defendants reasonably believed they could use the images under the terms of the Agreement, which explicitly authorized them to display Allen's "noncommercial digital media." *Allen*, 895 F.3d at 356-57. Further, Defendants had reason to believe that their noncommercial use of the images to make educational videos was fair use and, therefore, non-infringing. *Id.* Under this established law of the case, the best Allen can allege is a negligent, unintentional violation of his rights, if any. *U.S. v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) ("once the 'decision of an appellate court establishes 'the law of the case,' it 'must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal[.]'")

---

[4] In addition, a review of the copyrights for the images and videos contained in Table 1 confirms that Allen is not the copyright holder for the image titled "Ballast 1", Registration No. VA0001872054. (**Ex. 2**) While not dispositive to the issue of copyright infringement it does confirm that the parties-even Allen- are unsure on who owns the rights to the materials and in what context they can be used.

Therefore, as established by the Fourth Circuit and Allen's admission in the SAC ("the State took down the infringing videos specifically identified in Allen's Amended Complaint.")(DE 134 ¶127), the six alleged copyright infringements identified in Table 1 are not intentional, and cannot serve as a basis for a Fourteenth Amendment claim.

### 2.      2009 QAR Lab Report.

Allen alleges that N.C. continues to publish, display, and perform many of his works," DE 134 ¶129, by "posting" materials to the Internet Archive using Archive-It, a tool that collects, stores, and provides access DNCR's archived web sites. (DE 134 ¶129). *See,* Table 2 (DE 134 ¶130). Table 2 re-lists the 6 materials in Table 1 (DE 134 p22), but also includes 16 alleged infringements that are 8 photographs contained in 1 report listed twice, once from August 2016 to July 2018, and again from June 2021 to the present. *Id.* (**Ex. 3**) The photographs are watermarked "Nautilus Productions."

Allen fails to show that the alleged limited use of images for archival purposes constitutes an illicit infringement. See 17 U.S.C. §108(a). DNCR has proactively, out of abundance of caution and in good faith, attempted to remove this and other QAR records from its active and archived websites. In June 2017, DNCR identified the lab report as a record to be removed from active websites or replaced with a redacted version. DNCR believed that had been completed by the end of June 2017. (**Ex. 4**) However, Allen located an older version of the lab report that could not be deleted by DNCR and complained about it in his 24 July 2018 Petition for Rehearing En Banc in the Fourth Circuit Court of Appeals. DNCR removed that record on 25 July 2018, (**Ex. 5-6**), and other publicly accessible records it could identify containing Allen's work by 1 August 2018.(**Ex. 7**) In the SAC, Allen identifies what appears to be a "ghost" version of the lab report that had little or no metadata but could not be fully deleted because of a likely system error and

14

the unredacted version has since been removed. (**Ex. 7**) DNCR has spent hundreds of hours searching for records containing Allen's works and has no desire to display them. It repeatedly invited Allen to identify any works that he is aware of that could have been inadvertently displayed on archival or other sites and promised to work on removals. Notwithstanding the repeated state requests, Allen inexplicably refuses to inform DNCR of any works he believes are infringing. (**Exs. 8-11**).

Governmental agencies use the internet to disseminate information, provide services, and transact business. Internet resources must be managed the same as other records-keeping systems to comply with N.C. statutes concerning public records and to facilitate continuing public access and use to this information. The Public Records Act (G.S. §132) and the Depository Library System Act (G.S. §125.11) delegate the responsibility for preserving public records and publications, respectively to the Archives and Library. The Archives and Library have jointly subscribed to Internet Archive's "Archive-It" service since 2005 to manage the identification, selection, capture, and preservation of government websites with historical, legal, administrative, or evidentiary value. This service uses the Wayback Machine to crawl and capture websites. Even after a record or publication has been removed an archived crawl of the record or publication may still exist online because it was previously captured by the Wayback Machine. This archival method of Allen's work in state's custody is consistent with Allen's explicit stance on public records in the Agreement. Yet, the State has always been, and continues to be, willing to take down any archived images of Allen's work. The State repeatedly reached out to Allen to offer exactly that and request collaboration, but Allen prefers to use any instances of inadvertent displays in this lawsuit rather than to protect his alleged rights. Allen fails to demonstrate any intentional taking.

### 3.    2009 PBS Episode of Secrets of the Dead, Blackbeard's Lost Ship.

Allen alleges that DNCR has, for the last decade, shown Allen's video footage to visitors of the MMB in the theater without compensation or permission. DE 134 p25. What Allen fails to disclose to the Court is that the video in question is not Allen's, but a PBS video that DNCR is permitted to show. Approximately 5 minutes of Allen's underwater footage forming the basis of this allegation appears in a 2009 PBS episode of *Secrets of the Dead; Blackbeard's Lost Ship*, which also features current or former DNCR employees. Allen does not claim that PBS lacked a license to use that footage in its documentary or sell it to others. The MMB purchased a copy of the video from PBS, later purchased an "AV copy" with performance rights in classrooms and admission-free screenings and played it as part of its optional educational programming offered to visiting school groups through January 2023. (**Ex. 12, 13, 14 and 15**)

The MMB is an admission-free public museum that also provides educational programming to school groups. DNCR purchased the rights to show *Blackbeard's Lost Ship* from PBS. Showing PBS's television episode in the educational theater was permitted and was neither a taking nor a copyright violation[5].

### 4.    22 DVCAMS.

Since 2013, in compliance with the Agreement, DNCR has gathered and returned media produced by Allen without a time code stamp or "bug". In December 2013, DNCR returned over

---

[5] Allen also alleges DNCR sold copies of a "documentary" at the MMB gift shop from 2009 to 2015. DE 134 ¶86. DNCR is informed and believes that the gift shop was being operated by the Friends of the QAR at this time and was simply re-selling purchased copies of the PBS television series "Secrets of the Dead: Blackbeard's Lost Ship". Under 17 U.S.C. §109(a), the "first sale doctrine" allows a lawful purchaser of a copyrighted work to sale or dispose of the work without the authority of the copyright owner. *See also, Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013).

175 items to Allen (**Ex. 16**). DNCR was not able to locate 22 DVCAMS that Allen believed had not been returned. DNCR agreed it would continue the search for 10 years. *Id*. Allen thanked DNCR for its efforts to continue searching for the missing tapes. (**Ex. 17**) DNCR has continued to search for responsive materials. (**Ex. 18**)

Allen alleges DNCR withheld 22 videotapes containing Allen's most valuable footage which constituted a physical taking of his property. (DE 134 ¶¶94, 98, 163). The 22 DVCAMS were recently discovered in an unmarked box in the Office of the State Archeology Research Laboratory. DNCR has repeatedly attempted to return them to Allen since discovery. Despite claiming their immense value, Allen has failed to respond to the repeated attempts to return the tapes. (**Ex. 19**)

The 22 DVCAMS were not intentionally taken from Allen. DNCR does not believe the video and images from the DVCAMS were ever displayed or used, nor does Allen allege otherwise.

**F.    Allen has Adequate State Remedies Available that Satisfy the Due Process Requirements of a *Georgia* Claim.**

A federal *Georgia* takings claim is inappropriate where adequate state remedies are available. As argued *supra* on pp8-12, North Carolina provides a range of alternative remedies that are adequate under the circumstances of this case: State takings claim, tort claim, and breach of contract. The Supreme Court in *Georgia* explicitly recognized that these remedies satisfy due process. "[Plaintiff] differs from the claimants in our other cases addressing Congress's ability to abrogate sovereign immunity pursuant to its §5 powers. *See Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. at 644 n.9 (Florida satisfied due process by providing remedies for patent infringement by state actors)." *Georgia*, 546 U.S. at 158.

In analyzing a *Georgia* abrogation claim under the CRCA, courts have held that the

17

remedies available in N.C. satisfy the due process requirements. A viable takings claim against the [State] under the [State] Constitution would satisfy the due process requirements of *Georgia*. *Can. Hockey. LLC v. Tex A&M Univ Ath. Dep't,* 2022 U.S. App. LEXIS 3976 *21 (5th Cir. Feb. 14, 2022). In *Nettleman v. Fla. Atl. Univ. Bd. of Trustees,* 228 F. Supp. 3d 1303, 1312 (S.D. Fla. 2017), a state tort claim was held to be adequate. *Id*. at 1312-13.

As this Court has already determined, Allen has adequate State remedies available and his *Georgia* claim must be dismissed.

### G. Several Courts have Rejected a CRCA Due Process Claim Under *Georgia*.

Allen alleges he was not provided "due process" because he did not have an opportunity "to be heard and had no means to challenge the infringements, other than through this litigation" (DE 134 ¶169) and that N.C.G.S. §121-25(b) did not provide him "due process" or "with an opportunity to oppose" or "seek reclassification" of his work. DE 134 ¶183. Several courts have rejected these arguments and questioned whether a procedural due process claim under the CRCA is appropriate under *Georgia*. In *National Ass'n of Boards of Pharm. v. Board of Regents*, 633 F.3d 1297 (11th Cir. 2011) the Ninth Circuit doubted whether the appellant's procedural due process claim falls under *Georgia's* framework, stating that "one infringes a copyright by copying or distributing a work; no amount of process absent the owner's consent avoids liability under the statute...NABP's due process claim argues that it should have received a pre-deprivation hearing before its copyright was infringed. This alleged conduct—failing to provide a hearing—is not identical to copyright infringement. Therefore, NABP's argument that it was owed a pre-deprivation hearing is not implicated by a strict understanding of what it is to infringe a copyright and thus arguably not covered by *Georgia*." *National Ass'n*, 633 F.3d at 1316 n. 32.

In *Campinha-Bacote v. Regents of the University of Michigan*, 2016 U.S. Dist. LEXIS

5958 (S.D. Ohio Jan. 19, 2016), the district court rejected the plaintiff's argument that, under *Georgia*, the states' sovereign immunity was validly abrogated because the CRCA statutorily prescribed conduct also violated the guarantee of Due Process under the Fourteenth Amendment. The Court explained that the act of copyright infringement itself "does not simultaneously and independently violate a constitutional guarantee protected by the Fourteenth Amendment as it did in *Georgia*. Instead, the existence of a constitutional due process violation...is an inquiry distinct from whether a copyright was infringed. As such, [plaintiffs] attempt to rely on *Georgia* is unavailing." 2016 U.S. Dist. LEXIS 5958, [WL] at * 5. *See also*, *Am. Shooting Ctr., Inc. v. Secfor Int'l*, 2016 U.S. Dist. LEXIS 96111 at *11 (S.D. Cal. July 22, 2016)(Court agreed with reasoning in *National Ass'n* and *Campinha-Bacote* and held *Georgia* inapplicable when plaintiff alleged the State failed to provide due process).

Assuming, *arguendo*, *Georgia* is applicable to a CRCA claim, Allen has not alleged an intentional taking and has adequate state remedies available which satisfy the due process requirements of the Fourteenth Amendment. This claim must be dismissed.

### COUNTS V, VI, and VII

The N.C. Public Records Act provides a broad definition of "public record." N.C.G.S. §132-1(a) (including "photographs, films...that are "made or received pursuant to law or ordinance in connection with the transaction of public business."). The term "made or received pursuant to law or ordinance" includes any material kept in carrying out an agency's lawful duties. *News and Observer Publishing Co. v. Wake County Hospital System, Inc.*, 55 N.C. App. 1, 13, 284 S.E.2d 542, 549 (1981). Covered agencies include "every public office, public officer or official...or other unit of government of the State." N.C.G.S. §132-1(a).

Allen's allegations that §121-25(b) is a bill of attainder are meritless because the materials at issue were already public records pursuant to Chapter 132 and the Agreement. Well before the enactment of §121-25(b), Allen provided the materials directly to DNCR in connection with the *QAR*. Pursuant to Chapter 132, those materials were public records upon receipt by DNCR. The Agreement further confirms Allen's understanding that the materials at issue were and are public records.[6] The subsequent enactment of §121-25(b) stating "[a]ll photographs, video recordings, or other documentary materials of a derelict vessel of shipwreck...in the custody of any agency of North Carolina...shall be a public record pursuant to Chapter 132" merely reiterates what was already true under the public records law and confirmed in the Agreement. The Fourth Circuit agreed with that interpretation, finding that "[b]ased on the provisions of the…Agreement *and the then applicable public records law*, it is far from clear whether [DNCR] was prohibited from displaying Allen's copyrighted materials [especially] in view of [DNCR]'s role in the salvage project *to preserve for the public the site and artifacts and to document their salvage in furtherance of research and the education of the public*." *Allen*, 895 F.3d at 357 (emphasis added). Allen fails to cite to any exemption to public records law that applies here, especially since the Agreement confirmed the public records law applies. Allen's allegations, fail to state a cognizable claim and must be dismissed.

Assuming, *arguendo*, that the materials were not already public records pursuant to Chapter 132, Allen fails to sufficiently allege the necessary elements for bill of attainder. Allen cites to *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977). In *Nixon*, the U.S. Supreme Court

---

[6] "Nothing in this Agreement shall prevent [DNCR] from making records available to the public pursuant to N.C.G.S. Chapters 121 and 132, or any other applicable State or federal law or rule related to the inspection of public records." **Ex. 1** ¶27.

held that a bill of attainder is a legislative act that targets a specific individual or group and inflicts punishment without a judicial trial. Other factors considered include whether the alleged penalty is in line with the historical meaning of legislative punishment, whether the law furthers a non-punitive legislative purpose, and whether the record shows a congressional intent to punish. *See State v. Johnson*, 169 N.C. App. 301, 310 (2005). A bill of attainder is unconstitutional because it violates the separation of powers and due process protections. Not every legislative act that imposes burdens on an individual constitutes a bill of attainder; the legislative act must be targeted, punitive, and lacking in any non-punitive legislative purpose. §121-25 is none of these, it simply provides for the protection and preservation of historic artifacts and shipwrecks located in state waters, including the *QAR*. Despite Allen's conclusory allegations, §121-25(b) applies to State possessed records of many other ongoing salvage projects. These projects all involve many people inside and outside of Allen's chosen profession. In other words, §121-25(b) applies to *all* persons coming into contact with shipwrecks in N.C. waters.

The plain language of §121-25(b) shows there is no violation or penalty set out nor any mechanism for enforcement of any punishment. *Allen*, 895 F.3d at 355 ("Allen and Nautilus have not even shown that §121–25(b) can be enforced against a private party. In any event, in view of the officials' roles, it is apparent that none of them would or could have any role in enforcing the statute, as required.")(citations omitted).  Nor is there a sufficient allegation of a congressional intent to punish because preservation of North Carolina's history and cultural heritage for the benefit of all people is a legitimate legislative purpose. *Nixon*, 433 U.S. at 452, 97 S. Ct. at 2795.

Allen alleges that the statute is a "mode of punishment commonly employed against those legislatively branded as disloyal" and that the statute's (nonexistent) "penalties" are "historically associated with punishment" and somehow bar Allen from his vocation. DE 134 at ¶¶195-97. Again, §121-25(b) merely reiterates that documentation of ship salvages in the possession of a state agency is a public record. There is no historical punishment commonly employed for perceived disloyalty to the archeological or historical preservation interests of the sovereign; Defendants are not aware of any case law that even remotely suggests this as a common historical punishment associated with bills of attainder. Allen's conclusory statements that the State is engaging in some kind of battle between archeologists and treasure hunters are legally insufficient to state a cognizable claim for relief.

A statute is presumed constitutional and the party challenging the statute bears the burden of proving its unconstitutionality. *See United States v. Morrison*, 529 U.S. 598, 607 (2000). The materials at issue are public records pursuant to Chapter 132 and later confirmed as such in the Agreement. Allen's allegations are facially insufficient to establish that §121-25(b) is sufficiently targeted, punitive, and does not further a legitimate legislative purpose.

Similarly, Allen's *ex post facto* law claim fails. An *ex post facto* law is a retrospective law that punishes someone for an act that was committed before the existence of such laws made any such act illegal. *See State v. Johnson*, 169 N.C. App. at 304. The materials at issue were already public records pursuant to Chapter 132. Therefore, §121-25(b) cannot be read to *retroactively* make the materials at issue public records. Section 121-25(b) is devoid of any punitive language or enforcement mechanisms, and is rationally connected to a legitimate, non-punitive legislative interest in the preservation of state history for the benefit of the state's people.

22

Allen's claim for impairment of contract also fails on similar grounds. N.C. employs a three-part test in determining unconstitutional contractual impairment: (1) whether a contractual obligation is present; (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose. *Lake v. State Health Plan for Tchrs. & State Emps., 38*0 N.C. 502, 513 (2022). The contractual obligations are found in the  Agreement, which recognizes the materials as public records under Chapter 132. *Allen*, 895 F.3d at 357.

The alleged actions were made in furtherance of the important public purpose of historical preservation. *Id.* Allen's allegations are insufficient, and Counts V, VI and VII must be dismissed.

## <u>COUNT VIII</u>

Section 1983 claims against Defendants Schwarzer, Wilson, Carraway, Koonts, Kluttz, Cherry, and Cochran, in their individual capacities, are barred by sovereign immunity, estoppel, law of the case, res judicata, qualified and legislative immunity, and failure to state a claim. Additionally, Allen's claims exceed the scope of this Court's order granting reconsideration.

First, Kluttz, Wilson, Cochran, and Cherry were the named Defendants and sued in their individual capacities in the prior iteration of this lawsuit.  *See Allen*, 895 F. 3rd 337. The Fourth Circuit already concluded that these Defendants were protected from section 1983 claims under qualified immunity for the alleged publication of Allen's copyrighted materials (*Id*. at 355-57) and legislative immunity as to the individuals' "involvement in the enactment of §121-25(b)." *Id*. at 357.

The Fourth Circuit's instructions, which this Court should follow, were to dismiss with prejudice claims against these Defendants sued in their individual capacities. *Id*. These claims

23

are precluded by qualified and legislative immunities, res judicata, issue preclusion, and law of the case. *See Clodfelter v. Republic of Sudan*, 720 F.3d 199, 207 n.10 (4th Cir. 2013)("The term 'res judicata' is often used to refer to both "claim preclusion," where a previous judgment forecloses litigation on the basis that it was decided in the previous case, and "issue preclusion," which "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.")(citations omitted).

Section 1983 claims against Schwarzer, Carraway, and Koonts are likewise subject to dismissal. These individuals were not named as Defendants in the prior litigation, yet the Fourth Circuit's rationale on the qualified and legislative immunities extends to protect these new Defendants. *Allen*, 895 F.3d at 357 ("Based on these provisions of the 2013 Settlement Agreement and the then applicable public records law, it is far from clear whether the Department was prohibited from displaying Allen's copyrighted materials in the manner alleged in the complaint."). Qualified immunity and law of the case doctrine protect these new Defendants from liability for the limited public display and archival activities, even if the facts alleged are accurate. Similarly, legislative immunity protects these individuals from liability for their alleged involvement with enactment of section 121-25(b). *Id.*

The statute of limitations ("SOL") that governs much of this count has run.[7] Section 1983 contains no SOL, thus either "the most analogous state statute of limitations would apply[,]" *Duggan v. Ocean City*, 516 F. Supp. 1081, 1083 (D. Md. 1981), or, assuming the absence of the analogous state statute, "the court should turn to the lender of second resort-an analogous federal

---

[7] Kluttz left her state employment as of January 1, 2017, Cherry left as of December 31, 2020, Cochran left as of January 23, 2017. **See Ex. 20.**

statute." *J&J Sports Prods. v. W. Side Stories*, No. 5:10-CV-179-F, 2011 U.S. Dist. LEXIS 77964, at *15-16 (E.D.N.C. July 18, 2011). In N.C., that SOL is three years. N.C.G.S. §1-52. Even under the analogous federal statute prong, the Copyright Act is governed by a three-year SOL. 17 U.S.C. §507(b); *see J&J Sports Prods*, 2011 U.S. Dist. LEXIS 77964, at *16. No actionable factual allegation traceable to these Defendants has been made within the timeframe of three years prior to the filing of the SAC. *See* DE 134 ¶¶30, 139 (Schwarzer); ¶¶31, 139 (Carraway); ¶¶113, 130, 139, 216, 219 (Koonts). In any case, all allegations based on conduct before the year 2020 is barred by the SOL.

## COUNT IX

Sovereign immunity continues to bar Allen's injunctive claims because *Ex parte Young* is inapplicable here. The Eleventh Amendment bars actions against a state or its agencies, whether seeking compensatory, equitable, or declaratory relief. *S.C. State Bd. of Dentistry v. FTC* 455 F.3d 436, 446 n.8 (4th Cir. 2006). Neither the State nor the Department are "persons" under the *Ex parte Young* exception to sovereign immunity. *See, Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

The Fourth Circuit has already addressed Allen's claims under *Ex parte Young* in connection with §121-25(b). The Court held that "Ex Parte Young does not provide Allen and Nautilus with an exception to the Eleventh Amendment immunity claimed by North Carolina." *Allen*, 895 F.3d at 355. The Court explained that Allen "sued the State, the Governor, the Department, and several Department officials," but provided "no further explanation regarding any connection between the officials and the challenged enactment[,]" and "have not even shown that §121-25(b) can be enforced against a private party." *Id*. No injunctive relief is available against the State or the Department under *Ex parte Young* under the facts alleged.

Allen does not seek to assert any *Ex parte Young* claims against any state officials. *Ex parte Young* only extends to claims against state officials acting in their official capacities, not to claims against state entities. *Lynch v. West Virginia*, 805 F. Supp. 12, 13 (S.D. W. Va. 1992). This bar applies to suits for injunctive relief. *Cory v. White*, 457 U.S. 85, 91 (1982). Sovereign immunity bars Allen's current claims against these Defendants.

Second, the doctrines of res judicata, collateral estoppel, and law of the case preclude application of *Ex parte Young* in connection with Allen's claims. The Fourth Circuit has already held in this matter that "*Ex parte Young* does not provide Allen and Nautilus with an exception to the Eleventh Amendment immunity claimed by North Carolina." *Allen*, 895 F.3d at 355.

Third, Allen cannot establish jurisdiction to enjoin the State because Defendants here have not violated Allen's rights under color of state law, intentionally, or in bad faith. A crucial element of section 1983 claims against state officials is that, at the time of the challenged conduct, the violation is ongoing and undertaken under color of state law. Here, Defendants reached out to Allen well before the filing of the SAC with requests to identify any works Allen considers infringing so they could be promptly taken down. Defendants cited their disinterest in publicly displaying Allen's work but acknowledged that an inadvertent or third-party display was possible. Continuously, Defendants invited Allen to share any information of any such inadvertent display. Defendants, in good faith, promised to remove any inadvertently displayed work from public view. Allen refused to disclose information of public display outside of the lawsuit, and instead chose to include allegations of numerous public displays in court filings. **Exs**. **8-11**. Allen's refusal to work with Defendants to remedy the alleged public display of his work should serve as equitable estoppel.

Finally, to the extent Allen seeks any compensatory relief for the alleged damages

connected to the alleged past wrongdoings, *Ex parte Young* permits only prospective relief and does not permit the award of retroactive remedies against these Defendants.

<u>**COUNT X**</u>

The Declaratory Judgment Act (DJA), 28 U.S.C.S. §§2201-02, does not authorize suits against states, its agencies and officials and, therefore, cannot be used to circumvent sovereign immunity. "If a declaratory judgment proceeding actually constitutes a suit against the sovereign, it is barred absent a waiver of sovereign immunity." *Goldstein v. Moatz*, 364 F.3d 205, 219 (4th Cir. 2004). "[I]n such a situation, 'the compulsion, which the court is asked to impose, may be compulsion against the sovereign, although nominally directed against the individual officer.'" Id. (quotation omitted). Here, any order declaring §121-25(b) is unconstitutional or announcing the State has infringed Allen's property or effectuated an uncompensated taking would be a declaration against N.C. Therefore, the declaratory judgment request fails.

Second, there is no equitable basis to grant declaratory relief here, where Allen requests declarations that Defendants engaged in copyright infringements, violated the CRCA, and effectuated a taking of property without compensation. DE 134 ¶¶ 227 (a)–(c). Allen does not seek any prospective relief at all, but rather only a declaration regarding alleged past wrongdoings. *See Clay v. Osteen*, 2010 U.S. Dist. LEXIS 111395 (M.D.N.C. 2010). Declaratory relief under *Ex parte Young* applies only to prospective requests not to proclaim liability for a past act. *Id.*

Third, there is no actual controversy between the parties to justify the requested relief. Defendants never maintained that they are entitled to infringe any purported copyright, take property without compensation, or enforce §121-25(b) to strip Allen of any constitutional or statutory rights. To the contrary, Defendants proactively reached out to Allen seeking

collaboration to ensure that any inadvertent display of Allen's works would be terminated without litigation. **Exs**. **8-11**. While Defendants are not members of the legislative branch, they stand ready to assist in repeal of §121-25(b) because it is duplicative of public records law.

Defendants agree with the Fourth Circuit's conclusion that "[b]ased on [the] Agreement and…public records law, it is far from clear whether the Department was prohibited from displaying Allen's copyrighted materials in the manner alleged in the complaint." *Allen*, 895 F.3d at 357. Yet, the Department still sought to placate Allen by seeking to identify and remove any inadvertently displayed works. Instead, Allen shunned collaboration and chose litigation, secreting information about alleged infringing works for years only to reveal them in this legal pleading to this Court. DE 134 ¶¶85, 122. The clean hands doctrine should estop Allen from seeking equities and declarations under these circumstances. *Halscott Megaro, P.A. v. McCollum*, No. 22-1505, 2023 U.S. App. LEXIS 9179, at *22 (4th Cir. Apr. 18, 2023).

Defendants never contended that §121-25(b) entitles them to an uncompensated taking of private property or permits infringements of copyright law, nor has Allen pled any facts showing that Defendants enforced, tried to enforce, or even could have enforced the statute against Allen in the manner alleged. *Allen*, 895 F.3d at 355 ("Indeed, Allen and Nautilus have not even shown that §121-25(b) can be enforced against a private party."). Other than Allen's unsubstantiated beliefs, no controversy exists on any of these legal issues.

Finally, if the Court dismisses the substantive causes of action as requested *supra*, Allen's claim for declaratory relief is subject to dismissal. The DJA does not create its own substantive cause of action; it "is 'remedial only, and is not itself a basis for federal subject matter jurisdiction.'" *Volvo GM Heavy Truck Corp. v. U.S. DOL*, 118 F.3d 205, 210 (4th Cir. 1997) (quotations omitted).

## **CONCLUSION**

WHEREFORE, the Defendants respectfully requests this Court dismiss the SAC in its

entirety.

Respectfully submitted, this the 21st day of April, 2023.

JOSHUA H. STEIN
Attorney General

/s/ Charles G. Whitehead
Charles Whitehead
Special Deputy Attorney General
State Bar No. 39222
Email: cwhitehead@ncdoj.gov
Phone: (919) 716-6816

Olga E. Vysotskaya de Brito
Special Deputy Attorney General
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov
Phone: (919) 716-0185

N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602
*Counsel for Defendants*

29

**<u>CERTIFICATE OF WORD COUNT</u>**

The undersigned hereby certify that pursuant to LR 7.2(f)(3) of the Local Civil Rules, the foregoing Memorandum contains 8,398 words (including the body of the brief, headings, and footnotes, but excluding the caption, signature blocks, this certificate of compliance, and exhibits) as reported by the word-processing software.

This the 21st day of April, 2023.

<u>/s/ Charles G. Whitehead</u>
Charles Whitehead
Special Deputy Attorney General

30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Case No.: 5:15-cv-627-BO

| | |
|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC<br><br>Plaintiffs<br><br>v.<br><br>ROY **COOPER**, Governor of the State of North<br>Carolina, in his official capacity; JOSH **STEIN**,<br>Attorney General of North Carolina of North<br>Carolina, in his official capacity; D. REID<br>**WILSON**, individually and in his official capacity;<br>MIKE **CARRAWAY**, individually and in his official<br>capacity; KEVIN B. **CHERRY**, individually and in<br>his official capacity; STEPHEN R. **CLAGGETT**,<br>individually and in his official capacity; KARIN<br>**COCHRAN**, individually and in her official capacity;<br>CARY **COX**, individually and in her official capacity;<br>SUSAN WEAR **KLUTTZ**, individually and in her<br>official capacity; SARAH **KOONTS**, individually and<br>in her official capacity; JOHN W. **MORRIS**,<br>individually and in his official capacity; JOSEPH K.<br>**SCHWARZER** II, individually and in his official<br>capacity; **Jane, John, and Jill Doe**, individually and in<br>their official capacity; **NORTH CAROLINA<br>DEPARTMENT OF NATURAL AND<br>CULTURAL RESOURCES;** and the **STATE OF<br>NORTH CAROLINA**, a body politic,<br>Defendants | **JURY TRIAL REQUESTED** |

**PLAINTIFFS' FREDERICK L. ALLEN AND NAUTILUS PRODUCTION LLC'S BRIEF
IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE  (DE 144)
AND MOTION TO DISMISS (DE 146)**

**TABLE OF CONTENTS**

**Page**

Summary of the Case................................................................................................1

Statement of the Facts..............................................................................................1

Procedural History...................................................................................................2

Argument .................................................................................................................3

I.   The Court should Deny Defendants' Motion To Strike.......................................3

    A.  Motions to Strike Are Disfavored............................................................3

    B.  North Carolina Does Not Meet the Test for Striking Under Rule 12(f)....................4

        1.  Allen's Allegations Are Relevant to the Claims at Issue. Therefore, Allen's Allegations are Not Impertinent or Immaterial................................4

        2.  Allen's Allegations Are Not "Scandalous."....................................4

        3.  North Carolina is Not Prejudiced by Allen's Allegations. ...................5

    C.  The Court Should Not "Strike" Defendants from the Case. ...........................5

        1.  Rule 10's Requirements Are Liberally Interpreted in the Absence of Prejudice................6

        2.  Rule 12(f) Cannot Be Used to Effectuate Case-Dispositive Sanctions. ...............6

    D.  Plaintiffs' SAC Was Expressly Allowed by the Court................................7

II.  The Court should Deny Defendants' Motion to Dismiss ...................................7

    A.  Defendants' Second Motion Is Procedurally Improper. ............................7

    B.  Legal Standards.......................................................................8

        1.  Sovereign Immunity.........................................................8

        2.  Failure to State a Claim....................................................8

    C.  Sovereign Immunity Does Not Bar Allen's Copyright or Takings Claims (Counts I-IV)........9

        1.  Congress Abrogated Sovereign Immunity ...................................10

        2.  The Right Against Unlawful Takings Is Self-Executing and Cannot Be Blocked by Sovereign Immunity................11

i

a.  Federal Courts Have Exclusive Jurisdiction over Allen's Claims (28 USC § 1338) ............................................................................................................... 14

b.  Allen's State Claims Are Expressly Preempted (17 U.S.C. § 301)........................... 14

D.  Allen Has Stated Claims for Copyright Infringement and DMCA Violations (Claims I & II). 16

E.  Allen Has Stated a Takings Claim With Respect to Blackbeard's Law (Claim IV) and the State's Direct and Indirect Infringement of His Copyrights (Claim III). ................... 17

1.  Defendant' Arguments Are Procedurally Improper. ............................................... 17

2.  Blackbeard's Law Is An Unconstitutional Taking (Claim IV). ............................ 18

3.  North Carolina's Infringement Constitutes an Unlawful Takings (Claim III) ................ 20

F.  Allen Has Alleged a Violation of Procedural Due Process (Claims III and IV). .............. 21

G.  Allen Has Alleged that Blackbeard's Law Is an Unlawful Bill of Attainder (Claim V). .......... 22

1.  Blackbeard's Law Targets Allen. ........................................................................ 22

2.  Blackbeard's Law Is Punitive. ............................................................................ 24

H.  Allen Has Alleged that Blackbeard's Law Is An Unlawful *Ex Post Facto Law* (Claim VI). ...... 26

I.  Allen Has Alleged that Blackbeard's Law Impairs the Settlement Agreement (Claim VII)... 26

J.  Allen Has Stated a Claim Under Section 1983 (Claim VIII) ........................................ 27

1.  Defendants Are Not Entitled to Qualified Immunity ............................................ 27

2.  There is Not a Statute of Limitations Problem. ................................................... 28

K.  Allen Is Entitled to Injunctive Relief Under *Ex Parte Young* (Claim IX) ...................... 28

L.  Allen Is Entitled to Declaratory Relief (Claim X) ..................................................... 30

CONCLUSION .......................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ABC Sand & Rock Co., Inc., v. Cnty. Of Maricopa*,
    2022 WL 1619019 (D. Ariz. May 23, 2022) ................................................19

*Acceptance Ins. Cos., Inc. v. United States*,
    583 F.3d 849 (Fed. Cir. 2009) ................................................17

*ACORN v. United States*,
    618 F.3d 125 (2d Cir. 2010) ................................................24

*Aldini AG v. Silvaco, Inc.*,
    2023 WL 3749792 (N.D. Cal. Mar. 27, 2023) ................................................17

*Allen v. Cooper*,
    140 S. Ct. (2020) ................................................ *passim*

*Allen v. GlaxoSmithKline PLC*,
    2008 WL 2247067 (E.D. Pa. May 30, 2008) ................................................14

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
    326 F.3d 505 (4th Cir. 2003) ................................................16

*Ameur v. Gates*,
    759 F.3d 317 (4th Cir. 2014) ................................................22, 24

*Avtec Sys., Inc. v. Peiffer*,
    21 F.3d 568 (4th Cir. 1994) ................................................15, 16

*Bailey v. Fairfax Cnty. Va.*,
    LEXIS 135512 (E.D. Va. Dec. 21, 2010) ................................................3

*Blackburn v. Dare Cnty.*,
    58 F.4th 807 (4th Cir. 2023) ................................................20

*Campinha-Bacote v. Regents of the Univ. of Michigan*,
    2015 WL 223408 (S.D. Ohio Jan. 19, 2016) ................................................10

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988) ................................................14

*Christopher v. Cavallo*,
    662 F.2d 1082 (4th Cir. 1981) ................................................14

*Cobell v. Norton*,
224 F.R.D. 1 (D.D.C. 2004)...................................................................3, 5

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007)..........................................................................18

*In re DNA Ex Post Facto Issues*,
561 F.3d 294 (4th Cir. 2009) .....................................................................26

*Doe v. The Citadel*,
2023 WL 3944370 (4th Cir. June 12, 2023) .............................................21

*Frye v. Brunswick Cnty. Bd. of Educ.*,
612 F. Supp. 2d 694 (E.D.N.C. 2009).........................................................8

*Godfredson v. JBC Legal Grp.*,
387 F. Supp. 2d 543 (E.D.N.C. 2005).....................................................3, 5

*Hans v. Louisiana*,
134 U.S. 1 (1890).........................................................................................9

*Hutto v. S.C. Ret. Sys.*,
773 F.3d 536 (4th Cir. 2014) ...............................................................11, 13

*Jessop v. City of Fresno*,
936 F.3d 937 (9th Cir. 2019) .....................................................................28

*Johnson v. Lett*,
2023 WL 362393 (W.D.N.C. Jan. 20, 2023) ..............................................7

*Kaiser Aetna v. United States*,
444 U.S. 179-80 (1979) ..............................................................................18

*Keller v. Hosp. of Morristown*,
2016 WL 6956621 (E.D. Tenn. 2016) .......................................................26

*Klinger v. Conan Doyle Est., Ltd.*,
755 F.3d 496 (7th Cir. 2014) .....................................................................18

*Knick v. Twp. of Scott, Pennsylvania*,
139 S. Ct. 2162 (2019)..........................................................................10, 13

*Krupski v. Costa Crociere S. p. A.*,
560 U.S. 538 (2018)....................................................................................28

*Lane v. Endurance Am. Specialty Ins. Co.*,
LEXIS (W.D.N.C. Apr. 8, 2011) ........................................................3, 4, 5

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005)..............................................................................................17

*Llewellyn-Jones v. Metro Prop. Grp., LLC*,
  22 F. Supp. 3d 760 (E.D. Mich. 2014)...............................................................4, 5

*Murr v. Wisconsin*,
  582 U.S. 383 (2017)..............................................................................................19

*Nat'l Ass'n of Boards of Pharmacy v. Bd. Of Regents of the Univ. Sys. of Georgia*,
  633 F.3d 1297 (11th Cir. 2011) ...........................................................................10

*Negron v. Sch. Dist. of Philadelphia*,
  994 F. Supp. 2d 663 (E.D. Pa. 2014) .....................................................................7

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1977)..........................................................................................22, 25

*Penn Cent. Transp. Co. v. City of N.Y.*,
  438 U.S. 104 (1978)...........................................................................................9, 19

*Perez v. Humphries*,
  2018 WL 4705560 (W.D.N.C. Oct. 1, 2018) ..........................................................7

*Pharmaceutical Research and Manufacturers of America v. Williams*,
  64 F. 4th 932 (8th Cir. 2023) ...............................................................................29

*Quinn v. Bd. of Cnty. Commr's. for Queen Anne's Cnty., Maryland*,
  862 F.3d 433 (4th Cir. 2017) ................................................................................20

*Racick v. Dominion L. Assocs.*,
  270 F.R.D. 228 (E.D.N.C. 2010) ...........................................................................4

*Reyes v. Dorchester Cnty.*,
  2022 WL 820029 (D.S.C. Mar. 18, 2022) ............................................................30

*Rosciszewski v. Arete Assocs., Inc.*,
  1 F.3d 225 (4th Cir. 1993) ....................................................................................15

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984)..............................................................................................18

*S.D. v. St. Johns Cnty. Sch. Dist.*,
  LEXIS 1941482 (M.D. Fla. 2009) ..........................................................................3

*Sageworks, Inc. v. Creatore*,
  2017 WL 633359 (E.D.N.C. Feb. 15, 2017) ...........................................................7

*Schultz v. Braga*,
    290 F. Supp. 2d 637 (D. Md. 2003) ....................................................................5

*SEC v. Lucent*,
    2006 WL 2168789 (D.N.J. June 20, 2006) .........................................................7

*Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*,
    468 U.S. 841 (1984) ...........................................................................................24

*Smith v. Wash. Metro. Area Transit Auth.*,
    290 F.3d 201 (4th Cir. 2002) ...............................................................................8

*Smith-Phifer v. City of Charlotte*,
    LEXIS 137321 (W.D.N.C. Aug. 14, 2019) ........................................................4

*Stoffels ex rel., SBC Concession Plan v. SBC Commc'ns, Inc.*,
    430 F. Supp. 2d 642 (W.D. Tex. 2006).................................................................7

*Swanson v. U.S. Forest Serv.*,
    87 F.3d 339 (9th Cir. 1996) ...............................................................................17

*Tire Eng'g & Distrib. v. Shandong Linglong Rubber Co.*,
    682 F.3d 292 (4th Cir. 2012) .......................................................................14, 15

*Trandes Corp. v. Guy F. Atkinson Co.*,
    996 F.2d 655 (4th Cir 1993) ..............................................................................15

*United States v. Georgia*,
    546 U.S. 151 (2006)...............................................................................2, 10, 11

*United States v. Wass*,
    954 F.3d 184 (4th Cir. 2020) .............................................................................26

*Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*,
    2004 WL 7339759 (D.N.J. June 22, 2004) ....................................................7, 11

*Washington v. Hous. Auth. of the City of Columbia*,
    58 F.4th 170 (4th Cir. 2023) ...............................................................................9

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
    252 F.3d 316 (4th Cir. 2001) ...............................................................................3

*Welch v. Texas Dept. of Highways & Pub. Transp.*,
    483 U.S. 468 (1987)..............................................................................................9

*West v. Winfield*,
    931 F.3d 978 (9th Cir. 2019) .............................................................................28

*Williams v. Kincaid,*
  45 F.4th 759 ...........................................................................................28

*Zak v. Chelsea Therapeutics Int'l, Ltd.,*
  780 F.3d 597 (4th Cir 2015) ............................................................9, 16

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017)..............................................................................27

*Zito v. N.C. Coastal Res. Comm'n,*
  8 F.4th 281 (4th Cir. 2021) ........................................................8, 11, 13

**State Cases**

*Corum v. Univ. of N. Carolina,*
  330 N.C. 761 (1992) .............................................................................15

*Montessori Children's House of Durham v. Blizzard,*
  244 N.C. App. 633 (2016) ....................................................................24

*State v. Williams,*
  286 N.C. 422 (1975) .............................................................................23

*Tetterton v. Long Mfg. Co., Inc.,*
  314 N.C. 44 (1985) ...............................................................................23

**Federal Statutes**

17 U.S.C.A. § 511 .......................................................................................10

17 U.S.C. § 106 ..........................................................................................18

17 U.S.C. § 301 ..........................................................................................14

17 U.S.C. § 507(b) ......................................................................................14

17 U.S.C. § 1202 ........................................................................................17

28 U.S.C. § 1338 ........................................................................................14

28 U.S.C. § 2201 ........................................................................................30

**State Statutes**

N.C.G.S. § 1-52............................................................................................13

N.C.G.S. § 121-25(b) (2015) .................................................................18, 25

N.C.G.S. § 132-1 .............................................................................................. 18, 23, 29

N.C.G.S. § 132-1(b) ...................................................................................................... 2

N.C.G.S. § 143-291 ..................................................................................................... 13

**Rules**

Fed. R. Civ. P. 10 ..................................................................................................... 3, 6

Fed. R. Civ. P. 12 ................................................................................................ *passim*

Fed. R. Civ. P. 12(b) ............................................................................................... 1, 9

Fed. R. Civ. P. 12(b)(1) ............................................................................................... 8

Fed. R. Civ. P. 12(f) ............................................................................................ *passim*

Fed. R. Civ. P. 12(g) ................................................................................................... 7

Fed. R. Civ. P. 12(h)(3) ............................................................................................... 8

Fed. R. Civ. P. 15 ..................................................................................................... 28

Fed. R. Civ. P. 15(c) ................................................................................................. 28

Fed. R. Civ. P. 15(c)(1) ............................................................................................. 28

## SUMMARY OF THE CASE

Plaintiffs Rick Allen and Nautilus Productions LLC (collectively, "Allen") claim that Blackbeard's Law violates their constitutional rights. Blackbeard's Law declared that Allen's lifelong work was "the property of the people," and allows anyone—including Defendants—to use it however and as much as they want for free.[1]

Allen has tried to reclaim his property, but North Carolina has been aggressive in its motions practice, giving Allen an exhaustive eight-year-long education in advanced civil procedure. At each point, North Carolina has deployed every conceivable procedural obstacle, irrespective of merit. Now, North Carolina seeks to maintain this trend with a double Rule 12 motion that is procedurally unjustifiable. Under the rules, parties are allowed to file *one* Rule 12 motion. Defendants filed two such, along with supporting briefs that span 54 pages. DE 144, 146. This violates Rule 12's "Consolidation Rule" and exceeds EDNC page and word limits.

North Carolina's Motion to Strike (its first Rule 12 motion) is also procedurally improper. Rule 12(f) is not a sanctioning rule and cannot be used as a surrogate Rule 12(b) motion to dismiss.

In terms of Rule 12(b)(6) analysis, North Carolina sidesteps relevant standards, grounding its argument in disputed facts not included in the Second Amended Complaint, DE 134 ("SAC")—including *20* separate factual exhibits attached to its brief. The balance of North Carolina's arguments overlook pertinent legal benchmarks, use incorrect standards, or draw from Allen's previous complaint without acknowledging the more detailed allegations in the SAC. Both motions should be denied in their entirety.

## STATEMENT OF THE FACTS

Allen, a premier underwater videographer and lifelong resident of North Carolina, landed a monumental opportunity when the wreck of Blackbeard's flagship, the *Queen Anne's Revenge* (QAR), was found just off the coast of Beaufort, North Carolina. His extensive experience in North Carolina waters naturally led to a deal with Intersal, the company that discovered the QAR, to become the videographer for the excavation. SAC ¶¶ 42-46, 57-59.

---

[1] Defendants include Roy Cooper, Josh Stein, D. Reid Wilson, Mike Carroway, Kevin Cherry, Stephen R. Claggett, Karin Cochran, Cary Cox, Susan Kluttz, Sarah Koonts, John W. Morris, Joseph K. Schwarzer II, North Carolina, North Carolina Department of Natural and Cultural Resources (DNCR) and three "Does." This brief refers to the defendants collectively as "Defendants" or "North Carolina."

1

For the following decades, Allen worked tirelessly to record and document the recovery of QAR and its underwater treasures. Allen poured thousands of hours and hundreds of thousands of dollars into his work. This effort resulted in a small but extremely valuable collection of videos and images related to the project – a treasure in its own right. To his shock, he found that Defendants, with whom he had closely collaborated, had used his work for their personal and professional gain without his consent. *Id.* ¶¶ 59-87.

Allen voiced his concerns to North Carolina, but was met with scorn and resentment. Defendants viewed Allen as a treasure hunter, who sought to exploit history for personal gain, and accused Allen of creating "friction" by monetizing his "hobby." When Allen refused to back down, they retaliated. *Id.* ¶¶ 88-101.

In August, 2015, North Carolina enacted Blackbeard's Law, N.C.G.S. § 121-25(b), which categorized most of Allen's life work—including all of his QAR work—as "public records" owned by the people. N.C.G.S. § 132-1(b). Defendants then copied and distributed Allen's work to millions for personal and professional gain. On December 1, 2015, Allen filed this lawsuit. DE 1. Defendants continue to infringe. *Id.* ¶¶ 126-131.

## PROCEDURAL HISTORY

The extended procedural background of this matter, dating back to 2015, is familiar to the Court. The following key events bear relevance to the current motion:

- On September 4, 2020, Allen filed a motion requesting this Court to reconsider a previous order, which dismissed some of Allen's constitutional claims. DE 105. Allen asked for permission to file the SAC so that he could proceed under the framework of *United States v. Georgia*, 546 U.S. 151 (2006) . DE 106. North Carolina opposed. DE 114.

- The Court held a hearing on Allen's motion in Raleigh, North Carolina, on February 16, 2021. Subsequently, the Court granted Allen's motion on August 19, 2021. DE 118.

- North Carolina responded by filing a motion on September 3, 2021 (DE 119), which can aptly be characterized as a 'Motion to Reconsider the Reconsideration.'

- While still awaiting the Court's decision on its motion, North Carolina proceeded to appeal the Court's order granting Allen's Motion to Reconsider on September 20, 2021. DE 122. The Fourth Circuit dismissed North Carolina's appeal on October 14, 2022. DE 128.

- After a hearing on January 17, 2023, the Court denied North Carolina's "Motion to Reconsider the Reconsideration" and granted Allen's request for permission to amend his complaint. DE 133.

- On February 8, 2023, Allen filed the SAC (DE 134) alleging claims for copyright infringement, DMCA infringement, unconstitutional takings, violations of the Due Process Clause and the

constitutional prohibition against bills of attainder, ex post facto laws, and impairment of contract. The SAC also asserted a claim under § 1983. Allen seeks monetary, declaratory, and injunctive relief. In response, North Carolina filed two Rule 12 motions: one to strike parties, claims, and allegations in the SAC (DE144), and one to dismiss (DE 146) under Rules 12(b)(1), 12(b)(2), and 12(b)(6).

Despite almost eight years of litigation, North Carolina has yet to file an Answer.

A<small>RGUMENT</small>

I.    T<small>HE</small> C<small>OURT SHOULD</small> D<small>ENY</small> D<small>EFENDANTS'</small> M<small>OTION</small> T<small>O</small> S<small>TRIKE.</small>

North Carolina misuses Rule 12(f) in its Motion to Strike, aiming to dismiss rather than strike defendants and claims from Allen's SAC. As the SAC is neither scandalous, redundant, nor immaterial, it does not meet Rule 12(f)'s strict striking criteria.

Rule 12(f) aims to uphold court dignity by striking extreme allegations. It cannot sanction supposed noncompliance with EDNC Local Rules or Federal Rules 10 and 15. North Carolina's effort to use Rule 12(f) to eliminate entire claims and defendants from Allen's SAC misconstrues the Rule's purpose.

A.    M<small>OTIONS TO</small> S<small>TRIKE ARE</small> D<small>ISFAVORED.</small>

Motions to strike should "be granted infrequently." *Lane v. Endurance Am. Specialty Ins. Co.*, 2011 LEXIS 40869, at *6 (W.D.N.C. Apr. 8, 2011). They are "generally viewed with disfavor because striking a portion of a pleading is a drastic remedy." *Godfredson v. JBC Legal Grp.*, 387 F. Supp. 2d 543, 547 (E.D.N.C. 2005) (citing *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001)). Indeed, motions to strike are "strictly considered" and should usually be denied 'unless it is clear that the allegations in question can have **no possible bearing** on the subject matter of the litigation.'" *Cobell v. Norton,* 224 F.R.D. 1, 2 (D.D.C. 2004) (citation omitted) (emphasis added); *Godfredson,* 387 F. Supp. 2d at 547-48; *see also S.D. v. St. Johns Cnty. Sch. Dist.,* 2009 LEXIS 1941482, at *11 (M.D. Fla. 2009) (denying motion to strike where assertions were not "obviously false and unrelated to the subject matter of the action"). Even then, the "drastic" remedy is appropriate only if the the allegations at issue are "prejudicial to the moving party." *Lane,* 2011 LEXIS 40869, at *10.

Allegations "are not improperly scandalous merely because they describe shocking conduct." *Bailey v. Fairfax Cnty. Va.*, 2010 LEXIS 135512, at *13 (E.D. Va. Dec. 21, 2010). Instead, Rule 12(f) regulates the form of the pleading, rather than its substance. *See id.* As the court explained in *S.D. v. St. John*:

> The facts ... may be unpleasant ... but the same is true of [permissible

allegations] ... . Such, for example, are the facts concerning a divorce for adultery. These may be scandalous and annoying and prejudicial to the accused party but a plaintiff or defendant is certainly entitled to plead them.

2009 LEXIS 62013, at *11. Doubts are categorically resolved in the pleader's favor. *Racick v.*

*Dominion L. Assocs.*, 270 F.R.D. 228, 232 (E.D.N.C. 2010); *Lane*, 2011 LEXIS 40869, at *10.

### B. NORTH CAROLINA DOES NOT MEET THE TEST FOR STRIKING UNDER RULE 12(F).

#### 1. ALLEN'S ALLEGATIONS ARE RELEVANT TO THE CLAIMS AT ISSUE. THEREFORE, ALLEN'S ALLEGATIONS ARE NOT IMPERTINENT OR IMMATERIAL.

Allen's SAC meticulously sets out relevant facts. In doing so, Allen creates a depiction of factual allegations that are verifiable and relevant to his constitutionally based claims. Allegations such as the rivalry between treasure hunters and archivists, the relationship between Allen and Defendants, and the personal impact of Blackbeard's Law are both factual and pertinent to Allen's claims. *See, e.g.*, *infra* at 24-25 (relaying on objected-to allegations). Defendants do not offer any reason to think otherwise.

#### 2. ALLEN'S ALLEGATIONS ARE NOT "SCANDALOUS."

North Carolina also argues that Allen's allegations should be struck as "scandalous." They should not. North Carolina's "scandalous" assertions are based on nothing more than *ipse dixit* – North Carolina does not explain how the allegations "degrade defendants' moral character, contain repulsive language, or detract from the dignity of the court." *Webster*, 2009 LEXIS 89458, at *4 (citations omitted). Instead, they simply assert that "[e]xamination of the paragraphs" and "surrounding paragraphs" proves the allegations are improper. DE 145. This argument cannot serve as grounds to strike under Rule 12(f).

The sole case North Carolina cites offers little clarity of "scandalous" as is it is a 295-word order that fails to explain how the stricken paragraphs violated Rule 12(f) or what caused them to be deemed scandalous. *Smith-Phifer v. City of Charlotte*, 2019 LEXIS 137321, at *2 (W.D.N.C. Aug. 14, 2019). Otherwise, North Carolina omits any discussion of the key consideration in *all* cases involving scandalous content—whether the purportedly improper allegations are baseless, unsubstantiated, or inflammatory.

An examination of the few cases granting a motion to strike confirms that the allegations at issue bear no similarity to allegations deemed unacceptable. As an example, consider *Llewellyn-Jones v. Metro Prop. Grp.,*

*LLC,* 22 F. Supp. 3d 760 (E.D. Mich. 2014). The allegations at issue there were entirely immaterial to the underlying claims, and were not well-pled in the first place. *Id.* at 776-777 ("plaintiffs have offered nothing to substantiate those conclusory allegations.").

Numerous other courts have held likewise. *Cobell*, 224 F.R.D. at *5 (discussing examples of "scandalous" claims as claims that are "so devoid of the necessary evidence to sustain them that they amount to little more than name-calling") (citations omitted); Jan, 17, *Schultz v. Braga,* 290 F. Supp. 2d 637, 654-55 (D. Md. 2003) (striking allegations due to "use [of] inflammatory language").

Allen's allegations are relevant and grounded in fact. There are no baseless or unsupported claims. He has not used inflammatory language to offend the court. The only "scandal" here is Defendants' own actions.

### 3. NORTH CAROLINA IS NOT PREJUDICED BY ALLEN'S ALLEGATIONS.

Improper allegations should only be struck if they are unfairly prejudicial to the moving party. *Lane*, 2011 LEXIS 40869, at *10; *Godfredson,* 387 F. Supp. 2d at 547-48 (citation omitted). It requires a lot for an allegation at the pleading stage to be deemed prejudicial under Rule 12, since Defendants can refute statements with which they disagree "through the usual course of litigation.". *Webster*, 2009 LEXIS 89458, at *5. North Carolina fails to articulate any tangible prejudice that would warrant striking Allen's allegations or claims.

North Carolina also claims that Allen's allegations will "potentiall inflame the jury." DE 145 p. 14. However, North Carolina has not even filed an Answer, and trial proceedings are a considerable way off. These concerns are premature, and are more appropriate, if at all, through a motion in limine just prior to trial. *Blevins v. Piatt,* 2015 LEXIS 162670, at *5-6 (D. Md. Dec. 4, 2015); *Godfredson,* 387 F. Supp. 2d at 556-57.

North Carolina would obviously prefer that Allen's allegations not be of record. But this discomfort arises from the *facts* alleged in the SAC, rather than the form of the pleading.

### C. THE COURT SHOULD NOT "STRIKE" DEFENDANTS FROM THE CASE.

In addition to striking particular allegations, Defendants seek to use Rule 12(f) to strike defendants, and even whole claims from the case. But Rule 12(f) is not a panacea for all grievances, and  cannot be used to transform a scrivener's error into a case dispositive sanction, let alone well-plead claims.

1.  **RULE 10'S REQUIREMENTS ARE LIBERALLY INTERPRETED IN THE ABSENCE OF PREJUDICE.**

Although the full name of each individual adult or entity named as a party should be set forth "in the title of the complaint," this requirement is interpreted liberally. Fed. R. Civ. P. 10. In the absence of prejudice, the court will overlook, or permit a party to amend, errors and omissions in the naming of parties. 2 *Moore's Federal Practice - Civil* § 10.02.

When finalizing the SAC, Plaintiffs' counsel made a clerical error that resulted in the omission of six defendants and three "Does" from the case caption. Each of the six omitted defendants—Kluttz, Cochrin, Cox, Claggett, Morris, and DNCR—has been a party to the case for years, as each was among the initially-named defendants when the case was filed.

Defendants have not demonstrated any prejudice resulting from this mistake, and there is none to be found. Each defendant—including those who were mistakenly omitted—was properly notified, summoned, and served. Further, the SAC contains detailed allegations that identify each defendant by name and that expressly allege each defendant's contributions to the alleged violations. *E.g.*, SAC ¶¶ 21-34. Thus, each defendant has been made aware of the proceedings and the nature of the misconduct alleged, fulfilling the objective of Rule 10.

To avoid any confusion, Plaintiffs have used the correct caption in this filing and have, contemporaneously with this brief, filed a motion to formally amend the caption.

2.  **RULE 12(F) CANNOT BE USED TO EFFECTUATE CASE-DISPOSITIVE SANCTIONS.**

North Carolina asks the Court to use Rule 12(f) to "strike" defendants from the case as a penalty for their mistaken omission from the case caption. But Rule 12(f) may not be used to dismiss claims or parties. Defendants' complaint relates to Rule 10, which has no connection to Rule 12(f). Moreover, the purpose of Rule 10 is to assist parties and the Court in understanding the issues at hand. Its purpose is not punitive, and a violation does not necessitate the drastic action North Carolina suggests.

Defendants' cases are not to the contrary, as neither case involved a Rule 12(f) motion, nor the kind of detailed allegations at issue here. DE 145 at 9. Likewise, neither involved a complaint whose omission of a

party was due to a clerical error. Instead, one of the cases involved the court's review of a *pro se* complaint that was dismissed as frivolous in its entirety, *Johnson v. Lett*, 2023 WL 362393, at *3 (W.D.N.C. Jan. 20, 2023), while the other involved a defendant who the plaintiff never intended to include in the first place, *Perez v. Humphries*, 2018 WL 4705560 (W.D.N.C. Oct. 1, 2018).

### D. PLAINTIFFS' SAC WAS EXPRESSLY ALLOWED BY THE COURT.

Finally, North Carolina argues that the Court should strike several claims as contrary to the Court's order allowing amendment. But the Court did not impose any limitations when it granted Plaintiffs' request to amend the complaint. DE 133. Moreover, the allegations in the SAC readily demonstrate that the claims about which Defendants complain are integrally connected to claims Defendants do not challenge as improper, such that there is no basis to grant their motion.

## II.   THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS

### A. DEFENDANTS' SECOND MOTION IS PROCEDURALLY IMPROPER.

Rule 12(g) sets a bright-line rule: "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Defendants violated this rule by filing two Rule 12 motions. Under these circumstances, courts do not hesitate to deny the second-filed motion as improper. *See Sageworks, Inc. v. Creatore*, 2017 WL 633359 at *7 (E.D.N.C. Feb. 15, 2017) (citing *Stoffels ex rel., SBC Concession Plan v. SBC Commc'ns, Inc.,* 430 F. Supp. 2d 642, 647 (W.D. Tex. 2006)); *SEC v. Lucent*, 2006 WL 2168789, at *5 (D.N.J. June 20, 2006) ("By its plain language, Rule 12(g) mandates that parties consolidate all of their pre-answer motions and file them together."); 5C Wright & Miller, *Fed. Prac. & Proc.* ¶ 1385).

Denying subsequent Rule 12 motions serves the interests of judicial economy, as piecemeal litigation wastes the Court's and the parties' resources. *Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 2004 WL 7339759, at *5 (D.N.J. June 22, 2004); *see also Negron v. Sch. Dist. of Philadelphia*, 994 F. Supp. 2d 663, 666 (E.D. Pa. 2014) (barring a second Rule 12 motion). These concerns are at the fore here, where the two motions at issue were filed in short succession in what seems to be an attempt to circumvent the Court's word limits. Viewed together, Defendants' motions comprise a total of 12,817 words—well over the 8,400 maximum allowed under the

Court's local rules. L.R. 7.2(f)(3)(A).[2]

~~

The Court should deny Defendants' second-filed motion as procedurally improper. This denial would not deprive Defendants of any relief to which they legitimately are entitled. Should there be issues raised in that motion and memorandum that are not subject to the timing and single-motion limits of Rule 12, Defendants are free to set out those issues in a new, properly filed motion.[3] What they are not entitled to do is thumb their noses at the long-established rules and procedures of the federal courts.

**B.  LEGAL STANDARDS**

**1.  SOVEREIGN IMMUNITY**

North Carolina argues that Allen's claims should be dismissed on sovereign immunity grounds for lack of personal and subject matter jurisdiction. But sovereign immunity does not implicate personal jurisdiction. *See Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir. 2002) ("[A]n assertion of governmental immunity is properly addressed under the provisions of Rule 12(b)(1)[.]"). Thus, sovereign immunity is fundamentally about subject matter jurisdiction, which is a question of law. *Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281, 284 (4th Cir. 2021). "Because sovereign immunity is waivable, [the Fourth Circuit] treats it 'akin to an affirmative defense,' meaning that the defendant bears the burden of demonstrating that sovereign immunity applies." *Id.*

If sovereign immunity hinges on factual questions, the Court is required to treat a plaintiff's allegations as evidence. *Frye v. Brunswick Cnty. Bd. of Educ.*, 612 F. Supp. 2d 694, 701 (E.D.N.C. 2009). While the Court may consider evidence outside the pleadings, it should only grant the motion to dismiss "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

**2.  FAILURE TO STATE A CLAIM**

---

[2] In fact, the word count is even higher, as the auto-generated word count of DE 147 (the second-filed memorandum) does not account for the portions of the brief that were incorporated through reference. *See* DE 147 at 2 (incorporating the State of Facts from the first-filed brief), 11 (incorporating 2-page argument from Defendants' motion for reconsideration).

[3] For example, objections to subject matter jurisdiction can be raised and determined at any time, and are not waived by failure to include them in a timely filed Rule 12 motion. Fed. R. Civ. P. 12(h)(3).

A Court must take as true all well-plead factual allegations, and must draw all reasonable inferences in favor of the nonmoving party when considering a Rule 12(b)(6) motion. *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023). Review is limited to the four corners of the complaint. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir 2015). "Consideration of extrinsic documents ... improperly converts the motion to dismiss into a motion for summary judgment. This conversion is not appropriate when the parties have not had an opportunity to conduct reasonable discovery." *Id.*

"To survive a motion to dismiss ... a complaint need only allege facts which, if true, state a claim to relief that is *plausible[.]*" *Washington,* 58 F.4th at 177. The allegations "need not be particularly detailed, and the chance of success need not be particularly high." *Id.* Dismissal is appropriate only when a complaint is conclusory or formulaic. *Id.*

## C. SOVEREIGN IMMUNITY DOES NOT BAR ALLEN'S COPYRIGHT OR TAKINGS CLAIMS (COUNTS I-IV).

Allen's copyrights are his property. *Allen v. Cooper*, 140 S. Ct. at 1004 (2020). The SAC alleges that North Carolina took Allen's property (1) by copying, displaying, and performing Allen's copyrighted works repeatedly and on massive scale without permission and (2) by placing Allen's life work into the public domain.

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." The Takings Clause has been made applicable to the states through the Fourteenth Amendment. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 122 (1978). Thus, when a state effectuates an unlawful taking, it violates both the Fifth and Fourteenth Amendments. *See id.*

The Eleventh Amendment provides that states are immune from suit with respect to claims brought by "Citizens of another State." While the plain language of the Amendment limits immunity to diversity claims, the Supreme Court has held that the Amendment shields states from liability regardless of who brings the claim. *Hans v. Louisiana*, 134 U.S. 1 (1890). Allen agrees with this Court's assessment of *Hans* (DE 69 at 10-17) and believes that the Eleventh Amendment should not bar suits brought by citizens against their own states. Allen seeks to preserve this argument for appeal. *Welch v. Texas Dept. of Highways & Pub. Transp.*, 483 U.S. 468, 520-21 (1987) (Stevens, J., dissenting); Akhil Amar, *Of Sovereignty and Federalism*, 86 Yale L.J. 1425, 1475-84 (1987).

Sovereign immunity is not absolute. Allen's takings claims can proceed due to two exceptions: abrogation as outlined in *Georgia*, 546 U.S. 151 at 158-159, and the self-enforcing character of the Fifth Amendment, as recognized in *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2170 (2019).

In the pages that follow, Plaintiffs explain why sovereign immunity should not block their claims. In addition, Plaintiffs have prepared a chart that explains how the various theories relate to each other and to the previous decisions in this case. That chart is shown on the next page and attached to this brief as Exhibit A.

1. **CONGRESS ABROGATED SOVEREIGN IMMUNITY**

Congress can abrogate sovereign immunity to enforce the provisions of the Fourteenth Amendment. *See Georgia*, 546 U.S. at 158-59. Congress has abrogated sovereign immunity here. In 1990, Congress passed CRCA, which abrogated state sovereign immunity for claims of copyright infringement. 17 U.S.C.A. § 511. As this Court previously recognized, CRCA validly abrogated immunity for acts of copyright infringement that also violate the Fourteenth Amendment. DE 118 at 22-24 ("[P]laintiffs can still use CRCA as a basis for its *Georgia* claim."). Thus, defendants are not entitled to sovereign immunity with respect to Plaintiffs' copyright claim (Claim I), DMCA claim (Claim II), or takings claims (Claims III-IV).

North Carolina claims that the US Supreme Court held that CRCA was not a valid abrogation. DE 147 ("Motion") at 5-6. But this Court already rejected that argument: "Although the Supreme Court ruled that CRCA was unconstitutional insofar as it attempted to abrogate sovereign immunity prophylactically, the statute remains whenever plaintiff alleges both a constitutional violation as well as a statutory violation." DE 118 at 23-24 (citation omitted). For the same reasons, North Carolina's argument that *Georgia* does not abrogate immunity for due process violations, Motion at 18-19, also fails.[4]

---

[4] Defendants cite three cases to support the proposition that "courts have rejected a CRCA due process claim under *Georgia*." Defendants overread these cases. The Court in *Nat'l Ass'n of Boards of Pharmacy v. Bd. Of Regents of the Univ. Sys. of Georgia* found that the plaintiff's due process claim failed on the merits, 633 F.3d 1297, 1319 n.35 (11th Cir. 2011), and so expressly did *not* reach a decision as to whether *Georgia* could support a due process claim, *id.* at 1316 n.32. Likewise, the complaint in *Campinha-Bacote v. Regents of the Univ. of Michigan* did not even allege a due process violation, but instead asserted just a single claim for ordinary copyright infringement, 2016 WL 223408, at *5 (S.D. Ohio Jan. 19, 2016) (dismissing complaint for failing to plead a due process violation); Ex. B (Complaint in *Campinha-Bacote*, No. 15-cv-330 (S.D. Ohio) (ECF No. 1)). The same

North Carolina also argues that "[a] federal *Georgia* takings claim is inappropriate where adequate state remedies are available." DE 147 at 17. That assertion (offered with no citation) finds no support in *Georgia* or anywhere else. To mount a successful claim under *Georgia*, one need only allege (1) a statutory violation (2) amounting to a constitutional violation (3) where Congress has expressly abrogated sovereign immunity. *Georgia*, 546 U.S. at 158-59. *Georgia* has nothing to do with the availability of state remedies. In any event, as explained below, no state remedies are available here.

### 2. THE RIGHT AGAINST UNLAWFUL TAKINGS IS SELF-EXECUTING AND CANNOT BE BLOCKED BY SOVEREIGN IMMUNITY.

The Fifth and Fourteenth Amendments preclude states from taking property without compensation. That right would be meaningless if states could use sovereign immunity to avoid takings liability. *See Hutto v. S.C. Ret. Sys.,* 773 F.3d 536, 551 (4th Cir. 2014) (acknowledging "tension" between Fifth and Eleventh amendments). Accordingly, the Fourth Circuit has held that sovereign immunity only bars takings claims "when the *State's courts* remain open to adjudicate such claims." *Id.* at 552. In other words, a takings claim can proceed in federal court if state courts are not "open." To satisfy the "open" requirement, states must provide a "'reasonable, certain, and adequate' means for challenging an action as a taking." *Zito*, 8 F.4th 281 at 288.

In this case, sovereign immunity's limits are even greater. The Fourth Circuit has not yet considered whether *Hutto's* "open" requirement applies to takings claims that involve a federally-created property right. The principles underlying *Hutto*, as well as basic principles of federalism suggest that the requirement should *not* apply, as state courts should not be allowed to resolve property rights that are exclusively federal.

---

is true regarding *Am. Shooting Center, Inc. v. Int'l*, which simply adopted the reasoning of the other two cases, 2016 WL 3952130, at *4 (S.D. Cal. July 22, 2016).

To the extent Defendants read these cases to mean that copyright infringement can *never* amount to a due process violation, that reading was expressly rejected by the Supreme Court. *Allen,* 140 S. Ct. at 1004 ("When does the Fourteenth Amendment care about copyright infringement? Sometimes, no doubt. Copyrights are a form of property.").



The *Hutto* rule assumes states have a sovereign interest in resolving disputes over state-based property rights. *Hutto*, 773 F.3d at 551-52. States do not, however, have an interest in interpreting or applying property rights originating in federal law. In some cases, such as this one, states may even prefer not to enforce federal rights when they conflict with state policies. SAC ¶¶ 103-104 (describing Blackbeard's Law). Federal courts, on the other hand, have a strong interest in ensuring federal rights are protected and that state governments do not have the ability to trump federal policy. A rule that precludes federal courts from defending federal property rights turns the Supremacy Clause on its head (US Const, Art VI, cl. 2).

Separately, there is good reason to think that the rule pronounced in *Hutto* has been abrogated by the Supreme Court's decision in *Knick*. As this Court previously explained, *Knick* held that "the Takings Clause requires a compensatory remedy without regard to what remedies state law may provide" and "rejected interpretations of federal rights and remedies that would leave those rights at the mercy of state courts." DE 118 at 12-13. While this reasoning was rejected by the Fourth Circuit's subsequent decision in *Zito*, 8.F.4th at 287-77, Plaintiffs believe *Zito* was wrongly decided, and seek to preserve this argument for appeal.

Even if we assume *Hutto* applies, dismissal is not justified because North Carolina courts cannot provide Plaintiffs with a "reasonable, certain, and adequate" cause of action. North Carolina argues that Allen could assert a claim under the North Carolina Tort Claims Act (NCTCA), for breach of Allen's 2013 contract with North Carolina (the "2013 Agreement," see SAC ¶ 7), or for a takings under the North Carolina constitution. DE 147 ("Motion") at 8. None of these options is viable.

The NCTCA is not a viable option because it only waives sovereign immunity for negligence and is not itself an independent cause of action. (N.C.G.S. § 143-291). Allen's claims are not based on negligence, and North Carolina does not identify any cause of action that could serve as a predicate. Furthermore, a breach of contract claim isn't feasible because the claims at hand (Claims I-IV) aren't contract-based, and because the statute of limitations for the 2013 Agreement has expired (N.C.G.S. § 1-52). Furthermore, North Carolina has already stated that the Settlement Agreement is void as against public policy. (SAC ¶ 124).

One theoretical claim remains—a takings claim made directly under the North Carolina Constitution. Motion at 9. But that claim is also not viable, since Allen's claims involve rights that, by statute, can only be

adjudicated by federal courts.[5] There are two statutory provisions at issue, each of which precludes North Carolina courts from resolving Allen's claims: 28 U.S.C. § 1338, which provides federal courts with exclusive jurisdiction over claims "arising under" the Copyright Act, and 17 U.S.C. § 301, which preempts state copyright claims.[6]

### a. FEDERAL COURTS HAVE EXCLUSIVE JURISDICTION OVER ALLEN'S CLAIMS (28 USC § 1338)

Federal courts have exclusive jurisdiction over all claims "arising under" the Copyright Act. 28 U.S.C. § 1338 ("No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to ... copyrights."). A claim "arises under" the Copyright Act if it (1) "seeks a remedy expressly granted by the Copyright Act" **or** (2) "requir[es] construction of the Copyright Act." 13 Fed. Prac. & Proc. Juris. § 3582 (3d ed.) & n.31 (noting "widespread agreement" on the "arising under" test); *see also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988); *Christopher v. Cavallo*, 662 F.2d 1082, 1083 (4th Cir. 1981).

Here, both conditions are satisfied, since the claims at issue are either copyright claims (Claims I-II) or are integrally connected to copyright claims (Claims III-IV). Moreover, the "just compensation" Allen seeks are the remedies specified in the Copyright Act and DMCA (SAC ¶¶ 150, 158, 171, 185). Hence, any attempt to resolve Allen's claims—even if framed as a North Carolina takings claims—would require the state court to interpret the Copyright Act and resolve key copyright issues such as fair use, infringement, authorship, and ownership. Motion at 13-14 & 16 n.5. Thus, North Carolina has no authority to resolve Allen's claims.

### b. ALLEN'S STATE CLAIMS ARE EXPRESSLY PREEMPTED (17 U.S.C. § 301).

Separately, any state claims Allen would otherwise be allowed to assert would be expressly preempted by the Copyright Act. 17 U.S.C. § 301. Section 301 has a "broad preemptive scope." *Tire Eng'g & Distrib. v.*

---

[5] Allen's claims may also be blocked by the Copyright Act's three-year statute of limitations. 17 U.S.C. § 507(b); *see also* Motion at 25 ("[A]ll allegations based on conduct before the year 2020 is barred by the SOL."). While there is no statute of limitations for takings claims in North Carolina, the fact that Allen's claims derive from the Copyright Act means Defendants have at least a colorable argument that the statute of limitations would apply to any claims brought now in state court.

[6] "[P]reemption and federal jurisdiction are distinct concepts," and so should be considered separately. *Allen v. GlaxoSmithKline PLC*, 2008 WL 2247067, at *10 (E.D. Pa. May 30, 2008) (citing cases). If either concept would prevent North Carolina Courts from resolving Allen's claims, then state courts would not be "open."

*Shandong Linglong Rubber Co.*, 682 F.3d 292, 309 (4th Cir. 2012), the purpose of which is to "insure that the enforcement of these rights remains *solely* within the federal domain." *Id.* (emphasis added)

A state claim is preempted by the Copyright Act if the claim "falls within the subject matter of copyright law" and if the rights protected by state law are "equivalent" to any of the exclusive rights guaranteed by the Copyright Act. *Id.* Rights implicated by a state claim are "equivalent" to those protected by the Copyright Act if the state-law right "may be abridged by an act which, in and of itself, would infringe one of the exclusive [copyright] rights." *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 230 (4th Cir. 1993).

Both requirements are satisfied here. Allen's state-law takings claim falls within the subject matter of copyright law since the claim is predicated on North Carolina's infringement, theft, and destruction of his copyrights. Further, Allen's state-based takings claim is "equivalent" to his copyright claim, since both claims are satisfied by showing that Defendants unlawfully infringed Allen's copyrights. Put differently, the state claim would not "regulate conduct qualitatively different from the conduct governed by federal copyright law," but would instead regulate the *exact same* conduct. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir 1993).[7]

~~

In view of the above, it cannot be said that state courts are "open" for Allen and his claims. It bears emphasis that to prevail on this issue, Allen need not definitively *prove* that North Carolina courts would dismiss his claims—the question is whether North Carolina provides a "reasonable, certain, and adequate" cause of action. The above analysis demonstrates that there are likely *no* viable causes of action, and that whatever cause of action *may* exist would, at best, be *un*certain and *in*adequate. To the extent the Court has doubts on this issue, it should resolve those doubts in Allen's favor to ensure that his constitutional rights are preserved.

North Carolina suggests that this Court previously concluded that North Carolina courts *are* "open" to hear Allen's claims. *See* Motion at 8 (citing DE 69 at 18). Nonsense. The Court's consideration of the "open"

---

[7] The elements of Allen's copyright claims are identical to the elements of his hypothetical state takings claim. Both require Allen to prove that he had a valid copyright and that defendants infringed that right. *See Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (elements for copyright claim); *Corum v. Univ. of N. Carolina*, 330 N.C. 761, 781-82 (1992) (describing North Carolina takings claim).

question was limited to Plaintiffs' previously-pled § 1983 claim. The Court did not consider whether state courts would be open for Plaintiffs' broader takings claims, as the Court had already concluded that Congress abrogated sovereign immunity through CRCA. *See* DE 69 at 7-9. Moreover, the SAC's takings theories are more detailed and expansive than those set forth in the previous complaint. Thus, the Court has good reason to consider the "open" question from scratch and with the benefit of more detailed briefing. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) ("law of the case" doctrine not absolute).

North Carolina also suggests that revisiting the sovereign immunity question is barred by *res judicata* and the law of the case doctrine. *See* Motion at 5-6. This, too, is incorrect, as *res judicata* only applies to final judgments, and none has been issued in this case. *See* DE 118 at 20 ("[F]inal judgment was never entered[.]"). Ironically, it is *North Carolina's* argument that is barred by the law of the case doctrine, as this Court already considered and rejected its "res judicata" argument when it held that the takings claims were "no longer dismissed." *See* DE 118 at 21, 24.

D. **ALLEN HAS STATED CLAIMS FOR COPYRIGHT INFRINGEMENT AND DMCA VIOLATIONS (CLAIMS I & II).**

While Defendants do not expressly argue that Plaintiffs have failed to state a claim for copyright infringement or for a violation of the DMCA, the Motion includes an extended five-page narrative that attempts to refute the SAC's allegations relating to those claims. *See* Motion at 13-17. Defendants also attached <u>20</u> exhibits to support their factual claims. The Court should not consider those arguments or exhibits, as they are based on facts that are not included in the SAC. *E.g.*, *Zak*, 780 F.3d at 606-07.

To state a claim for copyright infringement, Allen must allege that he has a valid copyright and that North Carolina infringed that right. *Avtec*, 21 F.3d 568, 571. The SAC alleges both. *See* SAC ¶¶ 63-67, 70-71, 85, 141-42, 177 (Allen's ownership and registration of copyrights); *id.* ¶¶ 82, 85-86, 89-91, 102-04, 118-122, 126, 135, 137, 143-45 (allegations supporting infringement).

To state a claim for a DMCA violation, Allen must allege that North Carolina intentionally removed or altered copyright management information without permission, or that North Carolina performed or distributed a copyrighted work while knowing that copyright management information has been removed or

altered without the authority of the copyright owner. 17 U.S.C. § 1202. Once again, the SAC alleges both. SAC ¶¶ 151-57. Thus, the Court should deny North Carolina's Motion with respect to Claims I and II.

### E. ALLEN HAS STATED A TAKINGS CLAIM WITH RESPECT TO BLACKBEARD'S LAW (CLAIM IV) AND THE STATE'S DIRECT AND INDIRECT INFRINGEMENT OF HIS COPYRIGHTS (CLAIM III).

To state a claim for an unconstitutional taking, Allen must allege (1) that he has a protectable property interest, and (2) that the property was "taken" without "just compensation." *See* U.S. Const., amend. V, cl. 4; *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-38 (2005); *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). Allen has alleged both. As to the first, the SAC alleges that Allen owns a valid copyright and that he has a property interest in his copyrights. *Allen*, 140 S. Ct. 994 at 1004 ("Copyrights are a form of property."); SAC ¶¶ 63-67, 70-71, 85, 141-42, 177 (allegations showing ownership of copyrights), ¶ 161 (identifying copyrights as a property interest).

The SAC also alleges that Allen's property was taken. The Supreme Court has recognized three kinds of takings: (1) "direct appropriation," which takes place if the government creates a "practical ouster of the owner's possession," (2) a "per se" taking, which takes place when the government "completely deprive[s] an owner of all economically beneficial use of her property," and (3) a *Penn Central* taking, which has no fixed criteria, but takes place when the economic impact of the government's action falls within the scope of conduct the Fifth Amendment was intended to prohibit. *See Lingle*, 544 U.S. at 538-39.

The SAC asserts two distinct takings claim. Claim IV alleges that Defendants took Allen's property by passing Blackbeard's Law, which destroyed Allen's copyrights by placing his life's work into the public domain, SAC ¶¶ 174-88, and Claim III alleges that Defendants took Allen's property through direct and indirect infringement of copyrighted works relating to the Queen Anne's Revenge project. *Id.* ¶¶ 159-73.

#### 1. DEFENDANT' ARGUMENTS ARE PROCEDURALLY IMPROPER.

North Carolina ostensibly questions the adequacy of Allen's takings claims but fails to address the substance of the allegations. Despite citing *Penn Central*, North Carolina offers zero argument. Motion at 11. Instead, North Carolina tries to reference an argument from a previous motion, which it cannot do. *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996); *Aldini AG v. Silvaco, Inc.*, 2023 WL 3749792, at *3 n.3 (N.D.

Cal. Mar. 27, 2023). ("The Court will only consider arguments actually raised in the parties' briefing in deciding each of the motions to dismiss before it."). Even assuming Defendants' incorporation were allowed, the arguments they seek to incorporate address Plaintiffs' *previous* complaint, and rely on facts not alleged in either the old or new complaint. *See* DE 114 at 22-23. Defendants have not offered any reason to depart from the normal rule.

### 2. BLACKBEARD'S LAW IS AN UNCONSTITUTIONAL TAKING (CLAIM IV).

Blackbeard's Law constitutes a taking under each of the three theories identified above.

*First*, Blackbeard's Law directly appropriated Allen's works. "The right to exclude others is generally 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984). For copyrights, the right to exclude is even more fundamental, as the right to exclude *is* the protectable property interest. *See* 17 U.S.C. § 106.

Blackbeard's Law destroyed Allen's copyrights by placing his works in the public domain, declaring that his works "are the property of the people," and expressly invalidating any "limitation on the use" of those works. *See* SAC ¶¶ 9, 13, 103-04, 108, 176-77; N.C.G.S. § 121-25(b) (2015); N.C.G.S. § 132-1 (defining "public records"). Additionally, under Blackbeard's Law, any member of the public "may obtain copies [of Allen's work] for free," and may use and distribute his works however they wish. *See id.*

By taking Allen's right to exclude and transferring his property to "the people," North Carolina directly appropriated Allen's property. *Kaiser Aetna v. United States*, 444 U.S. 179-80 (1979) ("[W]e hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation.").

For similar reasons, Blackbeard's Law qualifies as a "per se" taking. The "economically beneficial" use of a copyright is the ability to license or sell that copyright to others. *See Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007). For obvious reasons, there is no reason to take (or pay for) a license to material that is freely available and whose use cannot be restricted. *See Klinger v. Conan Doyle Est., Ltd.*, 755 F.3d 496, 497 (7th Cir. 2014) (works in the public domain "can be copied and sold without need to obtain a license from the [copyright] holder"). While the economic impact of Blackbeard's Law is apparent from the face of the statute, the effect of the

statute is also supported by allegations in the SAC that explain, in detail, how Blackbeard's Law has impacted Plaintiffs' licensing efforts, and by the fact that the Law—if maintained—precludes Allen from obtaining relief under the Copyright Act, since it renders null and void any law or policy that would restrict one's ability to use Allen's work. SAC ¶¶ 167-68, 178-182.

Finally, Blackbeard's Law qualifies as a taking under *Penn Central*. To determine whether a *Penn Central* taking has occurred, courts consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

The *Penn Central* inquiry is "fact-intensive," and so does not lend itself to resolution through a motion to dismiss. *Penn Central*, 438 U.S. at 124 (1978) (whether an act constitutes a takings "depends largely upon the particular circumstances in [the] case"); *ABC Sand & Rock Co., Inc., v. Cnty. Of Maricopa*, 2022 WL 1619019, at *7 (D. Ariz. May 23, 2022) (declining to consider *Penn Central* at pleading stage). Nevertheless, the SAC makes clear that Blackbeard's Law *does* qualify as a takings under *Penn Central*.

With respect to the first factor, Blackbeard's Law has a significant adverse economic impact on Plaintiffs, as placing the works into the public domain destroys 100% of their value.

Blackbeard's Law also interferes with Plaintiffs' "reasonable investment-backed expectations" (the second factor). The SAC includes detailed allegations regarding Allen's investments into his copyrighted works, including allegations that Allen spent thousands of hours and hundreds of thousands of dollars to create his works relating to the QAR. SAC ¶¶ 63-64, 165-66. But those investments are just the tip of the iceberg, as Blackbeard's Law is not limited to the QAR, but instead applies to *all* historical underwater footage obtained in North Carolina waters. SAC ¶¶ 104, 107. Thus, Plaintiffs' investment-backed expectations include the time and money Allen has invested during his entire career, including substantial investments in equipment, training, and time. *See id.* ¶¶ 106-08.

These investments were not speculative or fanciful, but were based on Allen's reasonable expectations that he would be able to make a profit from licensing his work— expectations grounded in decades of

experience doing just that. *See id.* ¶¶ 19, 58, 69, 167; *cf. Quinn v. Bd. of Cnty. Commr's. for Queen Anne's Cnty., Maryland*, 862 F.3d 433, 443 (4th Cir. 2017) (second factor favors plaintiffs if investments were "reasonable" rather than "speculative").

*Penn Central*'s third factor also favors Allen. This factor is "an open-ended inquiry into whatever considerations [the Court] think[s] [is] most relevant in each specific case." *Blackburn v. Dare Cnty.*, 58 F.4th 807, 813-14 (4th Cir. 2023). Here, the Court should consider the targeted nature of Blackbeard's Law, the fact that it impacts the vast majority of Allen's life work, and the fact that the law was passed in retaliation for Allen refusing to give up his work for free. *See* SAC ¶¶ 3-4, 10-13, 82, 100-02, 105, 126-38, 174-84. Indeed, Blackbeard's Law is exactly the kind of governmental abuse the Fifth Amendment was designed to prevent.

~~

As each of the *Penn Central* factors strongly favors Plaintiff, no further balancing or analysis is needed—Blackbeard's Law is unquestionably a taking.

### 3. NORTH CAROLINA'S INFRINGEMENT CONSTITUTES AN UNLAWFUL TAKINGS (CLAIM III)

North Carolina also effectuated a *Penn Central* taking by infringing Allen's copyrights. As above, each of the three *Penn Central* factors strongly favors Plaintiff.

Defendants' infringements and Blackbeard's Law devalues Allen's copyrights, depriving him of licensing revenue (SAC ¶ 69). The infringement went beyond simple use; Defendants distributed the works publicly online (including platforms like YouTube and state-run social media), allowing anyone to access, download, and use the works without license or permission (SAC ¶¶ 76, 79, 119 & Tbls. 1-2; SAC ¶ 80). This distribution and the consequent ubiquity of the works substantially undermined their value. *Id.*

Moreover, the state's removal of copyright management information, crucial for author attribution and reputation-building, further diminished the works' value and Allen's potential business opportunities (SAC ¶¶ 5, 79-80, 152-55). Thus, North Carolina's actions satisfy the first Penn Central factor, substantiating Allen's takings claims.

The second Penn Central factor supports Allen; he made substantial investments into his QAR

20

footage anticipating he could license it and prohibit its undervaluing use.

       The third Penn Central factor also favors Allen due to the defendants' ongoing, willful conduct, their previous commitment to halt all infringing activity, and their use of Allen's property, which contradicts the essence of copyright ownership.

    **F.**  <u>ALLEN HAS ALLEGED A VIOLATION OF PROCEDURAL DUE PROCESS (CLAIMS III AND IV).</u>

       To make a claim for procedural due process violation linked to a copyright interest, a plaintiff must show that the state intentionally or recklessly infringed a copyright, and failed to provide an appropriate remedy. *Allen*, 140 S. Ct. at 1004; *see also Doe v. The Citadel*, 2023 WL 3944370, at *2 (4th Cir. June 12, 2023).

       The SAC satisfies those requirements. As detailed above and in the SAC, Allen has a property interest in his works, which North Carolina took through Blackbeard's Law and other acts of infringement. Blackbeard's Law's passage was necessarily intentional, as one cannot negligently pass a statute. *See* SAC ¶ 117. Moreover, the SAC alleges that North Carolina expressly intended Blackbeard's Law to punish Allen and exploit Allen's works free of charge. SAC ¶¶ 102, 105, 114, 123.

       With respect to Defendants' infringement more generally (Claim III), the SAC alleges that Defendants' infringement was willful, and that "[a]t all relevant times, Defendants knew they were using Allen's works without permission ... [as] evidenced by the fact that Defendants continued to infringe Allen's copyrights even after Allen expressly notified Defendants of their infringement and demanded Defendants cease their infringement ... [and by] the timing and patterns associated with Defendants' infringement." *Id.* ¶¶ 147-48.

       Finally, the SAC alleges that North Carolina did not provide Allen with *any* notice, nor with any opportunity to challenge their unlawful acts (pre- or post- deprivation). *See* SAC ¶¶ 10, 110-12 (no procedural protections in Blackbeard's Law), 115 (no meaningful opportunity to be heard prior to the passage of Blackbeard's Law), 169, 183. And, as explained above, there is no adequate state remedy.

       North Carolina's arguments for dismissal are flawed. It neglects to address due process violations stemming from Blackbeard's Law (Claim IV). Regarding other infringements (Claim III), North Carolina's arguments are either irrelevant or based on information not in the SAC. North Carolina also claims that the Fourth Circuit "held that Defendants reasonably believed they could use the images." Motion at 13. But the

Fourth Circuit only considered whether Defendants were entitled to qualified immunity, an inquiry unrelated to the intentionality of the alleged infringement. The argument is also based on the previous complaint, rather than the SAC's more detailed allegations regarding motivations and intent.

G.  **ALLEN HAS ALLEGED THAT BLACKBEARD'S LAW IS AN UNLAWFUL BILL OF ATTAINDER (CLAIM V).**

Article I, § 10 of the United States Constitution states: "No State shall ... pass any Bill of Attainder[.]" A bill of attainder is a legislative act that inflicts punishment on specific individuals. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-74 (1977); *see also Ameur v. Gates*, 759 F.3d 317, 329 (4th Cir. 2014) (defining bill of attainder). Claim V of the SAC alleges that Blackbeard's Law is an unlawful bill of attainder that punishes Allen for defending his intellectual property rights, for his efforts to obtain compensation for his work, and for perceived disloyalty towards state archaeological interests. SAC ¶ 193.

Defendants argue that Blackbeard's Law is not a bill of attainder because it does not single out Allen and because it is not punitive. Motion at 19-22. Neither argument passes muster.

1.  **BLACKBEARD'S LAW TARGETS ALLEN.**

While Blackbeard's Law is sweeping in *what* it does, it is hyper-targeted as to *whom* it affects. The SAC includes detailed allegations explaining how Allen and Intersal are—by design—the only persons who are meaningfully impacted by the law. For instance, the SAC alleges that "Rick Allen and Intersal are the *only* persons on the planet with an extensive corpus of photography and video work" covered by the statute, SAC ¶ 105, that the provisions of the Law "mirror the provisions of the 2013 Settlement Agreement," to which Allen and Intersal were the only parties (other than DNCR itself), *id.* ¶ 194, and that the Law "was brought forth because of the [Intersal] lawsuit," *id.* ¶ 116.

North Carolina, meanwhile, does not acknowledge these allegations. Instead, it simply asserts that the Law "applies to State possessed records of many other ongoing salvage projects" that "involve many people." Motion at 21. But those facts are not alleged in (and are contrary to) those in the SAC.

Regardless, those facts would not help North Carolina. Whether North Carolina has other salvage operations says nothing about whether there are other individuals who are meaningfully impacted by the

statute, and North Carolina has not identified any such individuals. And contrary to North Carolina's assertion, Blackbeard's Law does not "appl[y] to *all* persons coming into contact with shipwrecks in N.C. waters"—it only applies to persons who created pictures or videos of shipwrecks or artifacts in state custody, which, as explained in the SAC, is functionally limited to Allen and his privities. *See id*; SAC ¶¶ 104-05.

North Carolina also claims that Blackbeard's Law does not actually affect Allen's works because "the materials at issue were already public records" under N.C.G.S. § 132-1, since "Allen provided the materials directly to DNCR." Motion at 20. This argument makes no sense. Allen has a wealth of material that was <u>never</u> provided to North Carolina, but that nevertheless falls within the ambit of Blackbeard's Law, since they depict vessels and shipwrecks in state waters. SAC ¶ 177 ( Blackbeard's Law "expansive" reach includes materials "not limited to the QAR Project.").

More broadly, North Carolina's interpretation of Blackbeard's Law would mean that the Law is complete surplusage. After all, there is no need to declare as public records "video recordings ... in the custody of any agency of North Carolina" if such recordings were *already* public records. The North Carolina Supreme Court has held that "a statute must be construed, if possible, so as to give effect to every part of it, it being presumed that the Legislature did not intend any of its provisions to be surplusage." *State v. Williams*, 286 N.C. 422, 431 (1975). Here, North Carolina's interpretation of Blackbeard's Law would render meaningless not just a phrase, but *the entire section*. *See* Motion at 27-28 (arguing that Blackbeard's Law "is duplicative of public records law"). North Carolina evidently believed that Blackbeard's Law had meaning, as otherwise they would not have gone to the effort of passing it, and would not have resumed their infringement immediately after its passage. *See generally* SAC ¶¶ 96-120.

Finally, North Carolina's interpretation of its public records law would lead to the absurd outcome that *any* document in an officer's possession would qualify as a public record. Thus, if Roy Cooper purchased a copy of Robert Caro's *Master of the Senate* to improve his leadership skills, that book would instantly become a public record, subject to copying and widespread publication. The phrase "made or received pursuant to law or ordinance," N.C.G.S. § 132-1, cannot be construed so broadly. *E.g.*, *Tetterton v. Long Mfg. Co., Inc.*, 314 N.C. 44, 55 (1985) ("[T]he statute will be interpreted so as to avoid absurd consequences.").

The 2013 Agreement does not warrant a different result. While the Agreement authorized *limited* use of *some* of Allen's work, it did not give North Carolina carte blanche to use *all* of Allen's work however it wanted. To the contrary, the Agreement included detailed restrictions governing North Carolina's use of Allen's works. SAC ¶¶ 92-94 (describing use restrictions in 2013 Agreement that would be incompatible with their treatment as public records). Finally, the limited rights granted in the 2013 Agreement were voided when North Carolina intentionally breached the agreement just days after signing, SAC ¶¶ 97-99, and, barring that, when North Carolina passed Blackbeard's Law which purported to void the 2013 Agreement as a violation of public policy. *See Montessori Children's House of Durham v. Blizzard*, 244 N.C. App. 633, 636 (2016) (under North Carolina law, "[i]t is well settled that where one party breaches a contract, the other party is relieved from the obligation to perform.").

~~

At bottom, the question is whether the legislative act at issue inflicts punishment upon "an *identifiable* individual." *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 846-47 (1984). Here, the narrow scope of the statute, the history surrounding its enactment, and the fact that it uniquely impacts Allen and Intersal each confirm that Blackbeard's Law satisfies the "targeting" requirement. SAC ¶ 106 (Blackbeard's law only impacts those who specialize in "underwater videography projects of derelict vessels and shipwrecks in North Carolina waters"—i.e., Rick Allen and his privities).

**2.   B̲L̲A̲C̲K̲B̲E̲A̲R̲D̲'̲S̲ ̲L̲A̲W̲ ̲I̲S̲ ̲P̲U̲N̲I̲T̲I̲V̲E̲.̲**

In deciding whether a legislative act is punitive, courts consider three factors: (1) whether the challenged statute falls within the historical meaning of legislative punishment, (2) whether the statute "reasonably can be said to further nonpunitive legislative purposes," and (3) whether the legislative record shows a legislative intent to punish. *ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010); *see also Ameur*, 759 F.3d at 329 (same). All three factors support the conclusion that Blackbeard's Law was punitive.

*First*, Blackbeard's Law falls within the historical meaning of legislative punishment since it amounts to a confiscation of Allen's property and because it functionally bars Allen from participating in his chosen

24

profession, *see* SAC ¶¶ 108, 195-97.[8] Both of these penalties are quintessential examples of punishments traditionally imposed by bills of attainder. *See Nixon*, 433 U.S. at 474 (listing "punitive confiscation of property" and "barring designated individuals ... from participation in a specified employments or vocations" as punishments historically associated with bills of attainder).

    *Second*, Blackbeard's Law does not advance any legitimate nonpunitive purpose. As explained in the SAC "[t]here is no legitimate reason to place large swaths of privately-owned copyrights into the public domain, and no reason to prevent copyright holders from entering into contracts that govern the use of their copyrights." SAC ¶ 199. Defendants' proffered non-punitive justification for the Law is that it "provides for the protection and preservation of historic artifacts and shipwrecks located in state waters." Motion at 21. That justification does not hold water, as Blackbeard's Law does not apply to artifacts and shipwrecks, but is instead limited to *pictures and videos* of those artifacts. N.C.G.S. § 121-25(b). To be clear, North Carolina law *does* have provisions that provide for the protection of historical artifacts—just not in Blackbeard's Law. *See id.* § 121-22. North Carolina has not identified any other legitimate non-punitive justifications.

    The political and legislative backstory of Blackbeard's Law strongly points to its purpose being to penalize Allen. The SAC describes the overt hostility Allen faced, including ridicule for monetizing his "hobby" and blame for the "friction" arising from his refusal to work without pay. SAC ¶ 100. The SAC also reveals a prolonged feud between archaeologists and treasure hunters, with Defendants resenting Allen for his perceived support of the latter. The SAC cites this feud and Defendants' frustrations with Allen as the impetus for Blackbeard's Law. *Id.* ¶¶ 47-52, 82-85, 96-102, 114, 193-94. The SAC also clarifies why legislative records about Blackbeard's Law are sparse, as it was a last-minute addition to a larger bill, presumably to

---

    [8] The SAC provides a detailed explanation as to why Blackbeard's Law precludes Allen from working in his chosen profession: "Blackbeard's Law targets Allen's chosen vocation with pinpoint precision, and functionally bars Allen from participation in that vocation by legislating away Allen's ability to obtain compensation for his work. ... The impact of Blackbeard's Law on Allen's vocational opportunities is especially significant in light of the injuries Allen sustained in 2011. After losing his arm, Allen no longer had the ability to shoot footage above water. Thus, the only job within Allen's chosen profession that he can perform is underwater photography. And because Allen lives in North Carolina and specializes in North Carolina maritime environments, Allen is primarily limited to shooting subjects in North Carolina waters, almost all of which fall under the ambit of Blackbeard's Law." SAC ¶¶ 196-97. Defendants do not acknowledge these allegations— let alone challenge their adequacy.

hinder Allen's ability to object. *Id.* ¶ 115. This is supported by at least one published interview, where Senator Sanderson acknowledged the law's genesis in the feud with Allen and Intersal. Id. ¶ 116.

Again, North Carolina does not address these allegations, other than to simply assert that the SAC's allegations are conclusory. Motion at 22. But conclusory assertions of conclusiveness are not grounds for dismissal—especially where, as here, the SAC contains *pages* of detailed facts and extensive narrative. *Keller v. Hosp. of Morristown*, 2016 WL 6956621, at *6 (E.D. Tenn. 2016) ("A general conclusory allegation that the complaint does not sufficiently plead a claim for relief is insufficient to support dismissal of that claim.").[9]

**H. ALLEN HAS ALLEGED THAT BLACKBEARD'S LAW IS AN UNLAWFUL *EX POST FACTO LAW* (CLAIM VI).**

Article I, § 10 of the United States Constitution states, in relevant part: "No State shall ... pass any ... ex post facto Law[.]" An ex post facto law "is one that imposes a punishment for an act which was not punishable at the time it was committed[.]" *United States v. Wass*, 954 F.3d 184 (4th Cir. 2020). For the reasons explained above, Blackbeard's Law imposes a punishment. *See In re DNA Ex Post Facto Issues*, 561 F.3d 294, 298 (4th Cir. 2009). And there is no question that Blackbeard's Law has retroactive effect, as it was enacted after—and in response to—conduct Defendants found objectionable. *See* SAC ¶¶ 101-02, 206. North Carolina does not meaningfully challenge any of these elements, but instead simply repeats their arguments relating to bill of attainder. *See* Motion at 22.

**I. ALLEN HAS ALLEGED THAT BLACKBEARD'S LAW IMPAIRS THE SETTLEMENT AGREEMENT (CLAIM VII).**

North Carolina does not meaningfully engage with this claim. The entirety of their analysis is contained in a single sentence, which conclusively asserts that "the alleged actions were made in furtherance of the important public purpose of historical preservation," but does not acknowledge the many allegations in

---

[9] Ironically, Defendants have moved to strike many of the allegations that support this claim as "scandalous." *See supra* at 3-6. Plaintiffs agree that the alleged conduct is scandalous—but that just *supports* the claims for relief. For obvious reasons, Defendants cannot strike Allen's allegations as improper, and then point to those missing allegations as a basis to dismiss.

the SAC that show the opposite. Motion at 23. Defendants have not shown why dismissal is warranted.[10]

**J.** **A**LLEN **H**AS **S**TATED A **C**LAIM **U**NDER **S**ECTION 1983 (**C**LAIM **VIII**)

Allen is asserting his § 1983 claim against all defendants sued in their personal capacities. A plaintiff must allege that a defendant acted under color of law to deprive her of a Constitutional right to prevail under § 1983. Defendants do not challenge the merits of Allen's § 1983 claim, but instead argue that they are entitled to qualified immunity and that Allen's claims against the newly-added defendants should be dismissed under a statute of limitations. Motion at 23-25.

**1.** **D**EFENDANTS **A**RE **N**OT **E**NTITLED TO **Q**UALIFIED **I**MMUNITY.

Defendants' arguments as to qualified immunity are based entirely on the Fourth Circuit's earlier decision in this case, which considered the sufficiency of an earlier complaint and did not account for the SAC's new claims and allegations. 895 F.3d at 356-58. The Fourth Circuit held that Defendants were entitled to qualified immunity based on the 2013 Agreement. The SAC, however, introduces fresh allegations showing that Defendants' infringements—including newly alleged infringements—could not have been sanctioned by the 2013 Agreement, given they occurred (and are occurring) after Blackbeard's Law deemed the Agreement "void and unenforceable as a matter of public policy." See SAC ¶¶ 118-139 & Tbl.2. Without the Settlement Agreement, the Fourth Circuit's analysis loses relevance, as no justification exists for Defendants to assume their use of Allen's works is permissible. Indeed, the only arguable justification for their conduct would be Blackbeard's Law itself, but it is well established that state law cannot override or supersede federal law. Thus, Defendants are not entitled to qualified immunity.[11]

Separately, the operative standard for qualified immunity is deeply flawed and in dire need of revision. *Ziglar v. Abbasi*, 582 U.S. 120, 157-60 (Thomas, J., concurring) ("Our qualified immunity precedents ... represent precisely the sort of freewheeling policy choices that we have previously disclaimed the power to make.") The

---

[10] Strangely, in analyzing Claims V-VII Defendants do not cite any federal law, and choose instead to rely on North Carolina law. But Allen's claims are rooted in federal law. North Carolina's definition of bill of attainder, ex post facto, and impairment of contract are irrelevant.

[11] Defendants also claim they are entitled to legislative immunity. Motion at 23-24. But none of the claims against the individual defendants is based on legislative conduct—they are rooted solely in Defendants' infringing behavior.

Supreme Court has expanded the scope of qualified immunity to such an extent that it covers conduct that shocks the conscience, despite the fact that there is no historical or textual basis for the rule. *See Jessop v. City of Fresno*, 936 F.3d 937 (9th Cir. 2019) (finding qualified immunity for police officers who stole hundreds of thousands of dollars while executing a search warrant); *West v. Winfield*, 931 F.3d 978 (9th Cir. 2019) (finding qualified immunity for police officers who destroyed a house after obtaining consent to search it). Allen asserts and preserves for appeal the argument that qualified immunity should not be applicable in § 1983 cases. If it is deemed applicable, its application should be variable and dependent on factors such as the sophistication of the state actors, their access to legal advice, their subjective belief about the legality of their actions, and the adequacy of the time they had to contemplate the legal status and implications of their decisions.

      2.  THERE IS NOT A STATUTE OF LIMITATIONS PROBLEM.

Whether claims against the recently included defendants are associated with the initial complaint is determined by FRCP 15(c). This rule stipulates that claims against newly included defendants relate back to the date of the original pleading if the amendment asserts a claim or defense stemming from the conduct or occurrence outlined in the original pleading, if the new defendants received notice of the action and won't be prejudiced when defending on merits, and if the new defendants were aware or should have been aware that the action would have been brought against them. Fed. R. Civ. P. 15(c)(1). North Carolina does not address this standard and has not proven why dismissal should be granted based on a statute of limitations.

In any event, the SAC satisfies the rule. Each of the newly added Defendants played a key role in the alleged unlawful conduct, and so most certainly had knowledge of this suit and knew or should have known that they engaged in the same conduct as the originally-named Defendants, and so should have been named in the original complaint. That is all that is required. *Williams v. Kincaid*, 45 F.4th 759, 775-776 ("notice" and "mistake" requirements of Rule 15 should be construed broadly); *see also Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 547-54 (2010) (interpreting "notice" and "mistake" requirements).

    **K.  ALLEN IS ENTITLED TO INJUNCTIVE RELIEF UNDER *EX PARTE YOUNG* (CLAIM IX)**

Under the Supreme Court's decision in *Ex Parte Young*, plaintiffs can seek and receive injunctive relief in federal court concerning ongoing constitutional violations. 209 U.S. 123 (1908). Allen seeks such relief

against Defendants Wilson, Koonts, and several unnamed defendants (Does) in their official capacities.

Allen's requested injunction takes two forms. First, he seeks to halt the ongoing acts of infringement alleged in the SAC. SAC at 23 Tbl.2. Second, he seeks to enjoin Defendants from treating (or designating) Allen's works as "public records" that can be used without permission or compensation. SAC ¶ 221. Because Allen's works are classified as "public records," they are considered "the property of the people" under N.C.G.S. § 132-1, permitting anyone to use Allen's works without a license or providing him compensation.

Defendants previously mooted Allen's claims by stopping its infringing activities just before judicial consideration. SAC ¶ 127; *Allen*, 895 F.3d at 354-56. However, such voluntary cessations don't defeat *this* claim, as Defendants continue to assert that Allen's works are public records, and continue to claim—even in their recent filings—that they have the right to use Allen's works without charge. Motion at 20.

Defendants contend that Allen does not adequately allege the involvement of the individually named defendants (Motion at 25), yet it again bases its argument on the Fourth Circuit's analysis of Allen's previous complaint without addressing the specific allegations against each defendant in the SAC.

The SAC specifically alleges that Defendant Wilson, who runs the DNCR, sets and implements policies related to Allen and his property (SAC ¶¶ 23, 26, 217, 219). Given that DNCR is the statutory designee of North Carolina's public records, it's plausible that Wilson, as head of DNCR, can control whether Allen's works are treated as public records and can end DNCR's ongoing infringements (SAC ¶ 23). Similarly, the SAC alleges that, as North Carolina's chief archivist, Defendant Koonts plays a direct role in classifying and treating Allen's works as public records and in continuing the infringements (SAC ¶¶ 27, 113, 139, 216).

Finally, the SAC alleges that the Doe Defendants directly implement DNCR's unlawful policy by being responsible for the initial taking, copying, and performing of Allen's works (SAC ¶¶ 33-34, 79-80, 119).

Given these allegations, Allen is entitled to injunctive relief. *Pharmaceutical Research and Manufacturers of America v. Williams*, 64 F. 4th 932, 950 (8th Cir. 2023) (injunctive relief under *Ex Parte Young* is appropriate to

prevent ongoing takings violations).[12]

**L.   <u>ALLEN IS ENTITLED TO DECLARATORY RELIEF (CLAIM X)</u>**

Under 28 U.S.C. § 2201, the Court may issue declaratory relief in any action over which the Court has jurisdiction. Defendants do not challenge Allen's request for declaratory relief itself, but instead simply repeat their arguments regarding sovereign immunity, qualified immunity, and the underlying claims. Motion at 27-28. The arguments fare no better the second time around.

## CONCLUSION

For the foregoing reasons, this Court should deny North Carolina's motion to strike and motion to dismiss in their entirety.

Respectfully submitted this 22nd day of June 2023.

/s/ David McKenzie
**David McKenzie**
NC State Bar No. 36376
/s/ Susan Freya Olive
**Susan Freya Olive**
NC State Bar No. 7222
P.O. Box 2049
Durham, North Carolina 27702
Telephone: (919) 683-5514
Email: emailboxEDNC@oliveandolive.com

**Adam Adler**
DC Bar ID 888324890
**Reichman Jorgensen Lehman & Feldberg LLP**
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Email: aadler@reichmanjorgensen.com

---

[12] Defendants take issue with the fact that the sub-heading for Claim IX identifies only North Carolina and DNCR as defendants. As is clear from the substance of the underlying allegations and the prayer for relief, Allen seeks an injunction against the defendants who implement the state's unlawful policy. The SAC lists the institutional defendants to reflect the fact that it is, after all, North Carolina and DNCR's policy that is unlawful. *See* SAC ¶¶ 220-224, and at 39-40. *See Reyes v. Dorchester Cnty.*, 2022 WL 820029, at *10 (D.S.C. Mar. 18, 2022) (courts liberally construe claim descriptors, especially in immunity cases, where distinction between individual and professional capacity is a fiction).

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-627-BO

| | | |
|---|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROY COOPER, Governor of the | ) | |
| State of North Carolina, in his | ) | **DEFENDANTS' REPLY TO** |
| official capacity, JOSH STEIN, | ) | **PLAINTIFFS' RESPONSE TO** |
| Attorney General of North Carolina, | ) | **MOTIONS TO DISMISS (DE 147)** |
| in his official capacity, D. REID | ) | **AND MOTION TO STRIKE (DE** |
| WILSON, in his individual and | ) | **145) PLAINTIFFS' SECOND** |
| official capacity, DR. KEVIN B. | ) | **AMENDED COMPLAINT** |
| CHERRY, in his individual and | ) | |
| official capacity, SARAH KOONTS, | ) | |
| in her individual and official | ) | |
| capacity, JOSEPH K. | ) | |
| SCHWARZER II, in his individual | ) | |
| and official capacity, MIKE | ) | |
| CARRAWAY, in his individual and | ) | |
| official capacity, and the STATE OF | ) | |
| NORTH CAROLINA, a body | ) | |
| politic, | ) | |
| Defendants. | ) | |
| _____ | ) | |

Now come Defendants and respectfully submit this Reply in the above-captioned matter.

## I.     JURISDICTIONAL DEFICIENCIES BAR THIS CLAIM.

### A.     Counts I, II and V through X of the Second Amended Complaint are not properly before this Court.

Plaintiff fails to address the predicate issue in this matter, namely, whether Counts I, II and V through X (DE 134 at ¶¶ 140-58 and 189-227) are properly before this Court. Defendants moved to strike under Rule 12(f) and dismiss these claims under Rules 12(b)(1) and (6). Plaintiffs' failure to respond demonstrates they have no basis or argument why these Counts should not be dismissed.

Plaintiffs argue that the Court "did not impose any limitations when it granted Plaintiffs' request to amend the complaint" and the eight claims Defendant moved to strike and/or dismiss "are integrally connected to claims Defendants do not challenge as improper." DE 153 p. 16[1]. First, Defendant disagrees with Plaintiff's assertion that the other two claims were properly before the court and argued so in their respective motions. Moreover, Plaintiffs, citing to no legal precedent, fail to show how eight of the ten counts in the Second Amended Complaint ("SAC") could withstand Defendants' motions to strike and dismiss since they exceed the scope of this Court's Order granting the Motion for Reconsideration. (DE 118)  Plaintiffs' argument is conclusory and fails to explain why Plaintiffs first violated Local Rule 15.1(a) of the U.S. District Court for the Eastern District of North Carolina, when Plaintiffs' motion for reconsideration failed to feature a proposed amended pleading, and then exceeded the directives of this Court's Order allowing reconsideration.  *See*, DE 145 pp. 8-9.

It is well-settled that a motion for reconsideration is not intended to provide a party with a second opportunity to present arguments that were previously considered and rejected or to advance new arguments.  Similarly, a party may not exceed the scope of an order allowing a particular filing. DE 145 pp. 7-8 and DE 147 p. 4. To hold otherwise would allow litigants to expand a court's order beyond the holding. Which is exactly what the Plaintiffs want to do here.

---

[1] Unless otherwise specified, page numbers in citations shall be specified by the court's CM/ECF system number and not the page numbers of the underlying documents.

1

As previously argued by Plaintiffs, "motions for reconsideration are, at least in part, designed to accommodate changes in the law, and to allow reconsideration of decisions under such circumstances." DE 106 p. 7. In their motion, Plaintiffs requested reconsideration of only Count III of the Amended Complaint takings claim under the Fifth and Fourteenth Amendments, and sought to assert a *Georgia* claim. DE 106 pp. 1-3. DE 106. No other claims were addressed by Plaintiffs or this Court, and the Order explicitly states that only that previously dismissed Count was "no longer dismissed." DE 118 p 24. All remaining claims in the First Amended Complaint remained, and still remain, dismissed. DE 92. In addition to takings and Georgia claims, Plaintiffs now assert eight new and different claims in the SAC (DE 134) for which they **never** sought leave of court. *See* Fed. R. Civ. P. 15(a)(2) (2023) (a party may amend its pleading…only with leave of court).

Notably, Plaintiffs fail to address how, over the course of over seven years of litigation, they never raised bill of attainder, *ex post facto* law, or impairment of the obligation of contracts claims in any prior pleading or hearing. Plaintiffs repeatedly failed to make these "integrally connected" claims over the past seven years and the opportunity to do so does **not** arise pursuant to a motion for reconsideration.

As such, Plaintiffs' contention that no limitations on the SAC were imposed by the Court is disingenuous at best. Plaintiffs are improperly attempting to have a second bite at the apple to assert claims that they failed to assert for many years (and are now barred by the statute of limitations) or were otherwise already considered and rejected. Accordingly, all of Plaintiffs' causes of action in the SAC *except* for Counts III and IV for Takings Claims under the Fifth and Fourteenth Amendments to the United States Constitution through the Copyright Act are not properly before this Court and must be stricken pursuant to Rule 12(f) or dismissed pursuant to Rules 12(b)(1) and (6).

**B.      Plaintiff has failed to state a claim against Governor Cooper or Attorney General Stein.**

Plaintiffs named Governor Cooper and AG Stein, in their official capacities, in the SAC but failed to assert any factual allegations against either party. Defendants moved to strike and dismiss all claims against these Defendants. Plaintiffs subsequently failed to respond to these arguments in their brief in opposition to Defendants' motion to dismiss. DE 153.

2

When a claimant fails to meet the Twombly-Iqbal plausibility standard, then the complaint is too conclusory and will not move forward. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009); *Racick v. Dominion L. Associates*, 270 F.R.D. 228, 236 (E.D.N.C. 2010); *Waterford I at Cary Park Condo. Homeowners Assn., Inc. v. Nationwide Prop. and Cas. Ins. Co.,* 5:22-CV-470-D, 2023 U.S. Dist. WL 2959868 at 6 (E.D.N.C. Apr. 14, 2023) (to be plausible, the complaint must feature facts to support each claim). Further, when an opposing party fails to address an argument that has been raised in a dispositive motion, the party concedes that argument. *Feldman v. Law Enf't Assoc. Corp.,* 955 F. Supp. 2d 528, 536 (E.D.N.C. 2013)*; Hopkins v. Women's Div., Gen. Bd. Of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002).

Plaintiffs did not assert any factual allegations in the SAC against Governor Cooper or AG Stein beyond the conclusory language they may enforce North Carolina laws and failed to respond to Defendant's relevant motions. DE 134 pp. 4 and 20. The law in this area is settled and these vague conclusory allegations are insufficient to maintain a claim against the Governor or the Attorney General. *Allen v. Cooper*, 895 F.3d 337, 346 (4th Cir. 2018) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014)). Moreover, the Fourth Circuit has already dismissed Governor Cooper from this action. *Id*. All claims against Cooper and Stein should now be stricken and/or dismissed.

### C.    Plaintiffs' claims for Injunctive and Declaratory Relief are moot.

Recently, the North Carolina General Assembly, in an effort to "[c]larify public records statute related to photographs and video recordings of derelict vessels and shipwrecks," amended N.C. Gen. Stat. § 121-25[2] and removed section 121-25(b) challenged by Plaintiffs. 2023 N.C. ALS 70, 2023 N.C. Sess. Laws 70, 2023 N.C. Ch. 70, 2023 N.C. HB 168 (June 30, 2023). Therefore, all Plaintiffs' claims for Injunctive or Declaratory relief must be dismissed as moot.

"When a case or controversy ceases to exist, the litigation is moot, and the court's subject-matter jurisdiction ceases to exist also." *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789

---

[2] Unless otherwise specified, "N.C. Gen. Stat. § 121-25" and "N.C. Gen. Stat. § 121-25(b)" shall be cited as "G.S. 121-25" and "G.S. 121-25(b)".

F.3d 475, 482 (4th Cir. 2015) (citation omitted). A case becomes moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018). It is well established that "subsequent events can moot" a valid claim. *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013). Therefore, a case may become moot "due to a change in the facts or a change in the law." *S.C. Coastal Conservation League*, 789 F.3d at 482 (citation omitted). Any ruling by this Court on claims rendered moot "would constitute an impermissible advisory opinion." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021).

"[S]tatutory changes that discontinue a challenged practice" are enough to render a case moot under this standard. *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000). When a challenged law is "superseded by a significantly amended statutory scheme," then a claim against the original law becomes moot. *Esposito v. S.C. Coastal Council*, 939 F.2d 165, 171 (4th Cir. 1991).

By their own admission, Plaintiffs disagreed with and were seeking a repeal of the relevant part of G.S. 121-25(b). DE 147-12. That part of the statute has been repealed, the relevant law is now largely the same as it was prior to 2015 amendment, and Plaintiffs were made aware of this statutory change. Here, the redaction of G.S. 121-25(b) and a subsequent repeal negated what Plaintiffs argued was the "challenged practice." Specifically, Plaintiffs seek the injunction of Defendants' "use, implementation, administration, and enforcement of [G.S. 121-25(b)]." DE 134 at ¶ 223. Also, the "judicial declaration" that [G.S. 121-25(b)] violates the United Sates Constitution as well as the prohibition on "bills of attainder, ex post facto laws, and laws impairing the obligation of contracts." DE 134 at ¶ 227(d). Both these are issues are rendered moot by the amendment to G.S. 121-25 and must be dismissed.

### D.    Defendants' Rule 12(b) motions are proper and not procedurally barred.

Plaintiffs argue that the Defendants' motion to dismiss, which was filed only 16 minutes after Defendants' Rule 12(f) motion to strike, violates Rule 12(g)'s successive motion prohibition and should be denied as "procedurally improper." DE 153 p. 16. This argument is without merit.

All relevant motions to dismiss (sovereign immunity, qualified and legislative immunities, statute of limitations, law of the case, collateral estoppel, failure to state a claim, etc.) were grounded in Rules

4

12(b)(1) and (6) of the Fed. R. of Civ. P. Rules 12(b)(1) and (6) motions "are exempted by Rule 12(g) from the consolidation requirement and are protected against waiver by Rules 12(h)(2) and 12(h)(3)." 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1361 (3d ed. Oct. 2020 Update); *Miller v. Bd. of Educ. for Montgomery County,* 2020 U.S. Dist. LEXIS 233315, *12; *see also*, *Johnson v. Balt. PD*, 2021 U.S. Dist. LEXIS 78936 (2021). Additionally, a Rule 12(b)(1) motion may be filed at any time and its filing does not preclude a later filing for a different Rule 12 motion. *Cross v. Ciox Health, LLC*, 438 F. Supp. 3d 572, 581-82 (E.D.N.C. Feb. 3, 2020). Plaintiffs' argument to the contrary should be rejected.

Even if Plaintiffs' request had some currency, the Court should nevertheless deny it here. First, Plaintiffs ask this Court to put form over substance and disregard the goals of providing "just, speedy and inexpensive determination of every action and proceeding". Fed R. Civ P. 1 (2023). Plaintiffs' request contradicts the spirit of Rule 12 (g) and would lead to an unjust and unfair result. Rule 12(g) provides that "a motion under [Rule 12] may be joined with any other motion allowed by this rule." Fed R. Civ P. 12(g)(1). Rule 12(g) also provides that [e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule…that was available to the party but omitted from its earlier motion." Fed R. Civ P. 12(g)(2). Rule 12(g) was designed to avoid delays caused by successive and repetitive pretrial motions. 5C Wright & Miller, Federal Practice and procedure § 1384, at 208 (3d ed. 2020 update); *see also Ennanga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("The policy behind Rule 12(g) is to prevent piecemeal litigation in which a defendant moves to dismiss on one ground, loses, then files a second motion on another ground) (citation omitted). That is not the case at hand, where Defendants pointed the *ab initio* impropriety of Plaintiffs' SAC that exceeded this Court's order allowing reconsideration in a motion to strike, and moved to dismiss Plaintiffs' claims in a motion to dismiss.

Second, courts have interpreted the bar on successive Rule 12 motions "permissively and have accepted subsequent motions on discretionary grounds." *Superior Performers, Inc. v. Ewing*, 2015 U.S. Dist. LEXIS 79709 at *9 (N.C.M.D. June 19, 2015) (citation omitted). Specifically, concerning the interests of efficiency, courts have recognized that "[u]nder Rule 12(h) [a 12(b)(6) argument] could be raised in a judgment on the pleadings or at trial[.]" *Id*. Accordingly, "it is far more efficient to treat the arguments

5

prior to more extensive discovery." *Id.*  If the Court were to deny Defendants' motion to dismiss on procedural grounds, it would only delay a hearing on these grounds pending a motion for judgment on the pleadings pursuant to Rule 12(c) raising the same defenses.  This is not the intent and spirit of the Federal Rules. *See* 2-12 Moore's Federal Practice - Civil § 12.23 ("court might properly entertain a second motion if it were convinced it was not interposed for delay and that addressing it would expedite disposition of the case on the merits").

In *Chalk v. Lender Process Servs*., 2013 U.S. Dist. LEXIS 181585, at *7-8 (Dist. of MD Dec. 31, 2013), the court held that the defendant filed a Rule 12(f) motion to strike, and that a Rule 12(b)(6) motion filed fourteen days later did not cause delay, so the court considered both motions. *See also Urrego v. White*, 2018 U.S. Dist. Lexis 125606 at *13-14 (E.D. Va. July 3, 2018) (court found that Defendants separate same day Rule 12 filings did not prejudicially delay the pleadings stage and ruled on both motions to dismiss despite defendant's technical error) (*citing Amazon Web Servs., Inc., v. Global Equity Mgmt., S.A.,* 2017 U.S. Dist. LEXIS 148477, 2017 WL 4052381, at *5 (E.D. Va. Sept 13, 2017).

The courts have utilized Rule 12(g) on occasion to dismiss second filed Rule 12(b)(6) motions and egregiously delayed second filings. These cases are easily distinguished. In *Sageworks*, *Inc. v. Creatore,* 2017 WL 633359 (E.D.N.C. Feb 15, 2017) Defendant filed two Rule 12(b)(6) motions on separate claims approximately three weeks apart. *Id.* at *4-7 The Court held that the defendant was "procedurally barred from raising subsequent 12(b)(6) defenses." *Id*.; *see also, Warsila NSD N Am., Inc. v. Hill Int'l, Inc.* 2004 WL 7339759 (D.N.J. June 22, 2004) (court denied Rule 12(b)(6) motion filed over one year after Rule12(b)(2) motion on the same issues).  As discussed above, this concern is not implicated under the facts here at all.

Here, the interest of promoting justice, fairness, expediting the litigation and avoiding undue delay and duplicative motions are served by the Court hearing all the Defendant's pending Rule 12 motions. There is no prejudice or surprise to the Plaintiff. Defendants' motion to strike and motions to dismiss were filed on the same day within minutes of each other and involve the same defenses that have been raised by Defendants in this litigation since 2015.

6

**E.    Sovereign immunity bars Plaintiffs' claims.**

**1.    The CRCA is not a valid abrogation of sovereign immunity for Counts I and II of the SAC.**

The Supreme Court, in this matter, found that the Copyright Remedy Clarification Act ("CRCA") was not a valid abrogation of the State's sovereign immunity and confirmed that Plaintiffs' claims against the State for violating the CRCA were properly dismissed. *Allen v. Cooper*, 140 S. Ct. 994, 1007 (2020). Plaintiffs' allegations of copyright infringement in the SAC are the same claims Plaintiffs made in their first amended complaint namely, infringing the copyrighted work by copying, displaying, or distributing Plaintiffs' work without his permission, DE 134 at ¶¶ 140-150, and, additionally, violating the CRCA by altering or removing copyrighted information, DE 134 at ¶¶ 151-158. Plaintiffs' attempt to revitalize the copyright infringement claims is without merit and must be dismissed.

**2.    Plaintiffs have failed to allege a claim under *Georgia*.**

This Court need not decide whether *Georgia* extends to copyright infringement cases, which is not conceded, because even assuming it does, Plaintiffs have failed to allege conduct that actually violates the Fourteenth Amendment.

Plaintiffs concede that his taking claims [Counts III and IV] can only proceed under two exceptions from sovereign immunity; as outlined in *United States v. Georgia*, 546 U.S. 151, 159 (2006) and as recognized in *Knick v. Twp. Of Scott,* 139 S. Ct. 2162 (2019). DE 153 p. 19. Plaintiffs mischaracterize *Georgia*'s sovereign immunity implications.  In *Georgia*, the Court analyzed a claim under Title II of the Americans with Disability Act, which properly abrogated injunctive claims against a defendant, and held that an inmate's claims, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159. It is not an abrogation of sovereign immunity for copyright infringement—there must be an allegation of actual constitutional violations. For a copyright claim to come within the reach of the procedural due process requirements of the Due Process Clause, a violation must

(1) be "intentional, or at least reckless," and (2) lack an adequate post-deprivation state remedy. *Allen*, 140 S. Ct. at 1004. Plaintiffs' *Georgia* claim fails for both reasons.

Plaintiffs allege lack of "due process" or "just compensation" for their copyright violation takings claims. DE 134 at ¶¶169, 170, 183 and 184. The allegations of copyright violations were addressed previously, DE 147 pp. 21-24, and Plaintiffs have failed to refute the arguments that these "takings" were not intentional.  In fact, the 22 DV CAMS alleged to have been withheld, DE 134 at ¶¶ 98, 163, were returned to Plaintiffs without ever having been publicly copied, displayed or distributed. (*see,* **EX 1**)

Additionally, meaningful post-deprivation state remedies are available to redress any alleged injury.  *See Parrott v. Taylor*, 451 U.S. 527, 543-44 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986) ("Post-deprivation process is adequate if it allows the prospect of compensation for the loss.").  As argued previously, DE 147 pp. 8-12, North Carolina provides numerous state remedies including breach of contract, torts, and state takings claims, all of which have been found to satisfy state due process requirements under a *Georgia* analysis.  DE 147 pp. 17-18.

> **3.     Plaintiffs' takings claim is barred by sovereign immunity.**

This Court has affirmatively held, under Fourth Circuit precedent, that state remedies are available to Plaintiffs here and their takings claims "are barred by the Eleventh Amendment Immunity." DE 69 pp. 18, 28. Plaintiffs appealed from that ruling to the Fourth Circuit, which affirmed the dismissal. *Allen*, 895 F.3d at 354-55. As outlined in Defendants' memorandum, DE 147 pp.6-8, the Fourth Circuit additionally rejected the argument that *Knick* nullified the states' sovereign immunity in takings claims. DE 147 pp. 7-8. For those reasons, Plaintiffs' takings claim is barred and should be dismissed.

Plaintiffs also assert, as they unsuccessfully did before, that the state courts are not "open" to their claims because they are preempted by the CRCA. However, "[e]ven if federal courts have exclusive jurisdiction over a cause of action arising under a particular federal statute, a state court may decide federal issues under the statute if the issues arise in the course of a proceeding that is within the state court's jurisdiction. For example, federal district courts have original, exclusive jurisdiction of patent cases. However, if the validity of a patent become an issue in a breach of contract action in state court, the state

court may decide the validity of the patent for the purposes of that action." 17 Moore's Federal Practice-Civil § 120.12 (2023). *See also Fla. Prepaid Postsecondary Ed. Expense Bd, v. Coll. Sav. Bank*, 527 U.S. 627, 643-44, and n.9 (1999) (holding that Florida provided alternate state remedies for patent infringement, including through a takings or conversion claim and these remedies satisfy due process); *Can. Hockey. LLC v. Tex A&M Univ Ath. Dep't*, 2022 U.S. App. LEXIS 3976, at*21 (5th Cir. Feb. 14, 2022) (takings claim against the [State] under the [State] Constitution would satisfy the due process requirements); *Nettleman v. Fla. Atl. Univ. Bd. of Trustees,* 228 F. Supp. 3d 1303, 1312 (S.D. Fla. 2017) (state tort claim was held to be adequate.)  In sum, "[T]he Takings Clause does not override the Eleventh Amendment." *Hutto*, 773 F. 3d at 552. That rule applies to all takings claims, regardless of the source of the property right involved.

F. **Plaintiffs' Constitutional claims fail to state a cause of action, are untimely, and not properly before this court.**

1. **N.C. Gen. Stat. § 121-25(b) is not a bill of attainder.**

Plaintiffs argue that Allen and Intersal are "the only persons who are meaningfully impacted by the law[.]" DE 153 pp. 31-32.  Yet, by definition, before its repeal, G.S. 121-25(b) applied to all North Carolina shipwrecks other than the *QAR*[3] that Plaintiffs are not involved in photographing or otherwise documenting.

Plaintiffs now also argue that an entirely different statute, N.C. Gen. Stat. § 132-1, is suspect too. To wit, Plaintiffs argue that the phrase "made or received pursuant to law or ordinance" in N.C. Gen. Stat. § 132-1 should receive a narrow construction.  Yet, the example Plaintiffs conjure, DE 153 at 32, in support of this new argument is nonsensical and inapposite to any issue in this case: it is unclear how Governor Cooper's hypothetical purchase of a book for personal use would constitute a record "made or received pursuant to law or ordinance" or amount to "material kept in carrying out [his] duties."  *See News and Observer Publ'g Co. v. Wake County Hosp. Sys., Inc.*, 55 N.C. App. 1, 13, 284 S.E.2d 542, 549 (1981).

---

[3]For example, Winks Wreck (Steamer Mountaineer); Triangle Wrecks (Kyzikes and Carl Gerhard); USS Huron; Oriental; Old Tug Wreck; Olive Thurlow; Pocahontas/SS Richmond; CSS Neuse; USS Peterhoff; Condor; Explorer; USS LST-471; Strathairly; MacKnight Shipyard Wreck; Otter Creek Wreck; Pappy's Lane Wreck (LCS-123); Lois Joyce; Edenton/Burroughs Wreck; Lake Phelps Canoes; and Lake Waccamaw Canoes.

Even if such a book were received by the Governor's Office as part of the public's business and therefore a public record, Plaintiffs have failed to explain their illogical leap and how status as a public record somehow allows publication by a third party. Plaintiffs' attempt at analogy fails to support their argument in any respect. Especially since materials at issue here were subject to public records law pursuant to N.C. Gen. Stat. § 132-1, a fact previously acknowledged by Plaintiffs in the 2013 Agreement and recognized by the Fourth Circuit. *Allen*, 895 F.3d at 357.

### 2.  N.C.G.S. § 121-25(b) is not retroactive and cannot be an *Ex Post Facto* Law.

G.S. 121-25(b) is not an *ex post facto* law because it did not *retroactively* make the materials at issue public records. DE 145 and 147. G.S. 121-25(b) merely clarified that photographs and video of shipwreck salvage operations in the *custody* of a state agency are also considered public records. In that respect, although functionally serving as a clarification rather than pure surplusage, Plaintiffs are essentially correct that G.S. 121-25(b) was merely a clarification of N.C. Gen. Stat. § 132-1. DE 153 p. 32. In any case, with section G.S. 121-25(b) now repealed, N.C. Gen. Stat. § 132-1 still applies to Plaintiffs' records, which they explicitly agreed to in the 2013 Settlement Agreement.

### 3.  The Agreement between the parties explicitly stated that Plaintiffs' photographs and videos were public records.

Per section V, paragraph 17, of the Agreement, "[n]othing in this Agreement shall prevent DNCR from making records available to the public pursuant to [N.C.G.S.] Chapters 121 and 132, or any other applicable State of federal law or rule related to the inspection of public records." In Count VII of the SAC, Plaintiff disingenuously relies on language from G.S. 121-25(b), which was repealed in 2016. 2016 N.C. ALS 94; 2016 N.C. Sess. Laws 94; 2016 N.C. Ch. 94; 2015 N.C. HB 1030 (July 14, 2016). This claim fails to state a cause of action and is moot.

For reasons stated here and in the Defendants' original briefs in support of their motions to strike and dismiss, Plaintiffs' claims should either be stricken or dismissed with prejudice.

Respectfully submitted, this the 28th day of July, 2023.

10

JOSHUA H. STEIN
Attorney General

/s/ Charles G. Whitehead
Charles G. Whitehead
Special Deputy Attorney General
State Bar No. 39222
Email: cwhitehead@ncdoj.gov
Phone: (919) 716-6816

Olga E. Vysotskaya de Brito
Special Deputy Attorney General
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov
Phone: (919) 716-0185

N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602

*Counsel for Defendants*

11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-00627-BO

FREDERICK L. ALLEN and NAUTILUS )
PRODUCTIONS, LLC,                )
                                 )
              Plaintiffs,        )
                                 )
v.                               )              O R D E R
                                 )
ROY A. COOPER, Governor of North )
Carolina, *et al.*,              )
                                 )
              Defendants.        )

Before the Court is the second attempt of Frederick Allen and his company, Nautilus

Productions, LLC, (collectively "Allen") to abrogate North Carolina's sovereign immunity.

Allen's first attempt to sue the North Carolina, its Department of Natural and Cultural Resources,

and various state officials (collectively, "North Carolina" or "the State") foundered when the

Supreme Court held the Copyright Remedy Clarification Act of 1990 ("CRCA"). 17 U.S.C. § 501,

*et seq.*, was an invalid prophylactic abrogation of state sovereign immunity under § 5 of the

Fourteenth Amendment. Allen now asserts that two other theories of abrogation—as-applied

abrogation under § 5 of the Fourteenth Amendment and the "self-executing" Fifth Amendment—

allow this Court to hear his claims.

North Carolina disagrees. The State moves to strike much of Allen's Second Amended

Complaint for exceeding this Court's order granting reconsideration and giving leave to amend.

For the remaining claims, the State moves to dismiss, arguing that sovereign immunity precludes

jurisdiction here because Allen cannot show a valid abrogation under either theory.

This Court agrees with the State on some issues and Allen on others. Much of the Second Amended Complaint goes far beyond the Court's instructions; and much of what remains is outside this Court's subject-matter jurisdiction, but not everything. The Court, therefore, grants in part and denies in part North Carolina's motions.

## BACKGROUND

By this stage in the proceedings, the story of this case has been told and retold.[1] Another extensive retelling is unnecessary; a primer on the key facts will suffice. Still, a thorough recounting of the procedural history—which is admittedly dense—is necessary to understand the dispute as it currently stands.

## I.    The Origins of Allen's Copyrights

In 1996, Intersal, a marine salvager, discovered Blackbeard's flagship the *Queen Anne's Revenge* ("the *QAR*") in North Carolina's coastal waters near the Beaufort Inlet. Under North Carolina law, the *QAR* and its artifacts are state property. N.C. Gen. Stat. § 122-22. Intersal and the North Carolina Department of Natural and Cultural Resources ("DNCR" or "the Department") entered into a fifteen-year salvage agreement. That agreement gave Intersal, among other things, the exclusive right to make and market all commercial media of the salvage efforts. The agreement, however, contained exceptions for public records and non-commercial and educational uses. Intersal then retained Allen and his company, Nautilus Productions, LLC, to document the salvage efforts. Allen registered 13 copyrights with the U.S. Copyright Office, each copyright covering a year's worth of video and still images of the *QAR*'s preservation.

---

[1] For a more detailed account of the factual background *see Allen v. Cooper*, 244 F. Supp. 3d 525, 530–31 (E.D.N.C. 2017); *Allen v. Cooper*, 895 F.3d 337, 342–45 (4th Cir. 2018); *Allen v. Cooper*, 589 U.S. 248, 251–54 (2020); *Allen v. Cooper*, 555 F. Supp. 3d 226, 230–32 (E.D.N.C. 2021).

2

The relationship between Allen and the Department soured around 2013. At that time, Allen learned that the Department had uploaded copyrighted still images and video-footage to the internet without his consent. Allen, Intersal, and the Department reached a written settlement agreement resolving that dispute. Without admitting to any wrongdoing, the State and the Department compensated Allen for the alleged infringement. The agreement also clarified the parties' rights to the videos and photographs.[2]

Not long after the settlement agreement, Allen alleges the Department resumed its copyright infringement by publishing, performing, and displaying copyrighted videos and still images on the internet. To make matters worse for Allen, in 2015 the North Carolina General Assembly passed Session Law 2015-218. 2015 N.C. Sess. Laws 218, § 4(a). That law, codified as N.C. Gen. Stat. § 121-25(b)[3], amended a provision of North Carolina public records law, by adding the following language:

> (b) All photographs, video records, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions shall be public records pursuant to G.S. 132-1. There shall be no limitation on the use of or no requirement to alter any such photograph, video recording, or other documentary material, and any such provision in any agreement, permit or license shall be void and unenforceable as a matter of public policy.

2015 N.C. Sess. Laws 218, § 4.(a).

---

[2] Intersal and the State are in protracted litigation over the Settlement Agreement in the North Carolina Business Court. *See Intersal, Inc. v. Wilson*, 2024 NCBC LEXIS 51, at *1 (N.C. Super. Ct. Mar. 15, 2024).

[3] On 1 July 2016, the General Assembly amended § 121-25(b) to remove the last sentence detailing the absence of limitations on the use of the documentary materials. The amended version read as follows:

> All photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historical materials, in the custody of any agency of North Carolina government or its subdivisions shall be a public record pursuant to Chapter 132 of the General Statutes.

2016 N.C. Sess. Laws 94, § 16.2.

## II.    Allen's First Attempt to Sue the State

On 1 December 2015, Allen commenced this action. He alleged the State, the Department, and various state officials, violated federal law—namely, the Takings Clause of the Fifth Amendment, Due Process Clause of the Fourteenth Amendment, the Copyright Act, and 42 U.S.C. § 1983—through direct copyright infringement and the passage of § 121-25(b). Allen sought declaratory relief that § 121-25(b) was void and unenforceable not only as preempted by the Copyright Act but also under the Fifth and Fourteenth Amendments. For the ongoing constitutional violations, Allen sought injunctive relief under *Ex Parte Young*, 209 U.S. 213 (1908). In addition to these federal claims, Allen asserted claims under North Carolina law.

The State moved to dismiss Allen's amended complaint, arguing, among other things, that the CRCA was an invalid abrogation of state sovereign immunity under § 5 of the Fourteenth Amendment. On 23 March 2017, this Court denied in part and granted in part Defendants' motion to dismiss. *Allen*, 244 F. Supp. 3d at 546. Because this Court concluded that the CRCA abrogated North Carolina's sovereign immunity, it allowed plaintiffs' claims for copyright infringement and injunctive and declaratory relief to proceed. *Id.* at 535, 544.

Not all of Allen's claims survived. The Court granted the State's motion to dismiss Allen's § 1983 claims for unconstitutional takings and violations of due process as well as Allen's state-law claims because of the State's sovereign immunity. *Id.* at 540. The Court dismissed Allen's § 1983 claims on sovereign immunity grounds per the Fourth Circuit's decision in *Hutto v. South Carolina Retirement System*, 773 F.3d 526 (4th Cir. 2014), which held that state sovereign immunity bars taking claims in federal court when those claims can be brought in state court. *Allen*, 244 F. Supp. 3d at 540.

Because this Court did not dismiss all of Allen's claims on immunity grounds, North Carolina filed an interlocutory appeal. Regarding the CRCA's abrogation of sovereign immunity

4

under § 5 of the Fourteenth Amendment, the Fourth Circuit concluded that the CRCA satisfied neither element required for a valid abrogation. *Allen*, 895 F.3d at 348–54. The Circuit then took up (for the first time) Allen's claims for declaratory and injunctive relief for ongoing constitutional violations under *Ex Parte Young*. 895 F.3d at 354–55. It rejected that request on the grounds that Allen had failed to plausibly allege ongoing constitutional violations, citing the concession made by Allen's counsel at oral argument that ongoing infringements had stopped. *Id.* at 354. The Fourth Circuit also rejected prospective relief under *Ex Parte Young* against § 121-25(b) because of the lack of a meaningful relationship between that statute and the state officials Allen sought to enjoin. *Id.* at 355. Finally, the Fourth Circuit held that the state officials sued in their individual capacities were entitled to qualified and legislative immunity. *Id.* at 356–58.

Although the Fourth Circuit entered judgment on 10 July 2018, that judgment did not take effect until 17 August 2019 because the mandate was stayed under Federal Rule of Appellate Procedure 41(a)(1) pending a ruling on the petition for rehearing en banc, which was ultimately denied. [DE 88, 89, 91]. On remand, this Court lifted its stay and dismissed Allen's claims against the State, the Department, and the public officials in their official capacity without prejudice; the remaining claims against the public officials in their individual capacities were dismissed with prejudice. [DE 92].

Because the Fourth Circuit held provisions of the CRCA invalid, the Supreme Court granted certiorari. *Allen*, 598 U.S. at 254. On the contested issue—whether in enacting the CRCA Congress had validly exercised its constitutional authority to abrogate state sovereign immunity— the Court first rejected Allen's arguments that constitutional authorization could be found in Congress's power under Article I, Section 8, Clause 8. *Id.* at 256–260. The Court then concluded

the CRCA was an invalid prophylactic abrogation under § 5 of the Fourteenth Amendment. *Id.* at 260–66.

## III.     Intervening Developments Prompt Allen's Motion for Reconsideration.

While this case worked its way through the higher courts, the Supreme Court decided *Knick v. Township of Scott*, 588 U.S. 180 (2019), a decision with considerable implications for the substantive requirements of Fifth Amendment takings claims in federal court. *Knick*'s most pronounced impact is that overruled *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). *Williamson County* held that "if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Takings Clause until it has used the procedure and been denied just compensation." *Id.* at 195. "*Williamson County*'s state-litigation rule . . . created some real anomalies," Chief Justice Rehnquist noted later, because it, combined with preclusion doctrines, effectively "ensur[ed] that litigants who [went] to state court to seek compensation [were] likely. . . unable later to assert their federal takings claims in federal court." *San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, 351 (2005) (Rehnquist, C.J., concurring in the judgment). Ultimately, the Court jettisoned *Williamson County* in *Knick* because the "state-litigation requirement relegate[d] the Takings clause to the status of a poor relation among the provisions of the Bill of Rights." *Knick*, 588 U.S. at 189 (quotation marks omitted). The Court explained that "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Id.* Thus, the moment a government takes without payment, the government violates the Fifth Amendment, which—because it is "self-executing" as to compensation—gives the plaintiff the ability to bring a federal suit without exhausting state remedies. *Id.* at 194.

Seizing on *Knick,* Allen filed a motion for reconsideration. [DE 105]. Allen asked this Court to reconsider its dismissal of Count III of his Amended Complaint, which claimed Defendants acted "under color of state law to pass N.C. Gen. Stat. § 121-25(b) and to threaten Plaintiffs . . . with enforcement thereof." [DE 12 ¶ 76]. Count III elaborated that § 121-25(b) was not only an unconstitutional taking in violation of the Fifth Amendment itself, but also Defendants enforced it in disregard to Plaintiff's rights to notice and an opportunity to be heard under the Due Process Clause. *Id.* Additionally, Allen asked the Court to allow his Copyright Act and constitutional claims to proceed under the case-by-case abrogation framework set forth in *United States v. Georgia*, 546 U.S. 151 (2006).

On 18 August 2021, the Court granted Allen's motion for reconsideration. While the Court was aware that sovereign immunity was not at issue in *Knick*, *Knick*'s discussion of the Fifth Amendment's substantive requirements persuaded this Court that *Hutto*'s holding was fatally undermined. *Allen*, 555 F. Supp. 3d at 239–40. Specifically, the Court was persuaded that *Hutto* had been implicitly overturned by three aspects of *Knick*. First, *Knick*'s recognition that the Fifth Amendment right to just compensation arises at the time of the taking and is not susceptible to qualification by state remedies; second, its dismantling of *Williamson County*'s preclusion trap signaled that the similar trap created by *Hutto* was likewise constitutionally improper; and third, *Hutto*'s delegation of responsibility to state courts for federal takings litigation was contrary to the fundamental promise of the Fourteenth Amendment. *Id.* at 235–37.

On Allen's second ground for reconsideration, the Court concluded that Allen could proceed on his copyright infringement and constitutional claims under *Georgia*'s as-applied framework. *Id.* at 242–43. Allen's first attempt to sue the State focused on the CRCA as prophylactic abrogation. This Court, the Fourth Circuit, and the Supreme Court viewed Allen's

claims only through that lens. What's more, counsel for the State acknowledged the theoretical viability of a *Georgia* claim during oral argument before the Supreme Court. Additionally, the CRCA remains available to abrogate state sovereign immunity provided a plaintiff can show a constitutional violation as well as a violation of the Copyright Act.

Finally, the Court granted Allen leave to file an amended complaint to allege additional facts, buttressing their allegation of intentional infringements, unconstitutional takings, and that those taking were without due process of law. *Id.* at 243.

Allen's second amended complaint did not manifest for some time because of motions and appeals. On 03 September 2021, the State moved this Court to reconsider its order granting Allen's motion for reconsideration, arguing that the Fourth Circuit's post-*Knick* decision in *Zito v. North Carolina Coastal Resources Commission*, 8 F.4th 281 (4th Cir. 2021), reaffirmed *Hutto*'s holding that sovereign immunity bars a direct taking claim in federal court when a state's courts remain open to such claims. [DE 119, 120]. Before this Court could rule on that motion, however, the State filed an interlocutory appeal of the Court's 18 August Order on reconsideration. [DE 122]. The Court then granted a consent motion to stay proceedings pending a final determination of the State's interlocutory appeal. [DE 126]. On 14 October 2022, the Fourth Circuit granted Allen's motion to dismiss the interlocutory appeal for lack of jurisdiction with the mandate effecting the judgment on 7 November 2022. *See* [DE 128, 129, 130].

In January 2023, this Court issued an order following a conference that accomplished three case-management goals. [DE 133]. First, the Court lifted the stay; second, the Court ordered Allen to file their amended complaint within 21 days "[i]n accordance with the Court's August 18, 2021, order"; and third, the Court denied the State's motion to reconsider, [DE 119], without prejudice

8

as premature, allowing the State to renew its arguments in a response to the second amended complaint.

## IV.    Allen's Second Amended Complaint

On 8 February 2023, Allen filed his Second Amended Complaint, naming as defendants North Carolina, the Department, the Governor, the Attorney General, and seven Department officials. [DE 134]. Of the individual defendants, Allen sued only the Governor and Attorney General in their official capacity; the rest Allen sued in both their official and individual capacities. The Second Amended Complaint contains ten counts alleging violations under a wide range of federal statutes and constitutional provisions:

- **Count I.** North Carolina, the DNCR, and the individual defendants, in their official capacities, willfully infringed on Allen's copyrights by using his works without permission in violation of 17 U.S.C. §§ 106 and 501. [DE 134 ¶¶ 140–150].

- **Count II**. North Carolina, the DNCR and the individual defendant, in their official capacities, altered or removed copyright management information, violating 17 U.S.C. § 1202. [DE 134 ¶¶ 151–158].

- **Count III.** North Carolina and the DNCR violated the Fifth and Fourteenth Amendments, directly and through the Copyright Act, when they infringed on Allen's copyrights and took possession of physical media, effecting a takings. Allen claims those takings, occurred without notice or an opportunity to be heard, violating due process. [DE 134 ¶¶ 159–173].

- **Count IV**. North Carolina and the DNCR violated the Fifth and Fourteenth Amendments, directly and through the Copyright Act, by enacting § 121-125(b), which effected a taking by eliminating Allen's right to exclude others from using his work by placing that work in the public domain without due process. [DE 134 ¶¶ 174–188].

- **Count V**. North Carolina and the DNCR violated the Bill of Attainder Clause of Article I, Section 10, Clause 1 of the Constitution through the passage of § 121-125(b). [DE 134 ¶¶ 189–201].

- **Count VI**. North Carolina and the DNCR violated the Ex Post Facto Clause of Article I, Section 10, Clause 1 of the Constitution through the passage of § 121-125(b). [DE 134 ¶¶ 202–208].

9

JA 269

272 of 319

- **Count** VII. North Carolina and the DNCR violated the Contracts Clause of Art. I, Section 10, Clause 1 of the Constitution by passing 121-125(b), which unlawfully impairs the obligations set forth in the 2013 settlement agreement. [DE 134 ¶¶ 209–213].

- **Count VIII**. Seven Department Officials violated 42 U.S.C. § 1983 by unconstitutionally effecting a taking his copyrights through the passage of § 121-25(b) and promoting, implementing, and administering the DNCR's policy to infringe on his copyright works and disregard the 2013 settlement agreement. [DE 134 ¶¶ 214–219].

- **Count IX**. Allen requests injunctive relief against ongoing constitutional violations under *Ex Parte Young.* [DE 134 ¶¶ 220–224].

- **Count X**. Allen requests declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §2201. [DE 134 ¶¶ 225–227].

The State challenges the Second Amended Complaint through several Rule 12 motions. It moves to strike the Second Amended Complaint, contending that almost all of the counts in the Second Amended Complaint exceed the scope of the Court's order on reconsideration. [DE 144]. Next the State moves to dismiss what remains of the Second Amended Complaint under Rule 12(b)(1) for the lack of subject-matter jurisdiction and under Rule 12(b)(6) for failure to state a claim for relief. [DE 146]. As to the Motion to Strike, Allen responds the Court imposed no limitations on his ability amend the complaint. [DE 153]. As to the Motion to Dismiss, Allen responds that he has adequately alleged claims that abrogate North Carolina's sovereign immunity. [DE 153].

While the parties briefed these motions, the North Carolina General Assembly enacted Session Law 2023-70. That law amended § 121-25 by removing subsection (b) entirely, erasing all reference to documentary photographs, recordings, or other materials in the custody of the State or its subdivisions. 2023 N.C. Sess. Law. 70, § 11. Deleting § 121-25(b) reverberated immediately in these proceedings. Two days after Session Law 2023-70 was enacted, the State filed its reply

10

brief, raising new arguments. [DE 155]. Allen moved for leave to file a surreply. [DE 157]. The Court held a hearing on the State's motions on 25 August 2023. [DE 164]. At the hearing, the State stated that it does not oppose Allen's surreply.[4]

While the State's Rule 12 motions were under consideration, the Court, on its own motion, stayed the case in anticipation of a decision of the Supreme Court in *DeVillier v. Texas*, 601 U.S. 285 (2024). [DE 165]. The question presented in *Devillier* was whether a "property owner may sue for just compensation directly under the Takings Clause," which in turn is a question of "the procedural vehicle by which a property owner may seek to vindicate [his irrevocable] right" to just compensation. *Id.* at 289. The Court, however, left those questions for another case because "a state-law inverse-condemnation cause of action provides a vehicle" for the property owner's takings claims. *Id.* at 292, 294. Considering the range of potential outcomes for Allen's claims, *DeVillier* provided more of a restatement on the current state of the Takings Clause than a paradigm shift. Accordingly, the Court lifted the stay in a separate order filed contemporaneous with this order. All matters have been fully briefed and are ripe for decision.

## DISCUSSION

Throughout this case, the State's efforts to dismiss this case on sovereign immunity grounds has attracted the most attention. So too here. Before taking up sovereign immunity, however, the Court must address and resolve several preliminary matters: first, the State's Motion to Strike Allen's Second Amended Complaint for non-compliance with the Federal Rules of Civil Procedure, the Local Civil Rules, and this Court's order on the Motion for Reconsideration; second, Allen's argument in response that the second-filed Motion to Dismiss should be denied as procedurally improper for the State's failure to consolidate with its Motion to Strike.

_____

[4] With no objection from the Defendants, the Court will grant the Motion.

I.    **Motion to Strike**

Under Federal Rule of Civil Procedure 12(f), the Court—under its own motion or on motion made by a party—may strike "from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P 12(f). Beyond the limits of Rule 12 are the district court's "inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of case." *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017); *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 150 (4th Cir. 2009) (concluding "district court acted well within its discretion" when it struck filing for noncompliance with local rule). Although Rule 12(f) motions to strike are generally disfavored, *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001), the decision to strike is committed to the discretion of the district court. *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 324 (4th Cir. 2018).

Courts routinely strike parts of amended complaints—including claims, parties, and legal theories—when the offending parts exceed the scope of the court's order granting leave to amend. *See*, *e.g.*, *Gerritsen v. Warner Bros. Entm't*, 116 F. Supp.3d 1104, 1125 (C.D. Cal. 2015); *Patterson v. HG Ohio Emp. Holding Corp.*, 2024 U.S. Dist. LEXIS 892557, 2024 WL 2022088, at *2–4 (N.D. Ohio May 7, 2024); *Harris v. Louisiana*, 2024 U.S. Dist. LEXIS 76858, 2024 WL 1834370, at *2–3 (M.D. La. Apr. 26, 2024); *Nollen v. Fairshare Vacation Owners Ass'n*, 2021 U.S. Dist. LEXIS 138031, 2021 WL 3036371, at *3 (M.D. Fla. Apr. 9, 2021), *aff'd*, 2023 U.S. App. LEXIS 23181, 2023 WL 5622595 (11th Cir. Aug. 31, 2023); *Clements v. Austin*, 2022 U.S. Dist. LEXIS 152239, 2022 WL 3593621, at *1 (D.S.C. Aug. 19, 2022); *Whitehead v. Mgmt. & Training Corp.*, 2020 U.S. Dist. LEXIS 39297, 2020 WL 1078739, at *3 (D.N.M. Mar. 6, 2020); *Desouza v. Office of Children & Family Servs.*, 2019 U.S. Dist. LEXIS 99009, 2019 WL 2477796, at *5–6 (E.D.N.Y June 12, 2019).

12

When granting Allen's Motion for Reconsideration, the Court was clear in its instructions. Only certain claims were no longer dismissed. And the Court permitted Allen to file an amended complaint to allow him to allege additional facts in support of those claims. Plaintiffs are under the impression that "the Court did not impose any limitations when it granted [their] request to amend the complaint." [DE 153 at 7]. Not so. Allen is limited not only by the Court's order granting reconsideration but also the contours of his motion to reconsider. Allen moved to reconsider only Count III, which alleged a § 1983 claim a taking in violation of the Fifth Amendment and a related denial of procedural due process. Regarding the direct takings claim, the Court reconsidered its dismissal because it was persuaded that the Supreme Court's decision in *Knick* amounted to an intervening change in law. As to Allen's *Georgia* claim, the Court viewed it appropriate to consider case-by-case abrogation under the CRCA "[b]ecause this Court, the Fourth Circuit, and the Supreme Court all passed on the *Georgia* issue." 555 F. Supp. 3d at 242. Allen's direct takings claim and his *Georgia* claims are the only claims properly before this Court. And in the 18 January 2023 order lifting the stay, the Court reiterated that the amendment should be filed in accordance with its order granting reconsideration. [DE 133].

Allen maintains that striking certain claims would be improper because those claims are inextricably linked to the claims he is allowed to bring. The Court finds this concern warranted with respect to Allen's claim for copyright infringement in Count I of the Second Amended Complaint. To state a *Georgia* claim, a plaintiff must show that the same conduct that violates a federal statute that provides for damages against a State also works a constitutional violation. *Georgia*, 546 U.S. at 158–59. Allen claims that the Department's infringement on his copyrights resulted in a taking of his intellectual property and those infringement were deprivations without due process of law. The claims are linked inextricably. Striking Count I would frustrate Allen's

13

ability to proceed on the claims this Court has expressly permitted. Accordingly, the Court strikes Counts II, VI, and VIII–X from the Second Amended Complaint.[5] Allen may proceed on Counts I, III, and IV.

In addition to striking claims for exceeding this Court's orders, the State argues the Court should also strike allegations in the Second Amended Complaint the State deems immaterial, impertinent, scandalous, or otherwise irrelevant.[6] Having reviewed those allegations and the parties' submissions, the Court concludes that allegations do not rise to the level of "redundant, immaterial, impertinent, or scandalous" that clear Rule 12(f)'s high threshold for motions to strike.

Relatedly, Allen contends this Court should deny Defendants' Motion to Dismiss as an improper successive motion under the consolidation requirement set forth in Federal Rule of Civil Procedure 12(g).

Rule 12(g)(2) precludes a party from raising some defenses or objections in a subsequent motion if those defenses were available but not included in an earlier Rule 12 motion. That Rule, however, exempts the defenses of failure to state a claim for relief and lack of subject-matter jurisdiction. The former may be asserted in a subsequent responsive pleading, a motion for judgment on the pleadings, or at trial. Fed. R. Civ. P. 12(h)(2). The latter may be raised at any time. Fed. R. Civ. P. 12(h)(3).

To be sure, Defendants should have followed Rule 12 to the letter and filed one motion that joined all available defenses. But the second-filed motion is not as bad as Allen claims. For

---

[5] Defendants point to Allen's failure to follow Local Civil Rule 15.1 as an additional justification for striking the second amended complaint. That Rule, like all Local Civil Rules, is subject to the discretion of the presiding judge. *See* Local Civil Rule 1.1. The order granting the motion for reconsideration gave Plaintiffs leave to amend their complaint to add additional allegations, permitting them to deviate from the requirements of Rule 15.1.

[6] Specifically, Defendants move the Court to strike paragraphs 1, 4, 14, 47–52, 81, 83, 96, 100, 102, 114, and 175 in their entirety and paragraphs 10, 53, 82, 90, 117, 193, and 217 in part. [DE 145 at 14].

starters, the core of the State's motion challenges Court's subject-matter jurisdiction because of state sovereign immunity. As such, that challenge may be brought at any time. So the offending portions are essentially those sections where Defendants move to dismiss under Rule 12(b)(6) for failure to state a claim. But as with the subject-matter jurisdiction, the defense of failure to state a claim is not easily brushed aside. Rule 12(h)(2), for example, allows that defense to be raised on a motion for judgment on the pleadings, which would use the same standard. *See Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013).

Stepping back provides valuable perspective. Allen seeks to dismiss as improperly, successively filed a Rule 12 motion containing one defense that can be brought at any time and another that could be brought in a subsequent motion that would be evaluated under the same standard. Acceding to Allen's request would merely delay the inevitable. The Rules of Civil Procedure facilitate the "just, speedy, and inexpensive determination of every action and proceeding[]" and are to be construed accordingly. Fed. R. Civ. P. 1. To deny the second-filed motion would invert procedure from its subordinate role and frustrate these goals. The Court, therefore, rejects Allen's procedural opposition to the State's Motion to Dismiss.

## II.    Motion to Dismiss

Now on to the central issue: Does this Court lack subject-matter jurisdiction? Or, to put it differently, Has Allen shown that North Carolina' sovereign immunity has been abrogated? In this section, the Court answers both. To that end, Court will first discuss background principles of sovereign immunity relevant to Allen's theories of abrogation. The Court will then turn to Allen's theories that (1) the takings clause is self-executing and abrogates sovereign immunity by its own force and (2) that as-applied abrogation under *Georgia* is permissible here.

## A.  Legal Standards

### 1.  Rule 12(b)(1)

A Rule 12(b)(1) motion challenges the Court's subject-matter jurisdiction. "A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). A facial challenge occurs when a defendant argues that the complaint fails to allege facts sufficient to establish subject-matter jurisdiction. *Id.* A factual challenge occurs when a defendant argues that the allegations of jurisdiction in the complaint are not true. *Id.* A plaintiff's procedural protections vary depending on the type of jurisdictional challenge. With a facial challenge, the plaintiff is given the same protections as a Rule 12(b)(6) motion. *Id.* On the other hand, a factual challenge goes beyond the allegations in the complaint. As a result, the district court may decide disputed issues of fact relating to subject-matter jurisdiction. *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019). To that end, "the court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)).

Under Rule 12(b)(1), the Plaintiff typically has the burden of establishing, by a preponderance of evidence, subject-matter jurisdiction. *Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, (4th Cir. 1999) Because state sovereign immunity—unlike other limits on Article III jurisdiction—may be waived, the burden of establishing sovereign immunity is placed on the party asserting it. *Hutto*, 774 F.3d at 543; *Zito*, 8 F.4th at 284. Once a defendant has shown its entitled to sovereign immunity, the burden of proving abrogation or waiver falls to the plaintiff. *See Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019); *Allen*, 895 F.3d at 355 (discussing burden to show *Ex parte Young* exception); *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005) (noting

16

"[p]laintiff's burden to show that an unequivocal waiver of sovereign immunity exists"); *Cf.* *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020) (noting plaintiff's burden to establish that exception to FTCA's immunity waiver does not apply).

### 2. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief may be granted. This tests the complaint's legal and factual sufficiency. The focus is on the pleading requirements under the Federal Rules not the proof needed to succeed on a claim. "Federal Rules of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and grounds upon which it rests." *Bell Atl Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard does not require detailed factual allegations. *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). But it "demands more than unadorned, the-defendant-unlawfully-harmed-me accusation." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). For a claim to be plausible, its factual content must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Although the court accepts the factual allegations as true, the court does not accept the complaint's legal conclusions, so "simply reciting the cause of actions' elements and supporting them by conclusory statements does not meet the required standard." *ACA Fin. Guar. Corp.*, 917 F.3d at 212.

B.    **State sovereign immunity principles**

State immunity from suit is a structural component of our constitutional design. Before ratification, immunity from suit was a core aspect of the States' status as sovereign entities. *Alden v. Maine*, 527 U.S. 706, 713 (1999). Ratifying the Constitution created our federal system—"a system of dual sovereignty between the state and federal government," *Gregory v. Ashcroft,* 501 U.S. 452, 457 (1991). The States entered that system with their sovereignty, and their sovereign immunity, largely intact. *See Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991); *see also Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 597 ("The Constitution forged a Union, but it also protected the sovereign prerogatives of States within our government.").

The Courts of the United States must respect the fundamental aspects of the States' sovereignty. "The principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011) ("sovereign immunity principles enforce an important constitutional limitation on the power of the federal courts."). For a short moment in the Early Republic, it was thought that such limitations didn't apply to suits against the states by citizens of another state. *See Chisholm v. Georgia*, 2 U.S. 419, 2 Dall. 419 (1793). It is generally understood that the Eleventh Amendment—which "stands not so much for what it says but the presupposition of our constitutional structure which it confirms," *Blatchford*, 501 U.S. at 770—corrected this misunderstanding.[7] *See also Va. Off. for Prot. & Advoc. v. Stewart*,

---

[7] The text of the Eleventh Amendment "appear[s] to restrict only the Article III diversity jurisdiction of the federal courts, *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996). But "[the Supreme Court's] decision in *Hans v. Louisiana*, 134 U.S. 1 (1890), clarified that States retain their immunity from suit regardless of the citizenship of the plaintiff." *PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 499 (2021). The undersigned has discussed at-length both the text of the Eleventh Amendment and why *Hans* was poorly reasoned and wrongly decided. *See Allen*, 244 F. Supp. 3d at 535–40 ; *Allen*, 555 F. Supp. 3d at 238; *see also Richard Anderson Photography v Brown*, 852 F.2d 114, 124–25 (4th Cir. 1988) (Boyle, D.J., concurring in part and dissenting in part). In the words of Justice Breyer, who shared the view that the

18

563 U.S. 247, 253 (2011) (commenting that the Supreme Court "[has] understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant"). Now, state sovereign immunity generally prevents suits against nonconsenting states in federal and state forums.

Yet state sovereign immunity is not absolute. The first limits are those the States impose on themselves. "[A] State's sovereign immunity is a personal privilege which it may waive at pleasure." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675 (1999) (quotation omitted). "A state may of course consent to suit, although such consent must be unequivocally expressed." *PennEast*, 594 U.S. at 500 (quotations omitted). There are also "certain waivers of sovereign immunity to which all states implicitly consented at the founding." *PennEast*, 594 U.S. at 500. These "plan of the Convention waivers" spring from the structure of the Constitution. "Actions do not offend state sovereignty if the States consented to them at the founding." *Torres*, 597 U.S. at 587 (cleaned up) (quotations omitted). But plan of the Convention waivers are few and far between.[8]

The next limits come from Congress's power to abrogate the States' sovereign immunity through § 5 of the Fourteenth Amendment. '[T]he Fourteenth Amendment, by expanding federal power, at the expense of state autonomy, . . . fundamentally altered the balance of state and federal

---

sovereign-immunity precedents were amiss, the undersigned "recogniz[es] that my longstanding view has not carried the day." *Allen*, 589 U.S. at 248 (Breyer, J., concurring).

[8] In *Allen*, the Supreme Court described the plan of the Convention waiver of sovereign immunity under the Bankruptcy Clause recognized in *Central Va. Community College v. Katz*, 546 U.S. 356, 359 (2006), as "a good-for-one-clause-only holding." 589 U.S. at 259. Yet not long after, the Court recognized additional plan of the convention waivers in two cases. *PennEast*, 594 U.S. at 500–02 (concluding that a private party's action under federal eminent domain power "falls comfortably within the class of suits to which State consented under the plan of the Convention); *Torres*, 587 U.S. at 594 (holding that under "the plan of the Convention, the States waived their immunity under Congress' Article I power 'to raise and support armies' and 'provide and maintain a Navy.' " (cleaned up)).

power struck by the Constitution." *Seminole Tribe*, 517 U.S. at 59. Section 5 of the Fourteenth Amendment thus authorizes Congress to "provide for suits against state or state officials that are Constitutionally impermissible in other contexts." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Section 5, however, does not provide an unlimited power to abrogate.

When exercising its § 5 power to abrogate the States' sovereign immunity, Congress can take two paths. The first path is prophylactic abrogation, which occurs when Congress legislates broadly to deter or remedy constitutional violations even if in the process its remedial statute prohibits constitutional conduct. *Allen*, 589 U.S. at 260. Still, prophylactic abrogation is limited. The abrogation "must sufficiently connect[] to conduct courts have held Section 1 to proscribe." *Id.* This comes down to "a means-end test." *Id.* at 261. "There must be a congruence and proportionality between the injury to prevented or remedied and the means adopted to that end." *Fla. Prepaid*, 527 U.S. at 639 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). In other words, the abrogation must strike the proper balance between constitutional wrong and statutory remedy. Where the scope of the remedial or preventative statute exceeds the constitutional authorization, Congress goes beyond its authority under § 5 of the Fourteenth Amendment, and the statute is an invalid for that purpose.

The second path, seldom traveled, is case-by-case (or as-applied) abrogation. Case-by-case abrogation arises from the unassailable statement that "§ 5 [of the Fourteenth Amendment] grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the states for *actual* violations of those provisions." *Georgia*, 546 U.S. at 158. When Congress provides "a private cause of action for damages against the State for conduct that actually violates the Fourteenth Amendment," *Id.* at 159, the court "consider[s] only whether [a] claim

alleges conduct that, if it occurred and wasn't justified by a valid defense, would have violated the Fourteenth Amendment," *Alaska v. EEOC*, 564 F.3d 1062, 1068 (9th Cir. 2009)

Compared to its more aggressive and well-known sibling, as-applied abrogation ducks the risk of Congress regulating beyond its underlying constitutional authorization. A claim that meets *Georgia*'s test will always be within the bounds of Section 5 of the Fourteenth Amendment because of the symmetry between the statutory remedy and constitutional harm. Put differently, a private cause of action for damages against the State for conduct that actually violates the Fourteenth Amendment will be, by itself, perfectly congruent and perfectly proportional. *See* Ernest A. Young, *State Sovereign Immunity After the Revolution*, 102 Tex. L. Rev. 697, 759 (2024). *Cf. Alaska v. EEOC*, 564 F.3d at 1068 (stating that "congruence and proportionality requirement applies only to prophylactic legislation; it doesn't apply to a direct remedy for unconstitutional conduct").

C.     **Allen's first theory: abrogation under the "self-executing" Fifth Amendment**

Allen's alleges that this Court may hear his Fifth Amendment takings claims against the state because the "self-executing nature" of the Fifth Amendment directly abrogates state sovereign immunity. As discussed, Allen's argument rests on the theory that the Supreme Court's decision in *Knick* altered the sovereign-immunity framework.

But In *Zito v. North Carolina Coastal Resources Commission*, the Fourth Circuit held that *Knick*'s discussion of the self-executing nature of the Fifth Amendment did not alter the sovereign immunity framework. 8 F.3d at 286–88. Pre-*Knick* decisions such as *Hutto*—which held that "the Eleventh Amendment bars the Fifth Amendment takings claims against States in federal courts where the States Court remain open to adjudicating such claims," *Hutto*, 773 F.3d at 552—are undisturbed. The Fourth Circuit said it succinctly: "*Knick* did not undermine *Hutto*." *Zito*, 8 F.3d

at 288. Actions under the Takings Clause are subject to the same limits as other constitutional rights—including state sovereign immunity. *Id.*

Allen contends that *Zito* was wrongly decided and maintains that *Knick* fatally undermined *Hutto*. This Court "cannot for even a moment entertain" Allen's argument. *United States v. Pate*, 754 F.3d 550, 554 (8th Cir. 2014). Fourth Circuit precedent binds this Court and the parties alike. *See Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 352 (4th Cir. 2023). *Hutto* and *Zito* are circuit precedent. Neither are susceptible to being second-guessed much less overruled here. *See Allen*, 244 F. Supp. 3d at 540 ("[T]his Court is constrained[] [by] the absolute hierarchical system of courts in the federal judiciary."). That task is for the Fourth Circuit sitting en banc or for the Supreme Court. *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019); *Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016); *United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005). Thus, the Court will perform its duty and apply the rules set forth in *Hutto* and *Zito* to the extent they are applicable here.

Changing tacks and working within the confines of those decisions, Allen argues *Hutto* and *Zito* do not apply because the reasoning underlying those decisions is inapposite when federally created property interests are involved. *Hutto*'s holding, he contends, is premised on the assumption "that states have a sovereign interest in resolving disputes over state-based property rights." [DE 153 at 12].

The Court does not share that reading of *Hutto*. To be sure, *Hutto* involved property interests created by state law. *See Hutto*, 773 F.3d at 540–41 (describing Fifth Amendment claims arising from state pension benefits). But the underlying law creating the property interest did not play a meaningful much less decisive role in the outcome. Instead, *Hutto*'s reasoning is premised on the nature of constitutional remedies. The *Hutto* court analogized from *Reich v. Collins*, 513

U.S. 106 (1995), which involved state sovereign immunity and the remedies under the Due Process clause. Just as in *Reich*, where the Supreme Court noted that the Due Process Clause did not abrogate state sovereign immunity in federal court when state courts remain open for those claims, so too did *Hutto* conclude that state sovereign immunity bars "Fifth Amendment takings claims against States *in federal court* when the *State's courts* remain open to adjudicate such claims," *Hutto*, 773 F.3d at 552; *Reich*, 513 U.S. at 109.

Worse, Allen's property-rights argument does not square with key sovereign-immunity principles. Put any theory of abrogation under the Fifth or Fourteenth Amendment to the side and consider copyrights only as property. The Constitution doesn't create property interests. *Webb's Fabolous Pharmacies v. Beckwith*, 449 U.S. 155, 161 (1980). Instead, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Board of Regent of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). A copyright is a property interest created by Congress exercising its authority under Article I, Section 8, Clause 8 of the Constitution. *See Ladd v. Law & Tech. Press*, 762 F.2d 809, 812 (9th Cir. 1985). Authority incapable of abrogating state sovereign immunity. *Allen*, 589 U.S. at 1001–02 ("[T]he power 'to secur[e] an intellectual property owner's exclusive [r]ight[s]' under Article I stops when it runs into sovereign immunity." (quoting Art. I, § 8, cl.8)); *Fla. Prepaid*, 527 U.S. at 636. What's more, whatever limitations the Due Process and Just Compensation Clauses impose on state sovereign immunity, those limitations "arise from the Constitution itself" which means they do not "speak to the power of Congress to subject States to suits in [federal] courts." *See Alden*, 527 U.S. at 740 (discussing *Reich*'s limits). Accordingly, were this Court to accept Allen's theory— i.e., let the provenance of the property interests drive the analysis—it would let rejected theories of abrogation in through the backdoor.

Because *Hutto* remains valid, binding precedent, North Carolina's sovereign immunity bars this Court from hearing Allen's direct Fifth Amendment claims unless Allen can show that North Carolina courts do not offer a " 'reasonable, certain, and adequate' means for challenging an action as a taking and obtaining compensation if the challenge is successful." *Zito*, 8 F.4th at 288 (quoting *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019)). At bottom, this ask if there a recognized cause of action available in state court. *See, e.g.*, *Gerlach v. Rokita*, 95 F.4th 493, 499 (7th Cir. 2024); *74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 n.7 (2d Cir. 2023); *EEE Minerals, LLC v. North Dakota*, 81 F.4th 809, 816; *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 734 –35 (6th Cir. 2022); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213–14 (10th Cir. 2019).

North Carolina law provides Allen a cause of action to pursue a claim for just compensation in state court. Although the North Carolina Constitution does not have a lockstep provision for the Fifth Amendment, Article I, Section 19 of the North Carolina Constitution protects against takings of private property without compensation. *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 853, 786 S.E.2d 919, 924 (2016) (quoting *Long v. City of Charlotte*, 306 N.C. 187, 195–96, 293 S.Ed.2d 101, 107-08 (1982)). The North Carolina Supreme Court has held that "one whose constitutional rights have been abridged has a direct claim against the State under [the North Carolina] Constitution." *Corum v. Univ. of N.C.*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992) This direct cause of action, moreover, is not limited by North Carolina's sovereign immunity. *See Id.* at 786, 413 S.E.2d. at 291.

Allen argues that no state remedy is adequate, including a direct implied cause of action under *Corum*, because North Carolina's courts lack jurisdiction to hear those claims. Such claims, Allen contends, would either be preempted under the Copyright Act or must proceed in federal

24

court because of the exclusive jurisdiction of the federal courts for "any Act of Congress relating to . . . copyrights" under 28 U.S.C. § 1338.

This line of argument presents a question that goes beyond *Zito* and *Hutto*. How courts outside the Fourth Circuit have resolved copyright infringement actions with associated constitutional claims casts doubt on Allen's argument. For example, the Fifth Circuit recently dismissed a suit for copyright infringement with corresponding Fifth and Fourteenth Amendment claims on sovereign immunity grounds because the plaintiff could proceed in state court under the state constitution. *Can. Hockey L.L.C. v. Tex. A&M Univ. Athletic Dep't*, 2021 U.S. App. LEXIS 3976, 2022 WL 445172 (5th Cir. Feb. 14, 2022), *cert. denied*, 143 S.Ct. 118 (2022); *see also Jim Olive Photography v. Univ. of Hous. Sys.*, 624 S.W.3d 764 (Tex. 2021) (deciding copyright infringement takings claims under Fifth Amendment and Texas Constitution). Assuming, however, that either the Copyright Act or § 1338 precluded North Carolina's courts from hearing Allen's takings claim, the Court is not persuaded that state sovereign immunity under *Hutto* is susceptible to artful pleading. Again, the animating sovereign-immunity principle *Hutto* acknowledged is that whatever remedy the Constitution requires—be it under the Due Process clause as in *Reich*, or the Just Compensation Clause as in *Hutto*—a suit for that remedy in *federal court* must come after *the State* has closed its own courts. 773 F.3d at 552.

Allen flips of this principle on its head. Despite North Carolina's openness to takings claims in its courts, he argues that he is entitled to proceed directly in federal court because two federal statutes—17 U.S.C. § 301 and 28 U.S.C. § 1338—combine to preclude his claims from being heard in state court. Put differently, because Congress has decided to shut the doors of North Carolina's courts to the claims Allen wishes to bring, he argues the Fifth Amendment abrogates the State's sovereign immunity in federal court.

Allen's preemption argument runs into the same problem as his federal-property interest argument. At its root, abrogation of sovereign immunity through federal legislation is not concerned with *if* Congress can do so but *how* Congress may do so. Congress cannot use its Article I powers to abrogate the States' sovereign immunity: "The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe*, 517 U.S. at 72–73. It follows that it is equally impermissible for Congress to indirectly do the same via its Article I power to control the jurisdiction of the federal courts. *See Patchak v. Zinke*, 584 U.S. 244, 253 ("So long as Congress does not violate other constitutional provisions, its 'control over the jurisdiction of the federal courts' is plenary." (quoting *Trainmen v. Toledo, P.& W.R. Co.*, 321 U.S. 50, 63 -64 (1944)); *Cf. Bowles v. Russell*, 551 U.S. 205, 212 (2007) ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider.").

Finally, the Court draws attention to and rejects an implied premise of Allen's argument— that he could not bring a Fifth Amendment takings claim in state court. While *Hutto* makes clear that state sovereign immunity prevents Allen from proceeding on his takings claims in this Court, nothing in that decision forecloses Allen from raising the same in state court. *See Hutto*, 773. F.3d at 552; *Zito v. N.C. Coastal Resources Comm'n*, 449 F. Supp. 3d 567, 582 (E.D.N.C. 2020); *Cf. Jim Olive Photography*, 624 S.W.3d 764 (considering copyright infringement claims under Texas and United States Constitution). State courts have the jurisdiction and the obligation to hear federal constitutional claims. *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990) *Claflin v. Houseman*, 93 U.S. 130, 136 (1876); *Cf. Burt v. Titlow*, 571 U.S. 12, 19 (2013) ("State courts are adequate forums for the vindication of federal rights."). And this Court is "unwilling to assume

the State[] will refuse to honor the Constitution or obey the binding laws of the United States." *Alden*, 527 U.S. at 755; *see DeVillier*, 601 U.S. at 292 (same).

Whether North Carolina could invoke its sovereign immunity in state court for a Fifth Amendment takings claim is not before this Court. *Corum*, of course, waives the State's immunity for takings claims under the State Constitution only. 330 N.C. at 785–86, 413 S.E.2d at 291. But precedent suggests the North Carolina's waiver of its sovereign immunity for takings claims under the North Carolina Constitution bodes well for takings claims under the Constitution. *See Howlett v. Rose*, 496 U.S. 356, 375–76 (1990) (holding that the state court cannot "refus[e] to entertain" federal-law actions on jurisdictional grounds because of state sovereign immunity "when [those] courts entertain[] similar state-law actions against state defendants."). A definitive answer will have to be supplied by a North Carolina court.

Because North Carolina's Courts remain open for Allen to assert takings claims directly in state court, this Court returns to its original conclusion—Allen's takings claims against the State and the Department are barred from federal court under *Hutto*. *See Allen*, 244 F. Supp. 3d at 540.[9] Allen has failed to show the "self-executing' Fifth Amendment provides an exception to sovereign

---

[9] Independent of sovereign immunity, Allen's direct Fifth Amendment Takings Claim against the State and the Department raise additional thorny questions. Because "[c]onstitutional rights do not typically come with a built-in-cause of action to allow for private enforcement in courts," *DeVillier*, 601 U.S. at 291, to proceed directly under the Takings Clause without a procedural vehicle requires a plaintiff to show that "the Fifth Amendment Takings Clause creates an implied direct cause of action by its text alone," *Gerlach v. Rokita*, 95 F.4th 493, 498 (7th Cir. 2024). In 2017, this Court dismissed Allen and Nautilus's Takings Claims brought under § 1983 as barred by sovereign immunity under *Hutto*. *Allen*, 244 F. Supp. 3d at 540. In Allen's Second Amended Complaint, however, he does not return to this theory. Section 1983 provides an independent cause of action and thereby acts as a procedural vehicle. Of course, neither States nor "arms of the State" are "persons" under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Still, the absence of a procedural vehicle is potentially fatal, especially as nothing before this Court indicates that Allen attempts to state the Fifth Amendment provides an implied cause of action. Not to mention that such an attempt would face considerable challenges. In *DeVillier*, for example, the Supreme Court took up that question, acknowledged its "precedents do not cleanly answer" it, and declined to provide an answer. 601 U.S. at 292. Because North Carolina's sovereign immunity bars this Court from hearing Allen's claims as they are currently formulated, there is no need to discuss this issue further.

immunity. The Court therefore will dismiss Allen's Fifth Amendment Takings claims without prejudice unless he can show an abrogation of state sovereign immunity on other grounds.

**D.    Allen's second theory: case-by-case abrogation under *Georgia***

Because Allen's "self-executing" Fifth Amendment theory of abrogation does not pass muster, North Carolina's sovereign immunity will bar this Court from hearing Allen's claims absent a valid abrogation. To that end, Allen argues that claim-by-claim abrogation under *Georgia* allows his copyright infringement, takings, and procedural due process claims to proceed in federal court notwithstanding North Carolina's sovereign immunity.

*Georgia* sets out a three-part test instructing lowers courts to determine, "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated [a federal statute]; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated [the federal statute] but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." 546 U.S. at 159. The Supreme Court has already determined that the CRCA's prophylactic abrogation of sovereign immunity for copyright infringement is invalid. *Allen*, 589 U.S. at 265–66. So this Court need only consider whether Allen states claims for copyright infringement and that same conduct also violates the Fourteenth Amendment. *See Alaska v. EEOC*, 564 F.3d at 1068.

Case-by-case abrogation under *Georgia* intertwines the jurisdictional issue with the underlying merits of the statutory and constitutional violations. In order to have a valid abrogation, a plaintiff must show that both violations have occurred, which means that if either claim fails on the merits then there is no subject-matter jurisdiction. "[W]hen subject matter jurisdiction is dependent on the same statute that forms the basis of the underlying claim, the jurisdictional question is tied up with the merits of the case," as such "a decision of the jurisdictional issue

28

requires a ruling on the underlying substantive merits of the case." 5B Charles A. Wright et al., *Federal Practice and Procedure* § 1350 (4th ed. 2024). In such circumstances, the jurisdictional issue "should not be decided on a motion to dismiss but may be appropriate for summary judgment." *Id.*

With that in mind, the Court must consider whether Allen states a claim by accepting his well-pleaded allegations as true and considering them in the light most favorable to him. *See, e.g.*, *Pickett v. Texas Tech Univ. Health Sciences Center*, 37 F.4th 1013, 1031 (5th Cir. 2022) (analyzing *Georgia* claim under 12(b)(6) standard because "the jurisdictional and merits questions . . are inextricable). To that end, the Court will not consider evidence submitted by the State that is not integral to the complaint. *See Secretary of State for Defence v. Trimble Navigation Limited*, 484 F.3d 700, 705 (explaining the court, on a motion to dismiss, may "consider documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic.").

### 1. DNCR's alleged violation of the Copyright Act

The Court begins with the first requirement under the *Georgia* framework: Whether Allen has plausibly alleged the DNCR violated the Copyright Act through its infringements. Satisfying this first prong is critical. *See, e.g.*, *Buchanan v. Maine*, 469 F.3d 158 (for the *Georgia* analysis, "if the State's conduct does not violate [the federal state], the court does not proceed to the next step in the analysis").

The Copyright act grants the owner of copyright "the 'exclusive rights' to 'reproduce,' 'distribute,' 'perform,' 'display,' or 'prepare derivative works based upon' their copyrighted works." *Entm't v. Cox Commc'ns, Inc.*, 93 F.4th 222, 227 (4th Cir. 2024) (quoting 17 U.S.C. § 106). "Anyone who violates any of the[se] exclusive rights . . . is an infringer," 17 U.S.C. § 501(a), and the copyright owner may "institute an action" against an infringer, *Id.* § 501(b). A direct infringement claim requires proof that (1) plaintiff had a valid copyright and (2) defendant

infringed upon that copyright by violating one of the exclusive rights under § 106. *Smith v. Barnesandnoble.com*, 839 F.3d 163, 166 (2d Cir. 2016).

Taking the facts in the light most favorable to Allen, the Court concludes Allen has plausibly stated a claim that the DNCR infringed on his copyrights. It is undisputed that Allen holds valid copyrights in the materials he alleges the DNCR infringed. In the Second Amended Complaint, Allen provides detailed accounts of his copyrights and the DNCR's alleged infringements of specific copyrights by copying, displaying, distributing, and performing his works without permission online and in a state museum.

The State argues that the alleged infringements fall under the use exceptions under 17 U.S.C. §§ 108 and 109. Section 108 provides exemptions for infringements related to archival use but carves out pictorial works, with some exceptions. *See Id.* § 108(i). Section 109 codifies the first sales doctrine, which "provides that a 'rights holder's control over the distribution of any particular copy or phonorecord that was lawfully made effectively terminate when that copy or phonorecord is distributed to its first recipient." *Hachette Book Group, Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 384–85 (S.D.N.Y. 2023) (quoting *Capital Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 655 (2d Cir. 2018)). Like exemptions for fair use, the exemptions under § 108 and § 109 are affirmative defenses to copyright infringement. *See Adobe Systems Inc. v. Christenson*, 809 F.3d 1071, 1078–79 (9th Cir. 2015) (first sale); *Hachette Book Group*, 664 F. Supp. 3d, at 381 (fair use). Affirmative defense to copyright infringement provide "a permissible basis for dismissal only where the facts necessary to establish the defense are evident of the face of the complaint." *Spinelli v. National Football League*, 902 F.3d 185, 199 (2d Cir. 2018) (quotations omitted); *see also Santos v. Kimmel*, ---F. Supp. 3d ----, 2024 WL 3862149, at *3 (S.D.N.Y 2024) (explaining that affirmative defenses to copyright infringement are "most frequently resolved at summary

judgment"). Here, all the facts necessary to the resolution of the State's affirmative defenses do not clearly appear on the face of the Second Amended Complaint. The State's arguments, replete with citations to various exhibits, consist almost entirely of evidence beyond the face of the amended complaint. The State's arguments involve mixed questions of law and fact better suited to summary judgment. The Court, therefore, concludes that resolving these defenses is premature in this posture.

Allen has also plausibly alleged that the DNCR's infringements were willful or intentional. The Copyright Act does not define willful infringement. *Lyons P'ship v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001). Courts have held that willful infringement occurs, at minimum, when the defendant recklessly disregards the copyright holder's rights. *BMG Right Mgmt. (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293, 312 (4th Cir. 2018); *see Market Research Grp., Inc. v. Berge*, 953 F.3d 907, 920 (6th Cir. 2020) ("[A] defendant willfully commits copyright infringement when he knowingly or recklessly copies another's work."). The State was clearly on notice of Allen's copyrights given his proactive approach to policing potential infringements, his assertion of his exclusive rights after the fact, and his watermarks and other identifiers on works. What's more, the patter and timing of the infringements permit a reasonable inference that the DNCR knew of, or disregarded, the risk that posting would violate Allen's exclusive rights. At least six of the infringements, for example, were online posts that had previously been removed in 2013, which was the time a dispute over licenses between Allen, Intersal, and the State arose. After § 121-25(b) was enacted, those posts returned online. Accordingly, Allen has adequately stated a claim for willful copyright infringement.

### 2. Actual Constitutional Violations

Allen asserts that the State's copyright infringement and physical appropriation of his media during, after, and through § 121-125(b) constitute takings and a denial of procedural due

process in violation of the Fifth and Fourteenth Amendments. As to his Fifth Amendment claims, Allen alleges the State took his property in three distinct ways: (1) "by engaging in wide-scale, willful, and indiscriminate infringement of [his] copyrights"; (2) "by physical[ly] taking [ ] Allen's property by withholding and refusing to return Allen's physical media containing copies of his works"; and (3) by "plac[ing] the vast majority of Allen's portfolio into the public domain[]" through § 121-125(b). (*See* [DE 134 ¶¶ 162, 163, 177].)

Allen's Fourteenth Amendment due process claim piggyback of these allegations. Allen asserts he was not given "due process in connection with [the State's] takings . . . [because,] Allen did not have an opportunity to be heard and had not means to challenge the infringements." Likewise, because "[N.C. Gen. Stat. § 121-125(b)] is self-enforcing[,]" Allen claims he did not have "any opportunity to oppose the entry of his work into the public domain, or to seek reclassification once the work was added to the public domain." (See [DE 134 ¶¶ 169, 183].)

The State, not conceding that *Georgia* extends here, responds that Allen's allegations fail regardless because he has failed to allege actual constitutional violations within § 1 of the Fourteenth Amendment. The Court will address each violation in turn.

### (a) Allen's Fifth Amendment claims

"The Fifth Amendment's Takings Clause provides: 'nor shall private property be taken for public use, without just compensation.' " *Blackburn v. Dare County*, 58 F.4th 807, 810 (4th Cir. 2023) (quoting U.S. Const. Amend V). The Takings Clause applies to the States by incorporation through the Fourteenth Amendment. *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021); *Chi. B & Q R. Co. v. City of Chicago*, 166 U.S. 226 (1897). And the Takings Clause's protections extends to intellectual property. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04, (1984) (trade secrets); *James v. Campell*, 104 U.S. 356, 357–58 (1882) (patents). Because the parties agree

32

that the copyrights are property protected by the Fifth Amendment, the Court will proceed under the assumption that the Fifth Amendment's guarantee extends to copyrights.[10]

Government takings fall into one of two categories: physical appropriations or use restrictions. *Blackburn.* 58 F.4th at 810 n.3 (adopting "physical-appropriation versus use-restriction dichotomy"). Direct government appropriation or physical invasion of private property is the paradigmatic taking. *Lingle v. Chevron U.S.A Inc.*, 544 U.S. 28, 537 (2005); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 525 U.S. 302, 324 (2002). Moreover, a "physical appropriation is a taking whether it is permanent or temporary." *Cedar Point Nursery*, 594 U.S. at 153.

Takings also occur when government regulations go too far in restricting the use of a property. *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922). Use restrictions amounting to takings come in two varieties. Occasionally, a use restriction will deny the owner all economically beneficial use of the property, resulting in a per se taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). More common, however, are use restrictions which fall short of that mark. *See Tahoe-Sierra Preservation*, 535 U.S. at 322 (describing *Lucas* per se taking as rule for an "extraordinary case."). Those restrictions are evaluated under the "ad hoc, factual inquiry" set out in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), which tells courts "to examine (1) the economic impact of the use restriction, (2) how much the restriction interferes with investment-backed expectations, and (3) the character of the governmental action." *Blackburn*, 58 F.4th at 810–11 (quotation marks omitted).

---

[10] In *Allen*, the Supreme Court stated that "[c]opyrights are a form of property." 589 U.S. at 1004. That statement addressed whether are copyrights are property in the context of the Fourteenth Amendment Due Process Clause not the Fifth Amendment Takings Clause.

Here, the alleged taking is one of intellectual property. While Allen claims that the end of the State's action is the same—the taking of his copyrights—he alleges that the State used different means. These means can be placed in two buckets. The first bucket, Allen claims that the State took his copyright through § 121-25(b) when it placed them in public domain, eliminating his right to exclude others from using his copyrights; the second bucket, Allen claims that the state took his copyrights by its direct infringements. As discussed, Allen has not alleged a violation of the Copyright Act relating to the first bucket. Accordingly, the Court need only consider whether Allen has stated a takings claim stemming from the State's direct infringements.

The Supreme Court has addressed an alleged taking of intellectual property only once, in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), and the intellectual property at issue there was trade secrets not copyrights. The *Ruckelshaus* Court applied the multi-factor *Penn Central* test. 467 U.S. at 1005. When *Ruckelshaus* was decided, the distinction between the two lines of Taking Clause cases (physical takings or use-restrictions) was hazy. *See Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 34, n.6 (1st Cir. 2002) (en banc). But even as takings clause jurisprudence has matured, courts have followed *Ruckelshaus*'s lead and analyzed alleged takings of intellectual property under *Penn Central* multi-factor test. *See Philip Morris*, 312 F.3d at 35–36 (trade secrets); *Maine Educ. Ass'n Benefits trust v. Cioppa*, 695 F.3d 145, 153 n.5 (1st Cir. 2012) (declining to analyze taking of trade secret under physical taking *per se* rules because of inadequate development in the district court but noting that circuit precedent "supports the application of the *Penn Central* factors"). So this Court will follow the Supreme Court's lead.

To determine whether governmental action—here, direct copyright infringements—effects a taking, the Court must weigh factors in what is "essentially an 'ad hoc, factual' inquiry," *Ruckelshaus*, 467 U.S. at 1005. "This balancing requires the Court to consider, at least, three

34

factors of 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action." *Blackburn*, 58 F.4th at 812 (quoting *Penn Central*, 438 U.S. at 424); *see also Ruckelshaus*, 467 U.S. at 1005 (applying *Penn Central* factors to intellectual property).

The first *Penn Central* factor—the economic impact of the regulation on the claimant— favors the State. For this factor, the Court must weigh the diminution in value caused by the State's infringements against the value of the uninfringed copyrights. *See Blackburn*, 58 F.4th at 812. A diminution is value by itself is not enough to prevail; instead, a plaintiff must show a *substantial* diminution in the value of the property. *Id.* A substantial diminution is not easily satisfied. *See Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, (4th Cir. 2020) (40 percent diminution in value was insufficient to show a regulatory taking); *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018) (83 percent diminution in value insufficient to show regulatory takings). What's more, Allen must either plead facts establishing a substantial diminution in value or allege facts allowing the Court to infer a substantial diminution. *Blackburn*, 58 F.4th at 812.

Allen does not meet this standard. He claims that "Defendants' infringements cause the loss of all economically beneficial uses of [his] copyright." [DE 134 ¶ 164]. According to Allen, "the only economically beneficial use of his copyrights was to monetize the rights for license or sale," and the State's infringements prevent that since "there is no reason to license what can be used for free." *Id.* He also claims that the State's infringements caused the loss of "at least 150,000 in potential licensing fees." [DE 134 ¶ 168]. Once the legal conclusions are stripped away, there is nothing that allows the Court to infer a *substantial* diminution in the value of his copyrights. Even in the light most favorable to Allen, an assertion of potential lost licensing revenue does not

lead to the plausible inference that the copyrights are so incapable of generating other licensing revenue that the decrease in their value is substantial. And Allen's claims that he has lost all "economically beneficial uses of his copyrights" is a conclusory statement of the elements of a per se taking under *Lucas*. As such, it does not satisfy the pleading standard. *See Blackburn*, 58 F.4th at 812 (rejecting conclusory statement "because it simply alleges there as a taking and then recites the standard for compensation"). In sum, the first factor cuts against Allen.

The second *Penn Central* factor—interference with reasonable distinct investment-backed expectations—slightly favors Allen. Allen alleges that during the course of his involvement on the *QAR* project he made substantial investments of his time and money in obtaining his copyrights. For these investments, Allen expected to a return in the form of licensing fees for commercial media. Allen's copyrights and the State's entitlement to use them for some purposes are governed by several agreements. When he joined the *QAR* project, Allen obtained the rights to make non-commercial videos and photos of the *QAR* from Intersal; Intersal obtained the rights from the Department. Per the underlying agreements, the Department retained the right to use photographs and videos of the *QAR* and its artifacts for non-commercial purposes, including displaying on the Department's website and curating public records. To be reasonable, Allen's investment-backed expectations must have been consistent with those agreements. *Cf. Clayland Farm*, 987 F.3d at 345 (explaining that a taking is defined by the preexisting property right). Accepting Allen's allegations, the DNCR's infringements frustrated Allen's expectations of licensing his copyrights for commercial use, including the State's use for commercial purposes.

The third and final *Penn Central* factor—the character of the State's action—weighs in favor of the State. Conceptually, this factor is mess, as the Fourth Circuit has aptly noted: "combine an ad hoc balancing test with an open-ended factor and you're left with a doctrine that is a veritable

mess. " *Id.* at 813 (quotation marks omitted). That said, for the third factor courts "should seek to identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain." *Id.*

The mere infringement of a copyright by a state actor is not "functionally equivalent" to a government appropriation of the Copyright itself. Allen contends the State's appropriation of his right to exclude is tantamount to appropriation of his copyrights. The right to exclude is one of the exclusive rights conferred under the Copyright Act. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006) (A copyright holder possess 'the right to exclude others from using his property.'" (quoting *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932))). The Copyright Act precludes a state, or its agencies, from "seiz[ing], expropriat[ing], transfer[ing], or exercising rights of ownership to the copyright or any exclusive rights under a copyright." 17 U.S.C. § 201(d). As a result, the State's infringements cannot divest him of that right nor can the State actually possess that right for itself. Allen has always retained "the key legal rights that constitute property for purposes of the a [classic takings] analysis, despite government interference." *Jim Olive Photography*, 624 S.W.3d at 775. Accordingly, the State's infringements are not functionally equivalent to a classic taking, and the third *Penn Central* factor—the character of the government action—weighs against him.

Weighing these three factors, the Court concludes Allen has failed to plausibly state a claim for relief under *Penn Central*. As a result, Allen has failed to plausibly state a constitutional violation as required by *Georgia*'s second prong. And, absent an actual constitutional violation, he cannot show case-by-case abrogation under § 5 of the Fourteenth Amendment. Accordingly, the Court dismisses without prejudice his claims for copyright infringement insofar as they rely on actual violations of the Fifth Amendment as incorporated by the Fourteenth Amendment.

*(b) Allen's Fourteenth Amendment Procedural Due Process Claims*

Allen asserts that the DNCR's copyright infringements constituted a denial of due process, abrogating state sovereign immunity under *Georgia*'s case-by-case abrogation. The Second Amended Complaint elaborates that due process was denied because § 121-25(b) is (or was, now) self-enforcing, and Allen received no neither notice nor a hearing before his copyrights entered the public domain. There is no need to consider whether any procedural due process violations tied to § 121-25(b) beyond the DNCR's direct infringements under the policy set by that statute. As discussed, the *Georgia* framework looks to the actual constitutional violation only if that conduct also works a statutory violation, and Allen does not state that his copyrights were infringed directly by § 121-25(b). Now, on to Allen's claims for direct copyright infringement tied to actual violations of his right to procedural due process.

The Supreme Court has made it clear that the Due Process Clause cares about only a small subset of state copyright infringements. *Allen*, 589 U.S. at 261–62. Specifically, the Due Process Clause cares only about copyright infringements that satisfy two conditions: (1) "the infringements must be intentional, or at least, reckless"; and (2) the state must "fail to offer an adequate remedy for an infringement, because such a remedy itself satisfies the demand of the due process clause." *Id.*

Defendants argue that Allen has failed to show that either condition is satisfied. The Court, however, has already determined that Allen has plausibly alleged that the DNCR's infringements were willful—that is, intentional or at least reckless. So that leaves only the "failure to offer an adequate remedy." On that front, Defendants argue that the adequate post-deprivation remedies are available to Allen in state court, resulting in Allen's failure to satisfy that condition.

When detailing the extent the Due Process Clause is concerned with copyright infringements, Supreme Court did not conclude that the State would violate the Clause only if it

38

failed to provide adequate post-deprivation remedies. *Allen*, 589 U.S. at 261–62. Instead, the Court

stated only that "[a] State cannot violate that Clause unless it fails to offer *an adequate remedy* for

an infringement, because such a remedy itself satisfies the demand of "due process." *Id.* at 262

(emphasis added) (citing *Hudson v. Palmer*, 468 U.S. 517, 533, (1984)). The State elides the

nuances of the constitutional violation in its rush to rest on the purported adequacies of North

Carolina's post-deprivation remedies. The adequacy of post-deprivation remedies must come after

a determination that the demands of due process can be satisfied through a post-deprivation

remedies.

Due process generally requires some sort of notice and opportunity to be heard before the

deprivation of a protected property interest. 891 F.3d 141, 145-46; *Memphis Light, Gas & Water

Div. v. Craft*, 435 U.S. 1, 19 ("Ordinarily, due process of law requires an opportunity for some

kind of hearing prior to the deprivation of a significant property interest." (quotations omitted)). A

meaningful opportunity to be heard is the core of a due process claim. For "the deprivation by state

action of a constitutionally protected interest in 'life, liberty, or property,' is not in itself

unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process

of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Parratt v. Taylor*, 451 U.S. 527,

537 (1981)).

Still, due process is a "flexible concept that varies with the particular situation." *Id.* at 127;

*see also Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 ("[t]he very nature

of due process negates any concept of inflexible procedures universally applicable to every

imaginable situation."). For that reason, "to determine whether a constitutional violation has

occurred, it is necessary to ask what process the state provided, and whether it constitutionally

adequate." *Zinermon*, 494 U.S. at 983. What functions as constitutionally adequate process in one situation might be inadequate in others.

It is constitutionally adequate for the State to provide only post-deprivation remedies "where a loss of property is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure," *Hudson*, 468 U.S. at 532. Likewise, post-deprivation remedies "can satisfy the requirements of procedural due process" where, because of "the necessity of quick action by the State" or "the impracticability of providing any meaningful pre-deprivation process," that is all that can be expected. *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other ground by*, *Daniel v. Williams*, 474 U.S. 327 (1986). But post-deprivation remedies are constitutionally inadequate where it is foreseeable that individuals would be deprived of property because of state actors acting pursuant to established state procedure. Thus, "[i]n situations where the State can feasibly provide a pre-deprivation hearing before taking property, it generally must do so regardless of the adequacy of a post-deprivation tort remedy to compensate for the taking." *Zinermon*, 494 U.S. at 132; *see also Zimmerman Brush Co.*, 455 U.S. at 436 (holding post-deprivation hearing as constitutionally inadequate where established state procedure destroyed plaintiff's property interest).

An Eleventh Circuit case, *National Association of Boards of Pharmacy v. Board of Regents of the University System of Georgia,* illustrates a situation where post-deprivation remedies provided constitutionally adequate process for copyright infringement.[11] 633 F.3d 1297 (11th Cir. 2011) (hereafter "*NABP*"). In that case, the copyright owner sued the Board of Regents of a state university for copyright infringement and procedural due process violations after a professor used copyrighted materials in his course materials. The Eleventh Circuit held that the copyright holder

---

[11] To make the case even more on point here, the copyright holder sued under *Georgia* framework.

failed to establish that due process required a pre-deprivation hearing, concluding that "predeprivation process was not feasible under the acts alleged." *Id.* at 1319. Critically, the amended complaint was devoid of allegations that university officials "were acting pursuant to an established state procedure *designed* to deprive individuals of their copyrights." *Id.* at 1318. Because any copyright infringement was the random and unauthorized act of the professor, beyond the control of the state, the deprivation was not foreseeable rendering it impracticable, and unnecessary, to provide pre-deprivation process. *Id.* 1318 – 19.

Unlike in *NABP*, Allen has adequately alleged that the State committed direct infringements while operating under an established state procedure—§ 121-25(b)—designed to facilitate such a deprivation. The State was in the position to foresee a deprivation and the DNCR acted pursuant to an established state procedure—§ 121-25(b)—whose purpose was to deprive Allen of his protected interest in his copyrights. Section 121-25(b) permitted the DNCR to use copyrighted documentary materials in its custody without limitation. What's more, Allen has sufficiently alleged that § 121-25(b) was specifically passed to help the DNCR in its ongoing dispute with Allen and Intersal over the use of documentary materials from the *QAR*. So too does § 121-25(b)'s "in the custody of" requirement permit a reasonable inference that it was readily foreseeable to the State that the DNCR would be able, before infringing, to not only identify copyrighted materials but also the identity of the copyright holder. Thus, the DNCR's infringement under § 121-25(b) is a situation where" the state actor knows not only that he is depriving someone of property, but also the identity of the aggrieved party." *NABP*, 633 F.3d at 1319 (emphasis omitted). Allen has alleged that the State committed copyright infringements through an established state procedure rendering post-deprivation remedies inadequate to satisfy due process.

Accordingly, the Court concludes that he has shown an actual constitutional violation to satisfy the second prong of the *Georgia* framework.

Because Allen has adequately paired his statutory cause of action under the Copyright Act with a procedural due process claim, the State plays its ace in the hole, arguing that Allen fails to state a *Georgia* claim because his statutory violations are not capable of aligning with his due process claims. That is, the conduct that violates the Copyright Act—copyright infringement—is not identical to the conduct that violates the Due Process Clause—deprivation without due process of law. The State crafts this argument from a footnote in *NABP* that questions whether a procedural due process claim and a copyright infringement claim can succeed under the *Georgia* framework. *NABP*, 633 F.3d at 1316 n.32. The footnote's commentary has guided other district courts to dismiss *Georgia* claims that pair a copyright infringement and due process claims. *See Campinha-Bacote v. Regents of the Univ. of Mich.*, 2016 U.S. Dist. LEXIS 5958, 2016 WL 223408, at *4–5 (S.D. Ohio Jan. 19, 2016); *Am. Shooting Ctr., Inc. v. Secfor Intn'l*, 2016 U.S. Dist. LEXIS 96111, 2016 WL 3952130, at *3–4 (S.D. Cal. Jul. 22, 2016). In the footnote, however, the Eleventh Circuit expressly acknowledged it was unnecessary to reach that conclusion since the plaintiff failed to state a *Georgia* claim. The footnote is pure dicta. *See Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 36 F.3d 8, 11 (1994) ("If the first reason given is independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest *dicta*.").

More to the point, the Court does not read *Georgia* so narrowly. Case-by-case abrogation under *Georgia* occurs when a plaintiff can show that the conduct that violates a federal statute, which provides a private cause of action for damages against the States, also works an "independent[] violat[ion] [of] the provisions of § 1 of the Fourteenth Amendment." 546 U.S. at 157. Nothing in *Georgia* indicates that the Supreme Court limited its decision to the statutory

42

violation in that case or required the actual constitutional violation to be anything other than that—an actual constitutional violation.

A violation of the Copyright Act combined with an actual due process violation checks all of *Georgia*'s boxes. The CRCA creates a private cause of action for damages against the States for copyright infringement. 17 U.S.C. § 511(a). The CRCA, of course, went too far in abrogating state sovereign immunity for it be a valid prophylactic abrogation, but it is still available otherwise. What's more, the Supreme Court has held that state copyright infringements constitute Fourteenth Amendment violations when they are (1) intentional, or at least reckless, and (2) the state fails to offer an adequate remedy satisfies the demands of the Due Process Clause. 589 U.S. at 261–62. That means within the broader world of state copyright infringements there is a smaller class of infringements that also work constitutional violations. *Id.* at 262. *Georgia* does not require more for as-applied abrogation. "Thus, insofar as [the CRCA] creates a private cause of action for damages against the state for conduct that *actually* violates the Fourteenth Amendment, [the CRCA] validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159.

In sum, the Court concludes that Allen has plausibly alleged that the State's direct copyright infringements in violation of the Copyright Act also constitute a procedural due process violation. Accordingly, under *Georgia*, 17 U.S.C. § 511 validly abrogates the State's sovereign immunity as-applied. The State's motion to dismiss those claims is denied.

## CONCLUSION

For these reasons, the Court Orders as follows: Plaintiffs' Motion for Leave to File a Surreply [DE 157] is GRANTED; the Clerk of Court is DIRECTED to file Plaintiff's Surreply [DE 157-1]; Defendants' Motion to Strike [DE 144] is GRANTED IN PART and DENIED IN PART. Defendants' Motion to Dismiss [DE 146] is GRANTED IN PART and DENIED IN PART.

Allen may proceed on his claims for direct copyright infringement and procedural due process consistent with this order.


SO ORDERED, this **2 9** day of August 2024.


TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NORTH CAROLINA
Civil Case No.: 5:15-cv-627-BO

| | |
|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC<br><br>Plaintiffs<br><br>v.<br><br>**ROY COOPER**, Governor of the State of North Carolina, in his official capacity; **JOSH STEIN**, Attorney General of North Carolina of North Carolina, in his official capacity; **D. REID WILSON**, individually and in his official capacity; **MIKE CARRAWAY**, individually and in his official capacity; **KEVIN B**. **CHERRY**, individually and in his official capacity; **STEPHEN R. CLAGGETT**, individually and in his official capacity; **KARIN COCHRAN**, individually and in her official capacity; **CARY COX**, individually and in her official capacity; **SUSAN WEAR KLUTTZ**, individually and in her official capacity; SARAH **KOONTS**, individually and in her official capacity; **JOHN W. MORRIS**, individually and in his official capacity; **JOSEPH K. SCHWARZER** II, individually and in his official capacity; **Jane, John, and Jill Doe**, individually and in their official capacity;  **NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES;** and the **STATE OF NORTH CAROLINA**, a body politic, Defendants | |

# PLAINTIFFS' FREDERICK L. ALLEN AND NAUTILUS PRODUCTION LLC'S SURREPLY
# IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE (DE 144)
# AND MOTION TO DISMISS (DE 146)

# **TABLE OF CONTENTS**

**Page**

I.   Blackbeard's Law Repeal Does Not Moot Allen's Claims for Injunctive or
     Declaratory Relief. ............................................................................... 1

II.  North Carolina's Interpretation of Blackbeard's Law Is Wrong. ................ 5

III. Sovereign Immunity Does Not Bar Allen's Claims ................................... 6

IV.  The Remainder of North Carolina's Reply Simply Repeats Arguments Without
     Addressing Plaintiffs' Response. ........................................................... 8

CONCLUSION ............................................................................................ 9

Plaintiffs Rick Allen and Nautilus Productions LLC (collectively, "Allen") submit this surreply to address Defendants'[1] repeal of Blackbeard's Law and to respond to new arguments in Defendants' reply.

## I.    THE REPEAL OF BLACKBEARD'S LAW DOES NOT MOOT ALLEN'S CLAIMS FOR INJUNCTIVE OR DECLARATORY RELIEF

North Carolina is playing a shell game. In 2015, North Carolina passed Blackbeard's Law, which declared that Allen's works are public records, and thus "the property of the people." After spending eight years attempting to defend Blackbeard's Law, North Carolina realized what was obvious from the start—that Blackbeard's Law is indefensible. Thus, on June 30, 2023, just weeks before their reply was due (and a mere days after Allen filed his opposition brief), North Carolina repealed the Law with immediate effect. N.C. S.L 2023-70, §§ 11, 14.

At first glance, one might think the repeal is an unmitigated victory for Allen. In reality, the repeal changed nothing, since North Carolina continues to claim that Allen's works are "public records," and continues to claim the unfettered ability to use, copy, and distribute Allen's works. Dkt. 155 ("Reply") at 9-10 (stating that North Carolina's public records law "still applies to Plaintiffs' records" and that "Plaintiffs' photographs and videos [are] public records."). Indeed, North Carolina's current position is that Blackbeard's Law was completely ineffectual, since it "merely clarified" the pre-existing public records law. *Id.* at 10. But this latest maneuver is no more than a transparent attempt to get away with stealing Allen's work.

It's also a shell game—where North Carolina once pointed to Blackbeard's Law as the justification for its theft, *see* Dkt. 134 ("SAC") ¶¶ 116, 123-24, it now claims that the *real* source of its authority was North Carolina's public records law, and seeks to "gotcha" Allen for

---

[1] Throughout this brief, Allen refers to Defendants, collectively, as "Defendants," "North Carolina," or "the State."

1

challenging the wrong statute. Dkt. 155 at 9-10 (relying on N.C. Gen. Stat. § 132-1).  More specifically, Defendants argue that the repeal of Blackbeard's Law moots Allen's claims for declaratory and injunctive relief.  Reply at 3-4.

Defendants are wrong.  "A claim becomes moot 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 349 (4th Cir. 2017).  Simply replacing one illegal law (Blackbeard's Law) with an unconstitutional and incorrect interpretation of another (North Carolina's public records statute) does not moot anything.  This much is clear from Plaintiffs' requested relief, which is tied to Defendants' policies and practices, as summarized in Table 1.  By Defendants' own admission, these policies and practices have not changed, meaning that the issues presented are just as "live" today as they were before the repeal.  Reply at 9-10.

**Table 1: Allen's Request for Injunctive and Declaratory Relief**

| Count | Requested Relief from the SAC |
|---|---|
| Count 1 (Copyright Infringement) | Plaintiffs are entitled to injunctive relief enjoining Defendants from infringing Allen's copyrights.  SAC ¶ 150. |
| Count 2 (Violation of DMCA) | Plaintiffs are entitled to injunctive relief enjoining Defendants from violating the copyright management information provisions of the DMCA.  SAC ¶ 158. |
| Count 3 (Takings Claim Relating to Infringement) | Plaintiffs are also entitled to an order enjoining Defendants from taking Plaintiffs' property or infringing Plaintiffs' copyrights, and requiring Defendants to return Plaintiffs' physical media.  SAC ¶ 171. |
| Count 4 (Takings Claim Relating to Treatment of Allen's Works as Public Records) | Plaintiffs are entitled to ... an order enjoining Defendants from taking Plaintiffs' work[] and an order enjoining Defendants from treating Plaintiffs' works as a "public record" or from using Allen's work without permission or just compensation.  SAC ¶ 185. |
| Count 5 (Bill of Attainder) | Plaintiffs are also entitled to an order enjoining the State from treating Allen's works as a public record, from using Allen's work without permission, and from punishing or retaliating against Allen for his assertion of rights.  SAC ¶ 201. |

2

| Count 6 (Ex Post Facto Law) | Plaintiffs are also entitled to an order enjoining Defendants from using Allen's work without Plaintiffs' permission. SAC ¶ 208. |
| Count 7 (Impairment of Contracts) | Plaintiffs are also entitled to an order requiring Defendants to honor the terms of the 2013 Agreement. SAC ¶ 213. |
| Count 8 (Section 1983) | Plaintiffs are also entitled to an order enjoining Defendants Koonts and Wilson from taking Plaintiffs' property [or] infringing Plaintiffs' copyrights[.] SAC ¶ 219. |
| Count 9 (Injunctive Relief Under Ex Parte Young) | Plaintiffs expressly seek an injunction that requires Defendants to cease all infringement of Plaintiffs' copyrighted works [and] to return all of Plaintiffs' property[.] Plaintiffs further seek an order enjoining Defendants' current policy regarding Plaintiffs' copyrights. SAC ¶¶ 223-224. |
| Count 10 (Declaratory Relief) | Plaintiffs seek a judicial declaration stating [that] Defendants have engaged in widespread and willful infringement of Plaintiffs' copyrights[,] Defendants have violated [the DMCA], Defendants' have effectuated a taking of Plaintiffs' property without compensation or due process ... Federal courts have jurisdiction to resolve federal constitutional claims, and North Carolina cannot claim sovereign immunity with impunity. SAC ¶ 227. |

In other words, the repeal of Blackbeard's Law cannot moot Allen's request for injunctive relief, since the repeal did nothing to curb the (ongoing) policies and practices that form the basis for Allen's claims. *See* Dkt. 153 ("Opposition") at 29 ("Allen's requested injunction takes two forms. First, he seeks to halt the ongoing acts of infringement alleged in the SAC. Second, he seeks to enjoin Defendants from treating (or designating) Allen's works as 'public records' that can be used without permission or compensation.").

Defendants' mootness position is further undermined by Defendants' arguments regarding the supposed insignificance of Blackbeard's Law. Defendants' claimed that the Law had no independent effect, as it "merely reiterate[d] what was already true." Dkt. 147 ("Motion") at 20; Reply at 10. But if Blackbeard's Law did nothing in the first place, then it necessarily follows that its repeal was nothing more than a *de minimis* change, hardly enough to moot Allen's claims, let alone "a significantly amended statutory scheme." Reply at 4 (quoting *Esposito v. S.C. Coastal*

*Council*, 939 F.2d 165, 171 (4th Cir. 1991)).

While *some* of Plaintiff's items of requested relief specifically mention Blackbeard's Law, *E.g.*, SAC ¶ 201 (seeking revocation of the Law), those items do not warrant dismissal of any *claims*, since each claim seeks relief unconnected to Blackbeard's Law. Moreover, at the pleading stage, the question is not whether a plaintiff is entitled to *all* items of requested relief, but is instead whether the complaint alleges facts sufficient to support a claim for *any* relief. *See* Fed. R. Civ. P. 12(b)(6); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 229 (4th Cir. 2004) (dismissal is only appropriate where the plaintiff "would be entitled to no relief" for the challenged claims (quotation omitted)); *see also Benhur v. Madavaram*, 2015 WL 6739109, at *6 (D.N.J. Nov. 2, 2015) ("The only issue is whether the claim stated would give the plaintiff a right to *any* relief, not to the particular relief he demands." (emphasis added) (quotation omitted)).

North Carolina's (literal) revisionist history cannot change the underlying facts. Blackbeard's Law sought to authorize a gross invasion of Allen's constitutional rights. While the repeal of the law should have ended the violation, North Carolina has decided to continue its campaign under a different banner. But for Allen, labels are inconsequential. Whether the State seeks to justify its theft using Blackbeard's Law, the public records law, or no law at all does not change the nature of the underlying invasion, of Allen's claims, or of the requested relief. Instead, the State's shifting position simply confirms (or, as Defendants might say, "merely reiterates") what was already known—that the actions and policies at issue are and have always been motivated by Defendants' desire to thwart Allen at every turn.[2]

---

[2] Some of the arguments in Allen's opposition expressly reference Blackbeard's Law. The repeal of the Law does not undermine those arguments, both because Allen seeks damages for past violations (violations which were effectuated by Blackbeard's Law), and because the reference to Blackbeard's Law was simply a shorthand for Defendants' unlawful policies. This made sense, given that, until recently, Defendants pointed to Blackbeard's Law as the justification for and source of those policies.

4

## II.  NORTH CAROLINA'S INTERPRETATION OF BLACKBEARD'S LAW IS WRONG.

Claims 5-7 of the SAC allege that Blackbeard's Law was an unlawful bill of attainder, *ex post facto* law, and impairment of contract.  In connection with those claims, Allen seeks compensation for the harms incurred because of Blackbeard's Law. SAC ¶¶ 189-213.  Defendants' primary argument in favor of dismissal is that Blackbeard's Law was a legal nullity that did not change the law in any way, and so could not have caused Allen any harm. Motion at 19-22.  According to Defendants, Allen's work qualified as "public records" even before Blackbeard's Law was enacted.  *Id.*

Plaintiffs provided a detailed rebuttal to this argument in their opposition, and explained how Defendants' interpretation of North Carolina's public records law would "lead to the absurd outcome that *any* document in an officer's possession would qualify as a public record." Opposition at 23-24 (explaining how Defendants' interpretation is contrary to principles of statutory interpretation and ignores allegations form the SAC). Defendants did not address these arguments in their reply.  Reply at 9-10.

To their belated credit, Defendants agree that it would be absurd to treat copyrighted material as a public record merely because it is in the custody of a state officer. *Id.* at 9-10.  Yet, Defendants advance that exact interpretation of North Carolina's public records law in connection with Allen's work.  *Id.* at 10 ("photographs and video of shipwreck salvage operations in the *custody* of a state agency are also considered public records"). Likewise, Defendants seem to agree that it would be absurd to allow members of the public to freely copy copyrighted material simply because the material was "received ... as part of the public's business." *Id.* (describing such allowance as "[an] illogical leap"). Yet, that is *exactly* what Blackbeard's Law allowed and, more to the point, that was the reason why Blackbeard's Law was passed in the first place. *See* Blackbeard's Law (N.C. Gen. § 121-25(b) (2015)) (prohibiting

*any* "limitation on the use of" covered materials). In view of the above, the Court should reject

Defendants' efforts to recast Blackbeard's Law as a legal nullity.

## III.  SOVEREIGN IMMUNITY DOES NOT BAR ALLEN'S CLAIMS

In its opposition to Defendants' motion, Allen identified four reasons why sovereign

immunity does nor bar his claims: (1) Congress abrogated sovereign immunity for acts of

copyright infringement that violate the Fourteenth Amendment (the *Georgia* theory); (2)

sovereign immunity does not bar direct takings claims (the *Knick* theory); (3) sovereign

immunity does not bar takings claims relating to property rights created by federal law; and (4)

sovereign immunity does not bar Allen's claims because there is no adequate state remedy that is

"reasonable, certain, and adequate" (the *Hutto* theory). Opposition at 10-16.  In their reply,

Defendants only address the first and fourth theories. Reply at 7-9.

As to *Georgia*, Defendants simply repeat arguments from their opening brief, Reply at 7-

8, but do not address Allen's response to those arguments. *See* Opposition at 10 (*Allen v. Cooper*

did not foreclose copyright claims against states for actual constitutional violations),

11("*Georgia* has nothing to do with the availability of state remedies."), 17-20 (Defendants

ignored Allen's claims for substantive due process violations of the Fourteenth Amendment),

21(Defendants' actions were necessarily intentional).[3]

Defendants' only other argument relating to *Georgia* cannot be considered by the Court,

since it turns on factual content not alleged in the SAC.  *See* Reply at 8 (citing Ex. 1); Opposition

---

[3] The arguments in Allen's opposition reference Blackbeard's Law as evidence that Defendants intentionally infringed Allen's rights. *Id*. at 21. Defendants' subsequent decision to repeal Blackbeard's Law does not change that analysis. To the contrary, the timing of the repeal, in tandem with Defendants' decision to continue treating Allen's work as "public records," serves as *additional* evidence that Defendants' decisions were <u>knowing and strategic</u>, and so lends further support to Allen's constitutional claims. One cannot negligently or recklessly pass, amend, maintain, and defend an unconstitutional law.

6

at 8-9, 16 (explaining why the Court should not consider Defendants' factual arguments or 20+ factual exhibits).

Defendants' argument regarding the availability of state remedies does not fare any better.  Defendants' argument is confusing, since it conflates the question of exclusive jurisdiction with the question of preemption. Reply at 8-9.

But preemption and exclusive jurisdiction are distinct concepts that are evaluated using distinct tests. *See* Opposition at 14-15 & n.6.  Defendants do not engage with the substance of either test, nor do they explain how any state claim would be viable. Reply at 8-9. Instead, Defendants rely on inapposite caselaw. Reply at 9.  The cited cases do not establish the adequacy of state remedies for Allen's claims, as none address the issues of preemption or exclusive jurisdiction, and none involve the kind of taking alleged here, in which a state has attempted to usurp and invalidate the Copyright Act by passing a statute declaring that the Act is "void and unenforceable as a matter of public policy." N.C. Gen. § 121-25(b) (Blackbeard's Law); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 644 n.9 (1999) (complaint alleged single act of patent infringement, and Supreme Court recognized—in dicta— that *Florida* courts allowed the claim); *Canada Hockey, LLC v. Texas A&M Univ. Athletic Dept.*, 2022 WL 445172, at *7-9 (5th Cir. Feb. 14, 2022) (alleged infringement involved "the public display of [a single] book for four total days"); *Nettleman v. Fla. Atl. Univ. Bd. of Trs.*, 228 F. Supp. 3d 1303, 1312-1313 & n.6 (*declining* to consider whether the plaintiff had an adequate remedy under state law).

7

## IV.   <u>THE REMAINDER OF DEFENDANTS' REPLY SIMPLY REPEATS ARGUMENTS WITHOUT ADDRESSING PLAINTIFFS' RESPONSE.</u>

Other than the issues discussed above, Defendants simply repeat arguments from their opening brief without addressing Allen's response. Defendants do not address Allen's arguments on the following issues:

- Allen did not agree that his works should be treated as "public records" as part of the 2013 Settlement Agreement. Opposition at 24. To the contrary, the 2013 Agreement contained significant use restrictions that would preclude Allen's work from qualifying as a public record. *Id. Contra* Opposition at 10.

- The existence of other state salvage operations does not undermine Allen's allegations that he was specifically targeted by Blackbeard's Law. Opposition at 22-23. In their Reply, Defendants purport to name several additional salvage operations. Reply at 9 n.3. Even if the Court could consider those extrinsic allegations, Defendants have again failed to identify any individuals other than Allen and Intersal who were meaningfully impacted by the Law, let alone a large enough number to defeat the plausible inference that the law targeted Allen. *Cf. Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-74 (1977) (law can qualify as bill of attainder even if it applies to multiple people). *Contra* Reply at 9-10.

- Allen has alleged that Blackbeard's Law is punitive. Opposition at 24-26.

- The Court already overruled Defendants' objections regarding the procedural formalities of Rule 15, and did not impose any restrictions on the substance of the SAC. Opposition at 7. *Contra* Reply at 1-2.

- Allen's allegations are not "scandalous" and should not be struck under Rule 12(f). Opposition at 4-5.

- The Court should not "strike" defendants from the case. *Id.* at 5-7.

- Allen has stated a claim for copyright infringement. *Id.* at 16.

- Allen has stated a claim for violations of the DMCA. *Id.* at 16-17.

- Allen has stated a takings claim with respect to Blackbeard's Law. *Id.* at 18-20.

- Allen has stated a takings claim with respect to North Carolina's infringement of his copyrights. *Id.* at 20-21.

- Allen has stated a claim for substantive due process violations under the Fourteenth Amendment. *Id.* at 17-21.

- Allen has stated a claim for procedural due process violations under the Fourteenth Amendment, and Defendants' actions were necessarily intentional. *Id.* at 21-22. *Contra* Reply at 7-8 (conflating availability of a *Georgia* claim with the requirements of a procedural due process claim).

- Allen has alleged that Blackbeard's Law is an unlawful *ex post facto* law, with retroactive effect. Opposition at 26. *Contra* Reply at 10.

- Allen has alleged that Blackbeard's Law impairs the 2013 Agreement. Opposition at 26-27.

- Allen has stated a claim under § 1983, Defendants are not entitled to qualified immunity, and no statute of limitations bars Allen's claims. Opposition at 27-28.

## **CONCLUSION**

For the foregoing reasons, this Court should deny North Carolina's motion to strike and motion to dismiss.

Respectfully submitted this 11th day of August, 2023.

/s/ David L. McKenzie
**David L. McKenzie**
  NC State Bar No. 36376
**Susan Freya Olive**
  NC State Bar No. 7252
**Olive & Olive, P.A.**
P.O. Box 2049
Durham, North Carolina 27702
Telephone: (919) 683-5514
Email:
emailboxEDNC@oliveandolive.com

/s/ Adam Adler
**Adam Adler**
  DC Bar ID 888324890 (by special appearance)
**Reichman Jorgensen Lehman & Feldberg LLP**
  1909 K Street, NW, Suite 800
  Washington, DC 20006
  Telephone: (202) 894-7310
  Email: aadler@reichmanjorgensen.com

/s/ G. Jona Poe Jr.
**G. Jona Poe Jr.**
  NC State Bar No. 5920
**Poe Law Firm PLLC**
  PO Box 15455
  Durham, North Carolina 27704
  Telephone: (919) 471-4015
  Email: joe@poelaw.com

9

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-627

| | | |
|---|---|---|
| FREDERICK L. ALLEN and NAUTILUS PRODUCTIONS, LLC, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | **NOTICE OF APPEAL** |
| ROY COOPER, et al., | ) ) | |
| Defendants. | ) ) | |

State Defendants hereby notice their appeal to the United States Court of Appeals for the Fourth Circuit from those parts of the district court's order [D.E. 168] entered on August 30, 2024 that denied defendants' motions to dismiss the second amended complaint.

This the 30th day of September, 2024.

JOSHUA H. STEIN
Attorney General

*/s/ Olga E. Vysotskaya de Brito*
Ms. Olga E. Vysotskaya de Brito
Special Deputy Attorney General
North Carolina State Bar No. 31846
N.C. Dept. of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-0185
Facsimile: (919) 716-6759
Email: ovysotskaya@ncdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date a copy of the foregoing Notice of Appeal was filed electronically using the Court's ECF system, which will send notice electronically to all counsel of record who have entered an appearance in this case.

This the 30th day of September, 2024.

*/s/ Olga E. Vysotskaya de Brito*
Ms. Olga E. Vysotskaya de Brito
Special Deputy Attorney General